UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE WEISER LAW FIRM, P.C.<br>22 Cassatt Avenue<br>Berwyn, Pennsylvania 19312 | : | CIVIL ACTION |
| | : | |
| and | : | Case No. |
| | : | |
| ROBERT B. WEISER, ESQUIRE<br>22 Cassatt Avenue<br>Berwyn, Pennsylvania 19312 | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | |
| | : | |
| MICHAEL HARTLEIB<br>27020 Alicia Parkway, Suite G<br>Laguna Niguel, CA 92677 | : | |
| | : | |
| Defendant. | : | |

## VERIFIED COMPLAINT

Plaintiffs The Weiser Law Firm, P.C. (hereinafter the "Law Firm") and Robert B. Weiser, Esquire ("Weiser" or, together with the Law Firm, "Plaintiffs") bring this action by way of this complaint (this "Complaint") against Michael Hartleib ("Hartleib" or "Defendant") and allege as follows:

### Parties

1.　　Plaintiff Law Firm is a Pennsylvania professional corporation with offices located at 22 Cassatt Avenue, Berwyn, Pennsylvania 19312.

2.　　The Law Firm was originally incorporated in the Commonwealth of Pennsylvania in 2004 under entity number 3272161.

{01094580;1}

3.      Plaintiff Weiser is an adult individual and resident of the Commonwealth of Pennsylvania.

4.      Defendant Hartleib is an adult individual and resident of the State of California.

## Venue and Jurisdiction

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as the parties are citizens of diverse jurisdictions and the amount in controversy exceeds $75,000.

6.      Plaintiffs' principal place of business is located within the Eastern District of Pennsylvania.   As such, venue is appropriate within the Eastern District of Pennsylvania pursuant to 28 U.S.C.§ 1391(b)(1).

## Facts

7.      The Law Firm is engaged in the provision of legal services with a focus on shareholder class actions, shareholder derivative actions, mergers and acquisitions related litigation, and whistleblower "qui tam" cases.

8.      Weiser is a founder and principal of the Law Firm.

9.      Weiser is a licensed attorney duly admitted in the State of New Jersey and the Commonwealth of Pennsylvania.

10.     Weiser's law practice is focused primarily on shareholder derivative litigation.

### *The Sprint Securities Class Action & Shareholder Derivative Actions*

11.     On or about November 25, 2008, Hartleib e-mailed Bruce G. Murphy, Esquire ("Murphy") of the Law Offices of Bruce G. Murphy (the "Murphy Firm"), regarding the loss in value of shares he owned in Sprint Corporation and Nextel Communications when the two companies merged to become Sprint Nextel Corporation in 2005.  See November 25, 2008 e-mail string, a true and correct copy of which is attached hereto as **Exhibit 1**.

{01094580;1}

12.     Murphy is an attorney who had occasionally referred clients to the Law Firm.

13.     Because of the Law Firm's experience and expertise in the shareholder litigation arena, Murphy forwarded Hartleib's e-mail to Weiser and asked Weiser if he saw "a der" – meaning a stockholder derivative action that could be brought on Sprint's behalf – as a possibility in Hartleib's case based upon the $31 billion write-down Sprint was forced to take in connection with the failed Nextel merger.  Ex. 1

14.     In response to Murphy's inquiry, the Law Firm investigated the Sprint/Nextel merger and the resulting write-down, but the Law Firm's investigation did not produce sufficient information to recommend filing a derivative lawsuit on Sprint's behalf at that time.

15.     On March 10, 2009, the first securities class action lawsuit based on the Sprint/Nextel merger and the resulting write-down was filed against Sprint and certain of its officers and directors in the United States District Court for the District of Kansas (the "Kansas Federal Court"), by the law firm of Coughlin Stoia Geller Rudman & Robbins (the predecessor firm to Robbins Geller Rudman and Dowd, LLP, hereinafter "Robbins Geller").

16.     Several other substantially similar securities class action lawsuits were eventually filed against Sprint, which were subsequently consolidated in the Kansas Federal Court (the "Sprint Securities Class Action").

17.     Robbins Geller and Motley Rice LLC were appointed to serve as co-lead counsel for the plaintiff investor class in the Sprint Securities Class Action.

18.     On March 10, 2009, upon seeing that the first complaint in the Sprint Securities Class Action had been filed, Murphy contacted Weiser once again regarding potential shareholder derivative claims that could be brought on behalf of Sprint.

19.     The Law Firm thereupon reviewed the allegations forming the basis of the Sprint Securities Class Action, together with new information regarding the Sprint/Nextel merger and resulting write-down, and concluded within a few days of the March 10, 2009 initiation of the Sprint Securities Class Action that Sprint may have potential claims against its then-current and/or former officers and directors.

20.     Weiser asked Murphy if Hartleib or any other potential client was interested in initialing a shareholder derivative suit on behalf of Sprint against its directors and officers.

21.     Murphy informed Weiser that Hartleib and other potential clients were still interested in bringing a shareholder derivative suit for the benefit of Sprint.

22.     The Law Firm began researching and drafting a shareholder derivative complaint.

23.     On or about March 13, 2009, Weiser provided Murphy with the draft shareholder derivative complaint for circulation among Murphy's actual or potential clients.

24.     At that time, Weiser understood that Hartleib was one of Murphy's potential clients in the contemplated Sprint derivative lawsuit; however, neither Weiser nor anyone else at the Law Firm had yet communicated with Hartleib.

25.     On March 21 or 22, 2009, Weiser became aware that Murphy sent a draft retention letter to Hartleib, even though up to that point Weiser had never directly communicated with Hartleib.

26.     Neither Weiser nor the Law Firm agreed to represent Hartleib at that time.

27.     On or about March 26, 2009, Weiser and Hartleib spoke for the first time, by telephone.

28.     During the March 26, 2009 call, Hartleib claimed to have spent "hundreds of hours" investigating Sprint, and also stated that he previously contacted Robbins Geller and

"give[n] them" the facts and analysis necessary to prosecute the federal securities claims asserted against Sprint in the Sprint Securities Class Action.

29.     Hartleib also represented to Weiser during the March 26, 2009 call that he was interested in seeking appointment as the lead plaintiff or as a co-lead plaintiff in the Sprint Securities Class Action.  Hartleib stated to Weiser that Hartleib believed he would make an ideal lead plaintiff in the Sprint Securities Class Action based upon his claimed knowledge regarding Sprint.

30.     Also during the March 26, 2009 call, Hartleib strongly implied his interest in sharing any attorneys' fees the Law Firm might recover if it represented Hartleib in connection with a potential shareholder derivative action brought on Sprint's behalf.

31.     Based upon Hartleib's representations and/or statements to Weiser during the March 26, 2009 call regarding the Sprint Securities Class Action, Weiser concluded that the Law Firm could not represent Hartleib in any derivative action brought on behalf of Sprint, as any role potentially to be played by Hartleib in launching and/or prosecuting the Sprint Securities Class Action *against* Sprint would preclude his participation as a plaintiff to a derivative suit brought *on behalf of* Sprint.

32.     Furthermore, Hartleib's apparent interest in a fee sharing agreement with the Law Firm was extremely troubling to Weiser, as neither Weiser nor the Law Firm had ever or would ever agree to enter into such an agreement.

33.     By e-mail at 7:21 a.m. on March 27, 2009, a true and correct copy of which is attached hereto as **Exhibit 2**, Weiser informed Murphy of his decision that the Law Firm could not represent Hartleib in a shareholder derivative suit brought for the benefit of Sprint.

34.     Weiser explained to Murphy that his decision was based upon Hartleib's "potential conflict in light of the other [Sprint Securities Class Action] litigation he's involved in. Thus, I don't think he would make an adequate representative for Sprint." Ex. 2.

35.     Murphy and Weiser spoke by phone shortly after 7:21 a.m. on March 27, 2009, and Weiser reiterated that the Law Firm would not represent Hartleib in a shareholder derivative action brought on behalf of Sprint under any circumstances.

36.     By e-mail at 9:55 a.m. on March 27, 2009, a true and correct copy of which is attached hereto as **Exhibit 3**, Murphy informed Hartleib that neither the Murphy Firm nor the Law Firm would represent Hartleib in a shareholder derivative action on behalf of Sprint due to Hartleib's "potential conflict of interest." Ex. 3.

37.     The Law Firm eventually chose to represent Sprint shareholder Monica Ross-Williams ("Ross-Williams") as the plaintiff to a shareholder derivative action (the "Sprint Derivative Action") filed on behalf of Sprint against certain of its current and former officers and directors in the District Court of Johnson County, Kansas (the "Kansas State Court").

38.     In July 2011, the law firm of Kahn, Swick & Foti, LLC ("Kahn Swick") filed a separate shareholder derivative action on Sprint's behalf, naming Hartleib as the representative plaintiff.

### *The Sirius XM Litigation*

39.     On March 8, 2011, Hartleib and several other named plaintiffs filed a shareholder derivative action on behalf of Sirius XM Satellite Radio, Inc. ("Sirius XM") against Sirius XM's officers and directors in New York State Supreme Court (New York County), alleging negligence, fraud, breach of fiduciary duties and self-dealing (the "Sirius XM Derivative

Action"). A true and correct copy of Hartleib's Sirius XM shareholder derivative complaint is attached hereto as **Exhibit 4**.

40.     The plaintiffs in the Sirius XM Derivative Action were represented *pro se* by Hartleib and his fellow named plaintiff, John Sorge. Ex. 4 pp. 1, 21.

41.     Although the Law Firm previously declined to represent Hartleib in a shareholder derivative action on behalf of Sprint, Hartleib sought to engage the Law Firm as counsel for the plaintiffs in the Sirius XM Derivative Action.

42.     To wit, Hartleib e-mailed Weiser about the Sirius XM Derivative Action multiple times, without response. True and correct copies of e-mails from Hartleib to Weiser dated June 2, 2011, June 11, 2011 and June 20, 2011 are attached hereto as **Exhibit 5**.

43.     Weiser was wary of getting involved in the tangled and multi-faceted Sirius XM Derivative Action, and after undertaking a cursory review of the allegations and purported derivative claims asserted against Sirius XM's officers and directors, Weiser and the Law Firm determined that Hartleib's legal theories were insupportable. Accordingly, Weiser and the Law Firm declined to represent Hartleib and his fellow shareholder plaintiffs in the Sirius XM Derivative Action.

44.     On August 31, 2011, Hartleib again e-mailed Weiser: "Rob, we need to talk about you coming in on my Sirius state case. This Federal case was taken from my case which was filed first. Khan Swick will work with us as I am providing all of the research. Call me ASAP[.]" A true and correct copy of Hartleib's August 31, 2011 e-mail to Weiser is attached hereto as **Exhibit 6**.

45.     Weiser declined to call Hartleib, however, and the Law Firm elected not to represent Hartleib or any other plaintiff(s) in any legal action with respect to Sirius XM.

46.     On February 16, 2012, Hartleib e-mailed Weiser and copied Hartleib's colleague, David Sacks: "Rob, are we going to do some business together or what? You never called us back after we tried six times to reach you. David and I need to make some money so that we can buy you a new phone!"   A true and correct copy of Hartleib's February 16, 2012 e-mail to Weiser is attached hereto as **Exhibit 7**.

47.     The Law Firm declined to engage in any business transaction or litigation with Hartleib in 2012 or thereafter.

*The Sprint Derivative Settlement*

48.     Weiser did not speak with Hartleib for several years thereafter, until after the majority of the Sprint shareholder derivative lawsuits pending in the Kansas State Court and the Kansas Federal Court based on the Sprint/Nextel merger, including the Sprint Derivative Action initiated by Ross-Williams, achieved a collective settlement in or about 2016 (the "Sprint Derivative Settlement").

49.     Hartleib – the only Sprint derivative plaintiff in any forum who did not participate in the Sprint Derivative Settlement – was a vocal opponent of the Sprint Derivative Settlement.

50.     When the Law Firm and several other law firms representing other derivative plaintiffs sought final approval of the terms of the Sprint Derivative Settlement from the Kansas State Court, including the approval of agreed-to attorneys' fees for the plaintiffs' counsel, Hartleib filed a formal *pro se* objection.

51.     Weiser and Hartleib spoke by phone concerning Hartleib's objection to the Sprint Derivative Settlement on or about May 20, 2016, approximately one week prior to the Sprint Derivative Settlement's final approval hearing (the "Final Approval Hearing") in the Kansas State Court before the Honorable James Vano ("Judge Vano").

52.     During that telephone conversation, Hartleib expressed to Weiser his displeasure with the terms of the Sprint Derivative Settlement.

53.     Notwithstanding Hartleib's displeasure with the Sprint Derivative Settlement terms, however, Hartleib proposed to withdraw his formal objection to the Sprint Derivative Settlement if Weiser would agree to enter into a "consulting agreement" with Hartleib, pursuant to which Hartleib would receive several hundred thousand dollars and would provide the Law Firm with ideas for initiating lawsuits against unspecified corporate defendants.

54.     The Law Firm elected not to enter into any "consulting agreement" with Hartleib, and once again was roiled by the unethical request made by Hartleib.

55.     In retribution against the Law Firm, and because his own shareholder derivative action was not included in the Sprint Derivative Settlement, Hartleib appeared at the May 26, 2016 Final Approval Hearing before Judge Vano in support of his objection to the Sprint Derivative Settlement.

56.     As the approval process for the Sprint Derivative Settlement advanced, Hartleib sent occasional goading and derisive e-mails to Plaintiffs.  For example in a May 24, 2016 e-mail, a true and correct copy of which is attached hereto as **Exhibit 8**, Hartleib taunted Weiser: "Rob, you are going to lose either with the honorable Vano [sic] or on appeal!" and "You really should have been more diligent."  Ex. 9.

57.     Five days after the Final Approval Hearing, on May 31, 2016, Hartleib seemed to soften, e-mailing Weiser to "discuss the current case and any forthcoming derivative [sic] on the tax issues.  I would like to see the old [Sprint] board held accountable."  A true and correct copy of Hartleib's May 31, 2016 e-mail is attached hereto as **Exhibit 9**.

58.     Less than a month later, however, on June 28, 2016, Hartleib demanded certain information regarding attorneys' fees and reimbursement of costs for plaintiffs' counsel which had been submitted to the Kansas State Court *in camera*, e-mailing Weiser: "please provide me with the documents in support of your fees filed yesterday. . . I will notify the clerk if I don't get them today.  Also your delay will provide me yet another reason to appeal is [sic] the Honorable Vano approves the settlement."  A true and correct copy of Hartleib's June 28, 2016 e-mail to Weiser is attached hereto as **Exhibit 10**.

### *The Law Firm is Duped by a Disbarred Document Reviewer,*
### *and Hartleib's Harassment Campaign Begins in Earnest*

59.     Jeffrey M. Silow ("Silow") was hired by the Law Firm as a contract attorney on several occasions between 2008 and 2017 for the purposes of performing document review work; he was initially sourced through a Philadelphia-based legal search and placement firm, Abelson Legal Search ("Abelson"), with which the Law Firm had contracted.

60.     Abelson was responsible for vetting the credentials and bar status of the attorneys it placed, and Abelson held Silow out to the Law Firm as a licensed attorney in good standing.

61.     Meanwhile, in mid-2016, the Sprint Derivative Settlement was approved by the Kansas State Court, but only about ten percent of the amount of the attorneys' fees for the participating plaintiffs' counsel that was agreed to by the parties was awarded by the Court.

62.     The Law Firm and the other firms that participated in the Sprint Derivative Settlement appealed the sharply discounted attorneys' fees awarded by the Kansas State Court.

63.     In February 2017, for the first time, and to its utter shock and dismay, the Law Firm received notification that Silow had been disbarred in the Commonwealth of Pennsylvania decades earlier,[1] although he had been holding himself out as an attorney admitted in good

---

[1] Silow was also admitted to practice law in the District of Columbia until 2000.
{01094580;1}

standing to practice law.  In order to perpetrate his deception, Silow used his son's name on court submissions made by the Law Firm with respect to Silow, and represented to the Law Firm that although he went by the name "Jeffrey Silow" and wished to be called "Jeffrey," his legal name was "Alexander J. Silow."   Indeed, Silow represented himself to be Alexander J. Silow in a sworn certification filed with the Kansas State Court in the Sprint Derivative Action.

64.     After learning of this deceit, the Law Firm immediately severed ties with Silow, affirmatively notified the courts sitting in every action in which Silow's hours were included as part of an "attorney time" lodestar calculation, reported the incident to the Disciplinary Board of the Supreme Court of Pennsylvania, pressed criminal charges against Silow in Montgomery County, Pennsylvania, and instituted a pending civil case against Abelson and Silow in the Court of Common Pleas of Chester County, Pennsylvania captioned *The Weiser Law Firm, P.C. v. Abelson Legal Search and Jeffrey Mark Silow,* No. 2017-07778.

65.     After the Law Firm pressed criminal charges against him, Silow pled guilty to three criminal counts in Pennsylvania – unauthorized practice of law (42 Pa.C.S. § 2524), unsworn falsification to authorities (18 Pa.C.S. § 4904(b)) and securing execution of documents by deception (18 Pa.C.S. § 4114).

66.     Over a multi-year period, Silow engaged in significant document review work in the Sprint Derivative Action, and the Law Firm immediately and voluntarily disclosed to Judge Vano, who reviewed and approved the Sprint Derivative Settlement, and to the Clerk of the Kansas Court of Appeals (the "Kansas Appeals Court") – which was then considering the appeal from the attorneys' fee award in the Sprint Derivative Settlement as well as Hartleib's own *pro se* appeal of Judge Vano's approval of the Sprint Derivative Settlement – that Silow affirmatively misrepresented himself to the Kansas State Court as a licensed attorney in good

standing.  True and correct copies of the Law Firm's February 6, 2017 letters to both the Kansas State Court (Case No. 11-cv-01688) and the Kansas Appeals Court (Appeal No. 17-117139-A) are collectively attached hereto as **Exhibit 11**.

67.     Although a billing audit reinforced the validity of the hours Silow worked on the Sprint Derivative Action and the quality of Silow's review work, the reduced attorneys' fee award in the Sprint Derivative Settlement was affirmed on appeal.

68.     Hartleib was delighted to learn that the Law Firm had been duped by Silow, defrauded by Abelson, and awarded a vastly reduced fee in the Sprint Derivative Settlement, and he unleashed a deluge of abuse upon the Plaintiffs, and Weiser in particular.

69.     On March 6, 2017, Hartleib e-mailed Weiser and copied eleven members of the bar from five different law firms, as well as the administrative assistant for the Kansas State Court, writing in relevant portion as follows:

> Rob, I am a little confused!  . . . It seems your statements to the Appellate Court were disingenuous at best.  Shocking! . . .
>
> I especially like the comment that you felt as though you had an ethical obligation to inform the Court, prior to briefing . . . Ethical obligation, <u>what a Saint</u> [sic] . . . Your attempts, [sic] to obfuscate your chicanery in this case is galvanizing my convictions, strengthening my resolve to expose all of the corrupt parties in this case!  This lawyer driven litigation must and will cease.  Your temerity, to seek leave of the Appellate Court to reinstate fees, given what I have uncovered is frankly astonishing and provoking wrath.  I will take this all the way to the Kansas Supreme Court if needed, as the integrity of the judicial system is at stake!

A true and correct copy of Hartleib's March 6, 2017 e-mail is attached hereto as **Exhibit 12** (emphasis in original).

70.     On March 6, 2017, Hartleib contacted Ross-Williams, the plaintiff in the Sprint Derivative Action, by telephone.  Upon information and belief, Hartleib obtained the phone number for Ross-Williams through an internet search.

71.     During the March 6, 2017 call, Hartleib verbally harassed and threatened Ross-Williams; Hartleib also told Ross-Williams that the Law Firm was a "criminal enterprise" and was not serving her interests as a Sprint shareholder.

72.     Hartleib did not seek or obtain permission from Ross-Williams' counsel or an order of the Kansas Appeals Court to contact Ross-Williams, and therefore his unsolicited telephone call to her constituted a clear violation of Rule 4.2 of the Kansas Rules of Professional Conduct, asthe Kansas Appeals Court specifically held in its March 30, 2017 order (the "Protective Order").

73.     Ross-Williams explicitly asked Hartleib not to contact her again, and to direct all future communications to her counsel, the Law Firm.

74.     Ross-Williams then contacted the Law Firm, recounted Hartleib's call to her, and reported that she felt shocked, disturbed, harassed and threatened by Hartleib during the call.

75.     In a declaration filed with the Kansas Appeals Court on May 18, 2018, a true and correct copy of which declaration is attached hereto as **Exhibit 13**, Ross-Williams described the March 6, 2017 telephone call from Hartleib in relevant portion as follows:

> Upon answering the telephone when Hartleib called me on the evening of March 6, 2017, I did not realize at first who I was speaking to.  Hartleib proceeded to attempt to discuss matters related to the Appeal with me, in a highly confrontational manner.  Once I realized who Hartleib was and that he had somehow found my phone number and called me directly regarding the Appeal, I told Hartleib I did not wish to speak to him any further.  I asked Hartleib not to contact me again and to direct all future communications to my counsel.

> Hartleib, however, did not hang up the phone at that point.  Instead, he tried to continue the conversation by making references to certain matters about me that were wholly unrelated to the Appeal; specifically, my role as an elected official in Ypsilanti Township, Michigan, where I serve on the Township Board of Trustees. I can only assume that Hartleib conducted an internet search and tried to learn as much as he could about me prior to calling me on March 6, 2017.

In the first instance, I was taken aback and frightened once I realized that Hartleib had called me directly about the Appeal, and given the tenor of the call I suspected that he did so in an attempt to intimidate me. But once Hartleib brought up matters about me that were completely unrelated to the Appeal, I became certain that his purpose for calling was to harass and threaten me. I felt very uncomfortable and wanted to end the call with Hartleib as soon as possible, but I thought it best to try to end the conversation in a non-confrontational way. To that end, I told Hartleib that if he wished to do so he could copy me on communications directed to my counsel, and I provided him with an email address which I seldom use.

Ex. 13 ¶¶ 3-5.

76.     Inexplicably, Hartleib disregarded Ross-Williams' clear directive and e-mailed her directly, copying fifteen members of the bar and the Kansas State Court's administrative assistant, at 3:16 a.m. the following morning, March 7, 2017, a true and correct copy of which e-mail is attached hereto as **Exhibit 14**.

77.     Therein, Hartleib stated to Ross-Williams and members of the bar:

Dear Ms. Williams, it was a pleasure speaking with you this evening. I am sorry that your Counsel has not kept you apprised of the details of your case. **I find it unconscionable that your attorneys failed to inform you of Judge Vano's rulings or that an Appeal was filed on your behalf. I do believe that you are a unwitting victim of their fraud committed against the Court. As we discussed they have submitted millions of dollars in fraudulent billing in your case. As I informed you that this was not just my opinion, the Judge in your case came to a similar conclusion. In fact, your attorneys have now admitted to at least 1.6 million dollars in fraudulent bills submitted to the Court. Mr. Weiser has confirmed this in two separate letters.** (See attached). I am no expert, but **when a Firm admits criminal acts in a case** I believe they are obligated to notify you as the Plaintiff. Mr. Weiser and his Firm have already contacted their Bar associations and other Courts to **self-report their criminal acts.** I have contacted the district attorney's offices in Pennsylvania and Kansas and will be filing formal complaints. I am sorry to be the person to inform you of this, as it was your attorneys responsibility to do so. I am seeking a full evidentiary hearing where your Counsel will be forced to testify under oath and you can address the Court. As you can see by the letters from Mr. Weiser **they are in a lot of trouble,** but claim they are victims of Mr. Silow. **I will provide incontrovertible proof that Mr. Weiser et. al. is just as guilty as Mr. Silow. This is just the tip of the iceberg.** Details of our call will be submitted to the Kansas Court of Appeals in a sworn declaration and provided to Judge Vano. As

per your request I copied all of the attorneys in your case as well as Judge Vano's Clerk. Thank you for taking the time to speak with me this evening.

Ex. 14 (emphasis supplied).

78.     Hartleib's March 7, 2017 e-mail to Ross-Williams, fifteen members of the bar and the Kansas State Court's administrative assistant was filled with gross misstatements of fact and outright lies; to wit, the Law Firm *never* admitted to fraudulent billing or committed any "criminal acts," Judge Vano never concluded that the Law Firm "submitted millions of dollars in fraudulent billing," nor did the Law Firm's letters to the Kansas State Court and Kansas Appeals Court regarding Silow "confirm" any misdeed.  See Ex. 14.  The Law Firm was not "in a lot of trouble" or "just as guilty as Mr. Silow," nor was the fraud Silow and Abelson committed against the Law Firm "just the tip of the iceberg." Id.

79.     Although the Law Firm sent Hartleib a cease-and-desist letter, see Ex. 14, Hartleib paid it no mind, responding by e-mail on March 7, 2017 (and copying fifteen members of the bar and Judge Vano's administrative assistant) as follows:

Mr. Weiser, as I am preparing my sworn declaration regarding my communication with you "client", I do not have time to address all of the self-serving misrepresentations in your letter. The 15 minute consensual conversation with your "client" was very enlightening. She provided her email address and ask that I copy Counsel, so that I could forward the documents you failed to provide. **For you to characterize this as harassment is another blatant attempt to distract and obfuscate your fraudulent acts and bastardization of the judicial system. I caution you, that coercing your "client" to misstate facts regarding our call will only inflict additional damage to what little credibility you have left. You Sir, and your coconspirators are the ones that need to Cease and Desist. Your so-called "client" is representing my interest and her attorneys are corrupt, therefore I will neither Cease nor Desist.** As far as your not so vailed threat that Ms. Williams "reserves all of her rights", **if you are threatening legal action against me, feel free, I will be happy to waive service to expedite said action. I find the prospects of discovery quite compelling. Your threats do nothing but, strengthen my resolve and galvanize my convictions. Call it a personality defect!** Instead of wasting my time, I would suggest you consult with an ethics attorney, that's right, you already have!

Ex. 14 (emphasis supplied).

80.     Of course, Hartleib lied about the consensual nature of his improper and unlawful contact with Ross-Williams, and his harassment of Ross-Williams resulted in the Kansas Appeals Court issuing its Protective Order on March 30, 2017 prohibiting Hartleib from contacting Ross-Williams.

81.     Hartleib sought twice before the Kansas Appeals Court and once before the Kansas Supreme Court to have the Protective Order lifted.  In response to one such effort, Ross-Williams wrote in a declaration submitted to the court:

> I was shocked to learn that Hartleib recently filed a motion to vacate the Protective Order.  I can only assume that Hartleib intends to try to contact me again and harass me further.  I was very frightened and disturbed by Hartleib's conduct in March 2017, and I was pleased and relieved that the Protective Order was granted.  If the Protective Order were to be vacated, I would fear that Hartleib would once again attempt to intimidate, harass, and threaten me.  I see no reason why Hartleib should be permitted to direct communications to me instead of my counsel.  I respectfully request that this Court deny Hartleib's motion and keep the Protective Order in place.

Ex. 13 ¶ 9.

82.     None of Hartleib's efforts to vacate the Protective Order were successful.

83.     In fact, one year later, on April 7, 2018, when the Law Firm opposed Hartleib's unsuccessful Motion to Reconsider and Vacate the Protective Order, Hartleib e-mailed Weiser and copied eight other members of the bar, as follows:

> **Rob, your ability to set the bar at new lows, never disappoints!** Clearly, this is in retaliation to your being rightfully removed as co-lead counsel in the Equifax case. **Your attempt to mislead the Appellate Court with incomplete records might be your standard operating procedure, but I believe it will cost you when I seek sanctions. Your personal attacks smack of desperation, they do nothing to dissuade me, in fact they galvanize my convictions and strengthen my resolve!** Rob, you may want to contact your investigators, L. English Research Services Inc. to seek a partial refund. When they pulled the records on March 26th, they missed a DUI from the eighties and a fixit ticket. **Your ill-**

**advised actions, and ad-hominem attacks are making the Weiser Firm radioactive!**

Have a wonderful weekend.

A true and correct copy of Hartleib's April 7, 2018 e-mail regarding the Law Firm's opposition to Hartleib's Motion to Reconsider and Vacate the Protective Order is attached hereto as **Exhibit 15** (emphasis supplied).

84.     After learning about Silow's duplicity, the Law Firm hired a public relations firm, which was contacted on or about March 8, 2017 by a reporter from *The Wall Street Journal*, a high-profile daily newspaper with international distribution.

85.     Upon information and belief, the reporter from *The Wall Street Journal* received a "tip" from Hartleib about Silow's disbarred status and role as a document reviewer in the Sprint Derivative Action.

86.     On March 13, 2017, *The Wall Street Journal* published the resulting article: "One Lawyer, 6,905 Hours Leads to $1.5 Million Bill in Sprint Suit." The article failed to mention the fact that Silow's nearly 7,000 billable hours were billed over the course of four years.

87.     Nearly one hundred media outlets picked up and further publicized *The Wall Street Journal*'s March 13, 2017 article.

88.     In an April 12, 2017 e-mail to Weiser and ten other members of the bar, as well as the Kansas State Court's administrative assistant, Hartleib wrote of Weiser: "What an embarrassment to the bar! See you in Court." A true and correct copy of Hartleib's April 12, 2017 e-mail is attached hereto as **Exhibit 16**.

89.     Alarmingly, upon information and belief, on April 25, 2017, Hartleib mailed several copies of an "anonymous" profanity-laced letter to six judges sitting on the Court of Common Pleas of Chester County, Pennsylvania, which was forwarded to Weiser on April 26,

{01094580;1}

17

2017 by Loretta M. Hines, Judicial Assistant to the Hon. Anthony A. Sarcione.  True and correct

copies of the April 26, 2017 forwarding e-mail, the transmitting envelope and the April 25, 2017

threatening letter are attached hereto as **Exhibit 17**.

90.     In the April 25, 2017 letter, Hartleib circles a headline referencing the Kansas

State Court's reduction of the attorneys' fees for plaintiffs' counsel in the Sprint Derivative

Settlement and writes in longhand: "What, if anything, do you intend to <u>DO</u> about this!!"  Ex.

16.  Over two typed and highlighted pages, Hartleib sets forth his negative views about class

actions – which are entirely distinguishable from the shareholder derivative litigation in which

the Law Firm and Weiser focus their practice – and recounts his version of Silow's fraud upon

the Law Firm, noting "**Judge <u>JIMMIE VANO</u> in Kansas, God Bless His soul, caught the**

**firm in the act and knocked out 90% of their billing** They claimed shock & surprise."  Ex.

17 (emphasis in original).

91.     Most concerningly, Hartleib attaches a page entitled "imaginary dialogue," which

ostensibly documents his imagined conversation with Weiser regarding Silow (including but not

limited to his misrepresentation of his first name, Jeffrey, on a court document, which he signed

"Alexander Jeffrey Silow," although Hartleib misstates this as "Andy").  Ex. 17.  The "imaginary

dialogue" concludes:

| | |
|---|---|
| [Weiser:] | "Well I get where you are going with this line of questioning.  Are you saying that we knew that he was a disbarred lawyer and we were trying to milk the class action jackpot with his phony billing" [sic] |
| [Hartleib:] | You said it better than I could. |
| [Weiser:] | "Well, you can *GO F\*\*K YOURSELF ASSHOLE.  I'M OUT OF HERE AND YOU CAN TALK TO MY LAWYER IF YOU WANT* [sic] |

Ex. 17.

92.     In forwarding the letter to Weiser from Judge Sarcione's chambers, Ms. Hines wrote: "The attached letter was received in Chambers yesterday, 4/25/17. Five other Judges in Chester County received the same letter. Judge Sarcione thought you should be alerted since you are referenced in the letter. Please feel free to contact Chambers if you feel it necessary or have any questions or concerns." Ex. 17.

93.     On May 19, 2018, Hartleib e-mailed Weiser and eight other members of the bar: "Plaintiff Counsel, and I use this term loosely, when making false allegations against a party I would suggest you at least get it right. I am no expert, but I am pretty sure it would be libelous! I will demonstrate its proper use posthaste!" A true and correct copy of Hartleib's May 19, 2018 e-mail is attached hereto as **Exhibit 18**.

94.     Two weeks later, on June 2, 2018, Hartleib sent an unsolicited e-mail to Weiser, eleven other members of the bar, and Judge Vano's administrative assistant, Jill Boren, regarding media coverage of a lawsuit against State Street Bank, with which Plaintiffs had no involvement whatsoever:

> Dear Ms. Boren, I thought the Honorable James Vano would find the link to the National Law Journal Article of interest. It is clear that the Plaintiff's Bar is rife with corruption, in both Class Action and Derivative cases. **Much like the fraud Weiser et.al. committed in the "Ross-Williams" case,** it appears to be standard operating procedure for many firms to submit millions in fraudulent fee requests upon the Court. This State Street case involves large well established firms and nearly 100 million in fees. **At present, it appears Weiser et.al. has not been out done, as there is no mention of the unlicensed practice of law by a convicted felon using an alias.**
>
> **I will be contacting the Special Master, and filing an Amicus Brief in the State Street case to inform them of the chicanery that has taken place in the "Ross-Williams" case. Although entirely unrelated, it presents a troubling pattern of fraud and corruption in these lawyer driven cases.** I will be seeking public dissemination of the Special Master's report to show the breadth of corruption within the Plaintiffs Bar. **The actions of Weiser et.al. and the Firms in the State Street case is the very definition of Racketeering**, and warrants legislative reform.

https://www.law.com/nationallawjournal/2018/05/31/judge-presses-lead-plaintiff-in-state-street-bank-lawsuit-on-overbilling-questions/

Michael Hartleib 646-494-5901

A true and correct copy of Hartleib's June 2, 2018 e-mail is attached hereto as **Exhibit 19** (emphasis supplied).

### *Hartleib Inserts Himself into the Law Firm's Pending Litigations*

95.     Hartleib then began injecting himself into the Law Firm's pending litigations nationwide.

96.     Upon information and belief, Hartleib scanned federal dockets around the country for the names of the Law Firm's attorneys, in order to insert himself into the Law Firm's cases; Hartleib's principal aim was to harass Weiser and damage the Law Firm.

97.     For example, on August 17, 2018, Hartleib sent Weiser the following e-mail, a true and correct copy of which is attached hereto as **Exhibit 20**:

> Rob, will you be at the Witmer v Steven hearing on the 27th? I will do my best to attend. I am very familiar with Judge Carney? [sic] **We can discuss my concerns with L.C, A 10 and several other companies in which I am a shareholder. It appears we will be forced to deal with each other for the foreseeable future.** In hindsight, I should have avoided stocks, and invested more in real estate. Our interest were supposed to be aligned. Instead, I was attacked! If you have any questions, or wish to proffer an apology, you know how to reach me. That said, **other action is eminent!**

Ex. 20 (emphasis supplied).

98.     The "Witmer v. Steven" matter Hartleib references is actually *Witmer v. Sugarman,* a shareholder derivative suit filed in the United States District Court for the Central District of California, which was dismissed on August 23, 2018.   No. SACV 18-00246-CJC(DFMx), 2018 U.S. Dist. LEXIS 217850 (C.D. Cal. Aug. 23, 2018).   Hartleib was not a party in *Witmer v. Sugarman,* and Plaintiffs have no evidence that Hartleib was a shareholder of

the underlying corporation.  No hearing was held in that case, and Hartleib never submitted any filing in that case.

99.     The *LC* and *A10* cases were other derivative actions pending in federal court in California at that time, in which Hartleib was not a named party and Plaintiffs have no evidence that Hartleib was a shareholder of the underlying corporations.

100.    Hartleib indicated in no uncertain terms that, as part of his laser-focused campaign to undermine Weiser and the Law Firm, he intended to involve himself in the Law Firm's other derivative litigations (which are unrelated to Hartleib in any way) throughout the country.  The following paragraphs offer a few examples of Hartleib's efforts.

<u>EQUIFAX DERIVATIVE LITIGATION</u>

101.    On March 15, 2018, in *In re Equifax, Inc. Derivative Litigation.*, No. 1:18-cv-00317-TWT (consolidated with Nos.: 1:218-cv-00477-TWT and 1:18-cv-00577-TWT) (N.D. Ga.) (the "Equifax Derivative Litigation"), during the pendency of competing motions for the appointment of lead counsel before the United States District Court for the Northern District of Georgia involving the Law Firm, Hartleib filed "Michael Hartleib, Shareholder and Concerned Citizen, Motion [sic] for Acceptance of Amicus Curiae Brief in Opposition to the Appointment of The Weiser Firm as Co-Lead Counsel," a true and correct copy of which – together with the proposed "Amicus Curiae Brief of Concerned Citizen and Shareholder Michael Hartleib in Opposition of [sic] the Appointment of The Weiser Firm as Co-Lead Counsel" – is attached hereto as **Exhibit 21**.

102.    Therein, Hartleib expresses his purported "extreme concern" about vague "troubling actions of Weiser et.al," in the Sprint Derivative Action; Hartleib's "concern" largely

pertains to the Law Firm's employment of disbarred attorney Silow as a document reviewer. Ex. 21 p. 4.

103.    Hartleib alleges that the Law Firm "lied, misl[ed] the court," "attempt[ed] to confuse the Court [sic]," "used an **unfit plaintiff**," engaged "in fraudulent billing," made "false statements," employed another attorney who "repeatedly perjured himself" and constituted "an utter embarrassment to the Plaintiff's Bar," operates a "criminal enterprise," "sees plaintiff's [sic] as a '**necessary nuisance**,'" displayed "hubris and utter contempt for the Court," engaged in "contemptuous actions in the case" and "Self-Dealing, Unclean Hands and Shameful Violations of Public Trust," undertook a "zealous quest for reinstatement of four million dollars in unwarranted fees," "follow[ed] a different set of standards, one that sets the bar at new lows," made a "desperate attempt to unjustly enrich themselves," and "has committed criminal acts upon the Kansas Court and a multitude of others across the country." Id. pp. 4-9 (emphasis in original).

104.    In his proposed *amicus* brief, Hartleib also grossly mischaracterizes the contents of the Law Firm's legal filings, the findings of the Kansas State Court, and certain statements from the appellate bench during oral argument before the Kansas Appeals Court, and admits to his unlawful contact with Ross Williams. Id. pp. 4, 6-8.

105.    Hartleib concludes: "what is going on at the Weiser firm?  Either they are completely corrupt, or entirely inept, whichever is the case they are not fit to act as lead on any representative suit." Id. p. 9.

106.    In its opposition to Hartleib's motion for leave to file his *amicus curiae* brief, a true and correct copy of which is attached hereto as **Exhibit 22**, the Law Firm notes:

> Hartleib submits his proposed *amicus* filing not as a true, disinterested "friend of the court" or even as a shareholder in Equifax, Inc., but purely in an adversarial

capacity in his continuing and openly hostile effort to harass and disturb the Weiser Firm, its clients, and other law firms with whom the Weiser Firm works ...

Hartleib is attempting to use his purported *amicus* filing in this Action as a weapon against the Weiser Firm and its clients, and this Court should not permit Hartleib's brazen abuse of the *amicus* mechanism to the partisan detriment of plaintiffs in this Action.

Hartleib is not an "impartial individual" suggesting the proper interpretation of any law, but rather a serial harasser of the Weiser Firm and its clients.

Hartleib is seeking to extend his malicious campaign against the Weiser Firm from the Sprint derivative action to this Action . . .

Ex. 22 pp. 1, 4, 6, 10 (parentheticals omitted).

107.    One of the attorneys at the Law Firm, James Ficaro, transmitted a copy of the Law Firm's opposition, to which Hartleib responded by e-mail on March 22, 2018, a true and correct copy of which is attached hereto as **Exhibit 23**: "I received these filings several hours ago!  Let Rob know he is making a catastrophic mistake!"

108.    At the hearing on the competing motions for appointment of lead counsel in the Equifax Derivative Litigation, prior to any ruling on Hartlieb's *amicus* motion, Hartlieb appeared before Judge Thomas W. Thrash, Jr. ("Judge Thrash") and was permitted to speak.[2]

109.    Without explaining his reasoning, Judge Thrash declined the Law Firm's motion to be appointed co-lead counsel in the Equifax Derivative LitigationHartlieb took credit for this result, e-mailing Weiser a copy of Judge Thrash's order on April 5, 2018, a true and correct copy of which e-mail is attached hereto as **Exhibit 24**, and stating: "Just got home and wanted to make sure that you have this!  Good to finally meet you Rob!  Like I said, none of this was necessary!" Ex. 24.

<u>BIG LOTS DERIVATIVE LITIGATION</u>

---

[2] A copy of the transcript of the hearing before Judge Thrash was not made available to Plaintiffs.
{01094580;1}

110.   *In re Big Lots, Inc. Shareholder Litigation*, No. 2:12-cv-445 (S.D. Oh.) ("Big Lots Derivative Litigation"), was a derivative suit which asserted a claim for corporate waste by certain of Big Lots' officers and directors in connection with an alleged insider stock selling scheme and stock repurchase plan.

111.   Settlement of the derivative claims received preliminary approval from the Honorable Michael H. Watson ("Judge Watson") of the United States District Court for the Southern District of Ohio on April 6, 2018.

112.   As Judge Watson noted in his August 28, 2018 Opinion and Order granting final approval to the settlement in the Big Lots Derivative Action, a true and correct copy of which Opinion and Order is attached hereto as **Exhibit 25**: "On August 24, 2018, well after the time to object and the fairness hearing took place, the Court received an email from Michael Hartleib ("Hartleib"), a shareholder who had an interest in a different case involving The Weiser Firm, P.C. ("Weiser")." Ex. 25 p. 11 fn.2.

113.   Hartleib's e-mail to Judge Watson in the Big Lots Derivative Litigation was never provided to Plaintiffs, but Judge Watson described it as follows: "Hartleib raised concerns over Weiser's billing practices in this prior case and stated that he wanted to inform the Court so that it could scrutinize the fee request in this case." Id.

114.   Judge Watson noted that: "Hartleib does not indicate that he is a shareholder in Big Lots or otherwise an interested party in this case. Furthermore, the Court always scrutinizes the billing records of plaintiffs' counsel before approving fee awards." Id.

115.   Judge Watson elected "out of an abundance of caution" to re-analyze the Law Firm's billing entries submitted in the Big Lots Derivative Litigation, gave the Law Firm an

opportunity to respond to Hartleib's scurrilous allegations, and determined that "[t]he Court is fully satisfied that the hours billed by Weiser were reasonable in this case." Id.

<u>CENTURYLINK DERIVATIVE LITIGATION</u>

116.    *In re Centurylink Sales Practices and Securities Litigation,* No. 17-md-2795-MJD—MM (the "Centurylink Derivative Litigation"), was initiated in 2017 in the United States District Court for the District of Minnesota.  It includes a consolidation of the separately-filed shareholder derivative cases captioned *Tansey v. Perry, et al.,* No. 18-cv-02460-MJD-KMM; *Flanders v. Post, et al.,* No. 18-cv-02833-MJD-KMM; *Ault v. Post, et al.,* No. 18-cv-02834-MJD-KMM; *Barbree, et al. v. Bejar, et al.,* No. 18-cv-02835-MJD-KMM; and *Palkon v. Boulet, et al.,* No. 19-cv-00284-MJD-KMM.

117.    On March 5, 2019, one day prior to a hearing addressing competing motions for appointment of lead counsel in the Centurylink Derivative Litigation, Hartleib filed a self-styled "Amicus Curiae Brief of Shareholder Michael Hartleib and Concerned Citizen in Opposition of [sic] the Appointment of Robbins Arroyo and the Weiser Firm et. al. as Lead Counsel in the Consolidated Derivative Action," a true and correct copy of which is attached hereto as **Exhibit 26**.

118.    The Law Firm was not seeking appointment as co-lead counsel with Robbins Arroyo LLP ("Robbins Arroyo") or any other law firm in the Centurylink Derivative Litigation. Instead, the Law Firm was a part of the support structure proposed by the law firm of Bragar Eagle & Squire, P.C. in *its* motion for appointment as lead counsel in the Centurylink Derivative Litigation.

119.    Robbins Arroyo filed an application for *its own* appointment as lead counsel in the Centurylink Derivative Litigation.

120.    Years earlier, Robbins Arroyo filed a shareholder derivative lawsuit on behalf of Sprint, arising from the Sprint/Nextel merger, which – like the Sprint Derivative Action filed by the Law Firm – was resolved by the Sprint Derivative Settlement.

121.    As noted hereinabove, Hartleib did not participate in the Sprint Derivative Settlement, and objected vociferously to the Sprint Derivative Settlement.

122.    Furthermore, Hartleib is not a shareholder in Centurylink, nor does he claim to be a shareholder in Centurylink, thus depriving him of standing as *amici* in the Centurylink Derivative Litigation.

123.    In his brief, Hartleib claims that he seeks to "inform this Court of ongoing troubling actions by the Weiser and Robbins Arroyo et.al. [sic] Firms," pertaining to the Sprint Derivative Settlement.  Ex. 26 p. 2.

124.    Hartleib alleges that the Law Firm and Robbins Arroyo utilized "deceased parties, friends and family members which [sic] lacked standing, and paid serial criminal Plaintiffs," and that they "generate thousands of billable hours for illusory work, submit fraudulent time logs and seek hundreds of millions in unjust fees in cases across the country."  Id.

125.    Hartleib alleges that when he objected to the Sprint Derivative Settlement, "I was subjected to vicious ad hominem attacks as Weiser and Robbins Arroyo et.al. [sic] proved they would stop at nothing to protect their criminal enterprise . . . Weiser et.al [sic] lied, misleading the court [sic] . . . Weiser et.al. [sic] committed perjury and admitted to billing fraud."  Id. pp. 6-7.

126.    Hartleib admits to contacting Ross-Williams without consent of counsel or the Kansas Appeals Court, and further admits that upon receiving the Law Firm's cease-and-desist letter, "I replied by informing them that I would neither cease nor desist as the truth is an

absolute defense.  I informed them that they and their co-conspirators were the ones that needed
to *Cease and Desist*." Id. p. 7 (emphasis in original).

127.    Hartleib alleges that in the Centurylink Derivative Litigation, Weiser "is now
forced to initiate a new strategy, one of hiding behind another firm Bragar Eagel [sic] and Squire
seeking lead in this case in an effort to manage cases behind the scene [sic].  Greed appears to be
powerful [sic] motivator." Id.

128.    Hartleib also alleges without any basis that "Mr. Jeffrey Mark Silow has worked
for the Weiser and Robbins Arroyo et.al. Firms [sic] for over 10 years, billing likely more than
100 million dollars in illicit fees, in a multitude of cases across the country." Id. p. 8.

129.    On the following day, March 6, 2019, Hartleib appeared at a hearing before the
Honorable  Michael  J.  Davis  ("Judge Davis")  with  respect  to  the  competing  motions  for
appointment of lead counsel in the Centurylink Derivative Litigation.  A true and correct copy of
the relevant portions of the transcript of the March 6, 2019 hearing before Judge Davis is
attached hereto as **Exhibit 27**.

130.    As the Law Firm did not seek lead counsel appointment in the Centurylink
Derivative Litigation, neither Weiser nor anyone else from the Law Firm attended that hearing.

131.    After counsel for each of the competing movants were heard, Hartleib was
permitted to speak by Judge Davis, and did so as follows, in relevant portion:

> As your honor knows, in the amicus brief I lay things out that shows [sic] a
> pattern, a course of conduct over many years.  I, as a shareholder, have had to
> defend my interests against the likes of Robbins Arroyo and more recently the
> Weiser Law Firm.

Ex. 27 at 40:11-15.

> [T]he way I have gotten involved in this is I see someone that [sic] falsely
> purports to represent the shareholders' interests or the corporation, the
> shareholders derivatively, and then I see no meaningful relief or nearly illusory

relief and a tremendous amount in attorneys fees.   And in the Kansas case, I mean, I was subjected, I was – my character – I mean, I ended up having to defend my character, and I wasn't the one that [sic] did anything wrong.   You know, I mean, it's unbelievable the attacks that I took, so – **but it does nothing to dissuade me.  It just galvanizes my conviction and strengthens my resolve**.

Id. at 41:3-13 (emphasis provided).

With regard to the amicus brief, I didn't have a full service, the notice, you know, who to serve everyone.  And I understand that it could be prejudicial because they haven't had a chance to respond, but I welcome a response.   That said, **if the firms would like to give me a list of their forthcoming cases in which they are seeking leave, I could be certain to notify everybody timely** and I wouldn't have to prepare, stay up all night, all weekend long, to try to draft an amicus brief and get it to the court and then, you know, fly in.

Id. at 41:24-42:8 (emphasis provided).

And, Your Honor, *I know for a fact that the Weiser firm knew who Mr. Silow was and that will come out, you know, during the course of litigation.*  And I am pretty certain that the Robbins Arroyo firm knew who he was as well.

These firms, when these firms are up to no good, when they are billing illusory hours – you know, if I had 30 minutes with Your Honor in chambers, I could give Your Honor a lot more information . . .

Id. at 43:4-12.

132.   After bringing Hartleib's meandering comments to a close, Judge Davis permitted George C. Aguilar, Esquire of Robbins Arroyo to respond to Hartleib's *amicus* brief and remarks at the hearing.  Id. at 44:1-46:11.  The Court also gave Mr. Aguilar one week to respond in writing to Hartleib's *amicus* brief.  Id. at 46:12-13.

133.   Hartleib then concluded his statements to the Court in relevant portion as follows:

HARTLEIB:  . . . The allegations that I make against these firms are very serious allegations.   He says that I am libeling him, slandering him and defaming the firm.   I have asked Mr. Aguilar on numerous occasions **if they would like to sue me, I will waive service. I am perfectly happy for you – if you want to commence an action, then I will get the discovery** –

THE COURT: Speak to me.

> HARTLEIB:    Then I will get the discovery that I need to finally put an end to this, all of this, you know, unjust enrichment, you know, literally bastardizing our judicial process.
> THE COURT:   Okay.
> HARTLEIB:    Thank you.

Id. at 47:8-21 (emphasis supplied).

134.    After the Centurylink hearing, on March 14, 2019, Harteib sent an e-mail to Jill Boren, administrative assistant to Judge Vano, who ruled on the Sprint Derivative Settlement in the Kansas State Court. A true and correct copy of Hartleib's March 14, 2019 e-mail is attached hereto as **Exhibit 28**.

135.    Hartleib copied the entire attorney distribution list for the Sprint Derivative Settlement on his March 14, 2019 e-mail to Ms. Boren. Id.

136.    Therein, Hartleib wrote:

> Dear Ms. Boren, I hope this email finds you well. I thought that the Honorable Vano would be interested to know that my quest to expose lawyer driven litigation and corruption rife throughout the Plaintiffs Bar continues. Attached is an Amicus Brief filed in Minnesota, and transcript of the hearing before the Honorable Michael J. Davis. In addition, I have initiated legal action against Weiser and representative plaintiff Ross-Williams as outlined in the attached complaint.
>
> . . . **Maybe Judge Vano would be interested in setting the record straight before the Court appoints lead Counsel in the aforementioned [Centurylink] case**.
>
> Interestingly, I received an anonymous letter last night which details an elaborate scheme by Weiser et.al. to procure "Relators" in Qui Tam cases. It involves the use of several LLC shell corporations set up for the sole purpose of soliciting information under false pretenses to facilitate lawyer driven Qui Tam cases. This has resulted in the DOJ filing a motion to dismiss 11 active cases, filed by Weiser et.al. including ABBVIE. The level of sinister is [sic] truly unbelievable, some of which is outlined in the attached Motion to dismiss by the Feds!
>
> Lastly, I would like to express my gratitude to Judge Vano, I am, and remain incredible [sic] grateful for allowing me to be heard, and finding my arguments compelling. I will continue my quest to expose and reform the corruption rife throughout Derivative litigation.

{01094580;1}

> With the Utmost Respect,
> Michael Hartleib  (646) 494-5901

Ex. 28.

137.    The *qui tam* cases referenced by Hartleib involve whistleblower complaints brought by the National Healthcare Analysis Group ("NHCA") and related organizations accusing eleven pharmaceutical manufacturers of enticing doctors to prescribe their products using nurse educators as "kickbacks".

138.    The Law Firm was nominally involved in only three of the eleven of the NHCA's *qui tam* cases – *United States of America, et al v. OTSUKA Holdings Company, Ltd. et al,* No. 1:17-CV-00966 (N.D. Ill.) (the "Otsuka case"); *United States of America et al v. SMSF, LLC et al,* No. 1:16-CV-11379 (D. Mass.) (the "Biogen case"); and *Miller et al v. AbbVie Inc. et al,* No. 3:16-CV-02111 (N.D. Tex.) (the "AbbVie case").

139.    In the Otsuka case, the Law Firm never entered an appearance, and upon learning that the government did not wish to proceed, the Law Firm immediately informed its clients that they would need to secure new counsel if they wished to proceed.   On October 29, 2018, substitute counsel appeared for the relators, and on October 31, 2018, local counsel's motion to withdraw was granted.   After the government filed a motion to dismiss the Otsuka case, the relators, through their new counsel, filed a notice of voluntary dismissal.

140.    Similarly, in the Biogen case, the Law Firm never entered an appearance or sought admission *pro hac vice,* and informed its clients of the need to secure new counsel upon learning that the government did not wish to prosecute the case.   On August 24, 2018, substitute counsel, GeyerGorey LLP, appeared in the case, and on December 17, 2018 the government filed a motion to dismiss; the case was closed on or about December 26, 2018.

{01094580;1}

141.    Finally, in the AbbVie case, the Law Firm entered its appearance on June 22, 2018.  As with the Otsuka case and the Biogen case, upon learning of the government's decision not to pursue the case, the Law Firm immediately informed its clients that they would need to secure new counsel.  On September 25, 2018, GeyerGorey LLP filed a notice of substitution for the Law Firm.  On December 17, 2018, the government moved to dismiss the case, and on March 13, 2019, the relators, through their new counsel, filed a notice of voluntary dismissal.

142.    The Law Firm did not engage in any nefarious conduct, nor has any court or government agency suggested the Law Firm did anything improper.

143.    On April 23, 2019, Judge Davis issued a Memorandum of Law & Order appointing Bragar Eagle & Squire, P.C. as lead counsel, whose proposed support structure includes the Law Firm.  A true and correct copy of the April 23, 2019 Memorandum issued by Judge Davis is attached hereto as **Exhibit 29**.

144.    With respect to Hartleib, Judge Davis wrote as follows: "The Court has carefully considered Hartleib's allegations, Robbins Arroyo's response, and the public record in the cases cited by Hartleib. The Court concludes that **Hartleib has raised no legitimate questions** with regard to the ethics or expertise of the Robbins Arroyo law firm. **The Court is satisfied that there are no ethical concerns** that would hinder Robbins Arroyo's application for appointment as Lead Counsel." Ex. 29 p. 5 (emphasis supplied).

### *Hartleib's Federal Lawsuit Against Plaintiffs*

145.    On December 12, 2018, Kansas-based counsel for Hartleib, Andrew Protzman, Esquire, provided Weiser with a draft copy of a petition alleging legal malpractice/breach of fiduciary duty and violations of Kansas Consumer Protection Act claims against Weiser and the Law Firm, and abuse of process and breach of fiduciary duty claims against Ross-Williams.  A

true and correct copy of counsel's December 12, 2018 correspondence and the attached draft petition are attached hereto as **Exhibit 30**.

146.    The petition stems from Hartleib's claim that he was a client of the Law Firm for purposes of the 2009 Sprint Derivative Action, even though Hartleib filed separate derivative litigation with respect to Sprint in 2011 by and through separate counsel.

147.    In his December 12, 2018 letter, Mr. Protzman invited Weiser to "explore avenues to an agreeable resolution to the matter before it is filed." Ex. 30 p. 1.

148.    The undersigned, Philip S. Rosenzweig, Esquire, corporate counsel for the Law Firm and personal counsel for Weiser, responded by letter dated December 19, 2018, a true and correct copy of which is attached hereto as **Exhibit 31**.

149.    Therein Mr. Rosenzweig wrote, in part:

[The] causes of action [alleged against Weiser and the Law Firm in the draft petition] depend, inter alia, upon a demonstrably false and absurd premise: that the Weiser Firm and/or Mr. Weiser "agreed to represent Mr. Hartleib" and "entered into an attorney-client relationship" with Hartleib in March 2009. . . .

. . . while Hartleib may have sought my Clients' legal services, such services were certainly never provided to or received by Hartleib, because my Clients flatly declined to act as counsel (or co-counsel) to Hartleib immediately after Mr. Weiser first communicated with Hartleib.

Surely you agree that an implied attorney-client relationship is not formed simply because an individual seeking legal representation communicated with a lawyer once, and of course, as set forth above, Kansas law does not provide otherwise.

Ex. 31 p. 2 (internal citations omitted).

150.    Mr. Protzman e-mailed Mr. Rosenzweig twice more – on December 21, 2018 and January 7, 2019 (true and correct copies of which e-mail correspondence are attached hereto collectively as **Exhibit 32**) – seeking both times to initiate "pre-suit mediation of this matter." Ex. 32 p. 1.

151.   Plaintiffs herein did not wish to entertain Hartleib's overture of "pre-suit mediation," and Mr. Rosenzweig accordingly did not respond to Mr. Protzman's e-mails.

152.   On January 22, 2019, Hartleib filed a civil action in the Kansas State Court, alleging legal malpractice/breach of fiduciary duty, violation of the Kansas Consumer Protection Act and abuse of process claims against Weiser and the Law Firm (the "Hartleib Action"). Hartleib's complaint also includes claims for abuse of process and breach of fiduciary duty against Ross-Williams.   A true and correct copy of Hartleib's complaint against Plaintiffs and Ross-Williams in the Hartleib Action is attached hereto as **Exhibit 33**.

153.   Plaintiffs herein subsequently removed the Hartleib Action to the Kansas Federal Court, and moved to dismiss Hartleib's complaint on February 27, 2019, which motion remains pending.

154.   Hartleib's comportment and behavior during and after the Sprint Derivative Settlement approval process, his baseless interjections into the Law Firm's ongoing litigations unrelated to Hartleib, his multiple improper contacts with judges, represented plaintiffs and members of the bar, and his unfounded lawsuit in Kansas against Plaintiffs all constitute abusive, groundless and vexatious litigation.

155.   Hartleib's actions as set forth hereinabove – including but not limited to the distribution of unsolicited missives to attorney contact lists in ongoing litigations, the multiple applications to vacate a Protective Order preventing Hartleib from continued unlawful contact with clients of the Law Firm, the filing of *amicus curiae* briefs and appearances at hearings in unrelated litigations simply to insult and defame Plaintiffs and their colleagues, the threatening and profane letters to the bench of the Court of Common Pleas of Chester County, Pennsylvania, the threats to insert himself into the Law Firm's pending cases such as *Witmer, LC* and *A10*, and

the repeated improper written and oral requests for *ex parte* contact with a judge or for a judge to insert himself into an unrelated pending case – together constitute a gross abuse of the legal process insofar as Hartleib's primary purpose has been to insult, degrade, belittle, harass, annoy, denigrate and malign Plaintiffs, which is not the primary purpose for which the legal processes were intended or designed.

156.    Hartleib's various communications to Plaintiffs' colleagues, to judges and to clients is defamatory insofar as it maligns Plaintiffs by name to third parties, thereby injuring Plaintiffs' professional reputations and profitability.

157.    Hartleib has intentionally caused Weiser to suffer emotional distress as a result of Hartleib's outrageously cruel, indecent, inflammatory and/or false personal attacks upon Weiser's abilities, character, actions, relationships, legal ethics, beyond all possible bounds of decency. Hartleib's targeted and personal affronts and intentional deceits, fabrications, slurs and smears have directly resulted in Weiser suffering great distress, anxiety and upset, and the primary interests of the Law Firm suffering severe harm.

158.    As a *pro se* litigant, Hartleib has breached his duty of honesty to the bar and violated that duty when he negligently misrepresented material facts with respect to Plaintiffs, thereby causing injury to Plaintiffs.

159.    By initiating a lawsuit against Plaintiffs in Kansas which is motivated by malice and lacks probable cause – after unsuccessfully attempting to extort Plaintiffs under the guise of "pre-suit mediation" – Hartleib has also committed wrongful use of civil proceedings.

160.    Hartleib has intentionally interfered with the Law Firm's prospective contracts with clients and colleagues without privilege or justification, causing damage to Plaintiffs.

161.    Finally, Hartleib has interfered with the Law Firm's existing contracts with clients and colleagues without privilege or justification, causing damage to Plaintiffs.

**162.**    Hartleib's outrageous behavior cannot be permitted in a judicial system founded on the pillars of honesty, fairness and legitimacy.

## Count I – Vexatious Litigant Order

163.    Plaintiffs repeat and reassert each of the previous paragraphs as though the same were set forth herein.

164.    Pursuant to the all Writs Act, 28 U.S.C. § 1651(a), a district court may enter a pre-filing injunction "to preclude abusive, groundless and vexatious litigation." *Brow v. Farrelly,* 994 F.2d 1027, 1038, 28 V.I. 345 (3d Cir. 1993).

165.    However, "the District Court should not restrict a litigant from filing claims absent exigent circumstances, such as a litigant's continuous abuse of the judicial process by filing meritless and repetitive actions." *Id.*

166.    Moreover, "[i]f the circumstances warrant the imposition of an injunction, the District Court must give notice to the litigant to show cause why the proposed injunctive relief should not issue." *Id.*

167.    Finally, "the scope of the injunctive order must be narrowly tailored to fit the particular circumstances of the case before the District Court." *Id.*

168.    The United States Court of Appeals for the Third Circuit has established the designation of "vexatious litigant," permitting the trial court to enter a Vexatious Litigant Order so as to curtail the litigant's filings. *See Chipps v. U.S.D.C. for the M.D. of Pa.,* 882 F.2d 72, 73 (3d Cir. 1989); *see also Fessler v. Sauer,* 455 F. App'x 220, 224-25 (3d Cir. 2011).

169.    Furthermore, where a litigant's "abusive pattern" of "rampant misconduct" and abuse of the legal system affords him the opportunity to harass and/or malign his target(s), "a full award of attorney fees [i]s proper." *Drone Techs., Inc. v. Parrot S.A.,* No. 2:14-cv-00111-AJS, 2015 U.S. Dist. LEXIS 98829, at *8-*9, 2015 WL 4545291 (W.D. Pa. July 21, 2015) (citing *Monolithic Power Sys., Inc. v. O2 Micro Int'l, Ltd.,* 726 F.3d 1359, 1369 (Fed. Cir. 2013)); *see also* 42 Pa.C.S. § 2503 ("The following participants shall be entitled to a reasonable counsel fee as part of the taxable costs of the matter: . . . Any participant who is awarded counsel fees because the conduct of another party in commencing the matter or otherwise was arbitrary, vexatious or in bad faith.").

170.    Plaintiffs seek a Vexatious Litigant Order (A) enjoining Hartlieb from (1) filing any action against Weiser or the Law Firm, (2) making any filing or submission in any case, derivative suit, class action suit, qui tam suit or otherwise involving Weiser or the Law Firm, and (3) contacting any person, organization, law firm, jurist and agent or employee thereof with respect to Weiser or the Law Firm, without obtaining leave of this Court, and (B) awarding attorneys' fees and costs to Plaintiffs.

171.    Hartlieb's continued abuse of the judicial process justifies such a Vexatious Litigant Order.

172.    To wit, Hartlieb has:

      a.    Sought to simultaneously assist with and/or participate in the prosecution of claims against Sprint in the Sprint Securities Class Action and bring a derivative suit on behalf of and for the benefit of Sprint;

b. Improperly sought a share of the Law Firm's attorneys' fees from any Sprint derivative action in which he might be a plaintiff represented by the Law Firm and/or the Murphy Firm;

c. Offered to withdraw his objection to the Sprint Derivative Settlement in exchange for a "consulting agreement" with the Law Firm;

d. Contacted Ross-Williams by telephone on March 6, 2017, despite knowing she was represented by counsel, making her feel shocked, disturbed, harassed and threatened;

e. Contacted Ross-Williams, fifteen members of the bar and Judge Vano's administrative assistant by e-mail in the early hours of March 7, 2017 and falsely stated: "you are a unwitting victim of [the Law Firm's] fraud committed against the Court. As we discussed they have submitted millions of dollars in fraudulent billing in your case. As I informed you that this was not just my opinion, the Judge in your case came to a similar conclusion. In fact, your attorneys have now admitted to at least 1.6 million dollars in fraudulent bills submitted to the Court. Mr. Weiser has confirmed this in two separate letters. (See attached). I am no expert, but when a Firm admits criminal acts in a case I believe they are obligated to notify you as the Plaintiff. Mr. Weiser and his Firm have already contacted their Bar associations and other Courts to self-report their criminal acts. . . they are in a lot of trouble . . . I will provide incontrovertible proof that Mr. Weiser et. al. is just as guilty as Mr. Silow. This is just the tip of the iceberg." Ex. 14;

f.  Repeatedly announced his intent to ignore any protective order sought by the Plaintiffs, as in a March 7, 2017 e-mail to Weiser, fifteen members of the bar and Judge Vano's administrative assistant: "You Sir, and your coconspirators are the ones that need to Cease and Desist. Your so-called "client" is representing my interest and her attorneys are corrupt, therefore I will neither Cease nor Desist." Ex. 14;

g.  Insulted and defamed the Plaintiffs in multiple e-mail missives distributed to Weiser *as well as attorneys from other law firms involved in the Sprint Derivative Settlement and to the Court*, for example:

  i.  on March 6, 2017 ("Rob, I am a little confused!  . . . It seems your statements to the Appellate Court were disingenuous at best. Shocking! . . . I especially like the comment that you felt as though you had an ethical obligation to inform the Court, prior to briefing . . . Ethical obligation, what a Saint [sic] . . . Your attempts, [sic] to obfuscate your chicanery in this case is galvanizing my convictions, strengthening my resolve to expose all of the corrupt parties in this case!") see Ex. 12;

  ii.  on March 7, 2017 ("I caution you, that coercing your "client" to misstate facts regarding our call will only inflict additional damage to what little credibility you have left. . . Instead of wasting my time, I would suggest you consult with an ethics attorney, that's right, you already have!") see Ex. 14;

iii.  on April 12, 2017 ("'"What an embarrassment to the bar!  See you in Court.") <u>see</u> Ex. 16;

iv.  on April 7, 2018 ("Rob, your ability to set the bar at new lows, never disappoints!  Clearly, this is in retaliation to your being rightfully removed as co-lead counsel in the Equifax case. Your attempt to mislead the Appellate Court with incomplete records might be your standard operating procedure, but I believe it will cost you when I seek sanctions. . . Your ill-advised actions, and ad-hominem attacks are making the Weiser Firm radioactive!") <u>see</u> Ex. 15;

v.  on May 19, 2018 ("Plaintiff Counsel, and I use this term loosely, when making false allegations against a party I would suggest you at least get it right.  I am no expert, but I am pretty sure it would be libelous!  I will demonstrate its proper use posthaste!") <u>see</u> Ex. 18;

vi.  on June 2, 2018 ("I thought the Honorable James Vano would find the link to the National Law Journal Article of interest. . . like the fraud Weiser et.al. committed in the "Ross-Williams" case, it appears to be standard operating procedure for many firms to submit millions in fraudulent fee requests upon the Court. . . it appears Weiser et.al. has not been out done, as there is no mention of the unlicensed practice of law by a convicted felon using an alias. . . The actions of Weiser et.al. and the Firms in the State

Street case is the very definition of Racketeering, and warrants legislative reform.") <u>see</u> Ex. 19; and

vii.  on March 14, 2019 ("I thought that the Honorable Vano would be interested to know [about] an Amicus Brief filed in Minnesota, and transcript of the hearing before the Honorable Michael J. Davis. In addition, I have initiated legal action against Weiser and representative plaintiff Ross-Williams as outlined in the attached complaint.. . . Maybe Judge Vano would be interested in setting the record straight before the Court appoints lead Counsel in the aforementioned [Centurylink] case. Interestingly, I received an anonymous letter last night which details an elaborate scheme by Weiser et.al. to procure "Relators" in Qui Tam cases. It involves the use of several LLC shell corporations set up for the sole purpose of soliciting information under false pretenses to facilitate lawyer driven Qui Tam cases. This has resulted in the DOJ filing a motion to dismiss 11 active cases, filed by Weiser et.al. including ABBVIE. The level of sinister is [sic] truly unbelievable, some of which is outlined in the attached Motion to dismiss by the Feds!") <u>see</u> Ex. 28;

h.  Threatened to appear at hearings and to file briefs in the Law Firm's unrelated pending litigation across the country ("Rob, will you be at the *Witmer v Steven* [sic] hearing on the 27th? I will do my best to attend. I am very familiar with Judge Carney? [sic] We can discuss my concerns

with *L.C, A 10* and several other companies in which I am a shareholder. It appears we will be forced to deal with each other for the foreseeable future. . . If you have any questions, or wish to proffer an apology, you know how to reach me. That said, other action is eminent!") Ex. 20;

i.   Opposed the Law Firm's application for appointment as co-lead counsel the Equifax Derivative Litigation (alleging in a proposed self-styled *amicus curiae* brief that the Law Firm "lied, misl[ed] the court," "attempt[ed] to confuse the Court [sic]," "used an unfit plaintiff," engaged "in fraudulent billing," made "false statements," employed another attorney who "repeatedly perjured himself" and constituted "an utter embarrassment to the Plaintiff's Bar," operates a "criminal enterprise," "sees plaintiff's [sic] as a 'necessary nuisance,'" displayed "hubris and utter contempt for the Court," engaged in "contemptuous actions in the case" and "Self-Dealing, Unclean Hands and Shameful Violations of Public Trust," undertook a "zealous quest for reinstatement of four million dollars in unwarranted fees," "follow[ed] a different set of standards, one that sets the bar at new lows," made a "desperate attempt to unjustly enrich themselves," and "has committed criminal acts upon the Kansas Court and a multitude of others across the country. . . . <u>what is going on at the Weiser firm?  Either they are completely corrupt, or entirely inept</u>, whichever is the case they are not fit to act as lead on any representative suit.") Ex. 21 pp. 4-9 (emphasis in original);

j.   Initiated *ex parte* communication with Judge Watson in the Big Lots Derivative Litigation concerning the Law Firm's billing entries, and alleging past improprieties by the Law Firm (see Ex. 25 p. 11 fn.2);

k.   Submitted a self-styled *amicus curiae* brief in unsuccessful opposition to the Law Firm's appointment as lead counsel in the Centurylink Derivative Litigation – even though the Law Firm did not seek lead counsel status (alleging that the Law Firm utilizes "deceased parties, friends and family members which [sic] lacked standing, and paid serial criminal Plaintiffs," "generate[s] thousands of billable hours for illusory work, submit fraudulent time logs and seek hundreds of millions in unjust fees in cases across the country," operates a "criminal enterprise . . . Weiser et.al [sic] lied, misleading the court [sic] . . . Weiser et.al. [sic] committed perjury and admitted to billing fraud . . .  Mr. Jeffrey Mark Silow has worked for the Weiser [Firm] . . . for over 10 years, billing likely more than 100 million dollars in illicit fees, in a multitude of cases across the country.") See Ex. 26 pp. 2, 6-8;

l.   Appeared before the Court in unsuccessful opposition to the Law Firm's appointment as lead counsel in the Centurylink Derivative Litigation – even though the Law Firm did not seek lead counsel status, sought an *ex parte* meeting with the judge in chambers, and announced his intent to inject himself into the Law Firm's other pending cases ("you know, if I had 30 minutes with Your Honor in chambers, I could give Your Honor a lot more information . . . if the firms would like to give me a list of their

forthcoming cases in which they are seeking leave [to be lead counsel], I could be certain to notify everybody timely") Ex. 27 at 41:24-42:8 & 43:4-12;

m.  Commenced an unfounded and untimely lawsuit against Plaintiffs alleging malpractice in representing Hartleib in the Sprint Derivative Action, even though Hartleib was *never* a Law Firm client; and

n.  Disparaged the Law Firm's *qui tam* practice to Judge Vano by misrepresenting the Law Firm's role in relator cases that were subsequently voluntarily dismissed *after* the Law Firm withdrew and new counsel appeared (see Ex. 28); and

o.  Claimed to Judge Vano that he "contacted the district attorney's offices in Pennsylvania and Kansas and . . .[was] filing formal complaints [against the Law Firm and/or Weiser]." See id.

173.    Hartleib has admitted on multiple occasions that his actions were undertaken as part of a personal "quest" to attack, malign, damage and disparage Plaintiffs.  See Ex. 12 ("Your [fee petition] is galvanizing my convictions, strengthening my resolve . . . and provoking wrath. I will take this all the way to the Kansas Supreme Court if needed . . ."); Ex. 14 ("I find the prospects of discovery quite compelling.  Your threats do nothing but, [sic] strengthen my resolve and galvanize my convictions.  Call it a personality defect!"); Ex. 15 ("Your personal attacks smack of desperation, they do nothing to dissuade me, in fact they galvanize my convictions and strengthen my resolve!"); Ex. 18 ("when making false allegations against a party I would suggest you at least get it right . . . I will demonstrate its proper use posthaste!"); Ex. 27 ("it's unbelievable the attacks I took, so – but it does nothing to dissuade me.  It just galvanizes

my conviction and strengthens my resolve.") and Ex. 28 ("my quest to expose lawyer driven litigation and corruption rife throughout the Plaintiffs Bar [sic] continues . . . I have initiated litigation against Weiser . . .").

174.    Hartleib has created the exigent circumstances that now justify a Vexatious Litigant Order by continually abusing the legal process between 2016 and the present, in state and federal courts nationwide – from Pennsylvania to Minnesota and from Georgia to Kansas – in an effort to harm Plaintiffs' professional reputations, business prospects, financial condition, and likelihood of success in existing and ongoing litigations.

175.    Hartleib's inappropriate appearances and improper filings, unsolicited e-mail missives to members of the bar and bench, unseemly fee-sharing proposals and *ex parte* contact, and knowing efforts to manipulate legal processes to achieve his own ends (i.e. assisting and/or participating in the initiation and prosecution of the Sprint Securities Class Action against Sprint while simultaneously seeking to file a shareholder derivative suit on behalf of Sprint) demonstrate the unabashed and out-of-control nature of his campaign.

176.    Pursuant to the All Writs Act, 28 U.S.C. § 1651(a), a pre-filing injunction is necessary in order "to preclude [Hartleib's] abusive, groundless and vexatious litigation" against Plaintiffs. *Brow,* 994 F.2d at 1038.

WHEREFORE, Plaintiffs Robert Weiser and The Weiser Law Firm, P.C. demand entry of a Vexatious Litigant Order (A) enjoining Hartleib from (1) filing any action against Weiser or the Law Firm, (2) making any filing or submission in any case, derivative suit, class action suit, qui tam suit or otherwise involving Weiser or the Law Firm, and (3) contacting any person, organization, law firm, jurist and agent or employee thereof with respect to Weiser or the Law Firm, without obtaining leave of this Court, and (B) awarding attorneys' fees and costs to

{01094580;1}

Plaintiffs, and respectfully request that this Honorable Court grant them such other relief that the Court deems appropriate under the circumstances.

## Count II – Abuse of Process

177.    Plaintiffs repeat and reassert each of the previous paragraphs as though the same were set forth herein.

178.    The Restatement (Second) of Torts § 682 defines abuse of process as the use of a legal process, civil or criminal, against another primarily to accomplish a purpose for which the process is not designed.  *See McGee v. Feege,* 517 Pa. 247, 256, 535 A.2d 1020 (1987).

179.    To state a claim for abuse of process under Pennsylvania law, a plaintiff must allege that "the defendant (1) used a legal process against the plaintiff, (2) primarily to accomplish a purpose for which the process was not designed, and (3) harm has been caused to the plaintiff." *Hart v. O'Malley,* 436 Pa. Super. 151, 647 A.2d 542, 551 (Pa. Super. Ct. 1994) (quoting *Rosen v. American Bank of Rolla,* 426 Pa. Super. 376, 627 A.2d 190, 192 (Pa. Super. Ct. 1993)).

180.    "The word 'process' as used in the tort of abuse of process 'has been interpreted broadly, and encompasses the entire range of procedures incident to the litigation process.'" *Rosen v. American Bank,* 426 Pa. Super. 376, 381, 627 A.2d 190, Pa. Super. 1993)(citing and quoting *Nienstedt v. Wetzel,* 133 Ariz. 348, 352, 651 P.2d 876, 880 (1982)); *see also Young Law Group, P.C. v. Weisberg,* 50 Pa. D. & C.5th 461, 466 (Phila. Ct. Com. Pl. 2015).

181.    "The significance of the word 'primarily' is that there is no action for abuse of process when the process is used for the purpose for which it is intended, but there is an incidental motive of spite or an ulterior purpose of benefit to the defendant.

182.    Certain litigation tactics may constitute perversion of process, to wit: "the point of liability is reached when the utilization of the procedure for the purpose for which it was designed becomes so lacking in justification as to lose its legitimate function as a reasonably justifiable litigation procedure." *Gen. Refractories Co. v. Fireman's Fund Ins. Co.,* 337 F.3d 297, 308 (3d Cir. 2003).

183.    In this case, the following procedures incident to litigation have been used against Plaintiffs:

a.    Repeated unsuccessful appeals of the Protective Order issued in connection with the Sprint Derivative Settlement; see, e.g., Ex. 14;

b.    Threats to appear at hearings and to file briefs in the Law Firm's unrelated pending litigation across the country; see Ex. 20;

c.    Submission of *amicus curiae* brief in opposition to the Law Firm's application for appointment as co-lead counsel in the Equifax Derivative Litigation; see Ex. 21;

d.    Submission of *ex parte* e-mail communication with Judge Watson in the Big Lots Derivative Litigation in opposition to the settlement of that litigation and the Law Firm's billing entries; see Ex. 25 p. 11 fn.2;

e.    Submission of *amicus curiae* brief in unsuccessful opposition to the Law Firm's appointment as lead counsel in the Centurylink Derivative Litigation – even though the Law Firm did not seek lead counsel status; see Ex. 26 pp. 2, 6-8;

f.    Appearance at oral argument before the Court in unsuccessful opposition to the Law Firm's appointment as lead counsel in the Centurylink

Derivative Litigation – even though the Law Firm did not seek lead counsel status – where he sought an *ex parte* meeting with the judge in chambers and announced his intent to inject himself into the Law Firm's other pending cases; see Ex. 27 at 41:24-42:8; and

g.  Commencement of an unfounded and untimely lawsuit against Plaintiffs alleging malpractice – although Hartleib was never Plaintiffs' client – after an unsuccessful attempt to extort Plaintiffs under the guise of "pre-suit mediation." See Ex. 33.

184.    Malice has been Hartleib's primary motive in initiating each and every one of these processes.

185.    Hartleib did not use any of these tactics for their legitimate reasons – to represent his interests in litigation in which he has standing – but rather used them to harass, embarrass, extort, malign and denigrate Plaintiffs.

186.    Plaintiffs have been forced to expend enormous resources of time and money to respond to Hartleib's numerous oppressive communications, briefs, arguments and law suit.

WHEREFORE, Plaintiffs Robert Weiser and The Weiser Law Firm, P.C. demand judgment in their favor and against Michael Hartleib in an amount to be determined at trial for damages attributable to Hartleib's abuse of process, and respectfully request that this Honorable Court grant them such other relief that the Court deems appropriate under the circumstances.

## Count III -- Defamation

187.    Plaintiffs repeat and reassert each of the previous paragraphs as though the same were set forth herein.

188.   "A prima facie case for defamation requires the plaintiff to plead the following: (1) the defamatory character of the communication; (2) publication of the communication to a third party; (3) the communication refers to the plaintiff; (4) the third party's understanding of the communication's defamatory character; and (5) injury." *Brown v. Blaine*, 833 A.2d 1166, 1173 n. 14 (Pa. Commw. 2003)(citing 42 Pa. C.S.A. § 8343).

189.   "Pennsylvania, like many other jurisdictions, recognizes a judicial litigation privilege providing immunity for communications which are made in the regular course of judicial proceedings and are material to the relief sought." *Schanne v. Addis,* 121 A.3d 942, 947 (Pa. 2015).   The privilege covers statements made by parties, witnesses, attorneys, or judges. *Id.* "[T]he privilege is absolute, meaning that, where it attaches, the declarant's intent is immaterial even if the statement is false and made with malice." *Id.* at 947 (citing *Bochetto v. Gibson,* 580 Pa. 245, 860 A.2d 67, 71 (Pa. 2004)).   The judicial privilege is not limited to statements made in open court, but encompasses pleadings as well. *Grey v. Johansson,* No. 15-2479 2016 U.S. Dist. LEXIS 53931 *14-*15, 2016 WL 1613804 (E.D. Pa. April 22, 2016)(citing *Post v. Mendel,* 510 Pa. 213, 507 A.2d 351, 353 (Pa. 1986); *Stein v. City of Philadelphia,* 2013 U.S. Dist. LEXIS 172172, 2013 WL 6408384, at *6 (E.D. Pa. Dec. 5, 2013) ("Parties in litigation are given an absolute privilege with regard to statements that relate to a judicial proceeding if the communications are preliminary to, instituting, or part of the proceeding.")).

190.   "[I]t is well-settled law that a communication which ascribes to another conduct, character, or a condition that would adversely affect his fitness for the proper conduct of his business, trade, or profession, is defamatory per se.   Where there is any doubt that the communication disparages or harms the complainant in his business or profession, that doubt must be resolved in favor of the complainant; even where a plausible innocent interpretation of

the communication exists, if there is an alternative defamatory interpretation, it is for the jury to determine if the defamatory meaning was understood by the recipient." Pelagatti v. Cohen, 370 Pa. Super. 422, 438-39, 536 A.2d 1337 (Pa. Super. 1987)(internal citations omitted).

191.    Hartleib made several defamatory statements about Plaintiffs to members of the bench and the bar who were involved in the Sprint Derivative Settlement, to wit:

    a. On March 6, 2017, Hartleib wrote to eleven members of the bar at five different law firms, as well as Judge Vano's administrative assistant, that Weiser made "statements to the Appellate Court [which] were disingenuous at best. Shocking!" Ex. 12. Hartleib implied that Weiser did not honor any "ethical obligation," and accused Weiser of "attempt[ing] to obfuscate your chicanery in this case," and being one of "the corrupt parties in this case!" who was threatening "the integrity of the judicial system . . ." Id.

    b. Also on March 6, 2017, Hartleib contacted the Law Firm's client, Ross-Williams, the lead plaintiff in the Sprint Derivative Action. Ex. 13. Therein Hartleib told Ross-Williams that the Law Firm was a "criminal enterprise" and was not serving her interests as a Sprint shareholder.

    c. On March 7, 2017, Hartleib e-mailed Ross-Williams, fifteen members of the bar and Judge Vano's administrative assistant and falsely stated: "you are a unwitting victim of [the Law Firm's] fraud committed against the Court. As we discussed they have submitted millions of dollars in fraudulent billing in your case. As I informed you that this was not just my opinion, the Judge in your case came to a similar conclusion. In fact,

your attorneys have now admitted to at least 1.6 million dollars in fraudulent bills submitted to the Court. Mr. Weiser has confirmed this in two separate letters. (See attached).  I am no expert, but when a Firm admits criminal acts in a case I believe they are obligated to notify you as the Plaintiff. Mr. Weiser and his Firm have already contacted their Bar associations and other Courts to self-report their criminal acts. . . they are in a lot of trouble . . . I will provide incontrovertible proof that Mr. Weiser et. al. is just as guilty as Mr. Silow. This is just the tip of the iceberg." Ex. 14.

d.  In a second March 7, 2017 e-mail to fifteen members of the bar and Judge Vano's administrative assistant, Hartleib accused Weiser of making "self-serving misrepresentations" in correspondence, of "fail[ing] to provide" documents to his client; of committing "fraudulent acts and bastardization [sic] of the judicial system," of "coercing your 'client' to misstate facts," of having "little credibility," of making a "not so vailed [sic] threat" to reserve Ross-Williams' rights, and of needing to "consult with an ethics attorney, that's right you already have!" Ex. 14.

e.  After Hartleib tipped *The Wall Street Journal* about the Law Firm's victimization by Silow and Abelson, Hartleib e-mailed eleven members of the bar and Judge Vano's assistant regarding Weiser: "What an embarrassment to the bar!  See you in Court." Ex. 16.

f.  In an April 7, 2018 e-mail to Weiser and eight other members of the bar, Hartleib accused Weiser of "attempt[ing] to mislead the Appellate Court

with incomplete records," of making "personal attacks [that] smack of desperation," and of making "ill-advised actions, [sic] and ad-hominem attacks [which] are making the Weiser Firm radioactive!" Ex. 15.

g.  On May 19, 2018, Hartleib admitted in writing in an e-mail to numerous attorneys that he intended to make false allegations against the Law Firm, stating: "Plaintiff Counsel, and I use this term loosely, when making false allegations against a party I would suggest you at least get it right. I am no expert, but I am pretty sure it would be libelous! I will demonstrate its proper use posthaste!" Ex. 18.

h.  On June 2, 2018, Hartleib sent an e-mail to a host of members of the bar in which he referred to the Law Firm's work in the Sprint Derivative Action as "fraud" and "the very definition of [r]acketeering." Ex. 19.  Hartleib implied that the Law Firm's "standard operating procedure" is "to submit millions in fraudulent fee requests upon the Court" which "prevents a troubling pattern of fraud and corruption in these lawyer-driven cases." Id.

i.  Finally, in a March 14, 2019 e-mail to Judge Vano's chambers, Hartleib asked Judge Vano to interject himself into the Centurylink Derivative Action in opposition to the Law Firm's role in the support structure of proposed (and ultimately approved) lead counsel Bragar, Eagle & Squire, P.C. ("Maybe Judge Vano would be interested in setting the record straight before the Court appoints lead counsel in the aforementioned case."); and accused the Law Firm and Weiser of "sinister" behavior in an

"elaborate scheme" involving "the use of LLC shell corporations set up for the sole purpose of soliciting information under false pretenses to facilitate lawyer driven Qui Tam cases." Ex. 28.

192.    Hartleib also made defamatory statements about Plaintiffs to members of the bench and bar outside of the Sprint Derivative Settlement context, for example:

    a.   On April 25, 2017, Hartleib mailed a letter to sitting members of the Court of Common Pleas of Chester County, Pennsylvania – where the Law Firm is located – about Weiser and the Law Firm, stating that Judge Vano "caught the firm in the act" of falsifying their billings in the Sprint Derivative Settlement, and implying that Weiser was a profane bully and incompetent lawyer and firm manager.  Ex. 17.

    b.   On August 24, 2018, Hartleib e-mailed Judge Watson in the Big Lots Derivative Action, even though he was not "a shareholder in Big lots or otherwise an interested party in this case" raising "concerns over Weiser's billing practices in [a] prior case and stat[ing] that he wanted to inform the Court so it would scrutinize the fee request in this case."  Ex. 25 p. 11 fn.2.

    c.   Similarly, in the Centurylink Derivative Litigation, Hartleib submitted an *amicus curiae* brief on March 5, 2019 opposing the Law Firm's role in the case, purportedly to "inform the Court of ongoing troubling actions by the Weiser [Firm] . . ." Ex. 26.  Hartleib specifically alleged that the Law firm utilized "deceased parties, friends and family members which [sic] lacked standing, and paid serial criminal Plaintiffs," and "generate thousands of

billable hours for illusory work, submit fraudulent time logs and seek hundreds of millions in unjust fees in cases across the country." Id. According to Hartleib, the Law Firm "would stop at nothing to protect their criminal enterprise . . . Weiser et.al [sic] lied, misleading the court [sic] . . . Weiser et.al. [sic] committed perjury and admitted to billing fraud . . . likely more than 100 million dollars in illicit fees, in a multitude of cases across the country." Id.

d. Hartleib appeared at a hearing in the Centurylink Derivative Action on March 6, 2019, stating to the Court and everyone present in the courtroom: "I lay things out that shows [sic] a pattern, a course of conduct over many years . . . I see no meaningful relief or nearly illusory relief and a tremendous amount in attorneys fees . . . And, Your Honor, I know for a fact that the Weiser firm knew who Mr, Silow was and that will come out, you know, during the course of litigation . . . These firms, when these firms are up to no good, when they are billing illusory house – you know, if I had 30 minutes with Your Honor in chambers, I could give Your Honor a lot more information . . . The allegations that I make against these firms are very serious allegations." Ex. 27.

193.   Upon information and belief, in each of the thirteen instances detailed hereinabove in which Hartleib made a defamatory statement to multiple third parties about Plaintiffs, the third parties hearing or reading the statement(s) understood the nature of those statements as disparaging Plaintiffs with respect to the practice of law.  Therefore, they constitute defamation *per se.*

194.    None of these defamatory statements could be excused by judicial privilege, as none were relevant to the "relief sought" by Hartlieb as a Sprint shareholder in the derivative case brought on behalf of Sprint.

195.    The effect of Hartlieb's defamatory statements to third parties has been to injure Plaintiffs' business and professional reputations.

196.    Defendants have been compelled to defend and repair their professional reputations against Hartlieb's baseless allegations.

WHEREFORE, Plaintiffs Robert Weiser and The Weiser Law Firm, P.C. demand judgment in their favor and against Michael Hartlieb in an amount to be determined at trial for damages due to defamation, and respectfully request that this Honorable Court grant them such other relief that the Court deems appropriate under the circumstances.

## Count IV – Intentional Infliction of Emotional Distress

197.    Plaintiffs repeat and reassert each of the previous paragraphs as though the same were set forth herein.

198.    "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Hoy v. Angelone,* 554 Pa. 134, 150-151, 720 A.2d 745 (Pa. 1998)(citing and quoting Restatement (Second) of Torts § 46(1) (1965)).

199.    To establish a claim for intentional infliction of emotional distress, a plaintiff must show that the defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Hoy,* 720 A.2d at 754 (internal citations omitted).

200.    Hartleib's insults, jeers, slurs, taunts, lies, affronts and abuses aimed at Weiser and at the Law Firm that he founded and operates with his spouse, and broadcast to judges and colleagues and to the legal community at large via publicly-available pleadings and to the international population via *The Wall Street Journal*'s article are indecent, dishonest, outrageous, malicious, atrocious and should not be tolerated by this Honorable Court.

201.    Hartleib's conduct as described hereinabove has intentionally caused Weiser to suffer enormous stress, anxiety, sleep deprivation, depression, anger and torment.

WHEREFORE, Plaintiff Robert Weiser demands judgment in his favor and against Michael Hartleib in an amount to be determined at trial for damages from intentional infliction of emotional distress, and respectfully request that this Honorable Court grant them such other relief that the Court deems appropriate under the circumstances.

**Count V – Negligent Misrepresentation**

202.    Plaintiffs repeat and reassert each of the previous paragraphs as though the same were set forth herein.

203.    Negligent misrepresentation requires proof of (1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and; (4) which results in injury. *Bucci v. Wachovia Bank*, N.A., 591 F. Supp. 2d 773, 784 (E.D. Pa. 2008)(citing *Bortz v. Noon*, 556 Pa. 489, 729 A.2d 555, 560 (Pa. 1999)).

204.    In order to make out a negligent misrepresentation claim, "there must be an existence of a duty owed by one party to another." *Bortz*, 729 A.2d at 560.

205.    The United States Court of Appeals for the Third Circuit has "recognize[d] that under our legal system counsel owe a duty to each other and to the court to be candid in their

pleadings and in discovery and not to lay a trap for the unwary by artful pleading or half-truths . .

." *Dudley v. South Jersey Metal, Inc.,* 555 F.2d 96 (3d Cir. 1977); *see also In re Third Circuit*

*Task Force on the Selection of Class Counsel,* 2002 U.S. App. LEXIS 30242, at *37, 208 F.R.D.

340 (3d Cir. Jan 15, 2002)(noting that "lawyers owe duties to third persons who are not clients,

to courts and other tribunals, and to the legal system and the law generally . . .").

206.    *Pro se* litigants are subject to the same duty to the legal system.

> Although the court may take a party's *pro se* status into account in evaluating his conduct, <u>Vukadinovich v. McCarthy,</u> 901 F.2d 1439, 1444 (7th Cir. 1990), his status as a non-lawyer does not confer a license recklessly to disregard the law. <u>Farguson v. MBank Houston, N.A.,</u> 808 F.2d 358, 359 (5th Cir.1986)("one acting pro se has no license to harass others, clog the judicial machinery with meritless litigation, and abuse already overloaded court dockets").

*Tomey v. Dizinno (In re Dizinno),* 559 B.R. 400, 414-415 (M.D. Pa. Bankr. 2016).

207.    "Before filing a pleading, a *pro se* litigant must have objective knowledge or belief that the motion or claim is well grounded in law and fact." *Id.*

208.    Hartleib negligently misrepresented to Ross-Williams that the Law Firm was a "criminal enterprise," in order to create shock, alarm and distress among the Law Firm's client base and to undermine the Law Firm's relationship with Ross-Williams. <u>See</u> Ex. 13.

209.    The Law Firm is not a criminal enterprise, it is a Pennsylvania corporation in good standing, and Hartlieb is aware of that fact.

210.    In contemplating Hartlieb's accusations against the Law Firm, Ross-Williams suffered distress, and the Law Firm suffered from the resulting corrosion of its client relationship with Ross-Williams.

211.    The Law Firm suffered money damages when it was forced by Hartlieb's negligent misrepresentation to Ross-Williams to advocate for the Protective Order, and later to

submit briefs and appear at oral arguments in order to defeat Hartleib's multiple attempts to vacate the Protective Order on appeal.

212.    Hartleib negligently misrepresented to the Court in his *amicus curiae* brief in the Equifax Derivative Litigation that in unrelated prior litigations the Law Firm "lied, misl[ed] the court," "attempt[ed] to confuse the Court [sic]," "used an unfit plaintiff," engaged "in fraudulent billing," made "false statements," employed another attorney who "repeatedly perjured himself" and was "an utter embarrassment to the Plaintiff's Bar," operates a "criminal enterprise," "sees plaintiffs [sic] as a 'necessary nuisance,'" displayed "hubris and utter contempt for the Court," engaged in "contemptuous actions in the case" as well as "Self-Dealing, Unclean Hands and Shameful Violations of Public Trust," undertook a "zealous quest for reinstatement of four million dollars in unwarranted fees," "follows a different set of standards, one that sets the bar at new lows," sought "to unjustly enrich themselves," "has committed criminal acts upon the Kansas Court and a multitude of others across the country," is "completely corrupt, or entirely inept," and "not fit to act as lead on any representative suit." Ex. 21.

213.    Hartleib is or should be aware that the Law Firm never lied to, purposefully misled or attempted to confuse any court in any matter; none of the Law Firm's attorneys have made false statements or perjured themselves; the Law Firm does not engage in any criminal acts, corruption or violations of trust; the Law Firm does not engage in fraudulent billing or seek unwarranted fees; and the Law Firm is fully fit to serve as lead counsel in derivative actions.

214.    Hartleib made these misrepresentations in his *amicus curiae* brief with the intent that the Court in the Equifax Derivative Action rely upon them in reaching its decision on competing motions for appointment of lead counsel.

215.    The Court in the Equifax Derivative Action declined to appoint the Law Firm as lead counsel.

216.    The Law Firm suffered money damages in the form of lost attorneys' fees as a result.

217.    Hartleib negligently misrepresented to the Court in the Big Lots Derivative Litigation that the Law Firm engaged in questionable billing practices in prior litigations, and that the Law Firm's fees submitted in the Big Lots Derivative Litigation therefore required re-examination. Ex. 25 p. 11 fn.2.

218.    Hartleib knew or should have known that these representations were false, and intended for the Court in the Big Lots Derivative Action to rely upon them.

219.    The Court relied upon Hartleib's allegations "out of an abundance of caution," forcing the Law Firm to expend resources to address Hartleib's *ex parte* communication to the Court and defend itself against his misrepresentations; thereby, the Law Firm suffered damages.

220.    Hartleib, as a *pro se* litigant and/or self-styled *amici*, has a duty to ensure that every motion filed and/or claim made is grounded in truthful fact,

221.    Hartleib breached that duty by making multiple negligent misrepresentations of fact to third parties regarding the Law Firm's practices and capabilities, including but not limited to the misrepresentations detailed hereinabove.

222.    Hartleib's breach resulted in damages.

WHEREFORE, Plaintiff The Weiser Law Firm, P.C. demands judgment in its favor and against Michael Hartleib in an amount to be determined at trial for damages caused by Hartleib's negligent misrepresentation, and respectfully request that this Honorable Court grant them such other relief that the Court deems appropriate under the circumstances.

{01094580;1}

### Count VI – Intentional Interference with Prospective Contractual Relations

223.   Plaintiffs repeat and reassert each of the previous paragraphs as though the same were set forth herein.

224.   "Pennsylvania . . . appl[ies] its 'intentional interference with contractual relations' tort to prospective contracts." *ClubCom, Inc. v. Captive Media, Inc.,* No. 02:07-cv-1462, 2009 U.S. Dist. LEXIS 7960, at *19, 2009 WL 249446 (W.D. Pa. Jan. 31, 2009).

225.   To plead a claim for intentional interference with prospective contractual relations, a plaintiff must plead: (a) a prospective contractual relation; (b) the purpose or intent to harm the plaintiff by preventing the relation from occurring; (c) the absence of privilege or justification on the part of the defendant; and (d) the occasioning of actual damage resulting from the defendant's conduct. *See Ruffing v. 84 Lumber Co.,* 410 Pa. Super. 459, 600 A.2d 545 (Pa. Super. Ct. 1991).

226.   "Defining a 'prospective contractual relation' is admittedly problematic.  To a certain extent, the term has an evasive quality, eluding precise definition.  It is something less than a contractual right, something more than a mere hope." Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 209, 412 A.2d 466 (1979).

227.   "Nevertheless, a working definition of the term is provided by Glenn v. Point Park College, [441 Pa. 474, 480-81, 272 A.2d 895, 898-99 (1971),] wherein it was stated that 'anything that is prospective in nature is necessarily uncertain.  We are not here dealing with certainties, but with reasonable likelihood or probability.  This must be something more than a mere hope or the innate optimism of the salesman.'" Id.

228.   In this case, Plaintiffs enjoy the valid ongoing expectation and reasonable likelihood of contractual relations with fellow members of the plaintiffs' bar in the securities and derivative litigation arena.

229.   When law firms compete for lead counsel status, they must propose a viable litigation support structure to the court – one which often involves partnerships with additional law firms; the Court considers the capabilities, reputation, track record and repute of any partnering law firm within that structure when making the lead counsel determination.

230.   The Law Firm, like many in its field of expertise, is a small firm with eight attorneys; in order to survive in the competitive securities and derivative litigation arena, the Law Firm *must* be an attractive candidate for partnerships with other law firms.

231.   To wit, the Law Firm partners with other law firms in the vast majority of the cases in which it is involved.

232.   These partnerships are more than "mere hope," they are reasonably likely and probable, particularly in light of the small number of law firms involved in securities and derivative litigation and the Law Firm's past history of involvement in securities and derivative litigations in partnership with other law firms.

233.   Hartleib is aware of the essential nature of these partnerships to the Law Firm, as exemplified by his twofold attack on the Law Firm and its frequent partner law firm, Robbins Arroyo, in the Centurylink Derivative Litigation. See Ex. 26 & 27 (Of course, in the Centurylink Derivative Litigation Hartleib was mistaken, as the Law Firm and the Robbins Arroyo firm were neither partners nor competitors for appointment as lead counsel).

234.   Hartleib has announced that his purpose and intent is the furtherance of his personal "quest" to attack, malign, damage and disparage Weiser and the Law Firm. See Ex. 12

{01094580;1}

("Your [fee petition] is galvanizing my convictions, strengthening my resolve . . . and provoking wrath.  I will take this all the way to the Kansas Supreme Court if needed . . ."); Ex. 14 ("I find the prospects of discovery quite compelling.  Your threats do nothing but, [sic] strengthen my resolve and galvanize my convictions.  Call it a personality defect!"); Ex. 15 ("Your personal attacks smack of desperation, they do nothing to dissuade me, in fact they galvanize my convictions and strengthen my resolve!"); Ex. 18 ("when making false allegations against a party I would suggest you at least get it right . . . I will demonstrate its proper use posthaste!"); Ex. 27 ("it's unbelievable the attacks I took, so – but it does nothing to dissuade me.  It just galvanizes my conviction and strengthens my resolve.") and Ex. 28 ("my quest to expose lawyer driven litigation and corruption rife throughout the Plaintiffs Bar [sic] continues . . . I have initiated litigation against Weiser . . .").

235.    Hartleib is not privileged or justified in his interference with the Law Firm's partnerships with other law firms for the purpose of prosecuting securities derivative lawsuits.

236.    The Restatement (Second) of Torts defines "actual damages" for interference with a contract as follows, at § 774A(1):

> One who is liable to another for interference with a contract or prospective contractual relation is liable for damages for
> (a) the pecuniary loss of the benefits of the contract or the prospective relation;
> (b) consequential losses for which the interference is a legal cause; and
> (c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference…. Pelagatti v. Cohen, 536 A.2d 1337, 1343-1344, 370 Pa. Super. 422, 436 (1987).

237.    As the direct result of Hartleib's acts, the Law Firm has suffered harm to its reputation and been denied lead counsel status, has been forced to withdraw fee petitions, has lost partnerships and has suffered resulting money damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs Robert Weiser and The Weiser Law Firm, P.C. demand judgment in their favor and against Michael Hartleib in an amount to be determined at trial for damages caused by Hartleib's intentional interference with prospective contractual relations, and respectfully request that this Honorable Court grant them such other relief that the Court deems appropriate under the circumstances.

## Count VII – Tortious Interference with Contract

238.     Plaintiffs repeat and reassert each of the previous paragraphs as though the same were set forth herein.

239.     The elements of tortious interference with contract are: (1) the existence of a contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct. Strickland v. University of Scranton, 700 A.2d 979, 985 (Pa. Super. 1997).

240.     In this case, the Law Firm had a contractual relationship with Ross-Williams in the Sprint Derivative Action.

241.     Hartleib purposefully called Ross-Williams on March 6, 2017 in order to insult, malign, undermine and deride the Law Firm to its client. See Ex. 13.

242.     Hartleib purposefully e-mailed Ross-Williams, Judge Vano's chambers, and every lawyer involved in the Sprint Derivative Settlement and intentionally sought to undermine the Law Firm's reputation with respect to its ability to represent clients effectively and ethically. See Ex. 14 ("Dear Ms. Williams, it was a pleasure speaking with you this evening. I am sorry that your Counsel has not kept you apprised of the details of your case. I find it unconscionable

that your attorneys failed to inform you of Judge Vano's rulings or that an Appeal was filed on your behalf. I do believe that you are a unwitting victim of their fraud committed against the Court. As we discussed they have submitted millions of dollars in fraudulent billing in your case. As I informed you that this was not just my opinion, the Judge in your case came to a similar conclusion. In fact, your attorneys have now admitted to at least 1.6 million dollars in fraudulent bills submitted to the Court. Mr. Weiser has confirmed this in two separate letters. (See attached).  I am no expert, but when a Firm admits criminal acts in a case I believe they are obligated to notify you as the Plaintiff. Mr. Weiser and his Firm have already contacted their Bar associations and other Courts to self-report their criminal acts. I have contacted the district attorney's offices in Pennsylvania and Kansas and will be filing formal complaints. I am sorry to be the person to inform you of this, as it was your attorneys responsibility to do so. I am seeking a full evidentiary hearing where your Counsel will be forced to testify under oath and you can address the Court. As you can see by the letters from Mr. Weiser they are in a lot of trouble, but claim they are victims of Mr. Silow. I will provide incontrovertible proof that Mr. Weiser et. al. is just as guilty as Mr. Silow. This is just the tip of the iceberg. Details of our call will be submitted to the Kansas Court of Appeals in a sworn declaration and provided to Judge Vano. As per your request I copied all of the attorneys in your case as well as Judge Vano's Clerk. Thank you for taking the time to speak with me this evening.").

243.    The Restatement (Second) of Torts defines "actual damages" for interference with a contract as follows, at § 774A(1):

> One who is liable to another for interference with a contract or prospective contractual relation is liable for damages for
>     (a) the pecuniary loss of the benefits of the contract or the prospective relation;
>     (b) consequential losses for which the interference is a legal cause; and

(c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference…. <u>Pelagatti v. Cohen</u>, 536 A.2d 1337, 1343-1344, 370 Pa. Super. 422, 436 (1987).

244.    Hartleib's acts affected not only the Law Firm's relationship with Ross-Williams, but also the likelihood that law firms and parties would recommend the Law Firm to future potential plaintiffs.

245.    As a reasonable result of Hartleib's interference, the Law Firm suffered harm to its reputation.

WHEREFORE, Plaintiffs Robert Weiser and The Weiser Law Firm, P.C. demand judgment in their favor and against Michael Hartleib in an amount to be determined at trial for damages caused by Hartleib's tortious interference with contract, and respectfully request that this Honorable Court grant them such other relief that the Court deems appropriate under the circumstances.

Respectfully submitted,

**SILVERANG, ROSENZWEIG & HALTZMAN, LLC**

By:

Philip S. Rosenzweig, Esquire
Attorney Identification No. 62461
prsoenzweig@sanddlwayers.com
595 East Lancaster Avenue, Suite 203
St. Davids, PA  19087
(610) 263-0115
*Attorneys for Plaintiffs*
*The Weiser Law Firm, P.C. and*
*Robert B. Weiser, Esquire*

{01094580;1}

# EXHIBIT 1

**Robert Weiser**

| | |
|---|---|
| **From:** | bgm@brucemurphy.biz |
| **Sent:** | Tuesday, November 25, 2008 5:59 PM |
| **To:** | Robert Weiser |
| **Subject:** | Fw: Sprint Nextel |

Rob,

In February Sprint confirmed a staggering $29.7 billion writedown in the book value of its assets, wiping out nearly all of the value of its $35 billion merger with Nextel. And dividend payments were suspended "for the foreseeable future." To top it off, Sprint announced it has borrowed $2.5 billion from its revolving credit facility to help pay off $2.25 billion in bonds that will mature in 2008 and 2009.

Do you see a der here?

Bruce

--- On **Tue, 11/25/08, Michael Hartleib <_michaelhartleib@cox.net_>** wrote:

From: Michael Hartleib <michaelhartleib@cox.net>
Subject: Sprint Nextel
To: bgm@brucemurphy.biz
Date: Tuesday, November 25, 2008, 4:57 PM

Bruce,

I own over 10,000 shares of Sprint and held Nextel before the merger. I believe I have owned the shares since 1999 or 2000 .This was the worst merger integration in history as management eventually had to write down $31billion of a $32billion deal.  They failed to properly merge and integrate the two different technologies of their networks, one being CDMA for Sprint, the other being TDMA for Nextel. Their attempts to do so have destroyed two perfectly good companies and driven Sprint shareprice down from $30 to $1.50.

1

# EXHIBIT 2

**Robert Weiser**

| | |
|---|---|
| **From:** | Robert Weiser |
| **Sent:** | Friday, March 27, 2009 7:21 AM |
| **To:** | Bruce Murphy |
| **Subject:** | Re: RE: Derivative_Retention Letter  S  MHartleib |

I think he has a potential conflict in light of the other litigation he's involved in. Thus, I don't think he would make an adequate representative for sprint.

Rob

Sent from my Verizon Wireless BlackBerry

**From**: "bgm@brucemurphy.biz"
**Date**: Fri, 27 Mar 2009 04:33:59 -0400
**To**: Michael Hartleib<michaelhartleib@cox.net>
**Subject**: RE: RE: Derivative_Retention Letter S MHartleib
Michael,
I am working on something else right now. I will try to get back with you tomorrow, or over the weekend.
Bruce

--- On **Thu, 3/26/09, Michael Hartleib <michaelhartleib@cox.net>** wrote:
From: Michael Hartleib <michaelhartleib@cox.net>
Subject: RE: RE: Derivative_Retention Letter S MHartleib
To: bgm@brucemurphy.biz
Date: Thursday, March 26, 2009, 10:29 PM

call me 949-283-2441

**From:** bgm@brucemurphy.biz [mailto:bgm@brucemurphy.biz]
**Sent:** Monday, March 23, 2009 8:59 AM
**To:** Michael Hartleib
**Cc:** rob weiser
**Subject:** Fw: RE: Derivative_Retention Letter S MHartleib

Michael,
Can you get this back to me this am, your time?
Bruce

--- On **Sun, 3/22/09, bgm@brucemurphy.biz <bgm@brucemurphy.biz>** wrote:
From: bgm@brucemurphy.biz <bgm@brucemurphy.biz>
Subject: RE: Derivative_Retention Letter S MHartleib
To: "Michael Hartleib" <michaelhartleib@cox.net>
Cc: "rob weiser" <rw@weiserlawfirm.com>
Date: Sunday, March 22, 2009, 9:53 PM

Michael,

I sent your revised retention letter to my co-counsel, Rob Weiser, for his review and comment. We are fine with your changes. We mostly just amplified and clarified the points you made. Yes, we do work 24/7.

Please review, sign and fax to 772-231-4804.

Thanks.

Bruce

--- On **Fri, 3/20/09, Michael Hartleib <_michaelhartleib@cox.net_>** wrote:

From: Michael Hartleib <michaelhartleib@cox.net>
Subject: Derivative_Retention Letter S MHartleib
To: bgm@brucemurphy.biz
Date: Friday, March 20, 2009, 11:50 PM

Bruce, I am faxing the signed copy over now

# EXHIBIT 3

**Robert Weiser**

| | |
|---|---|
| **From:** | bgm@brucemurphy.biz |
| **Sent:** | Friday, March 27, 2009 9:55 AM |
| **To:** | Michael Hartleib |
| **Cc:** | Robert Weiser |
| **Subject:** | Sprint.der |

Good morning, Michael:
Rob Weiser and I have conferred and thought about the motion to appoint the Sprint Derivative Action
Representative. We believe you may have a potential conflict in light of the other litigation in which you
are involved. Defense counsel can be expected to object to you serving as the Representative on the grounds of
adequacy.
Therefore, we will not be able to file the Sprint derivative suit in your name.
We appreciate the opportunity you gave us to look into this matter for you.
Bruce

**From:** "bgm@brucemurphy.biz"
**Date:** Fri, 27 Mar 2009 04:33:59 -0400
**To:** Michael Hartleib <michaelhartleib@cox.net>
**Subject:** RE: RE: Derivative_Retention Letter S MHartleib
Michael,
I am working on something else right now. I will try to get back with you tomorrow, or over the weekend.
Bruce

--- On **Thu, 3/26/09, Michael Hartleib** <michaelhartleib@cox.net> wrote:
From: Michael Hartleib <michaelhartleib@cox.net>
Subject: RE: RE: Derivative_Retention Letter S MHartleib
To: bgm@brucemurphy.biz
Date: Thursday, March 26, 2009, 10:29 PM

call me                    **REDACTED**

**From:** bgm@brucemurphy.biz [mailto:bgm@brucemurphy.biz]
**Sent:** Monday, March 23, 2009 8:59 AM
**To:** Michael Hartleib
**Cc:** rob weiser
**Subject:** Fw: RE: Derivative_Retention Letter S MHartleib

Michael,
Can you get this back to me this am, your time?
Bruce

--- On **Sun, 3/22/09, bgm@brucemurphy.biz** <bgm@brucemurphy.biz> wrote:
From: bgm@brucemurphy.biz <bgm@brucemurphy.biz>
Subject: RE: Derivative_Retention Letter S MHartleib
To: "Michael Hartleib" <michaelhartleib@cox.net>
Cc: "rob weiser" <rw@weiserlawfirm.com>

# EXHIBIT 4

866 313-5100

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

SIRIUS XM SATELLITE RADIO INC. ,and  )  Case No.: 650606/11
BRIAN DAVID GOE, MICHAEL  )
HARTLEIB, and JACK SORGE, DOES 1  )
THROUGH 47 INCLUSIVE as individuals,  )  **DERIVATIVE AND DIRECT**
           Plaintiff,  )  **COMPLAINT :**
     vs.  )
JOAN L. AMBLE, LEON BLACK,  )
LAWRENCE F. GILBERTI, EDDY W.  )
HARTENSTEIN, JAMES P. HOLDEN,  )
CHESTER A. HUBER, MEL KARMAZIN,  )
JOHN MENDEL, JAMES F. MOONEY,  )
GARY M. PARSONS, JOHN C. MALONE,  )
JACK SHAW, GREGORY B. MAFFEI,  )
DAVID FLOWERS and JEFFREY D.  )
ZIENTS,  )
  )
        Defendant  )
  )
  )

NEW YORK
COUNTY CLERKS OFFICE

MAR - 8 2011

NOT COMPARED
WITH COPY FILE

## COMPLAINT

Plaintiffs Brian David Goe, Michael Hartleib, and John (JACK) Sorge (herein after referred to as Plaintiffs) Pro Per, submit this Complaint against the defendants named herein.

### I. SUMMARY OF THE ACTION

1.    This is a shareholder action brought by multiple plaintiffs, directly and derivatively, on behalf of Sirius XM Satellite Radio, Inc. ("Sirius XM") against Sirius XM's directors and officers, for their negligence, fraud, breach of fiduciary duties, and self dealing. The mismanagement of Sirius XM has manifested itself in numerous ways.  In 2008, the misconduct of the management resulted in the second largest fine in the history of the Federal Communications Commission ("FCC"), in a consent decree that the FCC approved.  In the same year, the Defendants completed the longest-delayed merger in history, only to learn at the

1

"eleventh" hour that Sirius XM was assuming far more debt that had been previously disclosed. In order to obtain approval of the merger, Defendants made representations to the Department of Justice and to the FCC and entered into a consent decree with the FCC. Since the time of the merger, the Defendants have engaged in antitrust misconduct, which has resulted in the actions in the United States District Court for the Southern District of New York, 1:09-cv-10035-HB-RLE. The antitrust misconduct resulted at least in part from the Defendants violations of the representations made to the Department of Justice and the FCC and the consent decree with the FCC. In addition, the Defendants have engaged in consumer fraud and misconduct to the extent that nearly every Attorney General in the country is now engaged in an investigation of Sirius XM. This pattern of misconduct that threatens the on-going existence of Sirius XM has resulted from the fact that the Officers and Board of Directors has abdicated their responsibilities. An example of this abdication is that Defendant Leon Black continues to serve on the Board despite the fact that he did not receive sufficient shareholder votes to serve on the Board and the fact that he refuses to attend meetings of the Board.

## II. PARTIES

2.     Plaintiff Brian David Goe is an individual and resident of New Jersey, and was an owner of Sirius and/or XM securities and is now a current owner of Sirius XM securities.

3.     Plaintiff Michael Hartleib is an individual and a resident of California, and was an owner of Sirius and/or XM securities and is now a current owner of Sirius XM securities.

4.     Plaintiff John Sorge is an individual and a resident of California, and was an owner of Sirius and/or XM securities and is now a current owner of Sirius XM Securities.

5.     All collectively referred to as Plaintiffs.

6.      Defendant Sirius XM is a Delaware corporation with its principal place of business at 1221 Avenue of the Americas, 36th Floor, New York, New York. Its successor entity resulting from the merger of Sirius and XM.

7.      Defendant Joan L. Amble ("Amble") is currently a member of the board of directors.

8.      Defendant Leon D. Black ("Black") is a currently a member of the board of directors.

9.      Defendant Lawrence F. Gilberti ("Gilberti") is currently a member of the board of directors.

10.      Defendant Eddy W. Hartenstein ("Hartenstein") is currently a member of   the board of directors.

11.      Defendant James P. Holden ("Holden") is currently a member of the board of directors.

12.      Defendant Chester A. Huber, Jr. ("Huber") is currently a member of the board of directors.

13.      Defendant Mel Karmazin ("Karmazin") is the Chief Executive Officer.

14.      Defendant John Mendel ("Mendel") is currently a member of the board of directors.

15.      Defendant James F. Mooney ("Mooney") is currently a member of the board of directors.

16.      Defendant Gary M. Parsons ("Parsons") is currently Chairmen of the board of directors.

17.      Defendant Jack Shaw ("Shaw") is currently a member of the board of directors.

18.     Defendant John C. Malone ("Malone") is currently a member of the board of directors.

19.     Defendant Gregory B. Maffei ("Maffei") is currently a member of the board of directors.

20.     Defendant David J.A. Flowers ("Flowers") is currently a member of the board of directors.

21.     All collectively referred to as Defendants.

### III. JURISDICTION AND VENUE

22.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this State, or is an individual who has sufficient minimum contacts with  so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

23.     Venue is proper in this Court because one of more of the defendants conducts business, a substantial portion of the transactions and wrongs complained of herein, including the defendants primary participation in the wrongful acts detailed herein, breaches of fiduciary duties, and defendants have received substantial compensation in this State by doing business here and engaging in numerous activities that had an effect in this State.

### IV. DEMANDS AND FUTILITY

24.   Shareholders have made numerous demands on the Board of Directors, and those demands have steadfastly been denied.  It would be futile to make any further demands on the Board.

25. The demands that have been made on the current and past Board members include the following:

a. Starting on November 5, 2008, and continuing as recently as September 22, 2010, plaintiff Michael Hartleib made demands that relate to much of the misconduct alleged in this Complaint.

b. To the extent that the Defendants have responded, they have refused to take any substantive action in response to the demands.

c. Plaintiff Hartleib has also made demands for books and records, which the Defendants have refused.

26. It would be futile for any shareholder to make further demand before proceeding with this action.

### FACTS

27. In addition to ignoring the demands recited above, Sirius XM has been grossly mismanaged by its Board and Officers. It has paid the second largest FCC fine in history. This fine exceeds the previous highest fine by more than two times. It is now under investigation by almost every Attorney General in the country based upon its abusive consumer practices.

28. The Board and Officers agreed to complete a multi-billion dollar merger without knowing the extent of the debt that it was taking on, and that debt has created huge on-going financial problems for the company. Leon Black continues to sit on the Board even though he received an inadequate number of share votes and refuses to attend Board meetings.

29. In their 2007 proxy report Risk Metrics the nation's largest independent shareholder advisory firm recommended a **"withhold"** vote on Leon Black due to attendance issues. In their 2008 proxy report Risk Metrics recommended a vote **"no"** on Leon Black. Despite repeated "Formal Demands" on the Board, the Nations largest independent shareholder advisory service (Risk Metrics) recommending a "no" vote, and Mr. Black not receiving the required votes, he

continues to serve on the Board. 1.  This is another blatant breech of the Board of Directors fiduciary duties to protect, and represent the interest of their shareholders. This is an example of self-dealing at its worst. Clearly the Board is putting their interest ahead of that of their shareholders, and defying the vote of said shareholders.

*Sirius XM Business*

30. Sirius XM sells subscriptions to its satellite radio service as its main source of business revenues.

31. Satellite radio is a service in which audio programming is digitally transmitted by one or more place stations directly to fixed, mobile, and/or portable receivers. It was licensed by the Federal Communications Commission in 1997 and it became commercially available in 2001. The FCC held an auction to determine which companies would receive the two broadcasting licenses; there were four bidding companies. American Mobile Radio Corporation which was renamed XM Satellite Radio Holdings, Inc. (XM) and CD Radio, Inc. which was renamed Sirius Satellite Radio, Inc. (Sirius) won by bidding respectively $90 and $83 million.

32. Approximately two years after XM and Sirius won their broadcasting licenses they entered merger discussions. This was at a time that Dish and Direct TV tried to merge, but found that the regulatory agencies were not in favor of such Mergers. Sirius and XM called off the Merger negotiations at that time due to the unfavorable regulatory environment. XM's stock reached a high of $40 in December of 2004 and quickly dropped after subscriber growth fell short of their expected 4.8 million subscribers. Without enough subscribers, investors were concerned as to the ability of XM to repay their loans. Sirius was taking market share from XM.

| | Votes Cast For | Votes Cast Against |
|---|---|---|
| 1. Leon D. Black | 408,528,344 | 458,481,167 |

and in fact when consumers were given a choice, consumers chose Sirius over XM seven out of ten times.

33.  XM and Sirius began merger discussions again in 2006. The companies felt the merger would allow them to: (1) reduce costs through synergies, (2) better compete in the audio entertainment market, (3) provide superior programming, (4) advance technologically, and (5) increase value to shareholders. (6) provide consumers with more diverse programming at lower cost.

34.  XM and Sirius officially merged on or about June 29, 2008 becoming Sirius XM Satellite Radio, Inc.  Today the shares of the merged entity are trading at approximately $1.15 per share.  Due to the malfeasance of the Sirius XM Board, and their failure to procure proper financing, shares of Sirius XM traded near bankruptcy at a mere $ .05 per share  post merger. Sirius XM was driven to brink of bankruptcy, despite the Board having nearly 18 months to obtain proper financing. Prior to announcing the merger plans between Sirius and XM, shares of Sirius were trading at $5.65 per share after reaching a high of $9.49. XM shares were trading at $19.00 per share after reaching a high of $40.00.

35.  The union of XM and Sirius was one of the longest merger delays in our nation's history. The merger was wrought with controversy beginning with Mel Karmazin initiating negotiations behind closed doors without the board of director's knowledge.  Mr. Karmazin negotiated for nearly 18 months prior to notifying his Board of Directors of his unauthorized contact with XM executives.  A review of the Proxy Statement filed by Sirius and XM with the Securities Exchange Commission ("SEC") on or about October 3, 2007 was silent as to whether Karmazin had the necessary pre-approval of the Sirius Board of Directors ("The Board") prior to

approaching XM. In fact it wasn't until months later that the negotiations were affirmatively disclosed. This was an egregious breach of fiduciary duty.

36. Karmazin prevented The Board from being able to fulfill their fiduciary duties by considering other alternatives to the merger, or an independent audit of the true value of Sirius or XM; another egregious breach of their fiduciary duties. Without any other strategic alternatives or an independent audit, Sirius shareholders lacked the ability to make an informed vote on the merger. Sirius entered into a "no solicitation" clause which barred Sirius from soliciting transactions or giving suitors inside information. Sirius went further to prevent other alternative suitors when they agreed to a termination fee clause which would have caused Sirius to pay $175 million in the event Sirius determined the merger was not in the best interest of the company. Sirius would have to pay if the shareholders, the true owners of the company, voted against the deal; Although the termination fee would have been reduced to $58 million.

37. After the Merger was complete, Sirius acquired approximately 1.25 Billion dollars of XM debt which needed to be refinanced to satisfy provisions demanding repayment when XM became a unit of Sirius XM. Karmazin publicly stated that he was unaware of $600 million dollars of XM's debt until very late in the Merger process. In fact he stated he was unaware of this debt until the "eleventh hour". Karmazin and his Board were forced to issue 300 million shares of company stock to the financers of XM's debt for the sole purpose of being sold short on the open market, providing an arbitrage or hedge position on the bonds they issued.

38. At the time this was done Sirius stock was on the NASDQ Regulation SHO list for failure to deliver, so there were no shares available to short on the open market. This action alone caused a sudden drop in share price costing the shareholders over one billion dollars in market cap in a period of approximately one week. It is unclear how such an egregious error and

omission could occur, but it is clear that this was another breach of Karmazin and the Boards Duty of Diligence, Candor and Due care.

39.   Karmazin again publicly stated that he was forced to refinance XM's debt under **"ugly"** and **"toxic"** terms, which later resulted in Karmazin and the Board giving away preferred shares convertible to 40% of the outstanding common shares of Sirius XM. This was done without consideration. Mr. Malone became a super majority shareholder, controlling 40% of all vote able shares and six of eleven Board seats, for simply providing a loan.

40.   In obtaining approval for the merger, Sirius XM Board members and there predecessors had made numerous representations and commitments to the regulatory bodies, primarily the Department of Justice and the FCC.   Regulatory approval of the merger was dependent on those representations and commitments including the commitment not to increase charges to consumers for a minimum of three years.

41.   Prior to the completion of the merger, in July of 2008, Sirius XM entered into a consent decree with the FCC where, among other things, Sirius XM agreed to make a "voluntary contribution" known in common language as a fine, in the amount of $17,394,375, the <u>second</u> <u>largest</u> fine in FCC history. Officers and Directors of Sirius XM made other commitments in the consent decree that have not been met or satisfied.

42.   After wasting nearly 18 months, and with the company on the brink of bankruptcy, the Board had failed to procure the needed financing. With hundreds of millions of dollars in debt coming due, the Board began looking for investors. Charles Ergen of Dish was an interested investor. Mr. Ergen had been acquiring millions of dollars of XM debt. Published reports had Mr. Ergen making an offer of up to $1.50 per share. These reports also stated that, Mr. Karmazin and other Officers and Directors would be replaced. In fact Mr. Karmazin's (CEO) predecessor

Joseph Clayton was now an Officer at Dish. It was rumored that Mr. Clayton would replace Mr. Karmazin as CEO. The Board breeched their fiduciary duties by ignoring all other deals, including the Ergen deal, which would have been beneficial to their shareholders. It appears that this was done so that the Officers and Directors could control their employment destiny and unjustly enrich themselves in the process.

43. Mr. Karmazin has publicly stated the he and Mr. Malone have been friends for many years. On or about February 17, 2009, Liberty Media and Sirius XM entered into an Investment Agreement. Liberty Media provided a loan of $530 million dollars at what some would consider **"usurious"** interest rates of 15 percent. Mr. Malone was also paid an additional fee of $17,000,000 as a signing bonus. The most outrageous part of this financing agreement was that Mr. John Malone of Liberty Media was given 12,500,000 preferred shares convertible to a 40% ownership stake in Sirius XM. These shares had full voting rights and are convertible to 40% all outstanding common shares. Liberty Media was also granted six of twelve Board seats. These actions combined gave Mr. Malone of Liberty Media complete control of Sirius XM, creating a "super majority" shareholder rendering the "now minority" shareholders moot, without say, or control of their company. Karmazin and his Board of Directors gave Mr. Malone forty percent of Sirius XM without consideration, and complete control, creating a "super majority shareholder" with undue influence over the Board of Directors controlling 6 of 12 Board seats. Thereby, stealing billions of dollars from their shareholders, breaching the fiduciary duties owed them by putting their interest before that of their shareholders.

44. It should be noted that at the first Quarterly report and Conference Call after consummation of the Merger between Sirius and XM, the newly formed corporation wrote down 4.8 billion dollars in "Good Will" charges. This was nearly the entire value of the acquired

company XM. Therefore, a mere five months after management completed the acquisition of XM, they wrote down nearly the entire value of said acquisition. This at .64 cents per share. This gave Mr. Malone over six billion dollars in non-operating losses to carry forward. In less than a year, after giving his "friend," Malone forty percent of Sirius XM without consideration, Mr. Karmazin was granted a contract extension by his Board (now controlled by Malone) and 128,000,000 options at .39 cents per share. Mr. Karmazin has gains of approximately _100 million dollars on these options._ This is self-dealing at its worst. All of this despite shareholders losing over 90% of their value, 40% of their company, six Board seats, a 40% dilution of their preemptive/shareholder rights, and lastly their vote.

45.  All of this was done without the rightful owners of Sirius XM the "shareholders" having a say or vote.  In fact, not only did the rightful owners not have a vote, they did not even have a seat at the table. Karmazin and his Board fired Ernst and Young their accounting firm to avoid a "Going Concern Notice", the lack of a "going Concern" was also a requirement of the Malone deal. 2

46.  Ernst and Young failed to exit with a "noisy exit" as required by law. Management then hired KPMG as their accounting firm, presents a financial scenario that includes the Malone deal, which was predicated on the absence of a "Going Concern Notice" and is granted a clean bill of financial health by KPMG.  Mr. James Rhyu Sirius XM's Senior Vice President and Chief

---

2  February 8k 2009 The closing and funding of the XM Credit Agreement is subject to several conditions, including: (i) XM's existing credit agreements being amended to extend the maturity of the loans to a date and on terms reasonably satisfactory to Liberty Media Corporation, (ii) Liberty Media Corporation purchasing assignments of loans outstanding under such existing credit facilities in an aggregate principal amount of up to $100 million, (iii) delivery of a report from our auditors in respect of fiscal year 2008 without any "going concern" or like qualification (or receipt of a waiver from certain lenders), and (iv) issuance of the preferred stock under the Investment Agreement.

Accounting Officer made an announcement on December 19, 2008 that he would be resigning his newly appointed position in January 2009. On information and belief, Mr. Rhyu did not want to be a party to accounting fraud; therefore, he left the company. A mere five weeks after receiving a "clean bill of financial health," no going concern from their newly hired auditor, (KPMG) Sirius XM seeks shelter under an exemption to NASDQ Rule 4350i which basically invokes a "Going Concern Notice." According to the audit and report from KPMG Sirius XM was not a going concern, and in good financial health. Five weeks later they claim a going concern and tell the NASD that they are not financially sound and they could not stay in business long enough to give their shareholders a vote on the Malone deal. NASDQ Rule 4350i allows a company to avoid seeking shareholder approval for the issuance of securities that are convertible into 20% or more of the outstanding shares of a NASD listed company.

47.   When a company request the exemption to rule 4350i they are required by the NASD and their listing Rules and Regulations to provide written notice to all shareholders within ten days before the issuance of additional securities. This notice is to inform and alert the shareholders that they are about to lose twenty percent or more of their company without their vote of approval. Shareholder approval would otherwise be required. Additionally, the letter must also state that the company's audit committee or comparable body of the board of directors has expressly approved the exemption. On information and belief, Plaintiff Michael Hartleib was the only shareholder that received this required notice. As such, Mr. Karmazin and his Board of Directors willfully, and intentionally violated the very NASDQ Rule they used to give away forty percent of Sirius XM without consideration, as well as complete control with up to six board seats.

12

48. Despite the stock's abysmal performance and company's dire financial condition, the executives of Sirius XM unbelievably granted themselves hundreds of millions of options as they still believed they deserved a bonus. This is after the shareholders lost more than 95% percent of their value under this management's team so-called leadership.

49. Plaintiff Hartleib submitted a shareholder resolution that would have given shareholders a say on Executive compensation. The Board recommended a no vote on this resolution, even though the largest independent shareholder advisory firm in America, Risk Metrics, recommended a vote in favor of that resolution.

50. Because Malone controlled 40% of the vote and three current Board seats, this resolution was voted down. The minority shareholders have lost all say and/or control over their company.

51. Risk Metrics, the Nation's largest shareholder advisory service company, along with other shareholders were against additional compensation. In fact Sirius XM stock has continuously traded well below the premerger share price. Sirius XM shares are down approximately 75% from pre merger levels. Because of these actions the shareholders and the company, Sirius XM, have suffered damages.

52. After the merger, Sirius XM engaged in practices that violated the commitments it made in obtaining regulatory approval of the merger and in conduct that violates the antitrust laws and the consumer protection laws of practically every state in the country. As a result of the antitrust misconduct, Sirius XM faces expensive and potentially devastating antitrust litigation pending in the Southern District of New York.

53. As a result of the violations of the consumer protection laws, Sirius XM is now under investigation by nearly every Attorney General in the Country. The Attorneys General are

investigating Sirius XM's policies on billing, customer solicitation, violating no call list, and subscription cancellations and renewals.

54. The misconduct that has resulted in the litigation and investigation not only costs Sirius XM millions of dollars in legal expenses but also has created a serious danger to the survival of Sirius XM.

55. Despite demands to the contrary, Defendants have ignored their obligations to shareholders in other ways. For example, they have allowed defendant Leon Black to continue to serve on the Board of Directors despite the fact that he did not receive adequate shareholder votes and despite the fact that he has so ignored his duties that he has regularly refused to attend meetings of the Board.

## V. CAUSES OF ACTION

### COUNT ONE: NEGLIGENCE

56. Plaintiffs incorporate by reference all prior paragraphs as if fully set forth herein.

57. Defendants owed a legal duty to the plaintiffs to use ordinary care in managing the corporation's affairs. Because of their positions as directors, officers, and/or fiduciaries of the Company and because of their ability to control the business, corporate and financial affairs of the Company, each defendant owed the Company and its shareholders a duty to use ordinary care and diligence in the management and administration of the affairs of the Company.

58. Defendants breached their duty by merging with XM and not being fully aware of XM's total debt. As well as, for not having proper financing in place even thou they had nearly eighteen months to do so. Karmazin publicly admitted that he was not aware of 600 million dollars of XM's debt until it was too late. Either XM concealed this information, or Karmazin and his Board failed to carefully examine XM and its financial condition before the merger-

14

which took over a year and a half to complete. Also, they failed to have an independent audit which could have prevented this. Defendants had a duty to their shareholders to investigate all the details of the company it was merging with prior to consummation of the Merger.

59. Defendants' breach of duty proximately caused injury to the plaintiffs, which resulted in a dilution of Plaintiffs shares by 40% thereby diluting their voting power by 40%. Also, costing Plaintiffs' six of twelve Board seats, and a first rights offering. These actions have now made the minority shareholders vote moot or "meaningless".

## COUNT TWO: FRAUD

60. Plaintiffs incorporate by reference all prior paragraphs as if fully set forth herein.

61. Defendants knew or had reason to know that by Ernst and Young not issuing a going concern notice that they were representing to plaintiffs, that Sirius XM was a financially viable company that had sufficient capitol and was able to pay its debts. Because of the defendants positions in the company they had the most knowledge regarding the true financial status of the company. As such, they are responsible for disseminating true and correct information to the public and their shareholders.

62. Defendants' misrepresentations were material, because they affected the stock price of the company, the ownership interest of the plaintiffs, the voting rights of the Plaintiffs and the public's perception of its stability. These misrepresentations and breaches of fiduciary duties, combined, affected the stock price, ownership interest and voting power of the shareholders including the plaintiffs.

63. Defendants' actions were false because shortly after not being issued a going concern notice defendants relied on an exemption to NASDQ Rule 4350i to avoid a mandatory vote for

shareholder approval on the investment agreement with Liberty Media. The exemption request basically invoked a going concern.

64. Defendants willfully made false representation. No going concern notice issued, means a company is financially sound. This is in extreme conflict with reliance on an exemption to rule 4350i that allows for a company to avoid shareholder approval because a company is in such financial despair it would not be possible to wait long enough for their shareholders to vote.

65. Defendants had reason to expect plaintiffs would act in reliance on the false representations as would the general public.

66. Plaintiffs relied on defendants false representations.

67. Defendants false representations directly and proximately caused injury to plaintiffs, which resulted in a dilution of shares by 40%, and their preemptive/ shareholder rights.

## COUNT THREE: BREACH OF FIDUCIARY DUTY

68. Plaintiffs incorporate by reference all prior paragraphs as if fully set forth herein.

69. Defendants had a fiduciary responsibility and relationship with plaintiffs. By reason of their positions as directors, officers, and/or fiduciaries of the Company and because of their ability to control the business, corporate and financial affairs of the Company, the defendants owed the Company and its shareholders the duty to exercise due care, diligence and candor in the management and administration of the affairs of the Company, and in the use and preservation of its property and assets; the duty of loyalty, to put the interests of the Company above their own financial interests; and the duty of candor, including full and candid disclosure of all material facts related thereto. The conduct of the defendants complained of herein involves knowing violations of their duties as directors of the Company, and the absence of good faith on their part,

which defendants were aware or should have been aware, posed a risk of serious injury to the company and its shareholders.

70. The defendants breached their duties in the following ways:

 a. Failing to properly disclose any and all material information a reasonable shareholder would deem important and need to make a fully informed vote on the Malone deal;

 b. By entering into the "Malone" deal without considering other viable options; such as but not limited to, the Ergen deal. This prevented alternative investors from providing financing that would not have required the 40% dilution of shares and shareholder rights. Also, this prevented a buyout of Sirius XM which may have been at more favorable terms to their shareholders.

 c. By not obtaining the needed financing for the approximately two billion dollars in XM debt which needed to be refinanced. Six hundred million dollars of which, CEO Mel Karmazin publicly stated he was not aware of. Thereby, forcing an Investment Agreement with John Malone of Liberty Media on February 17, 2009 which resulted in the giving away of 12,500,000 Sirius XM preferred shares with full voting rights convertible to 40% of the common stock. These shares were issued at a time the stock was trading at very low levels and below fair value. These shares were granted without consideration to existing shareholders, which also lost; six of twelve Board seats, a first rights offering, and complete control of Sirius XM to Mr. John Malone and Liberty Media,

 d. By not providing written notice to all shareholders after invoking the exemption to NASDQ Rule 4350(i) as required by the NASD Rules and Regulations; By not

considering other viable options from of investors, such as Charles Ergen which would have been more favorable to shareholders. Instead putting their interest and employment concerns ahead of that of their shareholders.

  e. By allowing Leon Black to remain on the Board despite repeated demands that he be removed, and failure to obtain the necessary votes.

71. Defendant's actions injured plaintiffs by causing a dilution in shares, loss of voting rights, loss of board seats and a first rights offering to Malone; none of which the shareholders had a vote or say in.

## COUNT FOUR: SELF-DEALING

72. Plaintiffs incorporate by reference all prior paragraphs as if fully set forth herein.

73. By reason of their positions with Sirius XM, the Individual Defendants are in possession of non-public information concerning the financial condition and prospects of Sirius XM, and especially, the true value and expected increased future value of Sirius XM and its assets, which they failed to disclose to the plaintiffs.

74. The investment agreement with Liberty Media was wrongful, unfair, and harmful to plaintiffs. The terms of the agreement did not adequately value the company, or the 12,500,000 preferred shares granted Malone. As such, the agreement only benefited the defendants and was to the detriment of the plaintiffs. The defendants denied plaintiffs their right to a vote as shareholders. This caused a dilution in voting rights, replacement of up to six of twelve board members, a first rights offering, and dilution of their shares of Sirius XM.

## COUNT FIVE: BREACH OF FIDUCIARY DUTY

*ON BEHALF OF THE COMPANY*

75. Plaintiffs incorporate by reference all prior paragraphs as if fully set forth herein.

76. The defendants have violated fiduciary duties of care, loyalty, candor, and independence owed by law to the shareholders of Sirius XM. The defendants have acted in a way that put their personal interests ahead of the interests of their shareholders.

77. The defendants breached their duties in the following ways:

a. Failing to properly disclose all material information a reasonable shareholder would deem important as to other alternatives to the Malone deal.

b. By enacting a poison pill provision that only benefits Malone and would prevent any other suitors of Sirius XM from making an unsolicited bid for the Company at a higher price. This ensures that Malone and only Malone can Tender for the remaining shares he does not already own. Malone was granted a rights offer after completion of his financing;

c. By allowing Malone to vote his shares on the poison pill provision, as there was a huge conflict of interest;

d. By inheriting approximately 2 billion in XM debt, 600 million of which CEO Mel Karmazin publicly stated he did not know about;

e. By entering into an Investment Agreement with Liberty Media on February 17,2009 which resulted in the giving away of 12,500,000 preferred shares of Sirius XM stock with full voting rights, convertible to 40% of Sirius XM common stock; and six of twelve Board seats; and

f. By not providing written notice to all shareholders within 10 days after invoking the exemption to NASDQ Rule 4350(i). as required by the NASD Rules and Regulations

78. The foregoing acts, practices, and course of conduct performed by the defendants caused the defendants to fail to exercise care, diligence, and candor in the exercise of their fiduciary obligations towards the plaintiffs.

### COUNT FIVE: SELF-DEALING

*ON BEHALF OF THE COMPANY*

79. Plaintiffs incorporate by reference all prior paragraphs as if fully set forth herein.

80. By reason of their positions with Sirius XM, the Individual Defendants are in possession of non-public information concerning the financial condition and prospects of Sirius XM, and especially the true value and expected increased future value of Sirius XM and its assets, which they have not disclosed to the plaintiffs. The defendants have acted in ways that put their personal interests ahead of the interests of the shareholders.

81. The investment agreement with Liberty Media was wrongful, unfair, and harmful to plaintiffs. The terms of the agreement did not adequately value the company or the 12,500,000 preferred shares. As such, the agreement only benefited the defendants and was to the detriment of the plaintiffs. The defendants denied plaintiffs their right to vote as shareholders.

82. This caused a dilution in voting/preemptive rights, replacement of board members, a drop in stock price, the granting of a first rights offering, and a dilution of existing shares.

### VI. PRAYER

WHEREFORE, plaintiffs pray for relief and judgment as follows:

A.    Determining this action is a proper derivative action, Plaintiffs are adequate representatives on the Company's behalf, and demand is excused;

B.    Determining the Defendants have breached or aided and abetted the breach of their fiduciary duties to Sirius XM;

Michael Hartleib

Jack (John) Sorge

# EXHIBIT 5

**From:** Michael Hartleib
**Sent:** Thursday, June 02, 2011 6:59 PM
**To:** Robert Weiser
**Subject:** My Sirius case


Rob, give me a call so that we can talk about your thoughts on my case, as well as the settlement in the anti-trust suit. I did make multiple demands on the board.


Michael 949-283-2441


-----Original Message-----
From: Robert Weiser [mailto:RW@Weiserlawfirm.com]
Sent: Wednesday, June 01, 2011 1:59 PM
To: Michael Hartleib
Subject: Delivered: Email check

Your message was delivered to the recipient.

**From:** Michael Hartleib
**Sent:** Tuesday, June 21, 2011 3:03 AM
**To:** Robert Weiser
**Subject:** RE: Delivered: RE: Delivered: My Sirius case

Rob that works. Old merger case withdrawn, converted to an individual claim and then
dismissed. This was after they offered me 700k to go away. The case I sent you is
pending. Yes they were proper. Here is one of the older demands made.

Rob

-----Original Message-----
From: Michael Hartleib [mailto:michaelhartleib@cox.net]
Sent: Monday, June 20, 2011 4:48 PM
To: Robert Weiser
Subject: RE: Delivered: RE: Delivered: My Sirius case

Rob, when are you available?

# EXHIBIT 6

**From:** Robert Weiser
**Sent:** Wednesday, August 31, 2011 7:22 PM
**To:** Michael Hartleib
**Cc:** 'David Sacks'
**Subject:** Re: fax-sirius order

I can't tonight, I have a dinner meeting

Sent from my Verizon Wireless BlackBerry

---

**From:** Michael Hartleib <michaelhartleib@cox.net>
**Date:** Wed, 31 Aug 2011 18:38:10 -0400
**To:** Robert Weiser<RW@Weiserlawfirm.com>
**Cc:** 'David Sacks'<david@synergyent.net>
**Subject:** FW: fax-sirius order

Rob, we need to talk about you coming in on my Sirius state case. This Federal case was taken from my case which was filed first. Khan Swick will work with us as I am providing all of the research . Call me ASAP

Congratulations, Messrs. Shenk and Hartleib. Judge Rakoff has upheld your complaint in <u>all</u> important respects.

I am tied up this morning but can give you a call this afternoon, to discuss next steps.

# EXHIBIT 7

**From:** Michael Hartleib <michaelhartleib@cox.net>
**Date:** February 16, 2012 at 1:40:08 PM EST
**To:** Robert Weiser <rw@weiserlawfirm.com>
**Cc:** 'David Sacks' <david@synergyent.net>
**Subject: Litigation never sleeps**

Rob, are we going to do some business together or what? You never called us back after we tried six times to reach you. David and I need to make some money so that we can buy you a new phone!

# EXHIBIT 8

**From:** Michael Hartleib
**Sent:** Tuesday, May 24, 2016 2:55 AM
**To:** Robert Weiser
**Cc:** 'David Sacks'
**Subject:** I am flying in Wednesday evening so I can be rested

Rob, you are going to lose either with the honorable Vano or on appeal! You must not of thought that anyone would read these proposed "reforms", or that anyone would take a hard look at the standing issue. You really should have been more diligent.

# EXHIBIT 9

**Robert Weiser**

| | |
|---|---|
| **From:** | Michael Hartleib <michaelhartleib@cox.net> |
| **Sent:** | Tuesday, May 31, 2016 5:57 PM |
| **To:** | Robert Weiser |
| **Cc:** | David Sacks |
| **Subject:** | Re call regarding current and forthcoming case |

Rob, let me know when you are available to discuss the current case and any forthcoming derivative on the tax issues. I would like to see the old board held accountable.

# EXHIBIT 10

-----Original Message-----
From: Michael Hartleib <michaelhartleib@cox.net>
Sent: Tuesday, June 28, 2016 1:32 PM
To: Robert Weiser <rweiser@weiserlawfirm.com>
Cc: David Sacks <david@synergyent.net>; Scott.Musoff@skadden.com
Subject: Please provide Pdf of response in support of fees

Robert, please provide me with the documents in support of your fees filed yesterday. As I have said before I do not need conformed copies pdf copies of what was submitted will be fine. I will notify the clerk if I don't get them today. Also your delay will provide me yet another reason to appeal is the Honorable Vano approves the settlement.
Thank you,
Michael
Sent from my iPhone

# EXHIBIT 11



THE
**WEISER**
LAW FIRM
WWW.WEISERLAWFIRM.COM

<u>PENNSYLVANIA</u>
22 CASSATT AVE.
BERWYN, PA 19312
TELEPHONE: (610) 225-2677
FACSIMILE: (610) 408-8062

<u>CALIFORNIA</u>
12707 HIGH BLUFF DRIVE, SUITE 200
SAN DIEGO, CA 92130
TELEPHONE: (858) 794-1441
FACSIMILE: (858) 794-1450

The Honorable James F. Vano
Johnson County Courthouse
100 N. Kansas Ave
Olathe, KS 66061-3273

  **Re:** *Ross-Williams v. Bennett et al.*, **Case No. 11-cv-01688**

Dear Judge Vano –

  We write to provide promptly important information that the Weiser Law Firm, P.C. (the "Firm") has just learned with respect to a person whose time records were submitted to the Court together with a declaration in connection with the above-referenced shareholder derivative action (the "Action").

  As of February 2, 2017, the Firm learned that a person who had held himself out to us as Alexander J. Silow ("Silow"), was in actuality named Jeffrey M. Silow, and more importantly, that Mr. Silow is not a licensed Pennsylvania attorney in good standing, having been disbarred in Pennsylvania in 1987.[1]  Mr. Silow regularly represented to the Firm (as he represented to this Court in the Action) that he was a duly licensed, active attorney.  The Firm suspects that Mr. Silow may have misrepresented himself to numerous other law firms (including some of the largest law firms in this country) for many years, both before and after Mr. Silow began working with the Firm during the past decade.  Mr. Silow has immediately been released from any ongoing projects with the Firm and we are contacting any and all Courts where Mr. Silow's time records were previously submitted by the Firm.

  Mr. Silow began working with the Firm after a very well-respected attorney recruiting agency in Philadelphia, Abelson Legal Search ("Abelson"), recommended him to us.  Abelson represented to us at that time that Mr. Silow had worked on "four projects" through their service, and that Mr. Silow was "an excellent candidate…very experienced in document review projects of all types [who] works very hard and long hours."  *See* attached email and resume.  The Firm was informed both by Abelson and by Mr. Silow that Mr. Silow was a licensed attorney in good standing.

---

[1] Although not yet confirmed, it appears as though Mr. Silow has also been suspended from the practice of law by the District of Columbia.

On February 2, 2017, after being contacted by a third party not directly involved in the Action, the Firm learned that no "Alexander J. Silow" could be found on the Pennsylvania Disciplinary Board website.  Mr. Silow was then immediately contacted via e-mail by us to present his Pennsylvania bar identification number.  Within minutes, Mr. Silow provided us with a Pennsylvania attorney identification number, which we then quickly determined corresponded with an "Alexander L. Silow" practicing in Pennsylvania.   In a subsequent telephone conversation that morning, Mr. Silow reiterated that he was and is a licensed attorney in Pennsylvania and the District of Columbia in good standing.  Minutes after this initial phone call ended, however, Mr. Silow telephoned the Firm and during a second telephone conversation, confessed that he had been disbarred in Pennsylvania "since 1990".[2]  Moreover, although he did not state this to us, the Firm has now confirmed that Mr. Silow's legal name is not "Alexander J. Silow," but rather is "Jeffrey Mark Silow."

The Firm is in contact with both ethics and legal counsel, and has already contacted the Pennsylvania Disciplinary Board and other authorities.

With respect to this Action, we believed that Mr. Silow performed the work the reported time records indicate (as supported by the Firm's additional filings with this Court showing records from the electronic document review database).[3]  Nonetheless, the Firm is aware that Mr. Silow has been held out as an active attorney, and that Mr. Silow's declaration, signed under penalty of perjury, states, *inter alia*, that he is a licensed attorney in good standing that had never been the subject of any disciplinary action.  His declaration is therefore false in material respects.  According, the Firm will not be participating in any recovery that may result from the pending Cross-Appeal.

I am available at the Court's convenience either via telephone or in-person.

Sincerely,

Robert B. Weiser /bd

Robert B. Weiser

---

[2]  As noted above, according to the Disciplinary Board of Pennsylvania, Mr. Silow was actually disbarred on December 23, 1987.

[3]  We believe this to be true because the documents reviewed in the Action were hosted by on the Relativity platform.  It would not be possible for anyone outside of Relativity to manipulate the data points associated with this review.

## Brett Stecker

| | |
|---|---|
| **From:** | Jessica Abelson <jabelson@abelsonlegalsearch.com> |
| **Sent:** | Friday, June 27, 2008 2:12 PM |
| **To:** | Brett D. Stecker |
| **Cc:** | Robert Weiser |
| **Subject:** | New Candidate Resumes - Document Review Project |
| **Attachments:** | JBorock Resume Logo 6-2008.doc; SJones Resume logo 6-2008.doc; JSilow Resume logo 6-2008.doc |

Dear Brett & Robb,

Under strict confidence please find the resumes for **Jacqueline Borock, Esq., Sharon L. Jones, Esq., and Jeffrey Silow, Esq.** for your review and consideration. All are excellent candidates and would like to be considered for your document review project. A little more information on the candidates are as follows:

**Jacqueline Borock, Esq.** – Although she lives in Kingston NY she has close ties to Philadelphia. She is able to come in to Philadelphia to get training and meet with you with out a problem. She is very eager to meet with you to discuss the project in more detail.

**Sharon L. Jones, Esq.** – Very pleasant, professional and articulate on the phone. She is local and can absolutely commit to the project.

**Jeffrey Silow, Esq.** – We have worked with Jeff on at least four other projects. He is VERY experienced in document review projects of all types and works very hard and long hours.

Please let me know your thoughts regarding these candidates.

Best regards,
Jessica



**Attorneys, Paralegals & Legal Professionals**

**Jessica Abelson**
Legal Recruiter
1600 Market Street, Suite 505
Philadelphia, Pa. 19103
jabelson@abelsonlegalsearch.com
(215) 561-3010
www.abelsonlegalsearch.com

1

 Abelson Legal Search

**Attorneys, Paralegals & Legal Professionals**

**Jeffrey Silow, Esq.**
**Cell phone: (215)341-1561**
**Email: triman1@gmail.com**

**Contract Projects:** Electronic and hard copy reviews and trial preparation in finance, patent, antitrust and securities litigation, governmental investigations and acquisition/divestiture matters; supervision and quality control of other reviewers; privilege log; second request reviews; deposition digesting; and travel to perform duties.

**Selected Project Examples (2000 – 2008):**
McCarter & English, Newark, NJ
Reviewed documents for responsiveness, confidentiality and privilege in pharmaceutical class action litigation matter.
Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY
Electronic and hard copy document reviews for issue responsiveness in class action matters.
Skadden Arps Slate Meagher & Flom, New York, NY
Electronic document reviews in antitrust matter. Authored privilege log. Prepared witness binders. Deposition digesting. 2nd request. Supervision and quality control of reviewers. Traveled to review documents.
Hogan & Hartson, Washington, DC
Electronic document reviews and authored privilege logs in securities fraud, financial, FCPA and Hart-Scott-Rodino litigation matters.
Steptoe & Johnson, Washington, D.C.
Performed substantive document reviews, including privilege logs, in response to Justice Department CID and Grand Jury and U.S. Senate subpoenas.
White & Case, Washington, D.C.
Electronic document reviews in antitrust case. Prepared witness binders and deposition digesting. Supervised creation of privilege log.
Crowell & Moring, Washington D.C.
Document review in antitrust acquisition matter. 2nd request. Traveled to perform duties.
McKesson Corporation, Philadelphia, PA/San Francisco, CA
Subpoena response in class action/patent matter where client was not a party. Supervision and quality control of reviewers. Traveled to review documents.

**Other Employment:**
National Association of Securities Dealers, Inc., Washington, DC
Office of General Counsel; Federal litigation, arbitrations and Board of Governors presentations as well as advice to members.
Pennsylvania Securities Commission, Harrisburg, PA
Office of General Counsel, Senior Attorney; Investigation, financial analysis and prosecution of securities regulatory filings and matters.
Tax Debt Negotiators, Inc., Los Angeles, CA
Responsible for in-house matters including tax matters, litigation, reviewing and drafting leases, contracts and regulatory filings.

**Computer Training:** Concordance, Lextranet, Summation, Ringtail, Applied Discovery, DocHunter, Microsoft Word, Microsoft Office, Microsoft Outlook, Lotus Notes
**Languages:** English, working knowledge of Spanish, French, German

**Education:**
JD, University of Miami School of Law 1974
BS (Mathematics), La Salle University 1971

**Bar Admissions:** District of Columbia



THE
**WEISER**
LAW FIRM
WWW.WEISERLAWFIRM.COM

PENNSYLVANIA
22 CASSATT AVE.
BERWYN, PA 19312
TELEPHONE: (610) 225-2677
FACSIMILE:  (610) 408-8062

CALIFORNIA
12707 HIGH BLUFF DRIVE, SUITE 200
SAN DIEGO, CA 92130
TELEPHONE: (858) 794-1441
FACSIMILE: (858) 794-1450

February 6, 2017

Douglas T. Shima
Clerk of the Appellate Court
Kansas Court of Appeals
Appellate Clerk's Office
301 SW 10th Ave.
Topeka, KS 66612-1507

   Re:   *Ross-Williams v. Bennett et al.*, **Appellate Case No. 17-117139-A**

Dear Mr. Shima:

   We write to bring to the Court's attention an inaccuracy in the record in the above referenced action (the "Action"), which is currently pending before the Court.   Counsel for Cross-Appellant Monica Ross-Williams, The Weiser Law Firm, P.C. (the "Firm"), recently learned that a declaration submitted to the District Court of Johnson County (the "District Court") below, by a former affiliate of the Firm, is inaccurate in material respects.  The Firm believes it is its obligation to inform the Court before briefing in this matter begins.

   A central question on appeal in the Action is whether the District Court properly evaluated Plaintiff's counsel's request for fees and expenses in association with the material benefits provided to the corporation in this Action.  In connection with this request, District Court Judge James Vano ("Judge Vano") requested that the Firm submit attorney billing records for *in camera* review. *See* Transcript of May 26, 2016 Hearing.  The Firm submitted time on behalf of a former affiliate of the Firm who worked on an extensive, three-year document review project. *See* Plaintiff's Supplemental Brief in Further Support of Award of Attorneys' Fees and Reimbursement of Expenses. This submission would later include a declaration, sworn under the penalty of perjury, from the document reviewer stating that he was a member in good standing of the Pennsylvania and District of Columbia bar associations and had never been accused of an ethical violation or the subject of any disciplinary action. *See* Plaintiff's Second Motion to Alter or Amend the Court's November 22, 2016 Order.  The Firm has learned that this declaration was not true at the time it was submitted.

   As of February 2, 2017, the Firm learned that a person who had held himself out to us as Alexander J. Silow ("Silow"), was in actuality named Jeffrey M. Silow, and more importantly, that Mr. Silow is not a licensed Pennsylvania attorney in good standing, having been disbarred in

Pennsylvania in 1987.[1]   Mr. Silow regularly represented to the Firm (as he represented to the District Court) that he was a duly licensed, active attorney.   The Firm suspects that Mr. Silow may have misrepresented himself to numerous other law firms (including some of the largest law firms in this country) for many years, both before and after Mr. Silow began working with the Firm during the past decade. *See* attached email and resume.   Mr. Silow has immediately been released from any ongoing projects with the Firm and we are contacting any and all courts where Mr. Silow's time records were previously submitted by the Firm.[2]

Mr. Silow began working with the Firm after a very well-respected attorney recruiting agency in Philadelphia, Abelson Legal Search ("Abelson"), recommended him to us.   Abelson represented to us at that time that Mr. Silow had worked on "four projects" through their service, and that Mr. Silow was "an excellent candidate…very experienced in document review projects of all types [who] works very hard and long hours." *See* attached email and resume. The Firm was informed both by Abelson and by Mr. Silow that Mr. Silow was a licensed attorney in good standing.

On February 2, 2017, after being contacted by a third party not directly involved in the Action, the Firm learned that no "Alexander J. Silow" could be found on the Pennsylvania Disciplinary Board website.   Mr. Silow was then immediately contacted via e-mail by us to present his Pennsylvania bar identification number.   Within minutes, Mr. Silow provided us with a Pennsylvania attorney identification number, which we then quickly determined corresponded with an "Alexander L. Silow" practicing in Pennsylvania.     In a subsequent telephone conversation that morning, Mr. Silow reiterated that he was and is a licensed attorney in Pennsylvania and the District of Columbia in good standing.   Minutes after this initial phone call ended, however, Mr. Silow telephoned the Firm and during a second telephone conversation, confessed that he had been disbarred in Pennsylvania "since 1990."[3]   Moreover, although he did not state this to us, the Firm has now confirmed that Mr. Silow's legal name is not "Alexander J. Silow," but rather is "Jeffrey Mark Silow."

The Firm is in contact with both ethics and legal counsel, and has already contacted the Pennsylvania Disciplinary Board and other authorities.

With respect to this Action, the Firm continues to believe that the time records from Mr. Silow are accurate (as supported by the Firm's additional filings with the District Court showing records from the electronic document review database).   Nonetheless, the Firm is aware that the record before this Court is inaccurate and the Firm is actively attempting to correct the record

---

[1]   Although not yet confirmed, it appears as though Mr. Silow has also been suspended from the practice of law by the District of Columbia for non-payment of dues.

[2]   Mr. Silow's relationship with the Firm was limited to initial document review: at no time did Mr. Silow ever have any client contact, nor sign pleadings on behalf of the Firm, nor make any court appearances on behalf of the Firm.

[3]   As noted above, according to the Disciplinary Board of Pennsylvania, Mr. Silow was actually disbarred on December 23, 1987.

below.[4]   In the event the Firm is procedurally unable to do so, we felt it was our ethical obligation to ensure this matter was timely raised before the Court.

I am available at the Court's convenience either via telephone or in-person.

Sincerely,

Robert B. Weiser

---

[4] Similar correspondence has been sent to Judge Vano on February 3, 2017.

# EXHIBIT 12

**From:** Michael Hartleib <michaelhartleib@cox.net>
**Sent:** Monday, March 06, 2017 8:37 PM
**To:** Robert Weiser <rweiser@weiserlawfirm.com>
**Cc:** mark.mcgrory@eriseip.com; jay.kasner@skadden.com; scott.musoff@skadden.com; James M. Ficaro
<jficaro@weiserlawfirm.com>; 'Tom Hershewe' <tom@dollar-law.com>; Brett Stecker
<bdstecker@weiserlawfirm.com>; 'George C. Aguilar' <GAguilar@robbinsarroyo.com>; 'Boren, Jill, DCA'
<Jill.Boren@jocogov.org>; 'Brian J. Robbins' <BRobbins@robbinsarroyo.com>; 'Alfred G. Yates jr.' <yateslaw@aol.com>;
'Jay N. Razzouk' <JRazzouk@robbinsarroyo.com>; 'Laura Jakubec' <lauraj@dollar-law.com>
**Subject:** Re: ROSS-WMS v. SPRINT - Appellate Case No. 17-117139-A

Rob, I am a little confused! Your opposition to the Motion to remand is in contradiction to your
statements in the letter to Mr. Shima, Clerk of the Court of Appeals. Whereas you express your
desire to correct the record and inaccuracies at the District Court and were actively attempting
to do so! It seems your statements to the Appellate Court were disingenuous at best. Shocking!
Also, equally confusing is your statement regarding Mr. Silow, that "you just found out on
February 2, 2017 that Alexander Silow was not his real name, indeed it is Jeffrey". Although, in
your attached email correspondence from Abelson in 2008 you hired him as Jeffery. Are you
100 % certain that you want to stick to that story? I promise you that it will not be wise!

I especially like the comment that you felt as though you had an ethical obligation to inform the
Court, prior to briefing. Why, because you thought they might want to remand so that these
issues can be addressed at the District Court? The Court in which the fraud was committed
upon? Ethical obligation, what a Saint. The fact of the matter is that Ted Frank was holding a
proverbial gun to your head, so you had no choice but to come clean, or to be clear, partially

clean prior Ted Frank informing the appropriate agencies. Your attempts, to obfuscate your chicanery in this case is galvanizing my convictions, strengthening my resolve to expose all of the corrupt parties in this case! This lawyer driven litigation must and will cease. Your temerity, to seek leave of the Appellate Court to reinstate fees, given what I have uncovered is frankly astonishing and provoking wrath. I will take this all the way to the Kansas Supreme Court if needed, as the integrity of the judicial system is at stake!

On Mar 6, 2017, at 1:59 PM, Laura Jakubec <lauraj@dollar-law.com> wrote:

Counsel - please find a courtesy copy of the following which was e-filed today.  Thank you.

Laura Jakubec, Legal Assistant
lauraj@dollar-law.com

 <image001.png>

1100 Main Street, Suite 2600
Kansas City, MO 64105
Phone: (816) 876-2600
Fax: (816) 221-8763

This electronic message transmission and any files transmitted with it, are a communication from the law firm of Dollar Burns & Becker, L.C. This message contains information protected by the attorney/client privilege and is confidential or otherwise the exclusive property of the intended recipient or Dollar Burns & Becker, L.C. This information is solely for the use of the individual or entity that is the intended recipient. If you are not the designated recipient, or the person responsible for delivering the communication to its intended recipient, please be aware that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this electronic transmission in error, please notify by telephone (877-816-2600), or by electronic mail (lauraj@dollar-law.com) and promptly destroy the original transmission. Thank you for your assistance.NOTICE: The Missouri Bar and Missouri Supreme Court require all Missouri attorneys to notify e-mail recipients that e-mail is not a secure method of communication, that it may be copied and held by any computer through which it passes, and persons not participating in the communication may intercept the communication.  Should you wish to discontinue this method of communication, please advise, and no further e-mail communication will be sent.

<Opposition to Motion to Stay Appeal and Remand Case to District Court (342096x9E2E5).pdf>

# EXHIBIT 13

## IN THE COURT OF APPEALS OF THE STATE OF KANSAS

MONICA ROSS-WILLIAMS, derivatively, on behalf of SPRINT NEXTEL CORPORATION,

              Appellees,

V.

ROBERT R. BENNETT, ET AL.,
      and
SPRINT NEXTEL CORPORATION, a Kansas Corporation,

              Appellees,

Objector, Michael Hartleib,

              Appellant.

**Appellate Case No. 17-117139-A**

(District Court Case No. 11CV1688)

## DECLARATION OF MONICA ROSS-WILLIAMS IN OPPOSITION TO APPELLANT MICHAEL HARTLIEB'S MOTION TO RECONSIDER AND VACATE THE PROTECTIVE ORDER

I, Monica Ross-Williams, declare and state as follows:

1.      I, Monica Ross-Williams, am a party (appellee and cross-appellant) to the above-captioned appellate proceeding that is currently pending before this Court (the "Appeal"). At all times in connection with the Appeal, and the shareholder derivative litigation before the District Court for Johnson County, Kansas that is the subject of the instant Appeal, I have been and am represented by counsel.

2.      During the evening of March 6, 2017, I received an unsolicited telephone call from Appellant Michael Hartleib ("Hartleib"). I do not know how Hartleib obtained my phone

- 1 -

number, but I believe that he did so via an internet search.  I had never previously had any contact, engagement, or involvement with Hartleib.

3.      Upon answering the telephone when Hartleib called me on the evening of March 6, 2017, I did not realize at first who I was speaking to.  Hartleib proceeded to attempt to discuss matters related to the Appeal with me, in a highly confrontational manner.  Once I realized who Hartleib was and that he had somehow found my phone number and called me directly regarding the Appeal, I told Hartleib I did not wish to speak to him any further.  I asked Hartleib not to contact me again and to direct all future communications to my counsel.

4.      Hartleib, however, did not hang up the phone at that point.  Instead, he tried to continue the conversation by making references to certain matters about me that were wholly unrelated to the Appeal; specifically, my role as an elected official in Ypsilanti Township, Michigan, where I serve on the Township Board of Trustees.  I can only assume that Hartleib conducted an internet search and tried to learn as much as he could about me prior to calling me on March 6, 2017.

5.      In the first instance, I was taken aback and frightened once I realized that Hartleib had called me directly about the Appeal, and given the tenor of the call I suspected that he did so in an attempt to intimidate me.  But once Hartleib brought up matters about me that were completely unrelated to the Appeal, I became certain that his purpose for calling was to harass and threaten me.  I felt very uncomfortable and wanted to end the call with Hartleib as soon as possible, but I thought it best to try to end the conversation in a non-confrontational way.  To that end, I told Hartleib that if he wished to do so he could copy me on communications directed to my counsel, and I provided him with an email address which I seldom use.

6.     At that point, the call with Hartleib ended.  Immediately after I got off the phone with Hartleib on the evening of March 6, 2017, I contacted my counsel regarding the call from Hartleib.

7.     Although I had clearly instructed Hartleib that all future communications should be directed to my counsel and not to me, only a few hours later, at 3:16 a.m. central time on March 7, 2017, Hartleib sent an email directly to me regarding the Appeal.  I was very disturbed by the fact that he did so even though I had told him that all communications should be directed to my counsel.

8.     Later that same day, on March 7, 2017, my counsel sent Hartleib a letter at my request.  The letter from my counsel demanded that Hartleib cease any attempts to communicate with me.  Hartleib responded to my counsel in writing, however, by threatening that he "will neither cease nor desist."  Accordingly, at my request and with my authorization, my counsel filed a motion for a protective order on March 9, 2017.  That motion was granted, and the protective order was entered by this Court on March 30, 2017 (the "Protective Order").

9.     I was shocked to learn that Hartleib recently filed a motion to vacate the Protective Order.  I can only assume that Hartleib intends to try to contact me again and harass me further.  I was very frightened and disturbed by Hartleib's conduct in March 2017, and I was pleased and relieved when the Protective Order was granted.  If the Protective Order were to be vacated, I would fear that Hartleib would once again attempt to intimidate, harass, and threaten me.  I see no reason why Hartleib should be permitted to direct communications to me instead of my counsel.  I respectfully request that this Court deny Hartleib's motion and keep the Protective Order in place.

I declare under penalty of perjury that the above and foregoing is true and correct.

EXECUTED this _____ day of _March_, 2018.

_Monica Ross-Williams_
Monica Ross-Williams

# EXHIBIT 14

**From:** michael hartleib
**Sent:** Tuesday, March 7, 2017 4:25 AM
**To:** kayla9170@yahoo.com
**Cc:** MSK@HFMLEGAL.COM; perry.brandt@bryancave.com; MARK.MCGRORY@ERISEIP.COM;
DOCKETING@ERISEIP.COM; 'Chuck Schimmel' ; 'George C. Aguilar' ; 'Jay Razzouk' ; Brett Stecker ; 'Alfred G. Yates jr.' ;
'Robert Schubert' ; 'Willem F. Jonckheer' ; James M. Ficaro ; 'Dustin Schubert' ; 'Brian J. Robbins' ; 'Boren, Jill, DCA' ; 'Greg
Wright' ; tom@dollar-law.com; Robert Weiser
**Subject:** Ms. William's Per our conversation here are some of the documents your Counsel failed to provide you

Dear Ms. Williams, it was a pleasure speaking with you this evening. I am sorry that your
Counsel has not kept you apprised of the details of your case. I find it unconscionable that
your attorneys failed to inform you of Judge Vano's rulings or that an Appeal was filed on your
behalf. I do believe that you are a unwitting victim of their fraud committed against the Court.
As we discussed they have submitted millions of dollars in fraudulent billing in your case. As I
informed you that this was not just my opinion, the Judge in your case came to a similar
conclusion. In fact, your attorneys have now admitted to at least 1.6 million dollars in
fraudulent bills submitted to the Court. Mr. Weiser has confirmed this in two separate letters.
*(See attached).* I am no expert, but when a Firm admits criminal acts in a case I believe they
are obligated to notify you as the Plaintiff. Mr. Weiser and his Firm have already contacted
their Bar associations and other Courts to self-report their criminal acts. I have contacted the
district attorney's offices in Pennsylvania and Kansas and will be filing formal complaints. I am

sorry to be the person to inform you of this, as it was your attorneys responsibility to do so. I am seeking a full evidentiary hearing where your Counsel will be forced to testify under oath and you can address the Court. As you can see by the letters from Mr. Weiser they are in a lot of trouble, but claim they are victims of Mr. Silow. I will provide incontrovertible proof that Mr. Weiser et. al. is just as guilty as Mr. Silow. This is just the tip of the iceberg. Details of our call will be submitted to the Kansas Court of Appeals in a sworn declaration and provided to Judge Vano. As per your request I copied all of the attorneys in your case as well as Judge Vano's Clerk. Thank you for taking the time to speak with me this evening.

Michael



**THE**
**WEISER**
**LAW FIRM**
WWW.WEISERLAWFIRM.COM

PENNSYLVANIA
22 CASSATT AVE.
BERWYN, PA 19312
TELEPHONE: (610) 225-2677
FACSIMILE:  (610) 408-8062

CALIFORNIA
12707 HIGH BLUFF DRIVE, SUITE 200
SAN DIEGO, CA 92130
TELEPHONE: (858) 794-1441
FACSIMILE: (858) 794-1450

March 7, 2017

**VIA EMAIL**
Michael Hartlieb
27020 Alicia Parkway, Suite G
Laguna Niguel, CA 92677
Email: michaelhartlieb@cox.net

Re:   _**Ross-Williams v. Bennett et al.**_**, Appellate Case No. 17-117139-A**

Dear Mr. Hartlieb:

We want to caution you in the strongest of terms that your harassment of our client, Monica Ross-Williams, is highly improper.

As you know, we are counsel for Ms. Ross-Williams in the above-referenced litigation. Ms. Ross-Williams has informed us that last night, you telephoned her directly, despite knowing that she was and is represented by counsel. This conduct violates Rule 4.2 of the Kansas Rules of Professional Conduct, as you were not and are not authorized to contact Ms. Ross-Williams by her counsel or any Court.[1]

According to Ms. Ross-Williams, not only did you attempt to discuss the Sprint derivative litigation with her last night, you also referenced other matters pertaining to our client that are completely unrelated to the derivative litigation. Ms. Ross-Williams was shocked and disturbed by your phone call, and she reported to us this morning that she felt harassed and threatened -- both with respect to your attempt to speak directly with her in itself, and with respect to the substance of the phone call. Accordingly, Ms. Ross-Williams declined to speak with you, expressed to you that all future communications should be directed to her counsel, and instructed that you should not contact her directly again.

Nonetheless, several hours later, at 3:16 a.m. central time on March 7, 2017, you committed another violation and completely disregarded our client's directive to communicate with her counsel, by sending Ms. Ross-Williams a lengthy email and related attachments. Our

---

[1]     Pro se litigants are generally held to the same standards of procedure, evidence, and professional responsibility as attorneys. _See Mangiaracina v. Gutierrez,_ 11 Kan.App.2d 594, 595–96, 730 P.2d 1109 (1986).

client has reported to us that she also finds your email to be harassing and threatening, particularly in light of her express instruction to you only hours earlier that all communications should be directed to her counsel.

On behalf of Ms. Ross-Williams, we direct you to immediately cease and desist all attempts to communicate directly with Ms. Ross-Williams.  In addition, please be advised that with respect to those improper communications that have already taken place and any such future communications you may attempt, Ms. Ross-Williams expressly reserves all of her rights, including but not limited to her rights under Michigan, Kansas, California, and/or federal law.

Sincerely,

Robert B. Weiser

**From:** michael hartleib [mailto:michaelhartleib@cox.net]
**Sent:** Tuesday, March 7, 2017 7:21 PM
**Cc:** MSK@HFMLEGAL.COM; perry.brandt@bryancave.com; MARK.MCGRORY@ERISEIP.COM;
DOCKETING@ERISEIP.COM; 'Chuck Schimmel' <chuck@wrightschimmel.com>; 'George C. Aguilar'
<GAguilar@robbinsarroyo.com>; 'Jay Razzouk' <jrazzouk@robbinsarroyo.com>; Brett Stecker
<bds@weiserlawfirm.com>; 'Alfred G. Yates jr.' <yateslaw@aol.com>; 'Robert Schubert'
<rschubert@schubertlawfirm.com>; 'Willem F. Jonckheer' <wjonckheer@schubertlawfirm.com>; 'Dustin
Schubert' <dschubert@schubertlawfirm.com>; 'Boren, Jill, DCA' <Jill.Boren@jocogov.org>; 'Greg Wright'
<greg@wrightschimmel.com>; tom@dollar-law.com; Robert Weiser <rw@weiserlawfirm.com>; 'Brian J.
Robbins' <BRobbins@robbinsarroyo.com>; James Ficaro <jmf@weiserlawfirm.com>
**Subject:** RE: Ross-Williams v. Bennett et al., Appellate Case No. 17-117139-A

Mr. Weiser, as I am preparing my sworn declaration regarding my communication
with you "client", I do not have time to address all of the self-serving
misrepresentations in your letter. The 15 minute consensual conversation with
your "client" was very enlightening. She provided her email address and ask that I
copy Counsel, so that I could forward the documents you failed to provide. For
you to characterize this as harassment is another blatant attempt to distract and
obfuscate your fraudulent acts  and bastardization of the judicial system. I caution
you, that coercing your "client" to misstate facts regarding our call will only inflict
additional damage to what little credibility you have left. You Sir, and your
coconspirators are the ones that need to Cease and Desist. Your so-called "client"
is representing my interest and her attorneys are corrupt, therefore I will neither
Cease nor Desist. As far as your not so vailed threat that Ms. Williams "reserves all
of her rights", if you are threatening legal action against me, feel free, I will be
happy to waive service to expedite said action. I find the prospects of discovery
quite compelling. Your threats do nothing but, strengthen my resolve and
galvanize my convictions. Call it a personality defect! Instead of wasting my time, I
would suggest you consult with an ethics attorney, that's right, you already
have!

Michael

# EXHIBIT 15

**From:** Michael Hartleib
**Sent:** Saturday, April 07, 2018 12:33 AM
**To:** Robert Weiser
**Cc:** mark.mcgrory@eriseip.com; jay.kasner@skadden.com; scott.musoff@skadden.com;
jennifer.berhorst@bryancave.com; sarah.holdmeyer@bryancave.com; James M. Ficaro ; Brett Stecker ;
jenness.parker@skadden.com
**Subject:** RE: ROSS-WILLIAMS - Appellate Case No 17-117139-A

Rob, your ability to set the bar at new lows, never disappoints! Clearly, this is in retaliation to your being rightfully removed as co-lead counsel in the Equifax case. Your attempt to mislead the Appellate Court with incomplete records might be your standard operating procedure, but I believe it will cost you when I seek sanctions. Your personal attacks smack of desperation, they do nothing to dissuade me, in fact they galvanize my convictions and strengthen my resolve! Rob, you may want to contact your investigators, L. English Research Services Inc. to seek a partial refund. When they pulled the records on March 26th, they missed a DUI from the eighties and a fixit ticket. Your ill-advised actions, and ad-hominem attacks are making the Weiser Firm radioactive!

Have a wonderful weekend.

**From:** James Ficaro [mailto:jmf@weiserlawfirm.com]
**Sent:** Friday, April 6, 2018 11:29 AM
**To:** Michael Hartleib <mjhartleib@gmail.com>
**Subject:** FW: ROSS-WILLIAMS - Appellate Case No 17-117139-A

Mr. Hartleib, see attached filing.


**From:** Laura Jakubec <lauraj@dollar-law.com>
**Sent:** Friday, April 6, 2018 2:05 PM
**To:** mark.mcgrory@eriseip.com; jay.kasner@skadden.com; scott.musoff@skadden.com; jennifer.berhorst@bryancave.com; sarah.holdmeyer@bryancave.com; Marco H <mhartleib@gmail.com>
**Cc:** Tom Hershewe <tom@dollar-law.com>; Robert Weiser <rw@weiserlawfirm.com>; Brett Stecker <bds@weiserlawfirm.com>; James Ficaro <jmf@weiserlawfirm.com>
**Subject:** Re: ROSS-WILLIAMS - Appellate Case No 17-117139-A

Counsel/Parties - attached is a courtesy copy of Opposition to Hartleib Motion to Reconsider and Vacate the Protective Order.


Laura Jakubec, Legal Assistant
lauraj@dollar-law.com



DOLLAR
BURNS &
BECKER
TRIAL ATTORNEYS

1100 Main Street, Suite 2600
Kansas City, MO 64105
Phone: (816) 876-2600
Fax: (816) 221-8763

This electronic message transmission and any files transmitted with it, are a communication from the law firm of Dollar Burns & Becker, L.C. This message contains information protected by the attorney/client privilege and is confidential or otherwise the exclusive property of the intended recipient or Dollar Burns & Becker, L.C. This information is solely for the use of the individual or entity that is the intended recipient. If you are not the designated recipient, or the person responsible for delivering the communication to its intended recipient, please be aware that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this electronic transmission in error, please notify by telephone (877-816-2600), or by electronic mail (lauraj@dollar-law.com) and promptly destroy the original transmission. Thank you for your assistance. NOTICE: The Missouri Bar and Missouri Supreme Court require all Missouri attorneys to notify e-mail recipients that e-mail is not a secure method of communication, that it may be copied and held by any computer through which it passes, and persons not participating in the communication may intercept the communication. Should you wish to discontinue this method of communication, please advise, and no further e-mail communication will be sent.

# EXHIBIT 16

**From:** Michael Hartleib
**Sent:** Wednesday, April 12, 2017 10:43 AM
**To:** Laura Jakubec
**Cc:** mark.mcgrory@eriseip.com; jay.kasner@skadden.com; scott.musoff@skadden.com; James M. Ficaro ; Brett Stecker
; George C. Aguilar ; Jay N. Razzouk ; Tom Hershewe ; Boren, Jill, Dca ; Robert Weiser ; Brian J. Robbins
**Subject:** Re: ROSS-WMS v. SPRINT - Appellate Case No. 17-117139-A

When your position is indefensible, attack your opponent with claptrap. What an embarrassment to the bar! See you in Court.

Sent from my iPhone

On Apr 12, 2017, at 6:22 AM, Laura Jakubec <lauraj@dollar-law.com> wrote:

    Counsel - please find a courtesy copy of the following which was e-filed today. Thank you.

    Laura Jakubec, Legal Assistant
    lauraj@dollar-law.com

    1100 Main Street, Suite 2600
    Kansas City, MO 64105

1

Phone: (816) 876-2600
Fax: (816) 221-8763

This electronic message transmission and any files transmitted with it, are a communication from the law firm of Dollar Burns & Becker, L.C. This message contains information protected by the attorney/client privilege and is confidential or otherwise the exclusive property of the intended recipient or Dollar Burns & Becker, L.C. This information is solely for the use of the individual or entity that is the intended recipient. If you are not the designated recipient, or the person responsible for delivering the communication to its intended recipient, please be aware that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this electronic transmission in error, please notify by telephone (877-816-2600), or by electronic mail (lauraj@dollar-law.com) and promptly destroy the original transmission. Thank you for your assistance.NOTICE: The Missouri Bar and Missouri Supreme Court require all Missouri attorneys to notify e-mail recipients that e-mail is not a secure method of communication, that it may be copied and held by any computer through which it passes, and persons not participating in the communication may intercept the communication. Should you wish to discontinue this method of communication, please advise, and no further e-mail communication will be sent.

# EXHIBIT 17

**From:** Hines, Loretta M.
**Sent:** Wednesday, April 26, 2017 3:28 PM
**To:** Robert Weiser
**Subject:** Threatening Letter - rec'd 4/25/17

Mr. Weiser,

The attached letter was received in Chambers yesterday, 4/25/17. Five other Judges in Chester County received the same letter. Judge Sarcione thought you should be alerted since you are referenced in the letter. Please feel free to contact Chambers if you feel it necessary or have any questions or concerns.

*Loretta M. Hines, Judicial Assistant*

*to the Hon. Anthony A. Sarcione*
*Chester County Justice Center*
*201 W. Market Street, Suite 6213*
*PO Box 2746*
*West Chester, PA 19380-0989*
*Phone: 610.344.5900*
*FAX: 610.344.5596*

This County of Chester e-mail message, including any attachments, is intended for the sole use of the individual(s) and entity(ies) to whom it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended addressee, nor authorized to receive for the intended addressee, you are hereby notified that you may not use, copy, disclose or distribute to anyone this e-mail message including any attachments, or any information contained in this e-mail message including any attachments. If you have received this e-mail message in error, please immediately notify the sender by reply e-mail and delete the message. Thank you very much.



FOREVER USA

KENNETT SQUARE PA
APR 2 4 20

USPS

PURPLE HEART 15

Judge Anthony Scarcione
201 W. Market st. suite  4100
PO Box 2746, West Chester Pa
Zip>>>>  19380-0989

A. Nonymous Esquire
105 East  Evans Street
Suite " C "
West Chester Pa  19380

RECEIVED
APR 2 5  2017

Attorney e-Newsletter - March 2017

RECEIVED
APR 2 5 2017

**Subject:** Attorney e-Newsletter - March 2017
**From:** Disciplinary Board of the Supreme Court of Pennsylvania <news@padisciplinaryboard.org>
**Date:** 3/28/2017 3:20 PM

Click here to view this email in your browser

## Attorney News - March 2017

### Articles & Updates

- **Court Docks Pennsylvania Firm for Disbarred Lawyer Billings**

- **Annual Attorney Registration Opens in May**

- **Tip of the Month: Who Do I Call?**

- **Supreme Court Seeks Volunteers**

- **Lawyer's Pants Catch on Fire During Argument**

### Things to Remember

- **Follow the Disciplinary Board on Twitter**

*What, if anything, do you intend to DO about this!!..*

*This newsletter is intended to inform and educate members of the legal profession regarding activities and initiatives of the Disciplinary Board of the Supreme Court of Pennsylvania. To ensure you receive each newsletter and announcement from the Disciplinary Board of the Supreme Court of PA, please add us to your "safe recipients" list in your email system. Please do not reply to this email. Send any comments or questions to comments@padisciplinaryboard.org.*

## Court Docks Pennsylvania Firm for Disbarred Lawyer Billings

A Berwyn, Pennsylvania firm involved in a multimillion dollar shareholder lawsuit against cellphone provider Sprint was stunned when a Kansas judge **docked its attorney fees award by nearly 90%**. The action came after the Weiser Firm **advised the court** that a contract lawyer who compiled a massive number of hours on the case was in fact a disbarred former lawyer.

The firm included in its attorney fees claim a figure of 6,905 hours of service valued at $1.5 million for Alexander J. Silow, a contract attorney who reviewed discovery documents in the case.  A lawyer named Alexander J. Silow is admitted to the Pennsylvania bar in active status, but the person who performed the work for the Weiser Firm was not him. The imposter was Jeffrey M. Silow, who consented to disbarment in 1987.

A staffing agency placed Silow with the Weiser firm in 2008. The Wall Street Journal reports that despite his disbarment, Silow apparently worked for the staffing agency as a contract attorney for at least eight years prior to that.

Kansas Judge James Vano slashed the firm's requested $4.25 million to $450,000. The firm maintains that despite Jeffrey Silow's deceptions as to his licensure, its records are accurate and that the award is justified based on the results.  An appeal is pending.

## Annual Attorney Registration Opens in May

**May 8th – Online Registration Portal Opens**
**July 1st – Registration Due Date**

Online registration for Active and Inactive Attorneys, Attorney Participants in Defender or Legal Services Programs, In-House Counsels, and Foreign Legal Consultants will soon be open. Do not attempt to complete the annual registration process prior to May 8th. The ability to register online will not be available for attorneys who are currently on Retired status or are Administratively Suspended.

Attorneys have the option to pay their annual fee by credit card or by voucher and check. Last year, 60,790 attorneys paid with a credit card and 13,700 attorneys paid by voucher.

### License Status with the Pennsylvania Bar

| | |
|---|---|
| Active | 65,522 |
| Inactive | 10,726 |
| Retired | 17,447 |

**What, if anything , should the Chester County  Judiciary
do about the WEISER  lawfirm
located at Cassatt drive in Berwyn Pennsylvania?**

**This ball has bounced into your lap because the Chester County
Bar association likes to (1) plan picnics, (2) do seminars with
guest speakers, (3) hold "chummy bench-bar events" where the
lawyers in West Chester can snuggle up to the Judges before
whom they practice and (4) other meaningless social activities .**

**When it comes to exercising discipline and control over the very
profession of lawyer, so that the profession can continue on its
very marginal journey toward public acceptance and respect.....
well........ you know..... that's  a  troubling matter and sometimes,
you know..... it's better to just let things work themselves out !!!**

**In other words, we ain't going to do shit about this !!!!**

**The Weiser lawfirm is a six(6) man operation located on Cassatt drive in
Berwyn , Chester County. This ugly situation involves the famous...... or
should we say "INFAMOUS" class action lawsuit. Known as the pride of
the Ninth Circuit Court of Appeals in Northern California. It involves a
simple but very  lucrative operation. You get a friendly judge--- ------the
friendlier the better--- to award class action status to your firm in order
to "economically (HaHaHa)" represent a class of people who might not
otherwise be able to sue the offending corporation on an individual basis.
Whne the smoke clears, every member of the class gets $26.54 and you
get $4.5 million dollars. In this case, Andrew Silow Esquire, who _DOES
HAVE_ a license to practice law in Pennsylvania was ~~actually~~ putting in
6,905 hours of work and billing $4.5 million. But then...OMG... it wasn't
Andy at all. It was Jeff Silow who had been disbarred 30 years ago in
1987 who was billing 6,905 hours for the WEISER lawfirm. Judge
JIMMIE VANO in Kansas, God Bless His soul, caught the firm in the act
and knocked  out 90% of their billing They claimed shock & surprise.**

Imaginary dialogue:

"We were totally shocked to find out that he wasn't Andy after all but that he was Jeff"

Did he always answer to the name Andy so that if someone said "Hey Andy, come here and look at this?", he would automatically respond "Well...... yes, probably... I would say probably"

Did he ever take a phone call for Jeff Silow?

"Well.....I actually can't recall if he did or not. I mean it was not a thing that we paid attention to"

When he cashed office checks in his name was the name Andy Silow on each and every check. If we audited all of the checks written to him over the last 3 years, would all of them have been issued to Andrew Silow and endorseed by Andrew Silow?

"Well..... I am not sure about that. We will have to go back and check our records"

Do you have any idea what 6,905 billable hours comes to ?

"Not really"

Would you be surprised if , at 40 hours a week for every week in the year it comes to 162 weeks and that comes to over 3 consecutive years?

(No Response)

Weren't you just a little suspicious that he spent every working hour of every day in the week , for over 3 years on just one file in the office?

"Well........ YES ..... it did strike us as a little bit odd. Yes"

How could you pay him salary for over 3 years if he worked on only one file in the office? That's a little absurd isn't it?

"Well I get where you are going with this line of questioning. Are you saying that we knew that he was a disbarred lawyer and we were trying to milk the class action jackpot with his phony billing"

You said it better than I could.

"Well, you can GO FUCK YOURSELF ASSHOLE. I'M OUT OF HERE AND YOU CAN TALK TO MY LAWYER IF YOU WANT

.

# EXHIBIT 18

**From:** Michael Hartleib
**Sent:** Saturday, May 19, 2018 5:40 PM
**To:** 'Laura Jakubec' ; mark.mcgrory@eriseip.com; jay.kasner@skadden.com; scott.musoff@skadden.com; jennifer.berhorst@bryancave.com; sarah.holdmeyer@bryancave.com
**Cc:** 'Tom Hershewe' ; Robert Weiser ; Brett Stecker ; James M. Ficaro
**Subject:** RE: ROSS-WMS v. Spring, et al. - Appellate Case No.: 17-117139-A

Plaintiff Counsel, and I use this term loosely, when making false allegations against a party I would suggest you at least get it right. I am no expert, but I am pretty sure it would be libelous! I will demonstrate its proper use posthaste!

**From:** Laura Jakubec [mailto:lauraj@dollar-law.com]
**Sent:** Friday, May 18, 2018 2:12 PM
**To:** mark.mcgrory@eriseip.com; jay.kasner@skadden.com; scott.musoff@skadden.com; jennifer.berhorst@bryancave.com; sarah.holdmeyer@bryancave.com; Michael Hartleib <mjhartleib@gmail.com>
**Cc:** Tom Hershewe <tom@dollar-law.com>; Robert Weiser <rw@weiserlawfirm.com>; Brett Stecker <bds@weiserlawfirm.com>; James Ficaro <jmf@weiserlawfirm.com>
**Subject:** ROSS-WMS v. Spring, et al. - Appellate Case No.: 17-117139-A

Counsel - please find a courtesy copy of the pleading which was efiled this afternoon in this matter. Thank you.

Laura Jakubec, Legal Assistant
lauraj@dollar-law.com

# DOLLAR
# BURNS&
# BECKER
TRIAL ATTORNEYS

1100 Main Street, Suite 2600
Kansas City, MO 64105
Phone: (816) 876-2600
Fax: (816) 221-8763

This electronic message transmission and any files transmitted with it, are a communication from the law firm of Dollar Burns & Becker, L.C. This message contains information protected by the attorney/client privilege and is confidential or otherwise the exclusive property of the intended recipient or Dollar Burns & Becker, L.C. This information is solely for the use of the individual or entity that is the intended recipient. If you are not the designated recipient, or the person responsible for delivering the communication to its intended recipient, please be aware that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this electronic transmission in error, please notify by telephone (877-816-2600), or by electronic mail (lauraj@dollar-law.com) and promptly destroy the original transmission. Thank you for your assistance.NOTICE: The Missouri Bar and Missouri Supreme Court require all Missouri attorneys to notify e-mail recipients that e-mail is not a secure method of communication, that it may be copied and held by any computer through which it passes, and persons not participating in the communication may intercept the communication. Should you wish to discontinue this method of communication, please advise, and no further e-mail communication will be sent.

# EXHIBIT 19

**From:** Michael Hartleib
**Sent:** Saturday, June 02, 2018 12:12 AM
**To:** 'Boren, Jill, DCA'
**Cc:** 'Brian J. Robbins' ; James M. Ficaro ; 'George C. Aguilar' ; scott.musoff@skadden.com; jenness.parker@skadden.com; MARK.MCGRORY@ERISEIP.COM; perry.brandt@bryancave.com; sarah.holdmeyer@bryancave.com; jennifer.berhorst@bryancave.com; 'Tom Hershewe' ; Brett Stecker ; Robert Weiser
**Subject:** Judge Presses Lead Plaintiff in State Street Bank Lawsuit on Overbilling Questions | National Law Journal

Dear Ms. Boren, I thought the Honorable James Vano would find the link to the National Law Journal Article of interest. It is clear that the Plaintiff's Bar is rife with corruption, in both Class Action and Derivative cases. Much like the fraud Weiser et.al. committed in the "Ross-Williams" case, it appears to be standard operating procedure for many firms to submit millions in fraudulent fee requests upon the Court. This State Street case involves large well established firms and nearly 100 million in fees. At present, it appears Weiser et.al. has not been out done, as there is no mention of the unlicensed practice of law by a convicted felon using an alias.

I will be contacting the Special Master, and filing an Amicus Brief in the State Street case to inform them of the chicanery that has taken place in the "Ross-Williams" case. Although entirely unrelated, it presents a troubling pattern of fraud and corruption in these lawyer driven cases. I will be seeking public dissemination of the Special Master's report to show the breadth of corruption within the Plaintiffs Bar. The actions of Weiser et.al. and the Firms in the State Street case is the very definition of Racketeering, and warrants legislative reform.

https://www.law.com/nationallawjournal/2018/05/31/judge-presses-lead-plaintiff-in-state-street-bank-lawsuit-on-overbilling-questions/

Michael Hartleib 646-494-5901

# EXHIBIT 20

**From:** Michael Hartleib
**Sent:** Friday, August 17, 2018 10:45 PM
**To:** Robert Weiser
**Cc:** Brett Stecker
**Subject:** Forthcoming hearing

Rob, will you be at the Witmer v Steven hearing on the 27th? I will do my best to attend. I am very familiar with Judge Carney? We can discuss my concerns with L.C, A 10 and several other companies in which I am a shareholder. It appears we will be forced to deal with each other for the foreseeable future. In hindsight, I should have avoided stocks, and invested more in real estate. Our interest were supposed to be aligned. Instead, I was attacked! If you have any questions, or wish to proffer an apology, you know how to reach me. That said, other action is eminent!

# EXHIBIT 21

1

2

**IN THE DISTRICT COURT NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

3

4   GEORGE ASSAD, derivatively on behalf of

5   EQUIFAX, INC.,

                Plaintiff,

6

7   -against-

8   RICHARD F. SMITH, JOHN W.

9   GAMBLE, JR., JOHN J. KELLY, III,
    RODOLFO O.PLODER, JOESPH M.

10  LOUGHRAN, III, ROBERT D. DELEO,
    WALTER W. DRIVER, JR., MARK

11  L.FEIDLER, G. THOMAS HOUGH, L.
    PHILLIP HUMANN, ROBERT D.

12  MARCUS, SIRI S. MARSHALL, JOHN A.

13  MCKINLEY, ELAN B. STOCK and

14  MARK B. TEMPLETON,

15              Defendants,

16      -and-

17  EQUIFAX, INC., a Georgia Corporation,

18              Nominal Defendant.

19

20

Case No.: 1:18-cv-00477-TWT

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

MAR 1 5 2018

JAMES N. HATTEN, Clerk

By: _____ Deputy Clerk

21

22

23  **MICHAEL HARTLEIB, SHAREHOLDER AND CONCERNED CITIZEN,**

24  **MOTION FOR ACCEPTANCE OF AMICUS CURIAE BRIEF IN**
    **OPPOSSITION TO THE APPOINTMENT OF THE WEISER FIRM AS CO-**

25  **LEAD COUNSEL**

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## STATEMENT

Your Honor, Michael Hartleib respectfully seeks leave of the Court, allowing the filing of his Amicus Brief to inform the Court of troubling abuse of process by Weiser et.al. Details of which, are outlined in the Amicus Brief and exhibits. Whereby, providing information germane to the Courts appointment of Weiser et.al as co-lead Counsel. The Court must know of their chicanery in order to protect the public interest and shareholders of Equifax derivatively. It appears that Weiser et.al. failed to inform the Court of the ongoing Pennsylvania Bar investigation, and criminal charges against one of their attorney's. This not surprising considering their contemptuous actions before the Kansas Courts. Their candor or lack thereof should help the Court decide whether leave should be granted.

## CONCLUSION

Your Honor, for all of the reasons set forth in the Amicus Brief, I hereby request the Court grant leave to file said brief, and reconsider the appointment of Weiser et.al. as co-lead Counsel.

Respectfully,

Michael Hartleib
(646) 494-5901
mjhartleib@gmail.com
27020 Alicia Parkway Suite G
Laguna Niguel, CA 92677

1

2

## IN THE DISTRICT COURT NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

3

4   GEORGE ASSAD, derivatively on behalf of          Case No.: 1:18-cv-00477-TWT

5   EQUIFAX, INC.,

6                    Plaintiff,

    -against-

7

8   RICHARD F. SMITH, JOHN W.
    GAMBLE, JR., JOHN J. KELLY, III,

9   RODOLFO O.PLODER, JOESPH M.
    LOUGHRAN, III, ROBERT D. DELEO,

10  WALTER W. DRIVER, JR., MARK

11  L.FEIDLER, G. THOMAS HOUGH, L.
    PHILLIP HUMMAN, ROBERT D.

12  MARCUS, SIRI S. MARSHALL, JOHN A.

13  MCKINLEY, ELAN B. STOCK and

14  MARK B. TEMPLETON,

15                    Defendants,

16      -and-

17  EQUIFAX, INC., a Georgia Corporation,

18                    Nominal Defendant.

19

20

21

22

23  ## AMICUS CURIAE BRIEF OF CONCERNED CITIZEN AND

24  ## SHAREHOLDER MICHAEL HARTLEIB IN OPPOSSITION OF THE
    ## APPOINTMENT OF THE WEISER FIRM AS CO-LEAD COUNSEL

25

26

27

28

1
2
3          **STATEMENT**
4
5          Michael Hartleib respectfully submits the following in the public interest, and
6   preservation of jurisprudence as a whole.
7
8
9
10          **OVERVIEW**
11
12   Your Honor, it is with supreme concern that I inform this Court of troubling actions of
13   Weiser et.al, in the state of Kansas by way of a Derivative suit, captioned *Monica*
14   *Ross-Williams v. Robert Bennett et.al, (11-cv-01688) Appellate (17-117139-a).* As a
15   shareholder of Sprint Nextel, with losses in excess of seven hundred thousand dollars, I
16   was forced to defend my interest by objecting to a proposed settlement in the
17   aforementioned case. I had to commence a crash course in Derivative litigation, and
18   partake in an eighteen-month battle, which continues today, awaiting an Appellate
19   Court ruling. The so-called reforms outlined in the settlement were illusory and
20   misdirected, as the nominal Defendant in which the case was brought no longer exists.
21   Sprint Nextel was acquired by Softbank. Weiser et.al lied, misleading the court to infer
22   jurisdiction it lacked. They filed the case against Sprint Nextel, a Kansas corporation,
23   but sought to impose reforms on Sprint, a newly formed Delaware corporation in
24   violation of their bylaws. They failed to file a change of party notice in an attempt to
25   confuse the Court and avoid challenges of standing, and subject matter jurisdiction.
26   They used an **unfit plaintiff** who had little or no involvement in the case. On March 6,
27   2017, I called Monica Ross-Williams, whereby it became painfully clear that she was
28   wholly uninformed. She was not aware of Judge Vano's scathing orders, or that an

1   appeal was filed on her behalf. *(See exhibit A, Orders from Judge Vano)* She was

2   unaware that Weiser et.al. committed perjury and admitted to billing fraud. Mr. Weiser

3   failed to provide his "client" with copies of letters sent to Judge Vano, and Appellate

4   Clerk Douglas Shima, admitting to fraud upon the Court. *(See exhibit B, Weiser letters)*

5   During the call, she continually referred to herself as the Defendant, until I informed

6   her that she was in fact the plaintiff. *(See exhibit C, declaration of Michael Hartleib)*.

7

8       Your Honor, the actions by these so-called officers of the Court is truly

9   unconscionable. Weiser et.al. submitted over eight thousand hours in fraudulent

10  billing, seeking 4.5 million dollars in fees, 1.6 million of which submitted by a

11  criminal and disbarred attorney using his son's name, Alexander as an alias. Mr.

12  Jeffrey Mark Silow has worked for the Weiser firm for over 10 years, billing millions

13  of dollars in illicit fees, in a multitude of cases across the country. Jeffrey Mark Silow

14  was convicted and disbarred in 1989 for insurance fraud, mail fraud, and forgery. Mr.

15  Silow was caught after forging a will, making himself the beneficiary of a million

16  dollar estate, stealing the inheritance from the rightful heirs. *(See exhibit D, WSJ*

17  *article)*

18

19      After providing information to the Class Action Fairness Center, Ted Frank

20  confronted the Weiser firm about Mr. Silow's status. With a proverbial gun to his head,

21  Mr. Weiser attempts to exonerate his firm by claiming to be a **victim** of Mr. Silow's

22  chicanery. In letters to the Court, Mr. Weiser states that he was unaware of Silow's

23  disbarred status and criminal past. Weiser claims that he had no idea that Alexander

24  was not Silow's real name. Clearly, this strategy was not well thought out. Attached to

25  the letters was a copy Mr. Silow's resume from Abelson Legal Services, proving Mr.

26  Silow was presented as Jeffrey Mark, not Alexander at the time of hire. In addition, the

27  resume shows Mr. Silow as an attorney in the District Columbia, never Pennsylvania

28  as Weiser et.al. averred under penalty of perjury. In open Court, and through pleadings,

1  Weiser et.al makes more false statements, by claiming Mr. Silow was a securities
2  expert, who bills at $350 dollars per hour. Mr. Stecker has made all appearances on
3  behalf of the Weiser firm; he has repeatedly perjured himself, found himself unable to
4  answer the most rudimentary of questions regarding his case. Frankly Your Honor, his
5  appearances were an utter embarrassment to the Plaintiff's Bar. During a six-hour
6  settlement hearing, Judge Vano expressed skepticism over the eight thousand hours
7  billed in the stayed case. He warned Weiser et.al. to take a careful look at their fee
8  request. Instead of heeding Judge Vano's advice, **plaintiff's counsel doubles down**,
9  filing perjuriously declarations. In Mr. Silow's declaration he admonishes Judge Vano,
10  stating "*how dare you question my hours, I have worked each and every one of these*
11  *hours, and have been an officer of the Court in good standing for over forty years,*
12  *without so-much as a disciplinary action.*" *(See exhibit E, Silow declaration)* This,
13  while knowing his status as a criminal and disbarred attorney.
14
15      Weiser et.al. would stop at nothing to protect their criminal enterprise, I was
16  subjected to vicious ad hominem attacks as I exposed their duplicitous acts and
17  conspiracies against the Court. Sadly, this is not an isolated incident; in fact, this is the
18  fourth case in which Weiser et.al has falsely purported to represent the interest of a
19  corporation in which I was a large shareholder, having lost hundreds of thousands of
20  dollars! These cases have been entirely lawyer driven, as this firm sees plaintiff's as a
21  **"necessary nuisance".** They do not want an aggrieved party demanding tangible relief
22  on behalf of a company. At best, they seek a disinterested party who will not object to
23  a settlement providing nothing more than millions in attorney's fees. Fortunately, the
24  Honorable James Vano was not convinced by the Weiser firm's self-serving
25  arguments, or their desperate attempts proffering support for their fees. Judge Vano
26  ordered Weiser et.al. to submit their time-logs for an in-camera review. After six
27  months of careful deliberation, Judge Vano issued the first of two scathing orders,
28  wherein he excoriates Weiser et.al, finding that the time-logs submitted were not

1   credible, henceforth they were fraudulent! Although Judge Vano narrowly approved
2   the settlement, he slashed the 4.5-million-dollar fee request by **ninety percent,**
3   awarding a total of 450 thousand dollars in fees, and expenses. This was prior to the
4   Court's knowledge of Silow's criminal past and disbarred status.
5
6       Your Honor, it is unconscionable to think that after Judge Vano's highly critical
7   orders, that Weiser et.al. would not except the ruling, and quit while ahead, clearly
8   dodging a bullet. Instead, with hubris and utter contempt for the Court, they have the
9   temerity to ask Judge Vano for what is <u>tantamount to a</u> **do-over,** in the form of a
10  motion to Alter or Amend. *(See exhibit F, Objector's response to second Motion to
11  Alter or Amend)* They ask Judge Vano to remove all of the <u>damaging</u> statements of
12  <u>fact</u>, on the basis that it would <u>"hurt"</u> their reputations. They told Judge Vano that with
13  a few strokes of his pen he could fix everything, saving them untold amounts of
14  money, and countless hours of time trying to defend their contemptuous actions in the
15  case. Rightfully, they were concerned that the damaging orders would prejudice their
16  firm in other cases. They expressed concern, that the orders would be used to inform
17  other Courts of their <u>Self-Dealing</u>, <u>Unclean Hands</u> and <u>Shameful Violations of Public</u>
18  <u>Trust.</u> Wherefore, they confirm and acknowledge the gravity and consequence of their
19  subterfuge. *(See exhibit G, plaintiff's second Motion to Alter or Amend)*. The Motion
20  led to the second scathing order by Judge Vano, wherein he is unconvinced by their
21  absurd requests, and reaffirms his opinion in the strongest of terms. Unbelievably,
22  blinded by greed, Weiser et.al. informs Judge Vano of their intent to appeal the fee
23  reduction. Despite being admonished by Judge Vano, and caught committing billing
24  fraud, Weiser et.al. was unrelenting in their zealous quest for reinstatement of four
25  million dollars in unwarranted fees. Truly reprehensible! During the settlement
26  hearing, Mr. Stecker repeatedly informed Judge Vano that the settlement was obtained
27  through <u>"hard fought litigation"</u>. Mr. Stecker apparently considers the filing of a
28  **piggyback derivative suit** with valid claims, jettisoning said claims, staying the case

for years so that enough time passes to allow one to bill thousands of fraudulent hours, and millions of dollars, "Hard Fought Litigation". Pretending to review millions of documents from a Class Action, led by sister firm Robbins Geller; that facilitates no additional discovery, not a single document request, or deposition over a seven year period is certainly not tantamount to "hard fought" by my standards. Your Honor, from what I have witnessed, it appears Weiser et.al. follows a different set of standards, one that sets the bar at new lows. This perspective coming from a layperson with no legal background. The only thing hard fought in this case, was the Weiser firm's desperate attempt to unjustly enrich themselves by four million five hundred thousand dollars, on the backs of those they falsely purport to represent.

Your Honor an appeal was filed where I ask the Court to remand and rescind the case with directives for punitive sanctions, and a disgorgement order forcing the return of the four hundred fifty-thousand-dollar fee award. I argue that, Monica Ross-Williams, by way of her Counsel has unclean hands and therefore not entitled to equitable relief from the Court. Although initially set for summary calendar, I was able to compel the Appellate Court to grant oral argument. I attended the hearing on 2-13-18, although Robert Weiser was admitted pro hac vice, he failed to attend the hearing. The Weiser firm has retained counsel from an ethics and professional liability firm, likely at the request of their insurer. One could surmise that his failure to appear was on the advice of counsel. Chief Justice, Karen Arnold Burger informed those in attendance that the Court found this case very interesting and would not be as strict with enforcement of its time limits. Wherefore, the Court granted all in attendance more than double the docketed time. Mr. Stecker appeared on behalf of Weiser et.al, where he informed the Court that he had nothing to say, and that the firm stands on its pleadings. The Court was quick to respond, making it clear that they had questions for him regarding the criminal acts of Weiser et.al. Mr. Stecker faced a litany of cross-examining questions from the Appellate Court Justices, whereas he was unable to

provide cogent answers to most. Despite Mr. Stecker's attempts to convince the Court that Weiser et.al. was an unwitting victim of Mr. Silow, the Court appeared less than convinced. Mr. Stecker informed the Court that the Pennsylvania Bar was about to wrap up their investigation into the Weiser firm regarding the Sprint Nextel case, and find no need for disciplinary action, at which time, Justice David E. Burns stated, **"good to know counselor, this Court will be certain that the Pennsylvania Bar gets a copy of its forthcoming order"**. During my fifteen-minute rebuttal, Chief Justice Karen Arnold Burger stated, we concur that fraud was committed in this case with regard to the billing.

Your Honor, what I witnessed in this courtroom was worse than what transpired before the Honorable James Vano, which led to the highly critical orders. By all accounts, it was a train wreck of epic proportion for Weiser et.al. It is my belief that this will be reflected in the forthcoming order, which the clerk says is expected within the next thirty days!

Heretofore, whether Weiser et.al. knew of Mr. Silow's criminal past and disbarred status, is immaterial. Judge Vano clearly states in his order that even a cursory review of the time-logs would allow any reasonable person to ascertain that they were not credible. This begs the question, <u>what is going on at the Weiser firm? Either they are completely corrupt, or entirely inept</u>, whichever the case they are not fit to act as lead on any representative suit. It is undisputed that the Weiser firm has committed criminal acts upon the Kansas Court and a multitude of others across the country.

1
2
3
4

## **CONCLUSSION**

5
6
7
8
9
10
11
12

Your Honor, given the forthcoming order from the Appellate Court, the duplicitous acts of Counsel, and active Bar investigation of the Weiser firm, I respectfully request acceptance of this brief as part of the record, and the reconsideration of the Weiser firm's appointment as lead Counsel in this case. I welcome the opportunity to appear before the Court and provide sworn testimony. I encourage the Court to demand the same of Mr. Weiser. I stand ready to provide any additional information the Court may seek.

13

Respectfully,

14

15

Michael Hartleib

16

20720 Alicia Parkway Suite, G

17

Laguna Niguel C.A. 92677

18

(646) 494-5901

19
20
21
22
23
24
25
26
27
28

# EXHIBIT 22

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| IN RE EQUIFAX, INC. DERIVATIVE LITIGATION | Lead Case No.: 1:18-cv-00317-TWT |
| | (Consolidated with Nos.: 1:18-cv-00477-TWT and 1:18-cv-00577-TWT) |
| This Document Relates To: | (Consolidated Derivative Action) |
| ALL ACTIONS. | Judge Thomas W. Thrash, Jr. |

## OPPOSITION TO MICHAEL HARTLEIB'S MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF

Plaintiff George Assad and his undersigned counsel, The Weiser Law Firm, P.C. (the "Weiser Firm"), respectfully submit this opposition to the Motion for Leave to Amicus Curiae Brief (the "Motion") filed on March 16, 2018 by non-party Michael Hartleib ("Hartleib").   As discussed herein, Hartleib's Motion should be denied and he should not be invited to participate in this shareholder derivative action (the "Action") because, *inter alia*: (a) Hartleib submits his proposed *amicus* filing not as a true, disinterested "friend of the court" or even as a shareholder of Equifax, Inc. ("Equifax"), but purely in an adversarial capacity in his continuing and openly hostile effort to harass and disturb the Weiser Firm, its clients, and other law firms with whom the Weiser Firm works; and (b) the

1

substance of Hartleib's proposed *amicus* filing, which is replete with falsehoods and malicious, prejudicial attacks, has no bearing on this Action and will not assist the Court in fairly, accurately, and efficiently ruling in this Action.[1]

## A.   APPLICABLE STANDARDS FOR PROPOSED *AMICUS* FILINGS

"Whether to permit a nonparty to submit a brief, as *amicus curiae*, is, with immaterial exceptions, a matter of judicial grace." *Nat'l Org. for Women, Inc. v. Scheidler*, 223 F.3d 615, 616 (7th Cir. 2000). "Historically, *amicus curiae* is an **impartial individual** who suggests the interpretation and status of the law, gives information concerning it, and advises the Court in order that justice may be done, rather than to advocate a point of view so that a cause may be won by one party or another." *WildEarth Guardians*, 2012 WL 10028647 at *2. Where, as here, a proposed *amicus* submission comes from an individual with a partisan view, rather than an impartial one, the motion for leave to file an *amicus* brief should be denied,

---

[1]     Moreover, all movants for lead or co-lead plaintiff in this derivative Action and their respective counsel are more than capable of advocating for their positions without Hartleib's involvement or assistance, and Hartleib does not, and cannot, argue otherwise. *See, e.g., Hughes v. White*, 388 F. Supp. 2d 805, n.3 (S.D. Ohio 2005) (motion for leave to file *amicus* brief denied where movant had not argued or demonstrated that counsel did not adequately represent their clients' interests); *WildEarth Guardians v. Lane*, No. CIV 12-118 LFG/KBM, 2012 WL 10028647, at *4 (D.N.M. June 20, 2012) (denying motion for leave to file *amicus* brief and noting that "counsel of the parties…are fully capable of representing their positions without the assistance of an *amicus*…[t]his is not a situation where a party is not represented competently or not represented at all.").

because in such a scenario that individual is not acting as a "friend of the Court." *Leigh v. Engle*, 535 F. Supp. 418, 420 (N.D. Ill. 1982); *see also United States v. Bd. of Cty. Commissioners of the Cty. of Otero*, 184 F. Supp. 3d 1097, 1115 (D.N.M. 2015) (listing the first factor for courts to weigh in whether to accept an *amicus* brief as "whether the proposed *amicus* is a disinterested entity"); *WildEarth Guardians*, 2012 WL 10028647, at *4 (denying motion for leave to participate as *amicus curiae* and noting that movant "Sierra Club is not a disinterested entity").

Indeed, "[c]ourts generally permit *amicus* briefs only where the brief could provide helpful analysis of the law, and the proposed *amicus* has a special interest in the subject matter of the suit, or existing counsel is in need of assistance." *Sierra Club v. Virginia Elec. and Power Co.*, No. 2:15CV112, 2016 WL 5349081, at *2 (E.D. Va. Feb. 4, 2016) (internal quotations omitted).[2]  Otherwise, leave to file an *amicus* brief should be denied.   *Ryan v. Commodity Futures Trading Comm'n*, 125 F.3d 1062, 1063 (7th Cir. 1997).   The reasons for the policy of denying or limiting *amicus* submissions, as described by Judge Posner, include that

---

[2]     It is well-settled that *amicus* submissions are only supposed to provide the Court with helpful, impartial analysis on issues of ***law*** – they are not supposed to present a partisan account of purported ***facts***.  *See, e.g., New England Patriots Football Club, Inc. v. Univ. of Colorado*, 592 F.2d 1196, 1198 (1st Cir. 1979); *Strasser v. Dooley*, 432 F.2d 567, 569 (1st Cir. 1970). Suffice it to say, an *amicus* submission should not focus on attacks on a party's counsel on matters unrelated to the Action.

courts have heavy caseloads and, therefore, need to minimize extraneous filings; that time and other resources required for preparation and study of, and response to, *amicus* briefs drive up the cost of litigation; and that proposed filings of *amicus* briefs are frequently attempts by non-parties to inject their own partisan views into litigation matters. *Voices for Choice v. Ill. Bell Tel. Co.,* 339 F.3d 542, 544 (7th Cir. 2003). That is precisely the circumstance presented by Hartleib in this Action.

## B.   HARTLEIB'S MOTION SHOULD BE DENIED

The term "*amicus curiae*" is old Latin which literally means "a friend of the court," but Hartleib is no "friend" of this Court and is certainly not acting as one. Instead, he acts now purely as an adversary to the Weiser Firm and its clients. Hartleib's vicious and false attacks on the Weiser Firm, submitted to the Court under the guise of a proposed *amicus* filing without notice to or the consent of any of the parties to this Action, are merely Hartleib's latest efforts in his multi-year campaign to harass the Weiser Firm and exact retribution against the Weiser Firm for its refusal to pay Hartleib's extortive requests for money in connection with an unrelated shareholder derivative action. Hartleib is attempting to use his purported *amicus* filing in this Action as a weapon against the Weiser Firm and its clients, and this Court should not permit Hartleib's brazen abuse of the *amicus* mechanism to the partisan detriment of plaintiffs in this Action.

4

The proposed *amicus* filing before this Court can only be viewed in the context of Hartleib's unique relationship and history with the Weiser Firm, and when viewed in that context, it is obvious that Hartleib is anything but "impartial." In 2009, the Weiser Firm first came into contact with Hartleib and briefly considered representing Hartleib in connection with a shareholder derivative action to be brought on behalf of the company then known as Sprint Nextel Corp. ("Sprint") arising from Sprint's merger with Nextel Corp. The Weiser Firm ultimately elected not to represent Hartleib in connection with that matter, however, because Hartleib intimated his intention to receive material compensation for his role as a derivative plaintiff. *See* Declaration of Robert B. Weiser ("Weiser Decl.") filed herewith at ¶¶5-8, Ex. A.[3] The Weiser Firm would not then, and will not now, ever agree to any such improper and unethical financial proposal from a derivative client.

The Weiser Firm would later go on to represent another Sprint shareholder in connection with that derivative action and would coordinate its efforts and collaborate with several other law firms and their clients in that case. After several years, the Sprint derivative litigation was settled for a comprehensive set of corporate governance reforms for the benefit of Sprint, negotiated with the

---

[3] In addition, the Weiser Firm was concerned that Hartleib suffered from a conflict of interest in pursuing the derivative litigation. *Id.* at ¶¶5-8.

assistance of The Honorable Layn Phillips, a former U.S. District Court judge acting as neutral mediator. Hartleib objected to the settlement, allegedly because he did not believe the settlement was in the best interests of Sprint, but made his true intentions clear by contacting the managing partner of the Weiser Firm days prior to the May 26, 2016 settlement hearing before the trial court and offering to withdraw his objection if the Weiser Firm was willing to enter into a lucrative "consulting agreement" with Hartleib. Weiser Decl. at ¶10. Of course, the Weiser Firm rejected Hartleib's improper and outrageous overture, just as years earlier it had refused to represent Hartleib as a derivative plaintiff in light of his improper demands for compensation. *Id.* Although the agreed-to, mediated fee for plaintiffs' counsel was ultimately reduced by the trial court in Sprint case, the settlement was eventually approved over Hartleib's objection, and Hartleib has appealed both that decision and the trial court's denial of Hartleib's application for financial compensation to the Kansas Court of Appeals.

Hartleib's proposed *amicus* filing in no way informs any issue before the Court in this Action and should not be permitted on the docket. Hartleib is not an "impartial individual" suggesting the proper interpretation of any law, but rather a serial harasser of the Weiser Firm and its clients. In March 2017, the Weiser Firm sought and obtained a protective order from the Kansas Court of Appeals in order

to stop Hartleib's vexatious and threatening phone calls and e-mails to its client in the Sprint derivative action in violation of the Kansas Rules of Professional Conduct. *See* Weiser Decl. at Ex. B. Notably, the Weiser Firm was forced to take this drastic step and obtain the protective order for its client in the Sprint derivative litigation because even after the Weiser Firm's client and the Weiser Firm directed Hartleib to cease and desist, Hartleib expressly refused to do so. *Id*. at Ex. C. The Protective Order was granted on March 30, 2017. *Id*. at Ex. D.

Hartleib has no interest in being a "friend of the Court" – but he seemingly has limitless interest in trying to antagonize and harm the Weiser Firm. Because Hartleib's "proffer comes from an individual with a partisan, rather than impartial view, the motion for leave to file an *amicus* brief is to be denied, in keeping with the principle that an *amicus* must be a friend of the court and not a friend of a party to the cause." *Leigh*, 535 F. Supp. at 420; *see also Bd. of Cty. Commissioners of the Cty. of Otero*, 184 F. Supp. at 1115 (listing the first factor for courts to weigh in whether to accept an *amicus* brief as "whether the proposed *amicus* is a disinterested entity").

Further, as if his open hostility to the Weiser Firm and its clients were not enough to disqualify Hartleib's proposed *amicus* brief, the contents of his brief have no "necessary bearing on this case [and] do not assist the Court in fairly,

7

accurately, and efficiently resolving this matter." *Sierra Club*, 2016 WL 5349081 at *3; *Hughes*, 388 F. Supp. 2d at 805, n.3 (denying motion for leave to file *amicus* brief where proposed brief attempted to introduce irrelevant "facts" into the record). The brief only includes Hartleib's warped recitation of purported "facts" about the Weiser Firm and contains no legal analysis whatsoever as to any issue before the Court in this Action. *See, e.g., New England Patriots Football Club*, 592 F.2d at 1198 ("While *amici* properly may provide assistance to the court on a legal question or present their view of a legal issue, they cannot properly present a partisan view of the facts."); *Strasser*, 432 F.2d at 569 ("An *amicus* who argues facts should rarely be welcomed."). Therefore, the proposed *amicus* brief must not be considered.

As to Hartleib's twisted account of the "facts," while the Weiser Firm will not address every fabricated quotation or outright lie in Hartleib's proposed *amicus* brief here,[4] the Court should be aware of certain facts pertaining to Jeffrey M. Silow, who was employed on several occasions by the Weiser Firm as a contract attorney through a legal search and placement firm, Abelson Legal Search, to perform document review work. Weiser Decl. at ¶16. In February 2017, the

---

[4]   Should the Court grant the Motion – which it should not – the Weiser Firm reserves all rights with respect to a substantive response thereto.

8

Weiser Firm was notified that Mr. Silow had been disbarred nearly twenty years ago and was using a fake bar identification number while holding himself out as being a member in good standing of the bars of the Commonwealth of Pennsylvania and the District of Columbia.[5] *Id.* at ¶17. The legal recruiting service was responsible for vetting the credentials of attorneys it placed and falsely held out Mr. Silow as a licensed attorney in good standing to the Weiser Firm. *Id.* at ¶16.

After learning of this deceit, the Weiser Firm immediately: (1) severed all ties with the independent contractor Mr. Silow; (2) notified the judge in every action where Mr. Silow's hours were reported as part of a lodestar calculation as being "attorney time"; (3) self-reported the incident to the Disciplinary Board of the Supreme Court of Pennsylvania; (4) notified the Montgomery County, Pennsylvania District Attorney and pressed criminal charges against Mr. Silow; and (5) instituted a civil action against Mr. Silow and Abelson Legal Search, which is currently pending in the Pennsylvania Court of Common Pleas for Chester County. *Id.* at ¶18. Since then, Mr. Silow has pled guilty to three criminal counts

---

[5]    Mr. Silow would represent himself to be his son, Alexander L. Silow, an actual member in good standing of the Pennsylvania bar. *Id.* at ¶19.

in Pennsylvania[6] and the Weiser Firm is unaware of any ongoing investigation by the Disciplinary Board of the Supreme Court of Pennsylvania regarding the Weiser Firm or any of its attorneys. *Id.* at ¶¶20, 22.

Hartleib's very use of the Silow scenario in his proposed *amicus* submission for this Action and his conclusory mischaracterizations thereof, by maliciously presuming the Weiser Firm's knowledge of Mr. Silow's disbarred status and false affidavit to the Court, definitively demonstrates Hartleib's lack of actual interest in the subject matter of the Action and his animus to the Weiser Firm. Hartleib is seeking to extend his malicious campaign against the Weiser Firm from the Sprint derivative action to this Action, where the focus should be on the aggressive prosecution of the rights of Equifax.[7] The issues raised by the Motion and the proposed *amicus* submission, apart from being demonstrably false, have no relevance to this Action and the Weiser Firm respectfully requests that the Motion be denied.

---

[6]    On December 19, 2017, Mr. Silow pled guilty to the following charges: Unauthorized Practice of Law (42 Pa.C.S. §2524), Unsworn Falsification to Authorities (18 Pa.C.S. §4904(b)) and Securing Execution of Documents by Deception (18 Pa.C.S. §4114). *Id.* at ¶20.

[7]    While Hartleib vaguely describes himself in the Motion as a "shareholder," he conspicuously never refers to himself as a shareholder of Equifax, nor has he offered any proof that he is a current Equifax stockholder.

10

Dated: March 22, 2018                     **THE WEISER LAW FIRM, P.C.**

                                          *s/ Brett D. Stecker*
                                          Brett D. Stecker
                                          Robert B. Weiser
                                          James M. Ficaro
                                          22 Cassatt Avenue
                                          Berwyn, PA 19312
                                          Telephone:  (610) 225-2677
                                          Facsimile:  (610) 408-8062
                                          bds@weiserlawfirm.com
                                          rw@weiserlawfirm.com
                                          jmf@weiserlawfirm.com

                                          *Counsel for Plaintiff George Assad*

11

## RULE 7.1(D) CERTIFICATION

The undersigned counsel certifies that this document has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1(C).

Dated: March 22, 2018

                                              */s/ Brett D. Stecker*
                                              Brett D. Stecker (admitted *pro hac vice*)
                                              THE WEISER LAW FIRM, P.C.
                                              22 Cassatt Avenue
                                              Berwyn, PA 19312
                                              Telephone:  (610) 225-2677
                                              Facsimile:  (610) 408-8062
                                              bds@weiserlawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of March 2018 I electronically filed the above and foregoing with the Clerk of the Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

/s/ Brett D. Stecker
Brett D. Stecker (admitted *pro hac vice*)
THE WEISER LAW FIRM, P.C.
22 Cassatt Avenue
Berwyn, PA 19312
Telephone:  (610) 225-2677
Facsimile:  (610) 408-8062
bds@weiserlawfirm.com

# EXHIBIT 23

**From:** Michael Hartleib
**Sent:** Thursday, March 22, 2018 11:41 PM
**To:** James M. Ficaro
**Cc:** michaelhartleib@cox.net; Robert Weiser
**Subject:** Re: Response to Motion

James, much appreciated, I received these filings several hours ago! Let Rob know he is making a catastrophic mistake!

Sent from my iPhone

On Mar 22, 2018, at 8:20 PM, James Ficaro <jmf@weiserlawfirm.com> wrote:

> Mr. Hartleib, attached please find the filing made in the Equifax action today.
>
> Regards,
>
> Jimmy Ficaro
> **The Weiser Law Firm, P.C.**
> office: 610.225.0206 | fax: 610.408.8062
> 22 Cassatt Avenue | Berwyn, PA 19312

# EXHIBIT 24

**From:** Michael Hartleib
**Sent:** Thursday, April 05, 2018 4:02 AM
**To:** Robert Weiser ; Brett Stecker ; James M. Ficaro
**Cc:** mjhartlieb@gmail.com
**Subject:** Order

Just got home and wanted to make sure that you have this! Good to finally meet you Rob! Like I said, none of this was necessary!

http://assets2.pacermonitor.com/filings/IN_RE_EQUIFAX_INC_DERIVATIVE_LITIGATION/IN_RE_EQUIFAX_INC_DERIVATIVE_LITIGATI ON__gandce-18-00317__0053.0.pdf?X-Amz-Security-Token=FQoDYXdzEHAaDHNpyxtZ9eaCSNpv5SK3A4XhVthj018cuDu654%2FExY4%2Fg9ZaCeCByPPG7i29uIPAyPVOvhytRb5DJeJniWPr8 1PBIdOSLqrsMlpJjgowrxGSIsFTbjSPqy0ZVhh3dtTJAWhUS%2FUutbLl18hwSszkR6YA35WMA4AfBS9e8711qPujeJwAuqTteBi35v4BZW3 Jm3CXcZ8w%2BjDjOCTPVoiZOvgWuh4qvMkM%2BcwmH1%2Fk1AKAPOMd%2BhAO6OfXrhMvLPe2JfRxVZRvvyg8DzEEKL%2BAOihPT QZ1TlNcxSnF5vAUZHe3WNmJt1yVldIDu%2Bp60jpxLIq8oJnT9YWkBXqAliIONs45wrPt37Ng3gyZruDxrLM7MWr7TgZC%2B8qtKCMrYpmy xx6m0GpKNPXoOaW0wYf7U2sIUwfc1vKtqqohCFd6lIK%2FQtDI%2BGy7LPpjRbagA%2BEo84Xm1jQdKnMJFk59tugZptTcF57DPdfkR6uY 4MpxFHbS6FkVmcy%2B9kZBXOuoorJKX1gU%3D&X-Amz-Algorithm=AWS4-HMAC-SHA256&X-Amz-Date=20180405T075451Z&X-Amz-SignedHeaders=host&X-Amz-Expires=600&X-Amz-Credential=ASIAJDQHBFVWORVMWGWA%2F20180405%2Fus-east-1%2Fs3%2Faws4_request&X-Amz-Signature=0f99bf3d5f9b1d5cc8952757237f74f7b8d33ff650f0845aa10a8ddcd6c5c7c5

Sent from my iPhone

1

# EXHIBIT 25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE BIG LOTS, INC.
SHAREHOLDER LITIGATION

Case No. 2:12–cv–445

Judge Michael H. Watson

Magistrate Judge Jolson

## OPINION AND ORDER

Louisiana Municipal Police Employees' Retirement System ("LAMPERS") and City of Atlanta Firefighters' Pension Fund ("Atlanta Firefighters," and together with LAMPERS, "Lead Plaintiffs"), plaintiff Lorene Lamb ("Lamb," and together with LAMPERS and Atlanta Firefighters, the "Consolidated Plaintiffs"), and additional plaintiff Alan Brosz ("Brosz," and together with the Consolidated Plaintiffs, "Plaintiffs") move for an order granting final approval of a derivative litigation settlement ("Settlement")[1] with Defendants Jeffrey Paul Berger, Steven S. Fishman, David T. Kollat, Brenda J. Lauderback, Philip E. Mallot, Russell Solt, Dennis B. Tishkoff, Joe R. Cooper, Charles W. Haubiel II, Timothy A. Johnson, Robert Craig Claxton, John Charles Martin, Norman J. Rankin, Paul Alan Schroeder, Robert Samuel Segal, and Steven Ray Smart (the "Individual Defendants"), and nominal defendant Big Lots, Inc. ("Big Lots" or the "Company," and together with the Individual Defendants, the "Defendants"),

---

[1] The Settlement is memorialized between the parties in a Stipulation and Agreement of Settlement dated December 14, 2017. ECF No. 116-1.

acting through its Special  Litigation Committee ("SLC").  ECF No. 121.  Plaintiffs also move for an award of attorney's fees and expenses.  ECF No. 122.  Both motions are unopposed.  For the following reasons, Plaintiffs' motions are **GRANTED**.

## I.  BACKGROUND

The background of this case is laid out in great detail in the unopposed motion for final approval, ECF No. 121, and does not need to be repeated in-depth in this Opinion except as necessary to analyze the reasonableness of the Settlement.  As an initial overview, it suffices to say that Plaintiffs' only remaining claim against Defendants is for corporate waste by some of Big Lots' current and former officers and directors in connection with an alleged insider selling scheme and stock repurchase plan.  After multiple lawsuits were filed, protracted discovery, rulings on some dispositive motions, and multiple rounds of mediation, the parties agreed on the Settlement.  On April 6, 2018, the Court preliminarily approved the Settlement.  ECF No. 120.  On July 26, 2018, the Court held a fairness hearing.  The Court now considers whether final approval of the Settlement is warranted.

## A.    The Proposed Settlement

The Settlement consists of two primary components: monetary relief and corporate governance reforms.  First, Defendants have agreed that Big Lots' directors' and officers' insurance carriers will pay Big Lots $3.5 million. According to Plaintiffs' counsel, this payment represents a substantial percentage

of the potential damages, which were estimated to be between $8.2 million and $9.8 million.  Joint Decl. ¶ 49, ECF No. 123.  This money will be used to pay Plaintiffs' counsel's legal fees and expenses in this action as well as a portion of the settlement in a separate class action lawsuit (the "Willis Class Action"). Second, the parties have agreed that Big Lots will implement the following corporate governance reforms:

- Strengthening the Company's Insider Trading Policy, including implementing enhanced recordkeeping requirements for pre-clearance requests and a requirement that the General Counsel reports to the Nominating/Corporate Governance Committee on a semiannual basis about the Company's trading compliance program and related topics;

- Continuing to maintain a claw back policy that empowers the Compensation Committee of the Board of Directors to seek recovery of any excessive incentive-based compensation paid to any employee whose misconduct is found to have contributed to the Company's having to prepare an adverse accounting restatement;

- Engaging an outside consultant to provide continuing education to the Board of Directors on corporate governance topics including insider trading and securities laws;

- Enhancing the Company's Whistleblower Hotline procedures, including requiring the Audit Committee to receive and memorialize a report concerning any whistleblower complaint and follow-up action taken related to insider trading; and

- Amend the Company's Corporate Governance Guidelines requiring all directors to attend the Company's annual shareholder meeting in person.

**B.    Notice**

Big Lots submitted the affidavit of Robert W. Trafford ("Trafford"), one of the attorneys for the SLC.  ECF No. 126.  Trafford avers that Big Lots has complied with the notice provisions of the Preliminary Approval Order by

    (a) Posting the Notice of Pendency and Proposed Settlement of Stockholder Derivative Litigation (the "Notice") and the Stipulation and Agreement of Settlement ("Stipulation") on its corporate website on April 13, 2018, where they have remained continuously since that date; and

    (b) Filing the Stipulation and Notice as a Current Report on Form 8-K with the United States Securities and Exchange Commission on April 12, 2018 and posting the Form 8-K on its corporate website on April 13, 2018 where it has remained continuously since that date.

*Id.* at 1–2. The Court finds that there was sufficient notice provided to shareholders pursuant to Federal Rule of Civil Procedure 23.1.

## II. APPROVAL OF THE PROPOSED SETTLEMENT

This derivative action may only be settled with the Court's approval. Fed. R. Civ. P. 23.1(c). The Court "enjoys wide discretion in evaluating the settlement of derivative actions under Rule 23.1." *McDannold v. Star Bank, N.A.*, 261 F.3d 478, 488 (6th Cir. 2001) (citing *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205–06 (6th Cir. 1992)). "Settlements are welcome" in derivative actions and, "[a]bsent evidence of fraud or collusion, such settlements are not to be trifled with." *Granada*, 962 F.2d at 1205 (citations omitted). Relevant factors in evaluating the settlement "include the likelihood of success on the merits, the risk associated with the expense and complexity of litigation, and the objections raised by class members." *Id.* This Court has, on at least one occasion, also considered the other Rule 23(e) factors in determining whether a derivative action settlement should be approved. *McDannold v. Star Bank, N.A.*, No. C-1-94-002, 1999 U.S. Dist. LEXIS 22158, at *13 (S.D. Ohio June 2, 1999) (also

considering the amount of discovery conducted, whether the settlement was the result of an arms-length negotiation as opposed to fraud or collusion, and the opinion of counsel representing the parties), *vacated on other grounds*, 261 F.3d 478 (6th Cir. 2001).  Based on all of these factors, the Court determines that the Settlement is fair, reasonable, and adequate.

## A.    Likelihood of Success on the Merits

"The most important of the factors to be considered in reviewing a settlement is the probability of success on the merits. The likelihood of success, in turn, provides a gauge from which the benefits of the settlement must be measured." *Poplar Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.*, 636 F.3d 235, 245 (6th Cir. 2011) (quoting *In re Gen. Tire & Rubber Co. Sec. Litig.*, 726 F.2d 1075, 1086 (6th Cir. 1984)).

Both in the motion for final approval and at the fairness hearing, Plaintiffs asserted that they faced significant risks to successfully prosecuting their claims, including defeating the SLC's motion to dismiss and demonstrating Defendants' bad faith breaches of duty and resulting corporate waste.  Mot. 21, ECF No. 121. Defendants assert in their motion to dismiss that the SLC's determination that it was not in Big Lots' best interest to pursue a corporate waste claim is entitled to great deference.  Mot. to Dismiss 20, ECF No. 100.  Plaintiffs go so far as to state in their motion for final approval that their corporate waste claim "would have been exceptionally difficult to prove." Mot. 18, ECF No. 121.  Defendants were already successful on some dispositive motions in this case and had

winnowed down the claims brought to only corporate waste.  The likelihood of success for Plaintiffs was far from assured.  Thus, this factor weighs in favor of approval of the Settlement.

### B.    Complexity, Expense, and Likely Duration of the Litigation

As the Sixth Circuit has noted, derivative actions are "notoriously difficult and unpredictable."  *Granada*, 962 F.2d at 1205 (quoting *Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983)).  "[A]voiding the delay, risks, and costs of continued litigation against a defendant is a valid reason for counsel to recommend and for the court to approve a settlement."  *In re Nationwide Fin. Servs. Litig.*, No. 2:08-cv-249, 2009 U.S. Dist. LEXIS 126962, at *10 (S.D. Ohio Aug. 18, 2009).

This litigation has already lasted several years.  Absent settlement, continued litigation of this case would likely take more than a year and result in the parties incurring significant expense.  There is a pending motion to dismiss, which would likely be followed by motions for summary judgment, expert discovery and *Daubert* motions, and a complex trial.  Additionally, the parties are represented by very sophisticated counsel that would undoubtedly vigorously prosecute and defend the claims in this case.  This supports settlement.

C.    Objections Raised by Shareholders

After having provided sufficient notice, no shareholder objected to the settlement.  This is strong evidence that shareholders believed the settlement to be fair, reasonable, and adequate.

D.    The Amount of Discovery Engaged in By the Parties

To confirm that Plaintiffs "have had access to sufficient information to evaluate their case and to assess the adequacy of the proposed Settlement," the Court considers the amount of discovery engaged in by the parties.  *In re Broadwing, Inc. ERISA Litig.*, 252 F.R.D. 369, 374 (S.D. Ohio 2006).  "In considering whether there has been sufficient discovery to permit the plaintiffs to make an informed evaluation of the merits of a possible settlement, the court should take account not only of court-refereed discovery but also informal discovery in which parties engaged both before and after litigation commenced." *UAW v. Gen'l Motors Corp.*, No. 05-CV-73991-DT, 2006 WL 891151, at *19 (E.D. Mich. Mar. 31, 2006).  In this consideration, "the absence of formal discovery is not unusual or problematic, so long as the parties and the court have adequate information in order to evaluate the relative positions of the parties." *Id*.

The document production in this case totaled nearly 1,000,000 pages of documents.  Mot. 17, ECF No. 121.  The discovery process was hard fought at times, requiring multiple meetings between the parties and court resolution of some of the disputes.  There has been no indication that Plaintiffs lacked

information necessary to assess the strength of their case, which supports approval of the Settlement.

### E.     Arm's-Length Negotiation

The Court finds that there is no evidence—or even a suggestion—that the settlement was the product of fraud or collusion.  *See IUE-CWA v. Gen. Motors Corp.*, 238 F.R.D. 583, 598 (E.D. Mich. 2006) ("Courts presume the absence of fraud or collusion unless there is evidence to the contrary.").  The Settlement is the result of arm's-length, well-researched, and protracted negotiations that took place over the course of multiple years and involved at least two different mediation sessions with Robert A. Meyer, Esq., an experienced mediator.  This favors approval of the Settlement.

### F.     The Opinion of Counsel

The Court gives significant weight to the opinions of Plaintiffs' counsel, who have indicated that the Settlement is fair, reasonable, and adequate.  *See, e.g., Williams v. Vukovich*, 720 F.2d 909, 922–23 (6th Cir. 1983) ("The court should defer to the judgment of experienced counsel who has competently evaluated the strength of his proofs . . . . [T]he deference afforded counsel should correspond to the amount of discovery completed and the character of the evidence uncovered.").  The SLC's counsel has also expressed the opinion that the Settlement benefits the Company.  *See* Joint Decl. ¶ 55, ECF No. 123.

In this case, Class Counsel have extensive experience in complex shareholder derivative and class action litigation and corporate matters.  *See*

*generally* ECF Nos. 123–25 (providing years of experience and background of counsel). After significant discovery and protracted arm's-length negotiations, the parties reached the Settlement. Equipped with extensive experience, counsel have concluded that the Settlement is a good result for Plaintiffs and the Company. The Court therefore finds that this factor favors approval of the Settlement.

After considering the relevant factors, the Court **APPROVES** the Settlement.

## III. ATTORNEY'S FEES AND COSTS

### A.   Attorney's Fees

Plaintiffs' counsel has moved for an award of attorney's fees and costs. ECF No. 122. Defendants do not oppose the motion. In order to assess the reasonableness of the fee request, the Court first determines the method Plaintiffs' counsel used to calculate the fee. In this case, Plaintiffs are seeking a percentage of the fund award. Specifically, Plaintiffs' counsel seeks $1.25 million in fees, which represents 35.7% of the $3.5 million monetary settlement. Fee Mot. 8, ECF No. 122.

Next, the Court must analyze the factors laid out in *Ramey v. Cincinnati Enquirer, Inc.*, which include:

> 1) the value of the benefit rendered to the corporation or its stockholders, 2) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others, 3) whether the services were undertaken on a contingent fee basis, 4) the value of the services on an hourly basis, 5) the

complexity of the litigation, and 6) the professional skill and standing of counsel involved on both sides.

508 F.2d 1188, 1196 (6th Cir. 1974). Each of these factors favors approval of the requested attorney fee award.

First, the Court finds that the Settlement confers a substantial benefit on Plaintiffs. As discussed above, the $3.5 million payment represents a substantial percentage of the potential recovery in this case. Furthermore, as described both in the motion for final approval of the Settlement and at the fairness hearing, the corporate governance reforms that are included in the Settlement will be meaningful in preventing any future misconduct by Big Lots' officers and directors.

Second, society's stake in rewarding attorneys who produce such benefits supports an award of the requested attorney's fees. It is certainly in society's interest to have fiduciary laws and regulations enforced. If experienced counsel, such as the attorneys who represented Plaintiffs here, were unwilling to take on derivative action lawsuits for fear of not being compensated, it would be more difficult to enforce accountability for officers and directors.

Third, Plaintiffs' counsel agreed to undertake this case on a wholly contingent basis. *See* Fee Mot. 18, ECF No. 122. In doing so, Plaintiffs' counsel assumed a real risk by expending time, effort, and money over a period of approximately six years with no guarantee of recovery. This factor weighs in favor of approving the requested fee award.

The Court next considers whether the fourth factor, the value of the services on an hourly basis, favors the proposed fee award.  A cross-check using Plaintiffs' counsel's lodestar weighs in favor of granting the requested fee award. Plaintiffs' counsel has provided evidence that they devoted 6,016.06 hours to this case and incurred a total lodestar of $2,843,323.50.  Joint Decl. ¶ 60, ECF No. 123.  The Court has reviewed the declarations of Plaintiffs' counsel and finds the blended rate charged and hours incurred to be reasonable based on the location and experience of counsel.[2]  Therefore, the requested lodestar multiplier with respect to fees is approximately 0.44.  In other words, Plaintiffs' counsel is taking a substantial discount on their fees as a result of the contingent fee nature of their representation, which strongly supports approval.  *See  Kritzer v. Safelite Sols.*, LLC, No. 2:10–cv–0729, 2012 WL 1945144, at *10 (S.D. Ohio May 30, 2012) ("As for the value of the services rendered on an hourly basis, this factor

---

[2] On August 24, 2018, well after the time to object and the fairness hearing took place, the Court received an email from Michael Hartlieb ("Hartlieb"), a shareholder who had an interest in a different case involving The Weiser Law Firm, P.C. ("Weiser").  In his email, Hartlieb raised concerns over Weiser's billing practices in this prior case and stated that he wanted to inform the Court so that it could scrutinize the fee request in this case.  Hartlieb does not indicate that he is a shareholder in Big Lots or otherwise an interested party in this case.  Furthermore, the Court always scrutinizes the billing records of plaintiffs' counsel before approving fee awards.  Nevertheless, out of an abundance of caution, the Court re-reviewed Weiser's billing entries in this case and sees no similarities to the billing issues that may have occurred in the case involving Hartlieb. The Court held a teleconference with the parties on August 24, 2018, on which James Ficaro, one of the attorneys from Weiser, was afforded the opportunity to respond to Hartlieb's email.  The Court is fully satisfied that the hours billed by Weiser were reasonable in this case.

strongly favors the fee requested . . . . The amount of fees requested . . . is less than what the fee would be under a lodestar calculation.").

The remaining two factors, the complexity of the litigation and the professional skill and standing of the attorneys involved, has been discussed above and also supports approval of the attorney's fee request.

For all of these reasons, the Court concludes that Plaintiffs' counsel's request for $1.25 million in attorney's fees is reasonable.

## B.    Expenses

"Under the common fund doctrine . . . counsel is entitled to reimbursement of all reasonable out-of-pocket expenses and costs in the prosecution of claims, and in obtaining settlement, including but not limited to expenses incurred in connection with document productions, consulting with and deposing experts, travel and other litigation-related expenses." *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 532 (E.D. Mich. 2003).

Plaintiffs' counsel has provided documentation to support $46,740.59 in expenses in prosecuting this action.  These expenses include, among other things, mail costs, meals, lodging, transportation, legal research, copying costs, telephone expenses, and court filing fees.  *See* Joint Decl. Exs., ECF No. 123. These types of expenses are reasonable and necessary, and therefore entitled to reimbursement.  *Rikos v. P&G*, No. 1:11-cv-226, 2018 U.S. Dist. LEXIS 72722, at **27–28 (S.D. Ohio April 30, 2018).

## IV.  CONCLUSION

For the foregoing reasons, the Court **GRANTS** the unopposed motion for final approval of the settlement, ECF No. 121, **GRANTS** the unopposed motion for an award of attorney's fees and expenses, ECF No. 122, and **ORDERS** as follows:

1.     The Settlement is a fair, reasonable, and adequate resolution to this case for all parties, and is finally approved;

2.     To the extent not already done, the parties are **ORDERED** to perform under the terms of the Settlement;

3.     Plaintiffs' counsel are awarded $1,250,000 in attorney's fees and $46,740.59 in expenses, which shall be paid to lead counsel for distribution in accordance with the Settlement;

4.     The Court retains jurisdiction over this matter for purposes of enforcing the Settlement;

5.     This action is **DISMISSED with prejudice**, with each party to bear its own costs, except as described above.  The Clerk is **DIRECTED** to enter **FINAL JUDGMENT**.

     **IT IS SO ORDERED.**

**MICHAEL H. WATSON, JUDGE
UNITED STATES DISTRICT COURT**

# EXHIBIT 26

1
2
3
## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA
4
5
6   IN RE: CENTURYLINK RESIDENTIAL
    CUSTOMER BILLING DISPUTES
7   LITIGATION

MDL No. 17-2795 (MJD/KMM)

8
    This Brief Relates to:
9
10      *Tansey v. Perry, et al.*, No. 18-cv-
        02460-MJD-KMM;
11      *Flanders v. Post, et al.*, No. 18-cv-
        02833-MJD-KMM;
12      *Ault v. Post, et al.*, No. 18-cv-02834-
        MJD-KMM;
13      *Barbree, et al. v. Bejar, et al.*, No.
        18-cv-02835-MJD-KMM;
14      *Palkon v. Boulet, et al.*,
        No. 18-cv-[TBA]-MJD-KMM
15
16
17
18  **AMICUS CURIAE BRIEF OF SHAREHOLDER MICHAEL HARTLEIB AND**
19  **CONCERNED CITIZEN IN OPPOSSITION OF THE APPOINTMENT OF**
    **ROBBINS ARROYO AND THE WEISER FIRM ET. AL. AS LEAD**
20  **COUNSEL IN THE CONSOLIDATED DERIVATIVE ACTION**
21
22
23
24                          **STATEMENT**
25
        Michael Hartleib respectfully submits the following in the public interest, and
26
    preservation of jurisprudence as a whole.
27
28

1
2
3
4

**<u>OVERVIEW</u>**

5
6      Your Honor, it is with the utmost concern that I inform this Court of ongoing
7   troubling actions by the Weiser and Robbins Arroyo et.al. Firms, the most egregious of
8   which involves a lawyer driven Derivative case in the state of Kansas, captioned
9   *Monica Ross-Williams v. Robert Bennett et.al, (11-cv-01688) Appellate (17-117139-a)*.
10  Seeing Plaintiff's as a necessary nuisance, these firms seek parties that are disinterested
11  at best or worse something more sinister. Often soliciting a Plaintiff that is not
12  aggrieved, unqualified and willing to lend their name for nominal consideration in
13  order to facilitate their lawyer driven **"Piggyback Litigation"**. These firms collude and
14  conspire acting as one, whereby filing multiple Derivative cases on the backs of
15  Securities, or Consumer Class actions. Their past duplicitous acts have included the
16  use of the following as Plaintiffs, deceased parties, friends and family members which
17  lacked standing, and paid serial criminal Plaintiffs like that of the infamous firm,
18  Milberg Weiss. The latest and most creative use of unfit plaintiffs are those of shell
19  LLC corporations created by the law firms. They fund an LLC, instruct a co-
20  conspirator to purchase a nominal number of shares in as many publically traded
21  companies that funds will allow giving them what appears to be a legitimate Plaintiff
22  to facilitate their lawyer driven cases. The stock portfolio controlled by the LLC
23  ultimately becomes payment for the co-conspirator for facilitating said cases. These
24  firms fee split, interchange Plaintiff's, seek those that are compromised to generate
25  thousands of billable hours for illusory work, submit fraudulent time logs and seek
26  hundreds of millions in unjust fees in cases across the country. On information and
27  belief, the firms bill the same hours for Counsel on multiple cases. Given that hundreds
28  of thousands of hours have been billed in a multitude of cases that exceeds the number

2

1   of work hours in a defined period for the number of attorneys at the firm, it becomes
2   obvious that duplicative billing is taking place.

3

4      Your Honor, my initial encounter with Robbins Arroyo, formerly known as
5   Robbins Umeda was in 2006 wherein they filed a valuation suit surrounding the
6   merger of Sirius and XM Satellite Radio, allegedly on behalf of Sirius shareholders.
7   Unfortunately, their legitimate claims were jettisoned within days as they reached a
8   settlement that did nothing more than indemnify Sirius management who were unjustly
9   enriched and provide for millions in attorney fees. During this encounter, I discovered
10  what I call a **"race to the bottom"**. Firms like Robbins Arroyo and the Weiser firm get
11  a reputation for settling cases without meaning relief for those harmed, and providing
12  broad-breadth release for those Executives that have damaged the Corporation and its
13  shareholders in the first instance. Therein, these firms often do little more than
14  indemnify wrongdoers in exchange for millions in attorney fees. As a large
15  shareholder, I was forced to object to the Sirius settlement and discovered the Plaintiff
16  in the case, Gregory Brockwell lacked standing; Mr. Brockwell never owned a single
17  share of stock. He was a college friend of then partner Jeffrey P. Fink. After first
18  enduring a litany of threats and then rebuffing Mr. Finks half a million-dollar offer to
19  withdraw my objection, I contacted US attorney Richard Robinson, the FBI, and the
20  San Diego District Attorney, Bonnie Dumanis to report the illicit acts of the Firm.
21  Months later, Robbins Umeda dismissed their suit against Sirius and Mr. Fink was
22  fired from the practice.

23

24      The wrongdoing continued in a Derivative case of behalf of Red Hat. (*Egelhof v.*
25  *Szulik*) On February 4, 2008, Judge Tennille citing the solicitation of inadequate
26  plaintiffs, in a *"needless rush to file a complaint"* and criticizing the firm's *"slapdash*
27  *approach to representation"* and other professional misconduct, including inadequate
28  communications with the plaintiff and the unauthorized practice of law in North

3

Carolina by out-of-state attorneys, entered an order prohibiting the firm, and Brian Robbins individually, from appearing *pro hac vice* in the state courts of North Carolina for a period of five years.

Several months later in 2008, in yet another lawyer driven Derivative case in the United States District Court for the Southern District of New York, purportedly brought on behalf of JPMorgan, a federal judge cited similarities between the conduct addressed in the *Red Hat Egelhof* sanctions order and the proceedings in *JPMorgan*. Judge Cote exposed an unfit Plaintiff Mr. Shroff, which was removed and later replaced with a serial criminal Plaintiff Robert L. Garber. Mr. Garber was ultimately deemed unfit and removed. Being caught red handed trying to deceive the Court in violation of the *PSLRA*, former US attorney and partner of Robbins Umeda, George Aguilar informs the Court on July 15, 2008 that his firm is abandoning the Class and no longer seeks a lead position. Instead, they collude with other firms in an attempt to insulate themselves and run the case through surrogate Alfred G. Yates who used the same Plaintiff, Robert L. Garber that Judge Cote previously deemed unfit. Mr. Yates, although clearly obtuse, is likely the most corrupt lawyer in the Plaintiffs' Bar with direct connections to convicted felons William Lerach and Melvin Weiss. He has earned the reputation as the **Litigation Kennel Groomer,** whereas he has facilitated hundreds if not thousands of cases with serial criminal plaintiffs for firms across the country. Robert L. Garber being one that was most prolific. *See Exhibit, A (Opinion and Order of the Honorable Denise Cote, entered September 19, 2008,) (Case No. 08CIV9774 (DLC);*

In August of 2011, Robbins Umeda engaged in even more egregious conduct in two additional cases (*Carrigan v Solectron*) and (*Columbo v. Tara Gold*). In the Solectron case, Robbins Umeda is accused of abandoning the class to obfuscate facts surrounding illegal payments to professional plaintiffs including Steven Staehr. *See*

4

*Exhibit B, (Declaration of Richard Carrigan)*. It is clear that Robbins Umeda once again put its interest ahead of the Class, which they had a fiduciary duty to protect. It should be noted that I was an absent class member is this case having been injured. After Robbins Umeda abandoned the Class to hide their criminal acts, the Class was left without recourse. Given the mess that was made of the case, and significant loadstar Robbins Umeda claimed to have, I and other Class members were unable to obtain Counsel to seek redress of the legitimate claims outlined in the suit.

In Tara Gold, it appears that Robbins Umeda filed the case without the knowledge or consent of the plaintiff. *See Exhibit, C (Motion for Sanctions & Declaration of Chris Columbo)* This led to yet another rule eleven-sanction request on behalf of the defendants. Although it is my understanding that sanctions were not granted it shows that the case was entirely lawyer driven.

Judge Davis, Counsel will likely attempt to convince this Court that these contemptuous acts have become less relevant given the passing of time, but these acts which span more than a decade prove a course of conduct that has continued to present day. The Ross-Williams case has some of the very same player's involved in the aforementioned cases. Robbins Arroyo, Alfred G. Yates and Bruce Murphy. They have worked together for years making hundreds of millions of dollars bastardizing our judicial process for their unjust enrichment. I submit that they have gotten away with this for far too long; it is time to reform the corruption rife throughout Derivative litigation.

Further complicating things in the Ross-Williams case is the fact the lead Counsel in the related Securities Class action, Robbins Geller is the sister-firm of Robbins Arroyo, co-lead Counsel in this case along with the Weiser firm. Robert Weiser is close friends with the Robbins brothers; he has worked in concert with them in hundreds of cases in many

jurisdictions. Darren Robbins is managing partner of Robbins Geller and Brian Robbins is Darren's brother, and managing partner of Robbins Arroyo. Their modus operandi is Robbins Geller files the Securities Class action, whereby doing the "heavy lifting", often obtaining meaningful relief; conversely, Robbins Arroyo files the "Piggy Back" Derivative case which is stayed for prolonged periods of time to ensure their fraudulent hours billed do not exceed the number of work hours in a defined period of time. In this case, it required a stay of more than 5 years, as they submitted an astonishing 18,000 hours and a 4.5 million dollar fee request on an entirely dormant case! The majority of which was for illusory document review done under the supervision of Robbins Arroyo on their software platform Relativity. This case was managed and run by Robbins Arroyo, along with Weiser et.al.

In May of 2016, as large shareholder of Sprint Nextel, with loses over seven hundred thousand dollars, I was once again forced to defend my interest by objecting to the proposed settlement. I had to commence a crash course in Derivative litigation, and partake in a David vs. Goliath battle, which continued for over 18 months. I was forced to single handedly take on five firms that were coordinated in their efforts to stop me. Appearing at each hearing was Brent Stecker for the Weiser firm and George Aguilar for Robbins Arroyo. Many other attorneys were present but I was not privy to their names. I was subjected to vicious ad hominem attacks as Weiser and Robbins Arroyo et.al. proved they would stop at nothing in an attempt to protect their criminal enterprise. The so-called reforms outlined in the settlement were nearly illusory and misdirected, as the nominal Defendant in which the case was brought no longer exists. Softbank acquired Sprint Nextel. Weiser et.al lied, misleading the court, interchanging names of the former Kansas Corporation Sprint Nextel with Sprint the Delaware Corporation. They failed to file a change of party notice in an attempt to confuse the Court and avoid challenges of standing, and subject matter jurisdiction. They used an **unfit plaintiff** who had little or no involvement in the case. On March 6, 2017, I called Monica Ross-Williams, whereby it became painfully clear that she was wholly

uninformed. She was not aware of Judge Vano's scathing orders, or that an appeal was filed on her behalf. *(See Exhibit D, Order from Judge Vano)* She was unaware that Weiser et.al. committed perjury and admitted to billing fraud. Mr. Weiser failed to provide his "<u>client</u>" with copies of letters sent to Judge Vano, and Appellate Clerk Douglas Shima, admitting to fraud upon the Court. *(See Exhibit E, Weiser letters)* During the call, she continually referred to herself as the Defendant, until I informed her that she was in fact the Plaintiff. Ross-Williams appeared to have not spoken with her Counsel for years and was devoid of any relevant facts of "her" case. *See Exhibit G, (Declaration of Michael Hartleib).*

Your Honor, that 15-minute affable call with Monica Ross-Williams incensed Weiser and Robbins Arroyo et.al. as they immediately served me with a *Cease and Desist* Letter, fearing I had obtained information to prove Ross-Williams was a shill Plaintiff who had little or no involvement in the case. I replied by informing them that I would neither cease nor desist as the truth is an absolute defense. I informed them that they and their co-conspirators were the ones that needed to *Cease and Desist*. Although I had no need or intention to contact Ross-Williams again, informing the Appellate Court of same, Weiser et.al. was able to compel the Appellate Court under false pretenses to grant a protective order using the do not contact rule, Rule 4.2. I remain confused as to how a Rule addressing the Professional Conduct of attorneys applies to a layperson such as myself. It is my understanding that rule 4.2 is to prevent the sophistication and skill of Counsel from gaining unfair advantage over one less legally savvy when represented. My scenario appears to be in violation of First Amendment, wherefore it does not comport to the rule and is inapposite given the fact that I am not an attorney and have no legal background. Equally confusing is how the Appellate Court commends me for saving Sprint millions of dollars, exposing a conspiracy upon the Court, but then forces me to communicate with Ross-Williams corrupt attorneys the conspirators.

1
2    Judge Davis, this is of importance for multiple reasons, first Weiser and
3    Robbins Arroyo et.al. will likely use this in an attempt to attack my credibility and
4    convince this Court that I did something indecorous by making the single phone call to
5    Class representative Ross-Williams in the first instance. Weiser et.al. used this very
6    tactic in their failed opposition to a substantially similar Amicus Brief filed in the
7    Equifax data breach case in the Northern District of Georgia. The Weiser Firm, as well
8    as the firm of Johnson Fistel, (both seeking lead positions with this Court) were
9    appointed co-lead Counsel in the Equifax Derivative case, but other firms protested,
10   compelling a hearing to reconsider lead. After hearing from several firms and
11   testimony from Robert Weiser and myself, the Judge removed both firms from lead
12   position the following morning. Secondly and most importantly, I have commenced
13   litigation against Weiser et.al. and representative Plaintiff Ross-Williams for the
14   foregoing unconscionable acts that have transpired in the Kansas litigation. Weiser
15   et.al. has turned the case over to his insurer. *See Exhibit, H (Hartleib v.Wesier et.al.)*
16   This is the second active case that has arisen as a consequence of the chicanery in the
17   Ross-Williams action. Your Honor, I have read the Declarations in support of
18   appointment for lead in this case from the aforementioned firms professing their legal
19   skill, qualifications and alleged successes in prior cases, but I did not see any mention
20   of the Ross-Williams case, or other cases in which they have been admonished by the
21   Courts. Given Weiser's et.al. legal issues, it appears he is now forced to initiate a new
22   strategy, one of hiding behind another firm Bragar Eagel and Squire seeking lead in
23   this case in an effort to manage cases behind the scene. Greed appears to be powerful
24   motivator. While doing research I came upon an article that list the wealthiest
25   attorney's in the country, shockingly several of the top ten have been in prison.
26   William Lerach is number four on the list, with a net worth of nearly one billion
27   dollars. Your Honor, there is something wrong with a system that allows corrupt firms
28   to continue to violate the public trust year after year to unjustly enrich themselves.

1

2   Judge Davis, the actions by these so-called officers of the Court is truly
3   unconscionable. Robbins Arroyo and Weiser et.al. submitted over 18-thousand hours
4   in fraudulent billing, seeking 4.5 million dollars in fees, 1.6 million of which submitted
5   by a criminal and disbarred attorney using his son's name, Alexander as an alias. Mr.
6   Jeffrey Mark Silow has worked for the Weiser and Robbins Arroyo et.al. Firms for
7   over 10 years, billing likely more than 100 million dollars in illicit fees, in a multitude
8   of cases across the country. Jeffrey Mark Silow was convicted and disbarred in 1989
9   for insurance fraud, mail fraud, and forgery. Your basic Racketeer. Mr. Silow was
10  caught after forging a will, making himself the beneficiary of a million dollar estate,
11  stealing the inheritance from the rightful heirs. *See Exhibit 1, (WSJ article)*

12

13  After providing information to the Class Action Fairness Center, Ted Frank
14  confronted the Weiser firm about Mr. Silow's status. With a proverbial gun to his
15  head, Mr. Weiser attempts to exonerate his firm by claiming to be a **victim** of Mr.
16  Silow's felonious acts. In letters to the Court, Mr. Weiser states that he was unaware
17  of Silow's disbarred status and criminal past. Weiser claims that he had no idea that
18  Alexander was not Silow's real name. Clearly, this strategy was not well thought out.
19  Attached to the letters was a copy Mr. Silow's resume from Abelson Legal Services,
20  proving Mr. Silow was presented as Jeffrey Mark, not Alexander at the time of hire. In
21  addition, the Firm Resume lists Mr. Silow as a licensed attorney to practice in
22  Pennsylvania and the District of Columbia proving Weiser et.al. committed perjury as
23  Mr. Silow was not licensed to practice in Pennsylvania when Weiser et.al. hired him.
24  Something Justice Burns pointed out during oral argument at the appellate hearing. In
25  the Syllabus from the Kansas Appellate Court, Judge Burn's states; *In a disturbing*
26  *development, Robert B. Weiser sent a letter to the district court— as well as a similar*
27  *letter to the Clerk of the Kansas Appellate Courts—on February 3, 2017. In his letter*
28  *to the district court, Weiser stated that he had "learned that a person who had held*

9

*himself out . . . as Alexander J. Silow ('Silow') was in actuality named Jeffrey M. Silow, and more importantly, that Mr. Silow is not a licensed Pennsylvania attorney in good standing, having been disbarred in Pennsylvania in 1987." Weiser indicated that Silow had been "of counsel" with the Weiser Law Firm for "the past decade" after being recommended to the law firm by a recruiting agency in 2008.*

*Interestingly, although the résumé of the Weiser Law Firm—which is part of the record on appeal—listed "Alexander Jeffrey Silow" as being "admitted to practice in Pennsylvania and the District of Columbia," Silow's résumé—which was attached to Weiser's letter—listed his name as "Jeffrey Silow" and did not state that he was a member of the Pennsylvania bar. Instead, Silow's résumé only listed the District of Columbia under the heading "Bar Admissions." In a footnote to his letters, Weiser stated that "it appears as though Mr. Silow has also been suspended from the practice of law by the District of Columbia." We note that the District of Columbia subsequently disbarred Silow from the practice of law on December 21, 2017. In re Jeffrey M. Silow, 175 A.3d 88 (D.C. 2017). See (Syllabus)* Judge Davis, Alexander Silow is a former Deputy District Attorney of West Chester County PA. and on information and belief knew of his father's criminal activities and is likely complicit. Mr. Jeffrey Mark Silow has seemingly gotten off lightly for his crimes, whereby pleading guilty to three misdemeanors, in record time.

Your Honor, in open Court, and through pleadings, Weiser and Robbins Arroyo et.al. makes more false statements, by claiming Mr. Silow was a securities expert, who bills at $350 dollars per hour. Mr. Stecker has made all appearances on behalf of the Weiser firm; he has repeatedly perjured himself, found himself unable to answer the most rudimentary of questions regarding his case. Frankly Your Honor, his appearances were an utter embarrassment to the Plaintiff's Bar. During a six-hour settlement hearing, Judge Vano expressed skepticism over the eighteen thousand hours billed in the stayed case. He warned Weiser et.al. to take a careful look at their fee

1  request. Instead of heeding Judge Vano's advice, **plaintiff's counsel doubles down**,

2  filing perjurious declarations. In Mr. Silow's declaration he admonishes Judge Vano,

3  stating "*how dare you question my hours, I have worked each and every one of these*

4  *hours, and have been an officer of the Court in good standing for over forty years,*

5  *without so-much as a disciplinary action.*" *See Exhibit J, (Silow Declaration)* This,

6  while knowing his status as a criminal and disbarred attorney.

7

8      Weiser and Robbin Arroyo et.al. would stop at nothing to protect their criminal

9  enterprise, I was  subjected to repeated character attacks as I exposed their duplicitous

10  acts and conspiracies against the Court. Fortunately, the Honorable James Vano was

11  not convinced by Weiser and Robbins Arroyo et.al. and their self-serving arguments,

12  or desperate attempts proffering support for their fees. Judge Vano ordered Weiser and

13  Robbins Arroyo et.al. to submit their time-logs for an in-camera review. After six

14  months of careful deliberation, Judge Vano issued the first of two scathing orders,

15  wherein he excoriates Weiser and Robbins Arroyo et.al, finding that the time-logs

16  submitted were not credible, **henceforth they were fraudulent**! Although Judge Vano

17  narrowly approved the settlement, he slashed the 4.5-million-dollar fee request by

18  **ninety percent,** awarding a total of 450 thousand dollars in fees, and expenses. This

19  was prior to the Court's knowledge of Silow's criminal past and disbarred status.

20

21      Your Honor, it is unconscionable to think that after Judge Vano's highly critical

22  orders, that Weiser and Robbins Arroyo et.al. would not except the ruling, and quit

23  while ahead, clearly dodging a bullet. Instead, with hubris and utter contempt for the

24  Court, they have the temerity to ask Judge Vano for what is <u>tantamount to a **do-over,**</u>

25  in the form of two motions to Alter or Amend. *See Exhibit F, (Objector Hartleib's*

26  *opposition to Motions to Amend)*

27

28

Judge Davis, former US attorney George Aguilar and partner of Robbins Arroyo, *(also seeking lead in this case)* introduced new evidence purporting to be a report from their Relativity software program in an attempt to affirm the fraudulent hours billed by now known racketeer Silow. Attached to the second Motion to Alter or Amend was Mr. Aguilar's sworn Declaration, which states that Robbins Arroyo was wholly responsible for the oversight of all document review in the consolidated action. Mr. Aguilar continues by declaring that Robbins Arroyo was responsible for the management and coordination of said review, which was allegedly performed on his Firms software system Relativity. In his prior Declaration dated June 23, 2016, Mr. Aguilar declares that Robbins Arroyo reached an agreement with Defense Counsel to manage the case, therefore Robbins Arroyo was acting as lead behind the scene, making his Firm fully complicit in the fraud committed upon the Court. *See Exhibit K, (Declarations form George Aguilar)*

The Motion seeks to compel Judge Vano to remove all of the <u>damaging statements of fact</u>, on the basis that it would <u>"hurt"</u> their reputations. They informed Judge Vano that with a few strokes of his pen he could fix everything, saving them untold amounts of money, and countless hours of time trying to defend their contemptuous actions in the case. Rightfully, they were concerned that the damaging orders would prejudice their firm in other cases. They expressed concern, that the orders would be used to inform other Courts of their <u>Self-Dealing</u>, <u>Unclean Hands</u> and <u>Shameful Violations of Public Trust.</u> Wherefore, they confirm and acknowledge the gravity and consequence of their subterfuge. The Motion led to the second scathing order by Judge Vano, wherein he is unconvinced by their absurd requests, and reaffirms his opinion in the strongest of terms. Judge Vano states that it was not proper for Mr. Aguilar to submit new evidence after the Courts ruling, nonetheless, he was not persuaded stating; *"Plaintiff's counsel should have expected strong criticism of Mr. Silow's billing records had [they] bothered to examine the purported time [he]*

1 *submitted as spent on document review. . . . "A cursory glance at Mr. Silow's billing*
2 *records appropriately casts a shadow of doubt over the veracity of the billing records*
3 *in their entirety. [The] affidavits documenting Mr. Silow's time spent on [document*
4 *review] are wholly unpersuasive. They do support that it takes merely a keystroke of*
5 *activity once every hour to keep [the computer program] from timing out or logging*
6 *off a session. (See Syllabus from the Kansas Court of Appeals)*
7

8     Unbelievably, blinded by greed, Weiser and Robbins Arroyo et.al. informs
9 Judge Vano of their intent to appeal the fee reduction. Despite being admonished by
10 Judge Vano, and caught committing perjury and billing fraud, Weiser and Robbins
11 Arroyo et.al. were unrelenting in their zealous quest for reinstatement of the four
12 million dollars in unwarranted fees. Truly reprehensible! During the settlement
13 hearing, Mr. Stecker repeatedly informed Judge Vano that the settlement was obtained
14 through "hard fought litigation". Mr. Stecker apparently considers the filing of a
15 **piggyback derivative suit** with valid claims, jettisoning said claims, staying the case
16 for years so that enough time passes to allow one to bill thousands of fraudulent hours,
17 and millions of dollars, "Hard Fought Litigation". Pretending to review millions of
18 documents from a Class Action, led by sister firm Robbins Geller, that facilitates no
19 additional discovery, not a single document request, or deposition over a seven year
20 period is certainly not tantamount to "hard fought" by my standards. Your Honor,
21 from what I have witnessed, it appears Robbins Arroyo and Weiser et.al. follows a
22 different set of standards, one that continually sets the bar at new lows. This
23 perspective coming from a layperson with no legal background. The only thing hard
24 fought in this case, was the Weiser and Robbins Arroyo et.al. Firm's desperate attempt
25 to obfuscate their criminal acts to protect their criminal enterprise and unjustly enrich
26 themselves by four million five hundred thousand dollars, on the backs of those they
27 falsely purport to represent.
28

Your Honor an appeal was filed wherein I ask the Court to remand and rescind the case with directives for punitive sanctions, and a disgorgement order forcing the return of the four hundred fifty-thousand-dollar fee award. I argued that, Monica Ross-Williams, by way of her Counsel had unclean hands and therefore not entitled to equitable relief from the Court. Although initially set for summary calendar, I was able to compel the Appellate Court to grant oral argument. I attended the hearing on 2-13-18, although Robert Weiser was admitted *pro hac vice*, he failed to attend the hearing. The Weiser firm has retained counsel from an ethics and professional liability firm, likely at the request of their insurer. One could surmise that his failure to appear was on the advice of counsel. Chief Justice, Karen Arnold Burger informed those in attendance that the Court found this case very interesting and would not be as strict with enforcement of its time limits. Wherefore, the Court granted all in attendance more than double the docketed time. George Aguilar appeared on behalf of Robbins Arroyo but never addressed the Court. In fact, I do not believe he was admitted *pro hac vice* for the appellate hearing. Mr. Stecker appeared on behalf of Weiser et.al, where he informed the Court that he had nothing to say, and that the firm stands on its pleadings. The Court was quick to respond, making it clear that they had questions for him regarding the criminal acts of Weiser et.al. Mr. Stecker faced a litany of cross-examining questions from the Appellate Court Justices, whereas he was unable to provide cogent answers to most. Despite Mr. Stecker's attempts to convince the Court that Weiser et.al. was an unwitting victim of Mr. Silow, the Court appeared less than convinced. Mr. Stecker informed the Court that the Pennsylvania Bar was about to wrap up their investigation into the Weiser firm regarding the Sprint Nextel case, and find no need for disciplinary action, at which time, Justice David E. Burns stated, **"good to know counselor, this Court will be certain that the Pennsylvania Bar gets a copy of its forthcoming order"**. During my fifteen-minute rebuttal, Chief Justice Karen Arnold Burger stated, we concur that fraud was committed in this case with regard to the billing. On April 27, 2018 the Appellate Court issued its 50 page

14

published Opinion, unfortunately my standing argument failed, and I was unsuccessful in my attempt to disgorge the ill-gotten 450 thousand dollar fee award. The Court was nonetheless highly critical of the Weiser and Robbins Arroyo firms as reflected in the Syllabus from the Court, which states; *Weiser evidently continues to believe that Silow actually performed the work reported in the billing records submitted to the district court. Nevertheless, Weiser recognized in his letter "that Mr. Silow had been held out as an active attorney, and that Mr. Silow's declaration, signed under penalty of perjury, states, inter alia, that he is a licensed attorney in good standing that had never been the subject of any disciplinary action." Hence, Weiser acknowledges that Silow's "declaration is therefore false in material respects," and as a result, the Weiser Law Firm—which served as the lead counsel in this derivative action—"will not be participating in any recovery that may result from the pending Cross-Appeal." Although we will yield to the disciplinary authorities in the Commonwealth of Pennsylvania—or elsewhere—to sort out what the attorneys representing the plaintiffs in these derivative actions knew or should have known about the status of Jeffrey Silow's license to practice law, we find the information provided by Weiser to be very troubling. As indicated above, the hours billed by Silow constituted a substantial amount of the total hours allegedly worked by counsel for the plaintiffs in these derivative actions. Thus, we agree with Weiser that his law firm should not receive any of the attorney fees and expenses awarded in this case. (See Syllabus from Kansas Court of Appeals).*

Judge Davis, another deeply troubling concern involving these firms is the nexus between former Federal Judge Layn Phillips and the Robbins Gellar, Robbins Arroyo and Weiser Firms. By all accounts, Judge Phillips has been held in high esteem, but some now argue his once stellar reputation has been sullied by the duplicitous acts of Weiser and Robbins Arroyo et.al. In an attempt to proffer support for their fraudulent 4.5 million dollar fee request, Weiser et.al. attached a Declaration signed by former

1    Judge Phillips in support of the motion for final approval of the settlement. In his
2    Declaration, he reviewed his role as mediator in the derivative actions and stated that
3    *"the settlement was carefully reached through hard fought, arm's-length negotiations*
4    *conducted by skilled counsel in good faith."* He also noted that *the attorneys involved*
5    *in the mediation process were from 15 respected law firms and were experienced in*
6    *handling complex litigation. Moreover, former Judge Phillips rendered the opinion*
7    *that he believed an award of $4,250,000 in attorney fees and expenses in this case*
8    *would be fair, just, and reasonable. (See Syllabus from Appellate Court)* Given the
9    fraud that has transpired in the Ross-Williams case, and the fact the Judge Phillips
10   affirmed the fraudulent fees, the bad acts of these firms has damaged the reputation of
11   the former Federal Judge. Equally troublesome is the fact that Judge Phillips appears
12   to be the "go to" mediator in many of the cases for the aforementioned Firms. Some
13   believe that it is a conflict of interest for any mediator overseeing the case in question
14   to get involved in affirming fees on behalf of Plaintiff Counsel, whether just or unjust.
15   Making matters worse, after Judge Vano issued his scathing orders, I had reached out
16   to the office of Judge Phillips on several occasions seeking a call or meeting to discuss
17   what transpired in the Ross-Williams case in hopes of getting a retraction. After Mr.
18   Silow was exposed as a criminal, I was certain Judge Phillip's would want to file an
19   amended Declaration in the Ross-Williams case rescinding his prior support for fees,
20   now known to be fraudulent, in an effort to protect his good name, but my requests
21   went unanswered. Thereby, raising the question, why would a former Federal Court
22   Judge allow his name to be associated with corrupt law firms and a conspiracy upon
23   the Kansas Court? Some have speculated that Judge Phillips failure to act and silence
24   surrounding the fraud in the Ross-Williams action provides the answer, albeit a
25   troubling one! I sincerely hope they are incorrect.
26
27       Honorable Davis, the aforementioned shows a prolonged course of conduct and
28   pattern of criminal activity of the highest order, by so-called officers of the Court. It is

Arroyo, Weiser or their surrogates. I am confident that this Court has qualified firms that will properly represent the interest of CenturyLink, its shareholders and not breach the fiduciary duties owed, for their unjust enrichment.

## CONCLUSION

Your Honor, I respectfully seek leave of the Court allowing this Amicus Brief to be filed on short notice and be placed in the record. I also would like to address the Court at the forthcoming hearing for the appointment of lead Counsel on 3-6-19. I have made last minute travel plans from California and stand ready to provide any additional information the Court may seek on the record.

Respectfully,

Michael Hartleib

20720 Alicia Parkway Suite, G

Laguna Niguel C.A. 92677

(646) 494-5901

# CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of the above and forgoing the Amicus Curiae Brief and Exhibits A through K was served on the following parties by electronic mail on 03-05-19

THE WEISER LAW FIRM. P.C.
Robert E. Weiser
Brett D. Stecker
James M. Ficaro
22 Cassatt Ave., Suite 100
(610)-225-2677
rw@weiserlawfirm.com

JOHN FISTEL LLP
Michael I Fistel JR
40 Powder Springs Street
Marietta GA.

(770) 200-3104
michaelf@johnsonfistel.com

MELISSA A. FORTUNATO
885 Third Avenue Suite 3040
New York, NY. 10022
(212) 308-5858

fortunato@bespc.com

GARETT BLANCHFIELD
Reinhardt, Wendorf & Blanchfield

(651) 287-2100

E1250 First National Bank Building

332 Minnesota Street Saint Paul MN.
Gblanchfield@rwblawfirm.com

ROBBINS ARROYO LLP.
George   C. Aguilar
600 B Street Suite 1900
San Diego, C.A. 92101
(619)-525-3990
gaguilar@robbinsarroyo.com

SIGNED _____

MICHAEL HARTLEIB

27020 Alicia Parkway Suite G

Laguna Niguel C.A. 92677

646-494-5901

# EXHIBIT 27

1

<pre>
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
 2

 3       ------------------------------------------------------------
                                     )
 4       IN RE:  CENTURYLINK SALES    )  File No. 17-md-2795
         PRACTICES AND SECURITIES     )          (MJD/KMM)
 5       LITIGATION                    )
                                      )
 6                                    )  Courtroom 13E
                                      )  Minneapolis, Minnesota
 7                                    )  Wednesday, March 6, 2019
                                      )  9:38 a.m.
 8                                    )
         ------------------------------------------------------------

 9

10                  BEFORE THE HONORABLE MICHAEL J. DAVIS
              UNITED STATES DISTRICT COURT SENIOR JUDGE

11

12          MOTIONS HEARING ON DOCKET NOS. 330, 332, 342

13

14

15

16

17

18                     RENEE A. ROGGE, RMR-CRR
           Official Court Reporter - United States District Court
19                   1005 United States Courthouse
                        300 South Fourth Street
20                   Minneapolis, Minnesota 55415
                         (612)664-5107
21

22

23

24          Proceedings recorded by mechanical stenography;
                  transcript produced by computer.
25
</pre>

2

1    <u>APPEARANCES:</u>

2    For the Plaintiffs Sona        PERRY & PERRY PLLP
     Andresian, Glen Walker         SHAWN M. PERRY, ESQ.
3    and Michael Barbree:           1660 Highway 100 South, #335
                                     Minneapolis, Minnesota 55416
4
                                     GAINEY McKENNA & EGLESTON
5                                    THOMAS J. McKENNA, ESQ.
                                     440 Park Avenue South
6                                    New York, New York 10016

7    For the Proposed Lead          FEDERMAN & SHERWOOD
     or Co-Lead Counsel for         WILLIAM B. FEDERMAN, ESQ.
8    Shareholder Derivative         10205 North Pennsylvania
     Plaintiffs:                    Oklahoma City, Oklahoma 73120
9
     For the Plaintiff             REINHARDT WENDORF & BLANCHFIELD
10   Edward Tansey:                 GARRETT D. BLANCHFIELD, ESQ.
                                     322 Minnesota Street, #W1050
11                                   St. Paul, Minnesota 55101

12                                   ROBBINS ARROYO LLP
                                     GEORGE C. AGUILAR, ESQ.
13                                   5040 Shoreham Place
                                     San Diego, California 92122
14
     For the Plaintiff Tim          BRAGAR EAGEL & SQUIRE, PC
15   Ault:                          LAWRENCE P. EAGEL, ESQ.
                                     885 Third Avenue, #3040
16                                   New York, New York 10022

17                                   LEVENTHAL PLLC
                                     SETH LEVENTHAL, ESQ.
18                                   333 South Seventh Street, #1150
                                     Minneapolis, Minnesota 55402
19
     For the Defendant:             WINTHROP & WEINSTINE PA
20                                   WILLIAM A. McNAB, ESQ.
                                     225 South Sixth Street, #3500
21                                   Minneapolis, Minnesota 55402

22                                   COOLEY LLP
                                     SARAH M. LIGHTDALE, ESQ.
23                                   1114 Avenue of the Americas
                                     New York, New York 10036-7798
24

25

3

<pre>
 1    APPEARANCES (contd):

 2    For the Defendant          COOLEY LLP
      (continued):               PATRICK E. GIBBS, ESQ.
 3                               3175 Hanover Street
                                 Palo Alto, California 94304
 4
      For the Amicus Curiae:     MICHAEL HARTLEIB, PRO SE
 5                               20720 Alicia Parkway, Ste. G
                                 Laguna Niguel, California 92677
 6

 7                        *   *   *

 8

 9                  P R O C E E D I N G S

10                     IN OPEN COURT

11                        *   *   *

12         THE COURT:  Good morning.  Please be seated.

13         Let's call this matter, these matters.

14         COURTROOM DEPUTY:  In Re:  CenturyLink Residential

15    Customer Billing Disputes Litigation, MDL No. 17-2795.

16         Counsel, please state your appearances for the

17    record.

18         MR. AGUILAR:  Good morning, Your Honor.  George

19    Aguilar from the law firm of Robbins Arroyo for plaintiff

20    Edward Tansey.

21         THE COURT:  Good morning.

22         MR. BLANCHFIELD:  Good morning, Your Honor.

23    Garrett Blanchfield from Reinhardt Wendorf & Blanchfield

24    also on behalf of plaintiff Edward Tansey.

25         THE COURT:  Good morning.
</pre>

1        MR. EAGEL:  Good morning, Your Honor.  Lawrence

2   Eagel, Bragar Eagel & Squire, for plaintiff Tim Ault.  With

3   me is Seth Leventhal for plaintiff Tim Ault.

4        THE COURT:  Good morning.

5        MR. FEDERMAN:  Good morning, Your Honor.  William

6   B. Federman, Federman & Sherwood, on behalf of plaintiff

7   Inter-Marketing Group.

8        THE COURT:  Good morning.

9        MR. PERRY:  Good morning, Your Honor.  Shawn

10  Perry.  I am local counsel from Perry & Perry on behalf of

11  Gainey McKenna & Egleston.  T.J. McKenna or Thomas J.

12  McKenna is to my right.

13       MR. MCKENNA:  Good morning, Your Honor.

14       THE COURT:  Good morning.

15       MR. MCNAB:  Good morning, Judge Davis.  Bill

16  McNab, Winthrop & Weinstine, on behalf of defendant

17  CenturyLink and the individual director defendants.

18       THE COURT:  Good morning.

19       MR. GIBBS:  Good morning, Your Honor.  Patrick

20  Gibbs from Cooley also for defendants.

21       THE COURT:  Good morning.

22       MS. LIGHTDALE:  Good morning, Your Honor.  Sarah

23  Lightdale from Cooley also for the defendants.

24       THE COURT:  Good morning.

25       Would you call the other matter too?

5

1          COURTROOM DEPUTY:  The Tansey?

2          THE COURT:  Did they give you a number on it?

3          COURTROOM DEPUTY:  Pardon me?

4          THE COURT:  Did they give you a number on it?

5     (Off-record discussion between court and courtroom deputy.)

6          COURTROOM DEPUTY:  Tansey versus Perry, et al.,

7     Civil Case No. 18-cv-2460.

8          THE COURT:  All right.  Counsel late yesterday

9     received a motion from Mr. Hartlieb.  I don't believe he's

10    here.  I think you all know him or some of you know him.

11         MR. BLANCHFIELD:  I don't see him in the

12    courtroom.

13         THE COURT:  All right.  So we will just put that

14    till the end.  So let's begin with our motions that are

15    before us.

16         Who wants to proceed?

17         MR. AGUILAR:  I can go first, Your Honor.

18         THE COURT:  Thank you.

19         MR. AGUILAR:  Would you like me at the podium,

20    Your Honor?

21         THE COURT:  Oh, most definitely.

22         MR. AGUILAR:  Thank you, Your Honor.  George

23    Aguilar, again, with Robbins Arroyo on behalf of plaintiff

24    Tansey.  We've made an application to be appointed lead

25    counsel in the matter.

```
 1              Your Honor, we think the three most critical
 2      factors in the court's discretion in appointing lead counsel
 3      are to look at the experience and knowledge of the proposed
 4      lead counsel and his firm, the record of success by that
 5      firm and the resources that firm can bring to bear, and we
 6      believe we compare favorably on all three points.  Our firm
 7      has been a derivative litigation focused firm for over ten
 8      years.  We bring a vast number of lawyers and experience --
 9              THE COURT:  You talk about the numbers of lawyers
10      that are in your firm, but I need to know who is going to be
11      running this.
12              MR. AGUILAR:  Yes.  I am going to be running this,
13      the litigation, as the lead litigation partner.  Steve
14      Wedeking will be, an associate in the firm, and Ashley
15      Rifkin, also a partner at the firm, will also be assisting
16      in the litigation.  And we will have other resources to bear
17      as they are required and especially with respect to the
18      discovery that may be propounded in the case.
19              THE COURT:  All right.
20              MR. AGUILAR:  Our record of success is focused on
21      the derivative litigation.  As we lay out in our papers, the
22      success we have had in bringing necessary corporate reforms
23      where needed and to obtain financial recoveries on behalf of
24      the company and other shareholders are in the context of
25      derivative litigation.
```

```
 1              We do have a diversity practice within our firm.
 2    Myself, a former criminal prosecutor, also active in the
 3    antitrust practice, but primarily in the derivative space.
 4    We have other lawyers active in the 10(b) space, class
 5    action space.  Ms. Rifkin has been focused on the derivative
 6    angle for a number of years and as has Mr. Wedeking.
 7              And then, lastly, Your Honor, I can address the
 8    Hartlieb thing when it gets brought up, but we have never
 9    been denied a lead counsel as a result of any of these types
10    of allegations that have been brought forward.  In fact,
11    they have been brought by Mr. Hartlieb once before.
12              THE COURT:  Well, let's not talk about that right
13    now.  He's not here and --
14              MR. AGUILAR:  Very well.
15              THE COURT:  But I do need you to talk to me about
16    your plaintiff.
17              MR. AGUILAR:  Yes.  Mr. Tansey has been a
18    stockholder of the company since 2003.  He is a minor
19    stockholder who owns 13 shares, but, nonetheless, a
20    long-term holder, selling as the market would require, and
21    he currently holds 13 shares of the corporation.
22              THE COURT:  All right.  Anything else you wish to
23    bring forth at this time?
24              MR. AGUILAR:  Unless the court has some questions.
25              THE COURT:  Not at this time.  We will hear from
```

8

```
 1    everyone and then we will go -- I may have another round.

 2            Who is next?

 3            Let me -- no.  Come on back up.

 4            MR. AGUILAR:  Sure.

 5            THE COURT:  I need -- as you well know, I have

 6    handled a number of MDLs, and one of the things that is very

 7    important for me is coordination and cooperation, and you

 8    didn't talk about that with the other firms that are

 9    involved in this.  So I need to know, Did you meet and

10    confer?  What is your --

11            MR. AGUILAR:  We did.

12            THE COURT:  Have you had problems with -- in one

13    of the MDLs I had many, many years ago I didn't find out

14    that there were lawsuits between the lawyers in another MDL.

15    Everyone was quiet about it, because they wanted to get it

16    appointed.  And then once they got it, I'd made my

17    appointment, then I found out that there was lawsuits

18    between two of the lawyers and that caused a lot of

19    problems, so --

20            MR. AGUILAR:  No.  We certainly don't have any of

21    those issues with any of the other firms.

22            We did have discussions with a member of the firm

23    that makes up the Bragar firm.  There were discussions in

24    earnest to try to resolve a leadership or put together a

25    leadership structure.  It was our view that what was being
```

1  proposed, that we were being asked to be a part of, was just

2  too large, too diffuse.  It didn't really have a focus or a

3  sharpness that would allow the litigation to proceed

4  efficiently.  I have had recent discussions with

5  Mr. Federman and again along the same lines.

6         I believe for a case like this in an MDL

7  proceeding, which is already going to be fairly coordinated

8  and consolidated and managed by the court, we just thought

9  it was important that the top of the leadership structure be

10  as efficient and focused as possible.  So that's why we

11  proposed just a one-firm leadership structure at the top.

12         We do have experienced Minnesota counsel in

13  Reinhardt Wendorf in the representative litigation aspect.

14  But if we are appointed lead counsel, obviously, the first

15  thing we would do would be to consolidate the cases, put

16  together a consolidated complaint.  We would encourage and

17  ask the other plaintiffs to join in the case, and they

18  would, the other firms, would have an opportunity to

19  participate in the litigation, if their client decides to

20  partake in the case.  It would be -- you know, we are

21  dealing and up against very experienced and excellent

22  defense counsel, so there will be a need for significant

23  resources in this case, and we will be more than happy to

24  bring the other firms along.  We just thought at the very

25  top and there should be a very sparse and focused structure

1   at the top, and that's what we propose.

2          THE COURT:  Well, other than having a king at the

3   top or a queen at the top, what's your management structure?

4   What are you proposing?

5          MR. AGUILAR:  No formal committee structure.  It

6   would involve, again, based on the participation of the

7   plaintiffs, other plaintiffs in this case, a doling out of

8   work as it becomes available in the case, probably initially

9   not at the pleading stage.  That will be work that will be

10  handled by our firm and the Reinhardt firm.  But once we get

11  to discovery, if we are able to do that, there will be a

12  significant amount of work to be done in that arena, and we

13  would propose to have other counsel involved in that case,

14  to the extent that they are willing to or have the resources

15  at the time to do so.  We just believe that the management

16  of the practice -- the management of the case should

17  generate and originate from the focused leadership.

18         THE COURT:  What's your position dealing with the

19  other MDL that's involved here, the consumer side?

20         MR. AGUILAR:  We would certainly -- those cases

21  are progressing.  We would reach and make contact with lead

22  counsel on the plaintiffs' side for those actions.  We would

23  be particularly interested in the 10(b) action that's

24  proceeding, the securities part of the MDL.  There may be

25  some issues in common with this case that we'll certainly

1   work with the defense counsel and perhaps establishing an

2   efficient way to resolve those types of issues in

3   conjunction with what's already occurred in the securities

4   case and what's being proposed to occur in the securities

5   case.

6           THE COURT:  Now, you've indicated that you have

7   been involved in a number -- that your firm is a derivative

8   lawsuit firm.  Have you had other cases that you can cite to

9   me that you have dealt with the consumer side and it's

10  worked well and --

11          MR. AGUILAR:  Yeah, not so much on the derivative

12  MDL side.  I am currently part of an antitrust MDL as lead

13  counsel in one of the cases, antitrust cases that does have

14  a significant component with consumer -- with the consumer

15  cases, and we have been in very open and constant contact

16  with those lawyers.  It's the Interchange MDL case and the

17  Credit Card antitrust action in the Eastern District of New

18  York.

19          We're currently serving as associate counsel in a

20  consumer class action involving pharmacies and their

21  payments of certain usual and customary prices with respect

22  to the pharmacy benefit managers, and we have been working

23  in close contact with the consumer lawyers in that

24  particular instance.

25          So I don't anticipate any issues at all with

1      respect to our ability to cooperate and coordination with

2      any of those cases, with any of the cases that are currently

3      making up the MDL, and that would involve certainly

4      discovery, where we do think there probably will be a

5      significant amount of overlap in terms of the documents and

6      the discovery that's produced and would proceed and want to

7      do it in the most efficient way possible.

8                    THE COURT:  All right.  Thank you.

9                    You have given me a list of cases where you were

10     either lead counsel or co-lead counsel, but you never

11     mentioned who the judges were.

12                    No?  None?

13         (Off-record discussion between court and clerk.)

14                    THE COURT:  You gave me the name of the cases, but

15     you didn't give me the name of the judges, which is --

16                    MR. AGUILAR:  Sure.  In our pleading, Your Honor,

17     in our briefing, we did list -- I think it's a page and a

18     half and attached the transcripts of the judges who have

19     commented on our work, and that would include, for example,

20     District Court Judge Kinkeade in the Northern District of

21     Texas.  And we certainly can match those judges up with the

22     cases we mentioned in the early part of the brief.  So we do

23     have a listing of the judges who have proposed and stated on

24     the record complimentary things of the way we litigated the

25     case and the results that we have achieved.  And I certainly

1     have no --

2              THE COURT:  I am sure that's at the end of the

3     case when you, when it's --

4              MR. AGUILAR:  Right, right.

5              THE COURT:  I'm just teasing you.

6              MR. AGUILAR:  Yeah.  No, no, that's -- that's --

7              THE COURT:  I have done that many times.

8              MR. AGUILAR:  Right.

9              THE COURT:  So, no, I've just -- time flies.  I

10    have been -- soon I will be -- this is my 25th year as a

11    federal judge, and so I know a number of the judges and

12    especially on the MDL side.  So I just wanted to make sure

13    that I got all the names; and so if I wanted to make a quick

14    call, I could do that.

15             MR. AGUILAR:  Certainly, Your Honor.

16             And to the extent that the cases that we cite in

17    our brief and in our resume aren't reflected in the comments

18    made by the judges that are within our brief, I certainly

19    can provide a correspondence to your court listing those

20    judges.

21             THE COURT:  Please.  Make it easy for me.

22             MR. AGUILAR:  I will do so.

23             THE COURT:  I am senior status now.

24             MR. AGUILAR:  I will do that.

25             THE COURT:  I am just teasing you.

1        MR. AGUILAR:  All right.

2        THE COURT:  All right.  Anything else you --

3        MR. AGUILAR:  Not unless the court has additional

4   questions.  Thank you.

5        THE COURT:  All right.  We may have a second

6   round, so --

7        All right.  Who is next?  Good morning.

8        MR. EAGEL:  Good morning, Your Honor.

9        I've prepared a little graph I thought would maybe

10   be helpful to the court.  Can I approach and just hand --

11        THE COURT:  Please.  Have you given it to all

12   counsel?  I need one for my law clerk too.  Okay.  Good.

13        MR. EAGEL:  Good morning, Your Honor.

14        THE COURT:  Good morning.

15        MR. EAGEL:  May it please the court.  Lawrence

16   Eagel, Bragar Eagel & Squire.  We are here this morning

17   seeking the appointment of our client Tim Ault as lead

18   plaintiff and our firm as lead counsel.

19        First, with respect to the appointment of our

20   client as lead plaintiff, Tim Ault has been a long-time

21   shareholder of CenturyLink.  He's owned shares since 1999.

22   We have disclosed he has 235 shares.  He's submitted an

23   affidavit saying that he's committed to prosecuting the

24   action and supervising counsel or at least being a part of

25   the process.  So I think he's -- he is probably the most

1  qualified plaintiff of all of the plaintiffs, and I will

2  describe why in a few minutes.

3          THE COURT:  What's his background?  Why would he

4  want to take on that?

5          MR. EAGEL:  I believe he's an -- he's an

6  investment advisor, I mean, a skilled investor.  I'm not

7  sure he's an investment advisor.  And I don't have more

8  information for you.  I wish I did, but I don't have more

9  information.  I have -- others in my office have been more

10  in touch with him.  And I apologize that I don't have more

11  information, but what I understand is he's an experienced

12  investor and I understand he's interested in the case and

13  willing to participate in the case and wants to participate

14  in the case.

15          So let me speak a little bit about the reasons why

16  our firm should be appointed lead counsel in this case.

17          Well, first, I would say, in terms of the lead

18  plaintiff as compared to Mr. Tansey, he has not submitted a

19  declaration saying that he will support his lead plaintiff

20  position.  And as we point out with respect to IMG, which

21  is -- and there are a few reasons why we believe

22  Inter-Marketing Group is not a proper plaintiff, one of

23  which is that they're a corporation and as a result of being

24  a corporation I don't think they're a traditional, but they

25  refer to themselves as an institutional investor, but I

1   think in reality they're a corporate investor, and as a

2   corporate investor they have their own fiduciary obligations

3   to their shareholders, and, therefore, a possibility is they

4   will be required -- they might sell their shares; and if

5   they do sell their shares, they are, in fact, will lose

6   standing.  I think that's something the court sort of is

7   familiar with.  So I think that was one reason, and I will

8   speak in a few minutes about the additional reasons and that

9   is the vigor with which we've pursued the case.

10          I think with this what's important, I think, Your

11  Honor, is in terms of the standing of or how the cases have

12  been prosecuted, our firm has been proactive and --

13          THE COURT:  Let's back up.

14          MR. EAGEL:  Okay.

15          THE COURT:  My first question, Who is going to

16  lead the charge here from your firm?

17          MR. EAGEL:  I will, Your Honor.  I will be the

18  lead.  I will be the lead attorney from -- and we can talk a

19  little bit about the resources of our firm, but I will be

20  the lead attorney from our firm handling litigation.  With

21  me will be -- and I have been practicing litigation for

22  35 years, law for 35 years, I guess litigation probably most

23  of that time.  A few years before that I was a certified

24  public accountant.  I have spent the last 10, 15 years

25  focused more on derivative-type litigation representing

1    shareholders in various types of derivative litigation.

2    We've -- and so that's been my experience.

3            I was involved in several of the cases that we

4    have identified for Your Honor.  The *Activision Blizzard*

5    case was a case I was intimately involved with.  It was our

6    client.  We worked with other counsel and ultimately

7    succeeded in achieving a $275 million recovery on behalf of

8    the company, in fact, got a fee award of $72 million showing

9    that the court recognized the effort of counsel and the

10   unique effort of counsel.  In another case -- I was also

11   involved in the *El Paso* trial case, a case tried before --

12   and in terms of the judges that were involved, the judges

13   that were involved in the *Activision Blizzard* case is a vice

14   chancellor -- Vice Chancellor Laster, Travis Laster from

15   Delaware.  He's in the Court of Chancery in Delaware.  Vice

16   Chancellor Laster also was the judge in the trial in the *El*

17   *Paso* litigation.  The *El Paso* litigation was a derivative

18   case we tried through verdict and secured a verdict of -- in

19   that case a liability award of $171 million following a

20   finding of bad faith on behalf of the directors.  In fact,

21   subsequent, sort of, at the close of the trial, the trial

22   court -- the company merged, El Paso merged with the

23   subsidiary, and ultimately our client lost standing.  There

24   were posttrial proceedings involving our standing, and

25   ultimately the case on appeal.

1        THE COURT:  Dismissed.

2        MR. EAGEL:  Excuse me?

3        THE COURT:  It was dismissed.

4        MR. EAGEL:  Yes, on appeal.  And that was as a

5   result of the loss of standing, having nothing to do with

6   the trial.  And even in the Delaware Supreme Court decision

7   reversing the judgment that the vice chancellor had

8   instituted in the case, the Supreme Court said in this

9   difficult and troubling case we have to reverse because of

10  the loss of standing.  But I think that's -- it's a lesson

11  we have learned in terms of what could happen if you don't

12  have control over the shares that you hold, because the same

13  result could happen if ultimately you sell the shares or the

14  shares are otherwise -- you are not in control of that,

15  whatever, for Inter-Marketing.

16        Another more recent case, Your Honor, is before,

17  also a derivative case, before Vice Chancellor Slights in

18  the Delaware Chancery Court in which we have -- we're

19  representing a shareholder in a suit on behalf of Enbridge

20  Energy Company.  The suit was ultimately -- recently

21  Enbridge announced a merger, a roll-up of its subsidiary.  I

22  have unique expertise in master limited partnership

23  litigation.  And as a result of the roll-up, as a result of

24  the transaction, there were merger negotiations between

25  Enbridge Energy, Inc., Enbridge, Inc., and the master

1    limited partnership.  We interjected ourselves into those

2    negotiations seeking to have the committee that was

3    appointed value the derivative claim.  The committee that

4    was appointed valued the derivative claim at close to a

5    hundred million dollars, used that value in its negotiations

6    with Enbridge, Inc., and ultimately there was an increase in

7    the -- in the exchange ratio from about 3083 to about 3.33.

8    Ultimately, that case, as a result of the closing of the

9    merger, the case was dismissed to avoid a fee application by

10   our firms.  We negotiated a fee of 14 and a half million

11   dollars with the defendants on the case.

12            So we have achieved, I think, success.  We have

13   achieved success recently, and we've achieved success in

14   derivative cases.

15            In terms of -- I know I can -- I can continue.  I

16   kind of -- in terms of the consumer cases, I know Your Honor

17   mentioned consumer cases.  These cases have not

18   traditionally been consumer cases that I have just referred

19   to.  We have been in consumer cases, but not within a

20   derivative context that I can recall.  The derivative cases

21   ordinarily involved, sort of, the conduct of the board of

22   directors and their, sort of, obligations to monitor the

23   activities.  I also --

24            THE COURT:  The only reason I mention it is

25   because I have -- I have these two MDLs.

1          MR. EAGEL:  Yeah, understood.

2          THE COURT:  And the --

3          MR. EAGEL:  Understood.

4          THE COURT:  -- same issues.  And so I want to see

5    if you've had that type of experience.

6          MR. EAGEL:  Well, our firm actually did represent

7    a class of -- this is actually a class of purchasers of

8    Camel Cash cigarettes.  We ultimately entered into a

9    resolution, but this involved what were called C-Notes for

10   Camel Cash cigarettes.  For years in California and

11   throughout the country there was -- there were these C-Notes

12   that were much like -- I don't know if you remember Plaid

13   Stamps back in the day.  The C-Notes they would -- people

14   would buy packs of cigarettes, get C-Notes, be encouraged to

15   collect the C-Notes.  Ultimately, R.J. Reynolds terminated

16   the program without notice, and we --

17         THE COURT:  Do you really want to talk about that

18   and your attorney fees that were cut?

19         MR. EAGEL:  No.  I really just wanted to tell

20   you that -- I'm sorry.  I wanted to just tell you that it

21   was one of the cases we had.  It was a consumer case, and

22   the attorneys fees is -- it's more, sort of, just that we've

23   had some consumer experience.  That's all.  Yes, we have

24   succeeded in obtaining attorneys fees, but that really was

25   more so -- I was trying to really just touch on the consumer

1    experience.

2          I think in terms of Your Honor's questions

3    regarding our ability to interact with other counsel and as

4    well as counsel for the defendants and counsel in the other

5    cases, I think that we have had experience in all of those

6    areas.

7          I think, first, with respect to counsel in the

8    other securities cases, we have worked with counsel and

9    throughout the country in a number of different securities

10   cases.  I do think there would be some overlap through

11   discovery.  There might be depositions, since some of the

12   issues are related as it relates to the disclosure claims,

13   that while they touch on similar issues that might require

14   coordinated discovery, coordinated deposition, coordinated

15   document discovery.

16         I think in terms of -- excuse me -- in terms of

17   coordination -- and I guess I spoke a little bit about

18   myself.  I didn't get to tell you anybody else who is going

19   to be on the case.  I would be on the case, leading the

20   case.  In addition, our firm would have David Stone.  He's

21   been with us for about, I would say, close to eight or

22   nine years, and he would -- he's practicing law for about

23   25 years.  He will also be involved.  Melissa Fortunato has

24   been with us.  She submitted the affidavits.  She will work

25   for about -- she's been out about six years.  She will be on

1   the case.  I think we have Todd Henderson, who is also a

2   more junior lawyer.  He will be on the case.  I expect that

3   one of the things we're prepared to do is to devote the

4   resources that's necessary to prosecute the case.

5        We've also, as Your Honor knows, been supported in

6   leadership in this case by both the Johnson Fistel firm and

7   the Weiser firm.  Okay.  We are not seeking lead on their

8   behalf, but we are supported by them.  And they have in

9   fact -- and part of --

10        I know Your Honor asked about, well, any

11   leadership, how would we envision leadership amongst the

12   group of attorneys here.  We were not able to come to an

13   agreement amongst the attorneys here as to how -- a

14   leadership structure.  Often that involves who is going to

15   lead the charge, often involves economics, and certainly is

16   something I think that we concluded that we felt we could.

17   We had -- we had the right theory.  We had the right client.

18   We felt we were committed to pursuing the case.  We were

19   supported by Johnson Fistel and have nothing negative to say

20   about the other attorneys here, frankly.  It is not that the

21   attorneys here are bad attorneys.  It's just we had to

22   just -- we think these cases are effectively managed when

23   run by lead counsel who is sort of taking charge, running

24   the show, and not necessarily splitting authority amongst

25   ten or, you know, five or six different firms.  It just

1   happens.  And that was what we were planning.  We did feel

2   like we had support from the Johnson Fistel firm and the

3   other firm as well.

4         And I think that's really why we are here.  We

5   just didn't reach an agreement.  I know other counsel will

6   say they all reached out to try to come to some agreement.

7   I think we were prepared to try to come to some agreement,

8   but I think economics as well as just the desire to lead the

9   case and desire to be the one making the decisions was part

10  of what led us to where we are.

11        THE COURT:  Okay.

12        MR. EAGEL:  I think in terms of --

13           (Mr. Hartlieb entered the courtroom.)

14        THE COURT:  Mr. Hartlieb?

15        MR. HARTLIEB:  Here, Your Honor.

16        THE COURT:  Welcome.  We will get to you.  I just

17  assumed that, that you were you.  And so just have a seat.

18        MR. HARTLIEB:  Thank you, Your Honor.  Thank you.

19        THE COURT:  And we will get to you in a little

20  bit.

21        I am sorry, counsel.  Go ahead.

22        MR. EAGEL:  So I did want to just talk a little

23  bit about why we think, in addition to Mr. Ault, our firm is

24  the proper, sort of, selection in this case.  It's a

25  close -- it's a close question, and I am here trying to tell

1    you that I think we will do the best job.  We will work hard

2    at it.

3              We filed -- as you can see from this little

4    schedule, one of the things it does say is we made a demand

5    in September 2017, the first demand made by anybody in the

6    case.  We also have a long-time shareholder.

7              I think one of the things we have -- and I think

8    Your Honor may have asked a little bit about Mr. Tansey.

9    Again, he didn't submit an affidavit.  And one of the things

10   that we did point out in our briefing was the fact that, in

11   fact, he filed --

12             THE COURT:  District of Minnesota.

13             MR. EAGEL:  Yeah, which is a district that doesn't

14   have personal jurisdiction over the defendant in this case

15   or, in fact, it's -- you know, you would have to ask -- ask

16   Tansey why they would file in the District of Minnesota,

17   other than we understand there was an MDL here, but you've

18   got to have jurisdiction, and I don't believe there's

19   jurisdiction under the *Bristol-Myers* case we cited and

20   discussed in our brief.  We think that's an opportunity for

21   the defendants to raise another issue in support of their

22   motion to dismiss that shouldn't be before us.

23             We do expect much of the discovery to occur in

24   Louisiana.  We have, you know, we will be --

25             THE COURT:  It's warmer here.

1          MR. EAGEL:  Well, I don't know about that.  I have

2     a feeling defendants may say differently, but I think that's

3     where a lot of the discovery will be.

4          Let me talk a little bit about the Inter-Marketing

5     Group.  I mentioned the fact that they had -- they were a

6     corporation and that they were -- that there's a risk of

7     selling the shares.  And I think -- I think Your Honor knows

8     that the Inter-Marketing Group originally moved to be lead

9     as in connection with their bondholder case.  They pursued

10    that, and this was sort of the backstop, sort of, let's go

11    the second route.  And as you can see from the chart here,

12    they didn't actually file the demand until 2018.  And so

13    that's over a year after we made the demand to the special

14    litigation committee.  And they didn't file their complaint

15    until December 26, 2018.

16          So while I think they are all fine lawyers, I

17    think we've showed through the way we have prosecuted the

18    case that we have prosecuted properly, you know, and that we

19    have the resources to lead the case.

20          THE COURT:  Appreciate it.

21          MR. EAGEL:  Thank you, Your Honor.

22          THE COURT:  Thank you.

23          Good morning.

24          MR. FEDERMAN:  Good morning, Your Honor.  William

25    B. Federman, Federman & Sherwood, on behalf of the IMG

1    Group.

2         If I may, Your Honor, I'll address any questions

3    you have; otherwise, I would like to respond, if I might, to

4    some of the comments by other counsel.

5         The Bragar Law Firm I am not familiar with,

6    although I was told they played a role in one or two of my

7    other shareholder derivative cases.  By reputation, they

8    seem like a good firm.  The only problem, if there is one,

9    with the Bragar firm is I couldn't get a phone call returned

10   or an email responded to.  I had to call Mike Fistel, one of

11   their supporting lawyers, twice, Your Honor, to have someone

12   from their law firm return my call.  I don't know why that

13   is, but that's not a good way to present yourself, as you

14   know, if you are going to be a lead counsel.

15        In the briefing filed by the Bragar firm,

16   Document 343 at page 15 of 17, they note that they did not

17   reach out to me or my firm to try to work anything out here.

18   I did repeatedly try to get them to the table to talk about

19   a structure here.  I finally got a phone call.  I made a

20   proposal.  They were going to get back to me, which they did

21   not do.

22        Mr. Aguilar and I have known each other for a long

23   time.  We have had plenty of cases together, which, frankly,

24   surprises me in their pleadings, Your Honor, on

25   Document 358, page 6 and 7, they say that they are not

1    familiar with the results of any of our cases, which is odd.

2    It may have been the same associate who filed in the wrong

3    jurisdiction.

4           I was co-counsel with the Robbins firm in *Cell*

5    *Therapeutics* in the Western District of Washington, Your

6    Honor.

7           I worked closely in the *Dynavax* case, Alameda

8    County, California, where they filed in federal court, I

9    filed in state court.  We worked closely.  I presented the

10   settlement.  We had an objector.  The settlement was

11   sustained.  They asked me to make the presentation.

12          In the case of *Hemispherx*, Eastern District of

13   Pennsylvania, we were co-counsel.

14          In the *Spectrum* lawsuit, Clark County, Nevada,

15   they filed in state court, I filed in federal court.  They

16   asked me, Your Honor, to make an appearance on behalf of

17   their client in state court to present the settlement for

18   approval to the court.

19          And then there's the *SandRidge Energy* case,

20   Western District of Oklahoma, that Mr. Aguilar is very

21   familiar with.  I was part of the leadership structure of

22   that case before Judge Lee R. West, one of the finest

23   federal trial judges on the bench, now senior status.

24   Mr. Aguilar filed in state court where he was stayed after

25   initial activity.  He then pursued nothing other than his

1    fee application before the Western District of Oklahoma,

2    where he lost and the judge poured him out.  He then took it

3    up on appeal to get his fee.  And I spoke to him.  I asked

4    him if he wanted me to intercede on his behalf.  He said no.

5    And he wound up losing, getting no fee in the case, even

6    though he did provide services in the case.

7            So to come to the court and now say we don't know

8    anything about the Federman firm just smacks of lack of

9    candor.  I would look forward to working with these counsel.

10           T.J. McKenna.  Your Honor, his firm was part of

11   the *Spectrum* group of law firms.  He and I are co-counsel in

12   the case.  It's a small bar when you get into this practice

13   area.

14           Now, if you say, well, Mr. Federman, what

15   distinguishes you and your firm from these other lawsuits, I

16   would say, first and foremost, I will be the first person

17   standing for the plaintiffs at trial and I will be the last

18   to sit for the plaintiffs at trial.  I will be working with

19   other lawyers within my firm, particularly Sara Collier, who

20   George knows very, very well.  She has done nothing but --

21           THE COURT:  Please, no first names.  Please.  No

22   first names.

23           MR. FEDERMAN:  Ms. Collier.

24           THE COURT:  No first names.

25           MR. FEDERMAN:  Oh, I am sorry.  Mr. Aguilar.

1          THE COURT:  Thanks.

2          MR. FEDERMAN:  Excuse me.

3          Sara Collier from my firm has been practicing

4     shareholder derivative litigation exclusively for 13 years.

5     She's worked very, very closely with numerous attorneys at

6     the Robbins Arroyo Law Firm.

7          If you say, well, Mr. Federman, what concerns do

8     you have?  Well, obviously, his client having 13 shares, and

9     I think I heard that right, is somewhat of a concern.  And I

10    understand now why he sought for only lawyers to be

11    appointed and not a client, but that doesn't matter to me.

12    They're a good law firm.  I would welcome them in part of a

13    structure.  Having multiple partners billing to the case may

14    or may not be necessary.  That's something that Mr. Aguilar

15    and I could discuss.

16          As far as the Bragar Law Firm goes --

17          THE COURT:  Why don't you tell me, after I denied

18    a motion, it took you six months to file.

19          MR. FEDERMAN:  Your Honor, there, frankly, was no

20    rush to file.  They talk about the vigor in pursuing the

21    case, but in fact nothing has happened to this case other

22    than more facts have come out.  A shareholder derivative

23    case is not like a class action.  It's not the first to

24    file.  Inter-Marketing Group, which they say did not pursue

25    with vigor, is in the exact same spot, except with a better

1    drafted complaint than the Bragar Law Firm, because we had

2    more facts on which to base the complaint.  There was no

3    reason to file early other than to stand in front of the

4    court and say we filed first.  I am sure if they file enough

5    derivative cases that they were filed third or fourth in

6    order.  Robbins Arroyo has filed six, seven months after

7    other law firms in some of my cases, and I have welcomed

8    them into the structure.  I spoke to Mr. Aguilar in the

9    hallway again, after having reached out to him earlier, and

10   said do you want to work something out here.  And he said

11   no.  So, you know, I will work with him.

12         Now, you asked about the differences.  MDL

13   experience, Your Honor.  I think in this group I am the only

14   one who has been lead counsel in multiple MDL consumer

15   cases.  Judge Gwin in the Northern District of Ohio

16   appointed me over the *Sonic* data breach case as the sole

17   lead counsel with seven PSC members from around the country,

18   including New York counsel, Louisiana, South Carolina.  It's

19   a good diverse group.  And I'm lead in that case.  The

20   *Samsung* washing case, Your Honor, is a massive case.  We

21   have counsel from around the country on the PSC.  Judge

22   DeGiusti in the Western District of Oklahoma.  I am co-lead

23   counsel with a Lieff Cabraser case.

24         I have reached out to the consumer part of this

25   case in the MDL because I think particularly the arbitration

1    issue is important to the derivative case, because if it's

2    forced into arbitration, we lose access to a great deal of

3    discovery.  And I know Mr. Bragar discussed how they will

4    coordinate depositions and we could attend them, but if

5    there are no depositions, it becomes a bigger issue.  So we

6    have reached out to those attorneys.  We have reached out to

7    the class action counsel.  I know Max Berger very well.

8            But, Your Honor, where it comes down is I'll work

9    with these other firms.  We will efficiently handle this

10    case.  If you say, well, what's the advantage of being in

11    the central part of the United States?  Cost of doing

12    business, Your Honor.  Our billing rates are very

13    competitive.  I have got a specialist in Ms. Sara Collier,

14    who they have worked with.  T.J. -- excuse me.  Mr. McKenna

15    speaks with her periodically.  We're co-counsel on a case

16    now.  I think all these firms have had good results in

17    cases.  I am not going to say otherwise.

18            Mr. Bragar's law firm has a client who literally

19    has less than a one percent investment position compared to

20    IMG in this case.  There is no commitment by any other

21    plaintiff to hold stock throughout this proceeding.  As

22    Mr. Bragar discussed with you, his client could lose

23    standing at any time.  A 13 shareholder?  A 13-share

24    shareholder could sell at any time.  Mr. Bragar's client

25    with less than 300 shares could decide to sell at any time.

1    IMG, who he criticizes for some perceived lack of standing,

2    where all he had to do was call me, just give me a call, I'm

3    available, and say, Bill, is there a -- or, Mr. Federman, is

4    there an investment policy for IMG that will cause this

5    company to sell?  And I would have said no, there is none.

6    Instead, he makes a fanciful argument, which has no basis.

7    And as the court knows, for a trial attorney, candor,

8    accuracy and evidentiary value matters.

9            So here we stand, Your Honor, in front of you

10   ready to serve in a capacity of either lead counsel with a

11   three-member executive committee or I will be co-counsel and

12   gladly do that.

13           As far as resources, we have dropped from 18

14   attorneys at the Robbins Arroyo firm to some number of

15   multiple partners and an associate.

16           Your Honor, we just resolved the case in front of

17   Judge Consuelo Marshall in the Central District of

18   California, a very fine judge.  It took five years to do it.

19   We had a trip to Pasadena to the Ninth Circuit.  Sullivan &

20   Cromwell was on defense.  And the case was resolved

21   favorably for the plaintiffs, a $13 million recovery.  Fees

22   were awarded at 28 percent, which is above the benchmark of

23   the Ninth Circuit, as you may be aware.  We had an

24   institutional client there, who was a corporation.  Every

25   institutional client, Your Honor, is either a trust or a

1    corporation.  That's why they're an institutional client.

2    So if you would like to call a judge that knows my firm and

3    the quality of work we do, Judge Marshall would be a perfect

4    one.  She approved the settlement last week.

5           That also frees up both resources, i.e., cash, as

6    well as attorney time.  We are committed to this case.

7    Ms. Collier will be on this case nearly exclusively.  This

8    is a big case.  There are a lot of moving parts in it with

9    the investigation by the AG.  It's a large board.

10          I would welcome the assistance of these other law

11   firms, if they want to continue to participate.  I look

12   forward to working with the Bragar firm.  I have no issue

13   other than admiration for Mr. McKenna, who has been my

14   co-counsel.  He returns calls.  He responds.  He does his

15   work on time.  It doesn't take that much to work

16   cooperatively.  And we have shown we do that in other cases

17   in MDLs, and that's why we have been selected.  I am not a

18   jack of all trades.  We restrict our practice to certain

19   areas, and those areas are shareholder derivative cases,

20   securities class actions and consumer cases.

21          I have over the years practiced in other areas.

22   I'm right now co-counsel in a police shooting case out of

23   Bixby, Oklahoma, where a police officer lit up a 16-year-old

24   boy and killed him with eight shots, and I am assisting a

25   lawyer who came to me for financial backing and assistance

 1    in complexity of his case.  I am glad to help other

 2    attorneys.  And that's how I'd approach this case, Your

 3    Honor.

 4            THE COURT:  Thank you.

 5            MR. FEDERMAN:  Do you have any questions?

 6            THE COURT:  Thank you.

 7            MR. FEDERMAN:  Thank you very much.

 8            MR. MCKENNA:  Good morning, Your Honor.

 9            THE COURT:  Good morning.

10            MR. MCKENNA:  Thomas J. McKenna.  I represent

11    three individuals who are stockholders of the company.

12    Thank you for having us here today.

13            These lead plaintiff contests always make me

14    nervous too because arguments are made that could only help

15    the defense.

16            I reached out to all the firms here -- I am

17    familiar with all the firms; I have worked with all the

18    firms -- to see if we could make a structure.  We were not

19    successful.  It doesn't mean it couldn't happen.

20            I have worked with Mr. Federman, as he's told you,

21    many times.  And when I saw his papers that he represented

22    an institution, a corporation that holds 2,600 shares, that

23    the man has submitted a sworn statement that he will not

24    sell, because standing is a problem -- I have a case in

25    Chicago where my client promised me they were never going to

1  sell and had no intention of selling, then they sold.  I had

2  to drop him out of the case.  So I'm aware of those

3  problems, as well as probably happened to everyone.  So that

4  impressed me, a sworn statement of a corporation they're

5  going to hold the shares.  So I agreed to pull back and

6  support Mr. Federman in whatever way he needs.

7  　　　　My local counsel, Mr. Perry, has worked with me on

8  a number of cases in this district.  We have been before

9  Judge Schiltz a few times.  We have been before Judge

10  Ericksen.  We have been before Judge Tunheim and Judge Doty.

11  He also is prepared to be liaison counsel, if Your Honor

12  thinks that's appropriate, and he will serve under

13  Mr. Federman as well.

14  　　　　So I would just say one other thing too, you know,

15  not -- no one has all the answers, and often the best

16  answers come from collaboration.  I had a law professor who

17  gave us a take-home test.  The class was divided in two.

18  The other kids took their test with their professor in

19  class.  We got the take-home.  They were up in arms.  They

20  thought it was easy.  It was the hardest test I ever took.

21  And we sat in my living room, like six of us, and we came up

22  with, you know, decent answers, but by ourselves we had no

23  chance on that test because it was just too deep.  There

24  were too many levels.  And I learned from my professor that

25  the best -- the best answers come from collaboration, and I

1    would like to see that happen here, judge.

2            THE COURT:  All right.  Thank you.

3            Anyone else?

4            MR. EAGEL:  Your Honor, just one thing.  I just

5    wanted to say, one, I'm Mr. Eagel.  I know that --

6            THE COURT:  I can't hear you.  Come to the podium.

7            MR. EAGEL:  Just, one, I really did just want to

8    say, one, I'm Mr. Eagel as opposed to Mr. Bragar.  I think I

9    was referred to as Mr. Bragar a few times.  I didn't want

10   there to be any misunderstanding from Mr. Federman.

11           And, two, I did want to make sure that the court

12   was aware it's not that we've never worked with anybody or

13   unwilling to work with other people.  We couldn't reach an

14   agreement based on the parameters that were being discussed

15   at the time.  We have worked with counsel many times.  I

16   have -- don't have bad words to say about the people that

17   are here.  They have all been good lawyers, and they have

18   spoken well.  It's we have -- in terms of communications,

19   there were communications that were being made by other

20   attorneys to Mr. Federman.  There were communications -- if

21   there was a breakdown, it could have been because of some

22   desire as to who was -- discussions with Robbins Arroyo.  I

23   mean, the discussions that occurred, we just couldn't reach

24   an agreement, but there's no desire not to reach an

25   agreement or not to work with people.  We have worked

1   consistently with other firms and would continue to do so.

2   I just wanted to make sure that was clear, Your Honor.

3           Thank you.

4           THE COURT:  Thank you.

5           MR. AGUILAR:  One last thing, Your Honor.  I am

6   sorry.  I just wanted to -- my co-counsel --

7           THE COURT:  Well, you have to respond to -- I

8   think someone said some associate misfiled the case in

9   Minnesota.

10          MR. AGUILAR:  That wasn't us.

11          THE COURT:  Okay.

12          MR. AGUILAR:  No, we did not misfile.  We did file

13  in Minnesota.  It wasn't misfiled.

14          THE COURT:  Well, and you didn't -- maybe I didn't

15  say it right.  Counsel said that -- he was taking a dig at

16  your firm.

17          MR. AGUILAR:  Yeah.

18          THE COURT:  It's that you don't know what you are

19  doing.

20          MR. AGUILAR:  Right.

21          THE COURT:  And that you had an associate file it

22  in Minnesota.

23          MR. AGUILAR:  That's not the case.

24          THE COURT:  And so you are going to have to

25  respond to that.

1          MR. AGUILAR:  Sure.

2          At the moment there is no finding with respect to

3     jurisdiction on any of the cases, personal, general,

4     specific.  So that's not to say we couldn't establish

5     jurisdiction with the currently pending complaint.  However,

6     in the end in an MDL we are going to consolidate the cases

7     and have plaintiffs who had filed in Louisiana, filed in

8     Minnesota, and so it becomes a moot case, because if you

9     don't have jurisdiction as alleged by one of the plaintiffs,

10    there's another plaintiff who had alleged previously

11    Louisiana jurisdiction and that might arise and provide the

12    jurisdiction in this case.  So in an MDL that's not as

13    critical as you would -- as it would be in a stand-alone

14    litigation.

15          So I don't believe we've misfiled.  I approved the

16    filing.  It was here in Minnesota.  It's entirely possible

17    we can establish Minnesota jurisdiction here, but it's also

18    possible in an MDL we would be able to establish

19    jurisdiction through the filing of the Louisiana cases.  So

20    I think it's a lot less important in this context than it

21    may be otherwise.

22          And then, secondly, I just wanted to point out, as

23    my local counsel reminded me, we were involved as co-lead

24    counsel in the derivative case against Target in the data

25    breach cases.  That had an MDL, that was an MDL, and had a

1    consumer case component, and Judge Magnuson presided.  So if

2    you wanted to talk to him, that would be perfectly

3    appropriate.

4            And that's all I have.

5            THE COURT:  Anyone else?

6            MR. MCKENNA:  No, judge.

7            THE COURT:  All right.  Let's move on to the other

8    case, let's recall it, that was just dealing with

9    Mr. Hartlieb.  Let's call that again.

10           COURTROOM DEPUTY:  Tansey versus Perry, et al.,

11   Case No. 18-cv-2460.

12           THE COURT:  Mr. Hartlieb, come forward.

13           MR. HARTLIEB:  Thank you.  Thank you, Your Honor.

14           THE COURT:  Good morning.

15           MR. HARTLIEB:  Good morning.

16           I would just like to say that I apologize to the

17   court for being late.  I was up bright and early and ready

18   to go, had breakfast, went to put a suit on, had no dress

19   shirt, ran to Nordstrom Rack, pounded on the door, got them

20   to open five minutes early, got the dress shirt.  And let's

21   just say one wrong turn in the skyway and you are in serious

22   trouble, especially a California guy.

23           THE COURT:  So you were in St. Paul?  No.  I

24   understand.  Don't worry about that.

25           MR. HARTLIEB:  Thank you, Your Honor.

1          Does Your Honor have any questions?

2          THE COURT:  I travel quite a bit and --

3          MR. HARTLIEB:  It was a rookie mistake.

4          THE COURT:  No.  It's amazing how many times I've

5     forgotten a tie.

6          MR. HARTLIEB:  Thank you, Your Honor.

7          THE COURT:  So I understand, yes.

8          MR. HARTLIEB:  Does Your Honor have any questions

9     for me or -- okay.

10         THE COURT:  No.  Proceed with what you want.

11         MR. HARTLIEB:  Okay.  As Your Honor knows, in the

12    amicus brief I lay things out that shows a pattern, a course

13    of conduct over many years.  I, as a shareholder, have had

14    to defend my interests against the likes of Robbins Arroyo

15    and more recently the Weiser Law Firm.

16         I am now in litigation with the Weiser Law Firm

17    because of the chicanery that transpired in the Kansas

18    court.  That case went all the way up to the Kansas Supreme

19    Court.  We had oral arguments at the Kansas Supreme Court.

20    They were admonished, although there is no transcript of

21    that hearing, which I am very dismayed over.

22         And, also, I think that the Robbins firm and I

23    believe, you know, Weiser as well, but especially the

24    Robbins firm, given the long history I have had having to

25    defend my interests against those cases that were

1    lawyer-driven, plaintiffs that had no shares, no standing

2    whatsoever, representing -- I had 8, $900,000 in losses in

3    Sirius.  So the way I have gotten involved in this is I see

4    someone that falsely purports to represent the shareholders'

5    interests or the corporation, the shareholders derivatively,

6    and then I see no meaningful relief or nearly illusory

7    relief and a tremendous amount in attorneys fees.  And in

8    the Kansas case, I mean, I was subjected, I was -- my

9    character -- I mean, I ended up having to defend my

10   character, and I wasn't the one that did anything wrong.

11   You know, I mean, it's unbelievable the attacks that I took,

12   so -- but it does nothing to dissuade me.  It just

13   galvanizes my convictions and strengthens my resolve.

14           I have been on a quest to expose this

15   lawyer-driven litigation and the strong-arm tactics of firms

16   like Robbins Arroyo.  And I'll tell you, I think the reason

17   that they get away with it is because of who, you know, the

18   Robbins Geller firm is.  I mean, they are a very prominent

19   firm.  And I know many, many attorneys that are very unhappy

20   with what goes on at Robbins Arroyo, but they are afraid to

21   cross them.  So I am the one that's out here.  You know, I

22   am speaking my mind, because I have been a victim of them so

23   many times, and I intend to continue.

24           And with regard to the amicus brief, I didn't have

25   a full service, the notice, you know, who to serve everyone.

1    And I understand that it could be prejudicial because they

2    haven't had a chance to respond, but I welcome a response.

3    That said, if the firms would like to give me a list of

4    their forthcoming cases in which they are seeking leave, I

5    could be certain to notify everybody timely and I wouldn't

6    have to prepare, stay up all night, all weekend long, to try

7    to draft an amicus brief and get it to the court and then,

8    you know, fly in.

9              THE COURT:  Okay.  Anything else you wish to tell

10   me?

11             MR. HARTLIEB:  I mean, basically, that's it in a

12   nutshell, Your Honor.  I think that it's time that, you

13   know, the corruption that's rife throughout derivative

14   litigation needs to be cleaned up.

15             The other issue that I tread lightly on, but I

16   just don't understand why an esteemed federal court judge,

17   after fraud was committed in the case, he submitted a sworn

18   declaration affirming those fees.  I don't understand how it

19   is that a mediator who is supposed to be, you know,

20   nonbiased -- I don't think it's proper for a mediator to

21   affirm fees, you know, whether just or unjust, in my

22   opinion, because it creates at least the illusion of a

23   conflict of interest.

24             And then it's -- I'm dismayed by the fact that

25   during the course of the Kansas case that, you know, Judge

1    Phillips did not send a declaration retracting his support

2    for the fees because they were found to be completely

3    fraudulent, 1.6 million of which by a convicted felon and

4    disbarred attorney.  And, Your Honor, I know for a fact that

5    the Weiser firm knew who Mr. Silow was and that will come

6    out, you know, during the course of litigation.  And I am

7    pretty certain that the Robbins Arroyo firm knew who he was

8    as well.

9         These firms, when these firms are up to no good,

10   when they are billing illusory hours -- you know, if I had

11   30 minutes with Your Honor in chambers, I could give Your

12   Honor a lot more information with regard to Cardinal Health,

13   an attorney by the name of Colton, things that have happened

14   at the Robbins Arroyo firm that are extremely troubling,

15   extremely troubling.

16        So I ask Your Honor to consider like the Kansas

17   court did.  I understand I am pro se.  I understand I don't

18   have a legal background.  But the Kansas court took my

19   allegations, you know, sincerely and gave me the opportunity

20   to prove what I alleged early on, that there was fraud being

21   committed in that case.

22        THE COURT:  Okay.

23        MR. HARTLIEB:  Thank you, Your Honor.

24        THE COURT:  Thank you.

25        MR. HARTLIEB:  Thank you.

1          THE COURT:  Counsel, do you wish to be heard?

2          MR. AGUILAR:  Yes, Your Honor.

3          Unfortunately, this is what Mr. Hartlieb does.  He

4   has done this before.  He filed the last-second pleading in

5   a case before the Delaware Chancery for which I had and my

6   firm had placed an application for lead counsel, again, last

7   second, last minute, all sorts of parade of horribles that

8   our firm supposedly committed.  And at the time Chancellor

9   Strine, before his elevation to the Supreme Court, saw the

10   matter, heard the matter, he dismissed it and didn't take

11   into account any of the -- any of the allegations, any of

12   the pleadings.  They were as fanciful as they are in this

13   instance, delusionary in many instances and certainly

14   libelous and slanderous.  And he went ahead and appointed us

15   and me as lead counsel.  We obtained a $68 million default

16   judgment in the case.  We didn't apply for attorney fees and

17   won't until we are actually able to collect on the judgment.

18   But Mr. Hartlieb has no answer for the hundreds of cases

19   where we've successfully settled, where we have had

20   complimentary reviews by the judges involved.

21          The process by which these cases get resolved is

22   closely monitored by the court.  There's a reason for that.

23   And in this particular instance, and specifically I am

24   talking about the *Sprint* instance, there was a settlement in

25   the case that the court approved as reasonable, fair and

1   adequate to the company and its shareholders and to the

2   plaintiffs.  The settlement was approved.  The court had a

3   problem with the fee application, even though the fee

4   application was negotiated with the direct intervention of

5   the mediator, Judge Phillips, and we had declarations from

6   corporate governance experts who also vouched for the value

7   of the reforms involved.  Now, again, and it's perfectly

8   appropriate, the judge in Kansas determined, you know, that

9   wasn't good enough, and he has asserted his discretion and

10  judgment and determined that there shouldn't be an

11  application for the fees at anywhere near the amount that we

12  applied for.  We appealed that, lost that.  We didn't --

13  there was no argument in front of the Kansas Supreme Court.

14  So, you know, the system worked.  The process worked.  The

15  court reviewed it.  Everyone presented their arguments, and

16  the court ruled.

17          In the instance of the disbarred lawyer,

18  unfortunately, the Weiser firm had retained and vetted

19  somebody who purported to be an attorney, was a prominent

20  doc reviewer in the case, and all he did was review

21  documents.  We didn't vet him.  We didn't employ him.  He

22  wasn't part of our sphere of lawyers working on the case.

23  And, unfortunately, it turned out he had misrepresented his

24  status.  He was criminally prosecuted.  He was -- and had

25  served a sentence for defrauding the court and defrauding

1    the public as a purported attorney.  So, again, the process

2    worked.

3            And there's no, again, there's -- aside from the

4    matters that he brought before you in the pleading that he

5    lodged this morning, in which we received, again, late last

6    night by email, that doesn't account for the hundreds of

7    cases we have resolved successfully and had approved by the

8    court, through the court's own vigorous and careful scrutiny

9    over what had occurred in the case.  And that's a record

10   that we stand on and is appropriately before Your Honor in

11   our application for lead counsel.

12           THE COURT:  All right.  I'll give you a week to

13   respond in writing.  It will be the 13th of March.

14           MR. AGUILAR:  Thank you.

15           THE COURT:  By 12 noon.

16           All right.  Anyone else wish to be heard on this

17   issue?

18           Mr. Hartlieb, do you want to have the last word

19   here?

20           MR. HARTLIEB:  Thank you, Your Honor.

21           You know, I may be a lot of things.  Delusional is

22   not one of them.  That being said, the court should also

23   take into consideration that Mr. Aguilar would like to blame

24   the Weiser firm for what transpired, but the Robbins Arroyo

25   firm was the one -- all the fraud was committed in

1    fraudulent document review.  Basically, the entire

2    $4.5 million was for document review that was illusory.  All

3    of this was under Robbins Arroyo's supervision.  They were

4    running the case behind the scenes.  They negotiated the

5    case management, you know, agreement, and they were

6    controlling all of the document review.

7              The other thing is, I ask the court to consider

8    this.  The allegations that I make against these firms are

9    very serious allegations.  He says that I am libeling him,

10   slandering him and defaming the firm.  I have asked

11   Mr. Aguilar on numerous occasions if they would like to sue

12   me, I will waive service.

13             I am perfectly happy for you -- if you want to

14   commence an action, then I will get the discovery --

15             THE COURT:  Speak to me.

16             MR. HARTLIEB:  Then I will get the discovery that

17   I need to finally put an end to this, all of this, you know,

18   unjust enrichment, you know, literally bastardizing our

19   judicial process.

20             THE COURT:  Okay.

21             MR. HARTLIEB:  Thank you.

22             THE COURT:  Thank you.

23             All right.  Anyone else wish to speak on any

24   issues?  If not, I will take this matter under advisement.

25             MR. AGUILAR:  Thank you, Your Honor.

48

1          MR. FEDERMAN:  Thank you, Your Honor.

2          THE COURT:  Thank you.

3          COURTROOM DEPUTY:  All rise.

4      (Court adjourned at 10:42 a.m., 03-06-2019.)

5                       *   *   *

6      I, Renee A. Rogge, certify that the foregoing is a

7  correct transcript from the record of proceedings in the

8  above-entitled matter.

9                  Certified by:  /s/Renee A. Rogge
                                  _____
10                                Renee A. Rogge, RMR-CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 28

Begin forwarded message:

**From:** "Michael Hartleib" <mjhartleib@gmail.com>
**To:** "'Boren, Jill, DCA'" <Jill.Boren@jocogov.org>
**Cc:** "MSK@HFMLEGAL.COM" <MSK@HFMLEGAL.COM>,
"PERRY.BRANDT@BRYANCAVE.COM" <PERRY.BRANDT@BRYANCAVE.COM>,
"MARK.MCGRORY@ERISEIP.COM" <MARK.MCGRORY@ERISEIP.COM>,
"DOCKETING@ERISEIP.COM" <DOCKETING@ERISEIP.COM>, "'Chuck Schimmel'"
<chuck@wrightschimmel.com>, "'George C. Aguilar'" <GAguilar@robbinsarroyo.com>, "'Jay
Razzouk'" <jrazzouk@robbinsarroyo.com>, "Robert Weiser" <rweiser@weiserlawfirm.com>,
"Brett Stecker" <bdstecker@weiserlawfirm.com>, "'Alfred G. Yates jr.'" <yateslaw@aol.com>,
"'Robert Schubert'" <rschubert@schubertlawfirm.com>, "'Willem F. Jonckheer'"
<wjonckheer@schubertlawfirm.com>, "James M. Ficaro" <jficaro@weiserlawfirm.com>,
"tom@dollar-law.com" <tom@dollar-law.com>, "'Dustin Schubert'"
<dschubert@schubertlawfirm.com>, "'Brian J. Robbins'" <BRobbins@robbinsarroyo.com>
**Subject: FW: Emailing:  Amicus Curiae Centurylink**

Dear Ms. Boren, I hope this email finds you well. I thought that the
Honorable Vano would be interested to know that my quest to expose lawyer
driven litigation and corruption rife throughout the Plaintiffs Bar
continues. Attached is an Amicus Brief filed in Minnesota, and transcript of
the hearing before the Honorable Michael J. Davis. In addition, I have
initiated legal action against Weiser and representative plaintiff
Ross-Williams as outlined in the attached complaint.

I am a shareholder in Centurylink, and once again forced to defend my
interest against these firms. Weiser is hiding behind a New York firm in an
attempt to manage cases behind the scene, and Robbins Arroyo seeks lead with
a plaintiff holding 13 shares of a fourteen dollar stock. Clearly this case
would become yet another that is entirely lawyer driven. Wherefore, no party
would seek Counsel for redress with less than $300 dollars in damages. Once
again, proving the case would be entirely lawyer driven. To hear Mr. Aguilar
describe what transpired in Kansas is clearly misleading the Minnesota
Court. Maybe Judge Vano would be interested in setting the record straight
before the Court appoints lead Counsel in the aforementioned case.

Interestingly, I received an anonymous letter last night which details an

1

elaborate scheme by Weiser et.al. to procure "Relators" in Qui Tam cases. It involves the use of several LLC shell corporations set up for the sole purpose of soliciting information under false pretenses to facilitate lawyer driven Qui Tam cases. This has resulted in the DOJ filing a motion to dismiss 11 active cases, filed by Weiser et.al. including ABBVIE. The level of sinister is truly unbelievable, some of which is outlined in the attached Motion to dismiss by the Feds!

Lastly, I would like to express my gratitude to Judge Vano, I am, and remain incredible grateful for allowing me to be heard, and finding my arguments compelling. I will continue my quest to expose and reform the corruption rife throughout Derivative litigation.

With the Utmost Respect,

Michael Hartleib  (646) 494-5901

# EXHIBIT 29

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE: CENTURYLINK SALES PRACTICES AND SECURITIES LITIGATION | MDL No. 17-2795 (MJD/KMM) |
| This Document Relates to Civil File Nos. 18-2460, 18-2833, 18-2834, 18-2835, 19-263, 19-284 | MEMORANDUM OF LAW & ORDER |

Shawn M. Perry,  Perry & Perry, PLLP, and Thomas J. McKenna and Gregory M. Egleston, Gainey McKenna & Egleston, Counsel for Plaintiffs Sona Andresian, Glen Walker, and Michael Barbree.

William B. Federman, Federman & Sherwood, and Gregg M. Corwin, Gregg M. Corwin & Associate Law Office, PC, Counsel for Plaintiff Inter-Marketing Group USA, Inc.

George C. Aguilar and Brian J. Robbins, Robbins Arroyo LLP, and Garrett D. Blanchfield, Reinhardt Wendorf & Blanchfield, Counsel for Plaintiff Edward Tansey.

Lawrence P. Eagel, David J. Stone, and Melissa A. Fortunato, Bragar Eagel & Squire, P.C., Counsel for Plaintiff Tim Ault.

Michael I. Fistel, Jr., Johnson Fistel, LLP, Counsel for Plaintiff Neil T.S. Flanders.

James M. Ficaro, Robert B. Weiser, and Brett D. Stecker, The Weiser Law Firm, P.C., Counsel for Plaintiff Dennis Palkon.

## I.    INTRODUCTION

1

This matter is before the Court on Plaintiff Inter-Marketing Group USA, Inc.'s Motion to Consolidate Related Shareholder Derivative Action, Appoint Lead or Co-lead Plaintiff, and Approve Its Selection of Lead or Co-lead Counsel [Docket No. 330]; Application by Plaintiff Edward Tansey for Appointment of Lead and Liaison Counsel in Consolidated Derivative Action [Docket No. 332]; and Plaintiff Ault's Motion for Appointment of Lead Plaintiff and Lead Counsel [Docket No. 342].  Also before the Court is Michael Hartleib's Motion for Acceptance of Amicus Curiae Brief in Oppos[]ition to the Appointment of the Robbins Arroyo and Weiser Firms as Lead Counsel and Notice of Intent to Attend the Hearing on 3-6-19.  [Docket No. 381]

The Court heard oral argument on March 6, 2019.

## II.    BACKGROUND

### A.    Overview of the Consolidated Derivative Action

On June 6, 2018, Plaintiff Neil Flanders filed a verified derivative complaint against Nominal Defendant CenturyLink, Inc., ("CenturyLink") and its officers and directors in the Western District of Louisiana.  Later that same day, Plaintiff Tim Ault filed a similar action in the same court.

2

Plaintiffs Michael Barbree, Glen Walker, and Sona Andresian filed a similar complaint in the same court on July 3, 2018.  On August 23, 2018, Plaintiff Edward Tansey filed a similar derivative action in the District of Minnesota.

On October 3, 2018, based on an order from the Judicial Panel on Multidistrict Litigation ("JPML"), the Flanders Action, Ault Action, and Barbree Action were transferred to the District of Minnesota for inclusion in the CenturyLink MDL.  [Docket No. 285]

On December 4, 2018, this Court entered an order consolidating the four derivative actions that had been filed in or transferred to this Court: Tansey v. Perry, Civil File No. 18-2460, Flanders v. Post, Civil File No. 18-2833, Ault v Post, Civil File No. 18-2834, and Barbree v. Bejar, Civil File No. 18-2835.  [Docket No. 310]  Since that time, the JPML has transferred two additional derivative actions to this District, Inter-Marketing Group USA, Inc. v. Storey, Civil File No. 19-263, and Palkon v. CenturyLink, Inc., Civil File No. 19-284.

## B.    Ault Action

On June 6, 2018, Ault filed a verified derivative complaint against CenturyLink and its officers and board members in the Western District of Louisiana.  Ault now moves for an order appointing him Lead Plaintiff, appointing Bragar Eagel & Squire, P.C. ("Bragar") as Lead Counsel for the

3

Consolidated Derivative Action, and entering a scheduling order for the filing of a consolidated complaint.  [Docket Nos. 342-43]  Ault's motion is joined by Plaintiffs Flanders and Palkon.  [Docket No. 342]

### C.   Tansey Action

On August 23, 2018, Tansey filed a verified shareholder derivative complaint in this District against CenturyLink and its officers and directors. Tansey now moves for an order appointing the law firm of Robbins Arroyo LLP ("Robbins Arroyo") as Lead Counsel in the Consolidated Derivative Action and appointing the law firm of Reinhardt Wendorf & Blanchfield as Liaison Counsel in the Consolidated Derivative Action.  [Docket No. 332]  Tansey does not seek to be appointed Lead Plaintiff, but states that, if the Court seeks to appoint a Lead Plaintiff, he is willing to serve.  [Docket No. 358]

### D.   Inter-Marketing Group USA, Inc. Action

On December 26, 2018, Inter-Marketing Group USA, Inc. ("IMG") filed a verified shareholder derivative complaint in the Western District of Louisiana against CenturyLink and its officers and directors.  On January 17, 2019, the JPML transferred the matter to the District of Minnesota.  [Docket No. 375]  IMG now moves to consolidate the IMG Action with the Consolidated Derivative

Action, to appoint IMG as Lead or Co-Lead Plaintiff, and to appoint its counsel, Federman & Sherwood, as Lead or Co-Lead Counsel.  [Docket No. 330]

## III.   DISCUSSION

### A.   Amicus Brief

On March 6, the Court heard oral argument on three motions to be appointed Lead Counsel in the CenturyLink derivative action.  The Court also allowed Michael Hartleib to argue regarding his objection to the appointment of the Robbins Arroyo firm as Lead Counsel.  The Court allowed a post-hearing brief from Robbins Arroyo regarding the allegations against it.  The Court also received an email from Hartleib, copying all counsel, responding to Robbins Arroyo's brief.

The Court grants Hartleib's motion insofar as the Court allowed Hartleib to express his opinions to the Court during the hearing and to file his proposed amicus brief.  The Court has carefully considered Hartleib's allegations, Robbins Arroyo's response, and the public record in the cases cited by Hartleib.  The Court concludes that Hartleib has raised no legitimate questions with regard to the ethics or expertise of the Robbins Arroyo law firm.  The Court is satisfied that there are no ethical concerns that would hinder Robbins Arroyo's application for appointment as Lead Counsel.

**B.     Consolidation**

Under Federal Rule of Civil Procedure 42(a),

If actions before the court involve a common question of law or fact, the court may:

(1) join for hearing or trial any or all matters at issue in the actions;

(2) consolidate the actions; or

(3) issue any other orders to avoid unnecessary cost or delay.

"Consolidation can help alleviate needless duplication of time, effort, and expense on the part of the parties and the Court." Horn v. Raines, 227 F.R.D. 1, 2 (D.D.C. 2005) (citation omitted).  In derivative actions, "consolidation is appropriate where the cost of defending . . . multiple actions may well do serious harm to the very corporation in whose interest they are supposedly brought." Id. (citation omitted).

Pursuant to the Court's December 4, 2018 Order Granting Consolidation of Federal Derivative Actions, each action arising out of the same transactions and occurrences and asserting derivative claims filed in this Court or transferred here shall be consolidated into the Consolidated Derivative Action.  [Docket No. 310] Since entry of the Court's December 4 Order, the IMG and Palkon derivative actions have been transferred to this Court, and IMG has filed unopposed motion

6

to consolidate the IMG case with the Consolidated Derivative Action.  All cases arise out of the same operative facts and raise similar legal issues.  There has been no opposition to consolidation.  Failure to consolidate will increase inefficiency and duplication.  Therefore, Inter-Marketing Group USA, Inc. v. Storey, Civil File No. 19-263, and Palkon v. CenturyLink, Inc., Civil File No. 19-284 are hereby consolidated with the Consolidated Derivative Action.

## C.     Leadership

The counsel for three different Plaintiffs – Ault, Tansey, and IMG – each seek appointment as Lead Counsel.

### 1.     Standard for Appointment of Lead Counsel

The appointment of lead counsel in complex litigation is a long-standing practice in this country that has proved a great benefit to judicial economy and efficiency.  It is not open to serious question that a federal court in a complex, consolidated case may designate one attorney or set of attorneys to handle pre-trial activity on aspects of the case where the interests of all co-parties coincide.

In re Baycol Prod. Litig., No. 02-0200, 2007 WL 9717940, at *2 (D. Minn. July 13, 2007) (citations omitted).

In choosing lead counsel,

[t]he guiding principle is who will best serve the interest of the plaintiffs.  The criteria for selecting counsel when appointing a leadership structure include factors such as experience and prior

success record, the number, size, and extent of involvement of
represented litigants, the advanced stage of proceedings in a
particular suit, and the nature of the causes of action alleged.

Millman ex rel. Friedman's, Inc. v. Brinkley, No. 1:03-CV-0058-WSD, 2004 WL

2284505, at *3 (N.D. Ga. Oct. 1, 2004) (citations omitted). "Other factors include

the quality of the pleadings, the economic interest of the plaintiffs, and the vigor

with which the plaintiffs have prosecuted their lawsuits." Freeman on behalf of

Tesla, Inc. v. Musk, 324 F.R.D. 73, 88 (D. Del. 2018) (citation omitted).

### 2.   Standard for Appointment of Lead Plaintiff in a Derivative Action

"In a shareholder derivative action, unlike a private securities litigation

action, the Court is not required to appoint a lead plaintiff." In re Frontier

Commc'ns Corp. Derivative Litig., No. 3:17-CV-1792 (VAB), 2018 WL 3553332, at

*4 (D. Conn. July 23, 2018) (citations omitted). "The appointment of lead plaintiff

and lead counsel in a consolidated shareholder derivative litigation is a matter of

discretion." Id. at *3 (citations omitted).

Although no statutory authority exists for the appointment of a lead
plaintiff in shareholder derivative actions like these, courts have the
inherent authority to appoint a lead plaintiff . . . in a derivative
action in order to create an efficient case-management structure.

8

KBC Asset Mgmt. NV on behalf of Chemed Corp. v. McNamara, 78 F. Supp. 3d 599, 603 (D. Del. 2015) (citation omitted).

If the Court appoints a lead plaintiff, the lead plaintiff must comply with Federal Rule of Civil Procedure 23.1, which requires that the plaintiff "fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association."

Derivative standing requires that the verified complaint allege "that the plaintiff was a shareholder or member at the time of the transaction complained of." Fed. R. Civ. P. 23.1(b)(1). Additionally, Louisiana state law provides that no shareholder may commence a derivative action until the shareholder has made a written demand on the corporation and at least 90 days have passed from the date of the demand or the demand was rejected, whichever is earlier. See La. Rev. Stat. § 12:1-742.

> In determining which plaintiff should be chosen as lead plaintiff [in a derivatives action], a number of courts have considered the following factors: (1) which plaintiff has the largest financial interest; (2) the preference for institutional investors to lead a lawsuit for shareholders; (3) the quality of the pleadings; (4) the vigor with which the plaintiff has pursued the suit; and (5) the plaintiff's arrangement on the payment of attorney's fees.

KBC Asset Mgmt. NV on behalf of Chemed Corp., 78 F. Supp. 3d at 604 (citations omitted).

###   3.   Appointment of Lead Counsel and Lead Plaintiff

The Court concludes that appointment of both Lead Counsel and Lead Plaintiff is appropriate in this case to ensure an efficient and organized litigation that coordinates with the larger MDL, where appropriate. Appointing a lead plaintiff will ensure the efficient management and vigorous prosecution of the derivative claims by a representative who fairly and adequately represents the shareholders, and, therefore, the company's interest and oversees Lead Counsel's efforts.

The Court concludes that all law firms vying for appointment have substantial experience in derivative and complex financial litigation. All three have ample resources to lead this complex case. After considering all of the factors mentioned above, the Court finds that Bragar and Ault are the most qualified for appointment as Lead Counsel and Lead Plaintiff.

First, Bragar has already taken a leading role in this litigation. It filed one of the first derivative complaints and has demonstrated an ability to coordinate with counsel both in this MDL and in factually-related state derivative actions.

10

(Fortunato Decl. ¶¶ 7, 9.) Also, Bragar proposes a leadership structure that is

supported by Plaintiff Flanders' counsel and Plaintiff Palkon's counsel. (Id. ¶ 8.)

Bragar has aggressively and diligently pursued its client's interest, and its

briefing showed attention to detail and knowledge of the case. At oral argument,

Bragar demonstrated a commitment to work cooperatively with all counsel and

to communicate effectively with the entire Plaintiffs' counsel team. Tansey's

counsel and IMG's counsel are both competent, experienced counsel. However,

Tansey filed suit directly in the District of Minnesota, although no connection to

Minnesota is apparent from the Complaint. This strategic decision may have

unnecessarily opened the Tansey Complaint up to attack based on lack of

personal jurisdiction or improper venue. IMG's decisions regarding the timing

of its filings in this MDL, including in the securities cases, weigh against

appointment.

Second, balancing a number of factors, Ault is the most qualified Plaintiff.

Ault has demonstrated diligence through making a demand on CenturyLink in

September 2017, and filing his derivative complaint on June 6, 2018, the first day

that any federal derivative complaint was filed against CenturyLink and only

two months after CenturyLink rejected Ault's derivative demand letter. (Ault

11

Compl., Exs. A, D.)  (The only other Plaintiff to file a derivative complaint that day, Flanders, supports Ault's appointment as lead plaintiff.)  Ault has continuously been a CenturyLink shareholder since July 15, 1999.  He currently owns 245.506 shares of CenturyLink, valued at $3,790.  (Fortunato Decl., Ex. 1, Ault Decl. ¶ 8.)  Although Ault's financial interest in CenturyLink is not large, it is longstanding and far greater than the nominal interest of other Plaintiffs. Finally, Ault is an experienced investor, who has been actively involved in this lawsuit, but is not a professional plaintiff, and is committed to satisfying the duties of lead plaintiff.  (Ault Decl. ¶¶ 6-12.)

In contrast, Tansey has been a shareholder of CenturyLink since 2003 and only possesses 13 shares of CenturyLink stock.  ([Docket No. 393] Mar. 6, 2019 Hearing Tr. 7.)  IMG is a business entity and possesses the greatest economic interest in among the potential lead plaintiffs.  However, no evidence has been presented that it is an institutional investor, i.e., that its "principal purpose [] is to invest money on behalf of [its] shareholders or beneficiaries."  In re FleetBoston Fin. Corp. Sec. Litig., 253 F.R.D. 315, 341 (D.N.J. 2008).  Also, IMG did not become a CenturyLink shareholder until December 6, 2012.  (Corwin Aff., Ex. D, IMG Decl. ¶ 2.)

Overall, the Court concludes that the combination of Bragar as Lead Counsel and Ault as Lead Plaintiff is the most appropriate choice for the Consolidated Derivative Action.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

1. Plaintiff Inter-Marketing Group USA, Inc.'s Motion to Consolidate Related Shareholder Derivative Action, Appoint Lead or Co-lead Plaintiff, and Approve Its Selection of Lead or Co-lead Counsel [Docket No. 330] is **GRANTED IN PART** and **DENIED IN PART** as follows: the motion to consolidate is **GRANTED,** and the motion to appoint Lead Plaintiff and Lead Counsel is **DENIED**.

2. Inter-Marketing Group USA, Inc. v. Storey, Civil File No. 19-263, and Palkon v. CenturyLink, Inc., Civil File No. 19-284 are hereby consolidated with the Consolidated Derivative Action for all purposes in the above-captioned MDL.

3. The Application by Plaintiff Edward Tansey for Appointment of Lead and Liaison Counsel in Consolidated Derivative Action [Docket No. 332] is **DENIED**.

4. Plaintiff Ault's Motion for Appointment of Lead Plaintiff and Lead Counsel [Docket No. 342] is **GRANTED**. The Court appoints Bragar Eagel & Squire, P.C. as Lead Counsel in the Consolidated Derivative Action and appoints Tim Ault as Lead Plaintiff in the Consolidated Derivative Action. Within three weeks of the date of this Order, Lead Counsel shall submit a proposed leadership structure to this Court.

5. Michael Hartleib's Motion for Acceptance of Amicus Curiae Brief in Oppos[]ition to the Appointment of the Robbins Arroyo and Weiser Firms as Lead Counsel and Notice of Intent to Attend the Hearing on 3-6-19 [Docket No. 381] is **GRANTED**.

6. Lead Counsel and defense counsel shall meet and confer and shall submit a proposed draft case management order for the Consolidated Derivative Action within four weeks from the date of this Order.

Dated:   April 23, 2019

s/ Michael J. Davis
Michael J. Davis
United States District Court

# EXHIBIT 30



December 12, 2018
*andy@protzmanlaw.com*

**VIA U.S. MAIL & Electronic Mail (rw@weiserlawfirm.com)**
Mr. Robert Weiser
The Weiser Law Firm, P.C.
22 Cassatt Avenue
Berwyn, PA 19312

RE:  Hartleib v. The Weiser Law Firm, P.C., *et al.*

Dear Mr. Weiser:

I have been retained by Michael Hartleib with regard to the claims reflected in the enclosed draft petition.  I have reviewed the orders from the Ross-Williams case and have spoken with Mr. Hartleib at length about the contents of this petition, and I do not take these allegations lightly.  As is usually the case, it would seem in the best interest for all parties involved to explore avenues to an agreeable resolution to the matter before it is filed.  And, if there are documents that prove any of these allegations false, I am willing to be educated.  Please let me know if you would be interested in such a conversation on or before Friday, December 21, 2018.  If I don't hear from you, my client has requested that I proceed with filing the petition.

I look forward to hearing from you.

Sincerely,

Andrew B. Protzman

Enclosure

IN THE DISTRICT COURT FOR JOHNSON COUNTY, KANSAS

| | |
|---|---|
| MICHAEL HARTLEIB, | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE WEISER LAW FIRM, P.C., | ) |
|     Serve: | ) |
| | ) |
| and | ) |
| | ) |
| ROBERT WEISER, | ) |
|     Serve: | ) |
| | ) |
| and | ) |
| | ) |
| MONICA ROSS-WILLIAMS, | ) |
|     Serve: | ) |
| | ) |
|     Defendants. | ) |

Case No. _____

Division No. _____

## PETITION

Comes now Plaintiff Michael Hartleib and, for his claims and causes of action against Defendants The Weiser Law Firm, P.C., Robert Weiser and Monica Ross-Williams, states and alleges as follows:

## PARTIES, VENUE AND JURISDICTION

1. Plaintiff is an individual whose residence is in the state of California. He is a substantial shareholder in Sprint Nextel Corporation and is an objector to the proposed settlement in the underlying shareholder derivative litigation in Johnson County, Kansas.

2. Defendant The Weiser Law Firm, P.C. is a Pennsylvania corporation with its principal place of business in Pennsylvania. At all pertinent times, it acted by and through its agents and employees, including but not limited to Robert Weiser, who were admitted pro hac vice to represent a group

of plaintiffs in the underlying litigation in Johnson County, Kansas.  It performed the acts and omissions complained of in this petition in the underlying litigation in Johnson County, Kansas.

3.   Defendant Robert Weiser is an attorney licensed and residing in the state of Pennsylvania.  He is an officer, agent and/or employee of Defendant The Weiser Law Firm, P.C.  At all pertinent times he was admitted pro hac vice to practice law in connection with the underlying litigation in Johnson County, Kansas, and he committed the acts and omissions complained of in the underlying litigation in Johnson County, Kansas.  At all pertinent times, he was acting within the course and scope of his employment with and/or agency of Defendant The Weiser Law Firm, P.C.

4.   Defendant Monica Ross-Williams is an individual residing in the state of Michigan.  She is the lead named plaintiff in the underlying shareholder derivative litigation in Johnson County, Kansas, and committed the acts and omissions complained of in the underlying litigation in Johnson County, Kansas.

5.   This Court is a court of general jurisdiction, so it has jurisdiction over the claims asserted herein.

6.   All defendants, through their participation in the underlying litigation, committed the tortious acts and omissions that form the basis of these claims in the state of Kansas and submitted themselves to the jurisdiction of this Court, so this Court has personal jurisdiction over these defendants.

7.   Venue is proper in this Court because the tortious acts and omissions that form the basis of these claims were committed in Johnson County, Kansas in and through the underlying litigation.

8.   Claims under the Kansas Consumer Protection Act are properly brought in this Court pursuant to K.S.A. § 50-638 because the acts and omissions giving rise to these claims were committed in Johnson County, Kansas, in the underlying *Ross-Williams v. Sprint* litigation.

## BACKGROUND FACTS

9.  In early 2009, Plaintiff Michael Hartleib ("Hartleib") contacted The Law Offices of Bruce G. Murphy ("the Murphy firm") about a potential shareholder derivative suit Hartleib wanted to pursue on behalf of Sprint Nextel Corporation.  Hartleib was and is a substantial and vocal shareholder in Sprint and other corporations with a prior history of effecting positive corporate changes in the companies in which he holds an ownership interest.

10. On or about March 22, 2009, after a short period of negotiation of the terms of an attorney-client engagement, Plaintiff Michael Hartleib ("Hartleib") retained The Law Offices of Bruce G. Murphy ("the Murphy firm") to pursue a shareholder derivative action on behalf of Sprint Nextel Corporation arising from an unsuccessful merger between Sprint and Nextel ("the underlying litigation" or "the underlying shareholder derivative litigation").  Mr. Hartleib insisted the terms of this engagement must preclude the Murphy firm from working with the national derivative firm Robbins Arroyo due to that firm's unethical business practices witnessed by Mr. Hartleib in prior cases.

11. Prior to or on March 22, 2009, the Murphy firm entered into an agreement with Defendant The Weiser Law Firm, P.C. ("the Weiser firm") by which the Weiser firm would be co-counsel with the Murphy firm for purposes of representing Mr. Hartleib in the shareholder derivative action. Defendants Weiser and the Weiser firm agreed to the terms of the engagement with Hartleib and undertook representation of Hartleib in the underlying litigation.

12. Prior to their contact with Hartleib, on information and belief, neither the Murphy firm nor the Weiser firm was aware of the facts forming the basis for the underlying shareholder derivative suit that Hartleib alerted them to in his communications with them, nor had either firm been in contact with a potential client who knew of or had an interest in pursuing the underlying litigation.

3

13. On or shortly after March 22, 2009, Robert Weiser spoke with Mr. Hartleib.   During this conversation, Mr. Hartleib expressed that, as lead plaintiff representing the class of shareholders in Sprint Nextel, Hartleib took his duties to represent the interests of the corporation and its shareholders seriously and he would not endorse superficial and toothless corporate governance reforms in order to achieve a settlement that would consist primarily of attorney fees.

14. For Hartleib to agree to a settlement, he advised Weiser that it would have to provide meaningful relief resulting in a real and positive impact for the corporation and, by extension, its shareholders.

15. On the morning of March 27, 2009, Mr. Hartleib was notified by Murphy and Weiser via email that they were refusing to file the underlying shareholder derivative suit in Hartleib's name.

16. Their stated reason, which was false, was that they were concerned that Hartleib's history of effective and wholly unrelated shareholder derivative action somehow created a potential conflict and rendered Hartleib and inadequate shareholder representative.

17. This stated reason was pretextual.   Weiser did not want Hartleib as the named plaintiff because during their conversation Weiser learned that Hartleib is opposed to lawyer-driven derivative litigation in which the only meaningful relief obtained through a settlement is millions of dollars in attorney fees, and the substantive relief for the shareholders and the corporation is toothless or de minimis.

18. In fact, Hartleib's prior knowledge, skill and experience in shareholder matters rendered him a perfect shareholder representative.   For more than a decade, Hartleib has fought to ensure the interests of class and shareholder groups are given predominate consideration in the ultimate resolution of class action and shareholder derivative litigation, when many representative plaintiffs appear to be satisfied to accept minimal relief along with excessive attorney fee awards in what has been referred to as lawyer-driven litigation.

19. After refusing to file suit on behalf of Hartleib, Murphy used an elderly relative as a placeholder. This relative passed away during the pendency of the litigation, wherefore Murphy was forced to use yet another relative as placeholder in an attempt to maintain first to file status, while he and Weiser looked for a "legitimate" plaintiff for the case.

20. On information and belief, Weiser searched for, solicited and engaged a far less adequate shareholder representative to use as the named plaintiff in the underlying litigation, Monica Ross-Williams, who was unsophisticated in shareholder-corporate matters, corporate governance and litigation, and held a very small stake in Sprint Nextel Corporation, if any.

21. On March 6, 2017, Hartleib sought contact information for Ross-Williams via the internet and called Ross-Williams to confirm she existed in an effort to discern Ross-Williams level of involvement in the litigation and her suitability as a representative plaintiff.  Hartleib was concerned about these issues because he had, on prior occasions, observed the Weiser firm, as well as other class action and shareholder derivative firms who work in concert with the Weiser firm, utilizing deceased and otherwise unqualified parties as plaintiffs in other shareholder derivative and class litigation.

22. On March 7th 2017, Hartleib placed one 15-minute call to Ross-Williams in which it became painfully clear that she had no involvement in the case and that Ross-Williams had not spoken to her Counsel in years.

23. Ross-Williams admitted she was entirely unaware of any of the details in "her" case.

24. Ross-Williams was not aware of the scathing Orders from the District Court of Johnson County, Kansas, criticizing her attorneys' use of an unlicensed disbarred "lawyer" to inflate their bill. She was unaware the Judge in "her" case drastically reduced the attorney fees by ninety percent, from $4.5 million to $450,000, finding they were not remotely accurate or credible.

25. Ross-Williams was not aware that an appeal had been filed on her behalf and had not been provided with pleadings in her case.

26. Ross-Williams, plaintiff in the underlying litigation, even continually referred to herself as the Defendant and appeared to completely lack understanding of her obligations as a representative plaintiff.

27. The conversation between Mr. Hartleib and Ross-Williams was pleasant and non-confrontational. Ross-Williams provided Hartleib with a private email address to send the pleadings in her case that her Counsel failed to provide.

28. Later, instead of expressing outrage by the information Hartleib provides in the 15-minute affable call, after speaking with Defendant Weiser, Ross-Williams falsely accused Mr. Hartleib of threatening and harassing her.

29. Weiser induced Ross-Williams to file false declarations against Hartleib, accusing him of threats and harassment to gain a Protective Order under false pretenses. This was done to harm Hartleib's reputation and discredit him in the Ross-Williams action before the Court of Appeals, and other unrelated cases.

30. In court filings, the Weiser defendants made inflammatory false statements and allegations about Mr. Hartleib that were hurtful, harmful and without any basis in truth or fact.

31. The Weiser defendants also made false statements to District and Appellate courts in Kansas regarding their conduct and the conduct of their unlicensed non-lawyer whom they knowingly put forth as a licensed attorney who bills $350 per hour in search of their improper and excessive fee award (which Judge Vano noted and overwhelmingly reduced), as well as the practical effect of the near toothless "corporate reforms" they negotiated in the mediation with mediator Layn Phillips, with whom the Weiser defendants and other firms in the consolidated action regularly mediate cases. In his declaration, Layn Phillips affirmed the fraudulent $4.5M fee request.

32. As a result of Defendants' acts and omissions as described herein, Mr. Hartleib has suffered damage to his good name and reputation, lost the benefits of serving as lead plaintiff in the underlying litigation and the positive result that would likely have occurred had he been lead plaintiff, was forced to expend substantial sums to oppose and expose Defendants' conduct and chicanery, and has suffered significant mental and emotional trauma from Defendants' actions.

33. Despite filing a related action years later, Hartleib was estopped from participation in the consolidated cases. In fact, all firms in the consolidated cases colluded and conspired to work as one in their effort to prevent Hartleib from seeking meaningful relief on behalf of Sprint Nextel. All other cases in the consolidated action were settled except one, Mr. Hartleib's.

34. Defendants, Robert Weiser and the Weiser Law Firm's handling of the underlying litigation is part of a regular custom, pattern and practice they have engaged in for years.  This modus operandi has been to the detriment of both the classes of shareholder plaintiffs they have falsely purported to represent as well as the corporations those shareholders are seeking to protect and improve.

35. The Weiser defendants regularly handle shareholder derivative suits in concert with other firms with whom they have troubling relationships, and who file securities class action lawsuits based on the same issues or conduct.  The Weiser defendants will stay the shareholder derivative suit, whereby allowing sufficient time to pass allowing for the billing of thousands of fraudulent hours, piggyback on the discovery from the class action to bill fraudulent document review, then resolve the shareholder derivative suit by negotiating soft or meaningless corporate "reforms" and very high legal fees.

36. This framework is what the Weiser defendants attempted to do in the Ross-Williams matter when they piggybacked on a securities class action filed by the national class action firm Robbins Gellar, sister firm to the Robbins Arroyo firm in the consolidated action, with whom Weiser has numerous prior dealings and close relationships, until their efforts were partially derailed by Mr. Hartleib's objection, which resulted in Judge Vano's order finding the Weiser defendants' conduct and fee request to be both troubling and excessive.

## COUNT I
*Legal Malpractice/Breach of Fiduciary Duty*
*Robert Weiser and The Weiser Law Firm, P.C.*

37. Plaintiff incorporates all preceding allegations as if fully set forth herein.

38. Defendants Robert Weiser and The Weiser Law Firm, P.C., entered into an attorney-client relationship with Plaintiff Michael Hartleib which was never terminated.

39. Defendants Weiser and the Weiser firm owed Mr. Hartleib the duty to provide competent and skillful representation and the duties of undivided loyalty, to act solely for Mr. Hartleib's benefit as a fiduciary for Sprint Nextel, and to avoid engaging in conflicts of interest.

40. The Weiser defendants further had the duty of honesty and candor in their communications and representations to the District Court and the Court of Appeals.

41. Defendants Weiser and the Weiser firm breached these duties by:

   a. Refusing to file Mr. Hartleib's claim in the underlying litigation when it became apparent that he would not kowtow to Weiser's demands on a potential settlement and would not permit the underlying litigation to be lawyer-driven litigation, benefitting only the attorneys;

   b. By taking an adverse position to a former client in their attempt to protect their criminal enterprise, defraud the Court and unjustly enrich themselves by 4.5 million dollars in fraudulent fees.

   c. By abusing process in the case in question and using the instrumentalities of the judicial system to vex, harass and annoy in retaliation for Hartleib's filing of an Amicus Brief in the unrelated Equifax action. In the Equifax action, Weiser and the Weiser Firm was removed as co-lead counsel in said case based on their actions in the *Ross-Williams* case.

   d. Representing Defendant Ross-Williams in her claims and requests for relief against Mr. Hartleib which presented a conflict of interest that was not waived;

e. Using Mr. Hartleib's communications with them, which were protected by the attorney-client privilege, against him in connection with the underlying litigation and the dispute between Defendant Ross-Williams and Mr. Hartleib. In addition, sharing privileged communications in the unrelated case in the Northern district of Georgia *In Re Equifax* and proffering falsehoods relating to said communications in a willful attempt to harm Hartleib and obfuscate their duplicitous acts.

f. Replacing Mr. Hartleib as lead plaintiff in the underlying litigation, first with a straw plaintiff, and then with a less qualified lead plaintiff who had little or no involvement in the case, in order to bill over 18,000 hours, and 4.5 million dollars in fraudulent fees;

g. Employing in the underlying litigation the services of a criminal non-attorney, who was previously disbarred, charged with racketeering, and knowingly putting forth his work-product under a fraudulent name as a basis for a grossly excessive attorney fee request;

h. Putting forth and supporting Defendant Ross-Williams' untrue statements regarding Mr. Hartleib's actions and communications with her;

i. Making false statements to the District and Appellate Courts in Kansas regarding Mr. Hartleib's prior actions:

j. In such other and further ways as may be learned through discovery.

42. Defendants' actions and inactions described herein were willful, wanton, fraudulent and malicious.

43. As a direct and proximate result of Weiser's and the Weiser firm's breach of their duties, Plaintiff Michael Hartleib was damaged as described above in paragraphs 32 and 33.

WHEREFORE, Plaintiff Michael Hartleib prays for judgment in his favor on Count I, for compensatory damages in a fair and reasonable amount, for his costs incurred herein, and for such other and further relief as the Court deems just and proper.

## COUNT II
*Violations of Kansas Consumer Protection Act*
*Robert Weiser and The Weiser Law Firm, P.C.*

44. Plaintiff incorporates all preceding allegations as if fully set forth herein.

45. Pursuant to K.S.A. § 50-623, *et seq.* (the "Kansas Consumer Protection Act" or the "KCPA"), Mr. Hartleib is a "consumer" and the Weiser defendants are "suppliers" for purposes of claims under the Kansas Consumer Protection Act.

46. When the Weiser defendants agreed to represent Mr. Hartleib as the shareholder representative plaintiff for the case Mr. Hartleib hired them to pursue, the Weiser defendants offered to reasonably represent Mr. Hartleib in accordance with their ethical duties of loyal, zealous representation in those claims.

47. In fact, the Weiser defendants at that time knew they did not intend to provide such reasonable, expectable legal services, and they did not disclose to Mr. Hartleib this intent.

48. Weiser, the Weiser Firm and other parties involved in this case have colluded and conspired by falsely purporting to represent the interest of Sprint, and its shareholders, including Hartleib when their true motives were to stay this case for a prolonged period, over 5 years to allow them to bill over 18,000 fraudulent hours and 4.5 million in fees. Weiser knowingly employed a criminal and disbarred attorney using an alias, Alexander Silow to bill 1.6 million dollars in this case. Mr. Silow's actions in this case have led to new criminal convictions in Montgomery County Pennsylvania, including the Unauthorized Practice of Law, *(42Pa.C.S.2524),* Unsworn Falsification to Authorities *(18 Pa. C. S. 4904) (b)* and Securing Execution of Documents by Deception *(18 Pa. C. S. 4114)*

49. On information and belief, Weiser and the Weiser Firm knew Mr. Silow's status as disbarred attorney and criminal when they hired him from the Abelson placement agency. For over a decade, Weiser instructed Silow to fraudulently bill tens of millions of dollars in cases across the country

10

in addition to the 1.6 million in the Ross-Williams case. Weiser fraudulently put forth Mr. Silow as a Securities expert, and licensed attorney in Pennsylvania in the Ross-Williams case, when Silow's resume submitted by the Weiser firm in the case showed neither was true.

50. The Weiser defendants' "true" intent with regard to the legal services they offered Mr. Hartleib, as described above, was a material fact that was not disclosed.

51. As a direct and proximate result of the Weiser defendants' conduct set forth herein, Mr. Hartleib was damaged as described above in paragraphs 32 and 33.

52. The Weiser defendants' actions and inactions as set forth herein are in violation of the KCPA, §§ 50-626, 627.

53. This action is authorized and Plaintiff is entitled to an award of reasonable attorney fees pursuant to the KCPA, § 50-634.

WHEREFORE, Plaintiff Michael Hartleib prays for judgment in his favor on Count II, for compensatory damages in a fair and reasonable amount, for his attorney fees and costs incurred herein, and for such other and further relief as the Court deems just and proper.

## COUNT III
### *Abuse of Process*
### *Defendant Ross-Williams*

54. Plaintiff incorporates all preceding allegations as if fully set forth herein.

55. Ross-Williams knowingly made false statements against Hartleib in court documents and sought and obtained a protective order under false pretenses. Ross-William filed false declarations under oath against Hartleib at the request of Weiser in an attempt to assail his character and protect Weiser's unlawful acts.  These actions amount to the knowingly or improper use of legal process.

56. Ross-Williams' actions were taken for the purposes of harassing Mr. Hartleib and causing him hardship.

57. Ross-Williams' actions directly and proximately resulted in damages to Mr. Hartleib as described above in paragraphs 32 and 33.

WHEREFORE, Plaintiff Michael Hartleib prays for judgment in his favor on Count III, for compensatory damages in a fair and reasonable amount, for his costs incurred herein, and for such other and further relief as the Court deems just and proper.

**COUNT IV**
*Breach of Fiduciary Duty*
*Defendant Ross-Williams*

58. Ross-Williams was an unfit plaintiff who simply allowed her name to be used to facilitate a lawyer driven case for personal financial gain.

59. When Hartleib informed her of the fraud and chicanery that was taking place in "her" case, she did nothing to stop it. In fact, she became a willing participant in the fraud upon the Court by acting on behalf of Weiser in furtherance of his fraud upon the court.

60. Ross-Williams owed a fiduciary duty to Mr. Hartleib and all Sprint shareholders to fairly and adequately represent their interests in the litigation, including the duties to ensure that lead counsel fee requests were appropriate, the duties of care and loyalty to the class, and to fairly represent the interests of the entire class.

61. Ross-Williams failed to act in good faith and breached her fiduciary duty to properly represent Mr. Hartleib and the other Sprint shareholders by failing to ensure the fee request of Weiser was commensurate with the relief obtained, by failing to ensure that the relief agreed to in the settlement was sufficiently robust as to effect meaningful corporate change, by failing to adequately monitor and remain involved in the litigation, and by acting in her own interest rather than in the interest of Sprint Nextel and absent class of shareholders.

62. As a direct and proximate result of Ross-Williams' breach of her fiduciary duties, Mr. Hartleib was damaged as described above in paragraphs 32 and 33.

WHEREFORE, Plaintiff Michael Hartleib prays for judgment in his favor on Count IV, for compensatory damages in a fair and reasonable amount, for his costs incurred herein, and for such other and further relief as the Court deems just and proper.

Respectfully Submitted by:

/s/ Andrew B. Protzman

Andrew B. Protzman, #18015
Ben Stelter-Embry, #25891
Protzman Law Firm LLC
1100 Main Street
Suite 2430
T: 816-421-5100
F: 816-421-5105
andy@protzmanlaw.com
ben@protzmanlaw.com

*Attorneys for Plaintiff*

# EXHIBIT 31

# Silverang Donohoe
# Rosenzweig Haltzman llc

### Attorneys at Law

595 East Lancaster Avenue
Suite 203
St. Davids, PA 19087
(610) 263-0115 Telephone
(215) 754-4934 Facsimile
www.sanddlawyers.com

Philip S. Rosenzweig
(610) 263-0124 Direct Dial
(215) 754-4139 Direct Fax
Email: prosenzweig@sanddlawyers.com

December 19, 2018

*VIA EMAIL (andy@protzmanlaw.com)*
*AND FIRST CLASS MAIL*

Andrew Protzman, Esquire
Protzman Law Firm
1100 Main Street
Kansas City, MO 64105

Re:  *Hartleib v. Weiser Law Firm, P.C., et al.*

Dear Mr. Protzman:

As I indicated to you in my email of December 17, 2018 at 7:06 pm, I and my law firm are counsel to The Weiser Law Firm, P.C. (the "Weiser Firm") and Robert B. Weiser, Esquire ("Mr. Weiser") (the "Weiser Firm" and "Mr. Weiser" are collectively my "Clients"). While I am not as of yet prepared to respond to all the purported factual allegations of the draft petition ("Petition") you prepared and transmitted along with your December 12, 2018 letter on behalf of your client, the proposed plaintiff Michael Hartleib ("Hartleib"), your letter belies your own well founded skepticism as to the veracity of the allegations. Upon my cursory initial review thereof, the Petition is riddled with serious misrepresentations of fact and outright falsehoods. The claims the Petition contemplates raising against my Clients are frivolous and cannot be asserted in a signed pleading in a court of law in good faith.

In the interests of efficiency, and in an effort to timely respond to your letter, I will focus on the two utterly groundless causes of action which the Petition purports to assert on behalf of Hartleib against my Clients, who expressly reserve all rights with respect to the countless false and outrageous allegations in the Petition. This letter is not to be construed as a waiver of any kind with respect to any allegation set forth in the Petition, or any defense to the Petition, including, but not limited to, any and all defenses regarding jurisdiction, venue, the applicability of Kansas law (or lack thereof), any applicable statute(s) of limitations, or damages. Nor should this letter be construed as a waiver of my Clients' potential claims or counterclaims against Hartleib that could be asserted based on Hartleib's conduct, or against you and your law firm in the event the Petition as stated is filed by you.

{01025448;3}

Andrew Protzman, Esquire
December 19, 2018
Page 2

As you surely know, the Petition proposes two counts under Kansas law against my Clients: Count I for Legal Malpractice/Brief of Fiduciary Duty and Count II for violation of the Kansas Consumer Protection Act (the "KCPA"). Both causes of action depend, *inter alia*, upon a demonstrably false and absurd premise: that the Weiser Firm and/or Mr. Weiser "agreed to represent Mr. Hartleib" and "entered into an attorney-client relationship" with Hartleib in March 2009. Nothing could be further from the truth. As your client is well-aware, my Clients *expressly declined* to file a shareholder derivative action on behalf of Hartleib or otherwise serve as counsel (or co-counsel) to Hartleib in March 2009, and there exists clear, undebatable documentary evidence with respect to this explicit declination. *See* Exhibit 1 enclosed herewith. Moreover, the Petition's assertions as to why my Clients declined to serve as counsel for Hartleib are patently untrue, but nevertheless serve as an admission that Hartleib and my Clients did NOT have an attorney-client relationship. The Petition claims, *inter alia*, that Hartleib was advised on March 27, 2009 that his involvement with "effective and wholly unrelated shareholder derivative [litigation] somehow created a potential conflict and rendered Hartleib an[] inadequate shareholder representative." Aside from being nonsensical, as explained herein, that allegation is inaccurate. Rather, it was Hartleib's then involvement with, and intention to move for appointment as lead plaintiff in, the federal securities fraud class action (the "Securities Action") asserting wholly related, direct claims against Sprint Corp. ("Sprint") which presented a clear conflict for purposes of serving as a shareholder derivative plaintiff asserting claims on Sprint's behalf.

Under Kansas law, an attorney-client relationship can be explicitly formed based on the payment of a fee and/or a memorialized formal retention agreement. *Associated Wholesale Grocers, Inc. v. Americold Corp.*, 266 Kan. 1047 (1999) *citing In re Adoption of Irons*, 235 Kan. 540, 548, 684 P.2d 332 (1984). In the absence of such, an attorney-client relationship may be "implied by the conduct of the parties." *Id.* Significantly, an attorney-client relationship can be implied only when, based on the conduct of the parties, it is sufficiently established that the services of the attorney in matters pertinent to the attorney's profession *were both sought and received*. *Id.* The Petition does not allege (nor could it) that the Weiser Firm or Mr. Weiser ever accepted any fee from Hartleib, or that Hartleib executed a formal retention agreement with the Weiser Firm or Mr. Weiser. Even assuming *arguendo*, that as the Petition alleges, Hartleib retained the Law Offices of Bruce G. Murphy (the "Murphy Firm"), my Clients were not parties to any formal representation agreement between Hartleib and the Murphy Firm. Further, the documentary evidence with respect to the "conduct of the parties" plainly demonstrates that while Hartleib may have sought my Clients' legal services, such services were certainly never provided to or received by Hartleib, because my Clients flatly declined to act as counsel (or co-counsel) to Hartleib immediately after Mr. Weiser first communicated with Hartleib. *See* Exhibit 1.

Surely you agree that an implied attorney-client relationship is not formed simply because an individual seeking legal representation communicated with a lawyer once, and of course, as set forth above, Kansas law does not provide otherwise. In late March 2009, as your Petition indicates, Mr. Weiser spoke with Hartleib one time via telephone; the two men had never spoken previously. The phone call between Mr. Weiser and Hartleib took place specifically because my Clients had not agreed to act as co-counsel to Hartleib with the Murphy Firm in a derivative action on behalf of

{01025448;3}

Andrew Protzman, Esquire
December 19, 2018
Page 3

Sprint, and would not agree to doing so without having first conducted their own independent due diligence regarding Hartleib's adequacy as a derivative plaintiff and after an analysis of potential conflicts of interest implicating Hartleib. My Clients are specialists in the arena of shareholder derivative litigation and are intimately familiar with the unique issues and conflicts potentially posed by shareholder derivative plaintiffs, who bring derivative actions in a fiduciary capacity on behalf of and solely for the benefit of a corporation, rather than on their own behalf for their own personal direct benefit. My Clients routinely communicate directly with shareholders in light of these issues, in order to assess whether or not to proceed with representation in a shareholder derivative action.

During the telephone call between Hartleib and Mr. Weiser in late March 2009, Hartleib represented to Mr. Weiser that he had extensively investigated alleged wrongdoing by Sprint and previously contacted the law firm of Robbins Geller Rudman & Dowd LLP ("RGRD") in order to provide RGRD facts and analysis for the purposes of initiating and prosecuting the Securities Action *against Sprint*. Hartleib further represented that he was interested in filing a motion in federal court seeking his appointment as the lead plaintiff (or a co-lead plaintiff) in the Securities Action *against Sprint*, and that he believed he would be an ideal lead plaintiff for the Securities Action based upon his purportedly vast knowledge regarding Sprint's transgressions and its liability to the investor class. Moreover, Hartleib suggested that he wanted to receive a share of any attorneys' fees for plaintiffs' counsel which might be awarded in a derivative action to be brought on Sprint's behalf.

Mr. Weiser immediately concluded that my Clients could not and should not represent Hartleib or serve as his co-counsel in a derivative action brought for Sprint's benefit. Notwithstanding Hartleib's deeply troubling and improper suggestion that he wished to share in attorneys' fees, it is black-letter law that an investor plaintiff who simultaneously pursues both direct and derivative claims or lawsuits against and on behalf of the same corporate entity is an inadequate and conflicted plaintiff. *See Davis v. Comed, Inc.*, 619 F.2d 588, 597 (6th Cir. 1980) (derivative plaintiff found inadequate because he raised direct claims against the corporation in separate litigation, and thus "virtually admit[ted] this conflict between the derivative action and his other litigation"); *St. Clair Shores Gen. Emps. Ret. Sys. v. Eibeler*, No. 06 Civ. 688(SWK), 2006 WL 2849783, at *7 (S.D.N.Y. Oct. 4, 2006) (plaintiffs attempting to advance both derivative and direct claims "face an impermissible conflict of interest."); *Wall Street Sys., Inc. v. Lemence*, No. 04 Civ. 5299, 2005 WL 292744 (S.D.N.Y. Feb. 8, 2005) (finding that plaintiff who simultaneously brought direct and derivative actions had a conflict of interest and could not satisfy obligations pursuant to Fed. R. Civ. P. 23.1). *See also Ryan v. Aetna Life Ins. Co.*, 765 F. Supp. 133, 135 (S.D.N.Y. 1991); *Brickman v. Tyco*, 731 F. Supp. 101, 109 (S.D.N.Y. 1990).

After speaking with Hartleib, Mr. Weiser notified the Murphy Firm via email on March 27, 2009 at 7:21 a.m. that my Clients declined to serve as co-counsel to Hartleib, because my Clients had concluded that Hartleib had a conflict of interest which prevented him from serving as an adequate derivative plaintiff. *See* Exhibit 1. The Murphy Firm notified Hartleib in writing that both the Murphy Firm and my Clients declined to represent Hartleib based on the conflict of interest via email at 9:55 a.m. *Id.* Notably, the March 27, 2009 email to Hartleib from the Murphy Firm stated

Andrew Protzman, Esquire
December 19, 2018
Page 4

to Hartleib that if he were to file a derivative suit, "[d]efense counsel can be expected to object to you serving as the [derivative] Representative on the grounds of adequacy." Had Hartleib applied for appointment as lead plaintiff in the Securities Action against Sprint, as he informed Mr. Weiser via telephone that he intended to do, and had Hartleib initiated a derivative action on behalf of Sprint at that time, undoubtedly competing movants for lead plaintiff and defense counsel in the Securities Action would have attacked him as an inadequate lead plaintiff.

Thus, there is no legitimate basis upon which it can be alleged, in good faith, for purposes of Count I of the Petition, that my Clients "entered into an attorney-client relationship" with Hartleib, explicitly or implicitly, rendering Count I for legal malpractice/breach of fiduciary duty fatally flawed. Nor is there any legitimate basis upon which it can be alleged in good faith, for purposes of Count II of the Petition, that my Clients "agreed to represent Mr. Hartleib as the shareholder representative plaintiff for the case Mr. Hartleib hired them to pursue," and therefore Count II for violation of the KCPA is fatally flawed.

The "conduct of the parties" following March 27, 2009 also puts to rest any notion that an attorney-client relationship was ever formed by implication between my Clients and Hartleib, or that Hartleib was ever acting under any such impression. Neither my Clients nor Hartleib subsequently acted as if an attorney-client relationship had been formed, because of course there was never was any such relationship. Hartleib had no communications whatsoever with my Clients regarding Sprint until after over seven years had passed – and only then, in an attempt to extort money from my Clients by leveraging his objection to the settlement of the Sprint derivative litigation. The threatened litigation against my Clients set forth in the Petition merely serves as the latest iteration of Hartleib's unsuccessful extortion efforts against them. In fact, Hartleib subsequently retained another law firm in the field of shareholder litigation, Kahn, Swick & Foti, LLC ("Kahn Swick"), to serve as his counsel for purposes of bringing a derivative action on behalf of Sprint, which was filed on July 14, 2011. Interestingly, despite serving as counsel to Hartleib in his Sprint derivative action, Kahn Swick chose not to represent Hartleib in connection with his objection to the Sprint derivative settlement, his related application for a direct financial award, or his unsuccessful appeal of the orders denying his objection to the settlement and his application for a financial award.

Upon the completion of my investigation into the underlying Sprint-Nextel derivative case, I suspect I will be well prepared to address and rebut all of the outrageous and seemingly false factual allegations throughout the Petition. Moreover, although I do not represent proposed defendant Monica Ross-Williams, her status as an adequate derivative plaintiff was fully adjudicated in the Sprint-Nextel litigation, rendering any questions with respect thereto moot on the basis of collateral estoppel. Further, to suggest that Ms. Ross-Williams owes a fiduciary duty to another shareholder of a publicly traded company is patently absurd.

Should you possess any contrary evidence or information I am unaware of that would support the allegations that Hartleib retained my Clients as his counsel and that my Clients entered into an attorney-client relationship with Hartleib, I would be interested in reviewing the same. It would only be in that instance where it might make sense to engage in a dialogue with you regarding the many other deeply flawed and apparently false allegations of the Petition. I might also note that I am counsel for the Weiser Firm in a pending lawsuit against Mr. Silow and the lawyer placement

{01025448;3}

Andrew Protzman, Esquire
December 19, 2018
Page 5

agency responsible for Mr. Silow's placement at the Weiser Firm to perform document review work, so I am confident in assuring that your facts regarding Mr. Silow are flatly wrong in almost all instances.

I respectfully submit that the filing of the Petition would violate Kansas Rule of Professional Conduct 3.1 and/or various other ethical and professional obligations, and my Clients hereby reserve all rights to pursue all available remedies. Therefore, I suggest you carefully reconsider ever filing the Petition.

Be guided accordingly.

Very truly yours,

PHILIP S. ROSENZWEIG

PSR/mer
Enclosure

cc:     Robert B. Weiser, Esquire (via email)

{01025448;3}

# EXHIBIT 32

**From:**      Andrew Protzman <andy@protzmanlaw.com>
**Sent:**      Monday, January 07, 2019 3:06 PM
**To:**        Philip Rosenzweig
**Subject:**   Re: Hartleib v. Weiser Law Firm, P.C., et al.

Phil:

I have not received a response to my email, below.  Please advise before close of business Thursday if your client is interested in a pre-suit mediation of this matter.  If not, or if I don't hear from you, we will proceed with filing suit Friday.

Thank you.

Andy.

Andrew B. Protzman
Protzman Law Firm, LLC
1100 Main Street
Suite 2430
Kansas City, Missouri 64105
816.421.5100/5105(fax)
andy@protzmanlaw.com

NOTE: The Missouri Bar Disciplinary Counsel requires all Missouri lawyers to notify all recipients of e-mail that (1) e-mail communication is not a secure method of communication, (2) any e-mail that is sent to you or by you may be copied and held by various computers it passes through as it goes from me to you or vice versa, (3) persons not participating in our communication may intercept our communications by improperly accessing your computer or my computer or even some computer unconnected to either of us which the e-mail passed through. I am communicating to you via e-mail because you have consented to receive communications via this medium. If you change your mind and want future communications to be sent in a different fashion, please let me know AT ONCE. The information contained in this electronic message may be attorney-client privileged, confidential, and exempt from disclosure under applicable law and is intended only for the use of the individual(s) to whom this electronic message is addressed. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this electronic communication or any attachment thereto is strictly prohibited. If you have received this electronic communication in error, you should immediately return it to us and delete the message from your system. We would also

appreciate it if you would telephone us at (816) 421-5100, to advise of the misdirected communication. Thank you.

On 12/21/18, 11:23 AM, "Andrew Protzman" <andy@protzmanlaw.com> wrote:

Phil:

I write in response to your December 19, 2018 letter to me. Please dispense with the threats to me. They are neither well-founded, nor well-received.

Mr. Hartleib vigorously disputes virtually every statement made in your letter. Just as an example, on March 22, 2009, Mr. Murphy communicated to Mr. Hartleib on his and Mr. Weiser's behalf that they had jointly reviewed Mr. Hartleib's requested revisions to the retainer and agreed to them. Subsequent to that, Mr. Weiser and Mr. Hartleib spoke on multiple occasions wherein Mr. Hartleib relied on Mr. Weiser as his lawyer, provided confidential and work-product communications to him, and received legal advice. As you well know, or should, the existence of an attorney-client relationship is not dependent upon a written agreement but is based on conduct and client expectations. See, e.g., Matter of Hodge, 307 Kan. 170, 407 P.3d 613 (2017). I will not belabor the additional misstatements Mr. Weiser has provided you that you repeat in your correspondence.

Regardless of these parties' factual disagreements about the course of their relationship, I did not receive an answer to the ultimate question posed: Does your client want to follow through on his suggestion of a mediation between these parties prior to Mr. Hartleib filing suit? If the answer is no, that is fine, we will file. If the answer is yes, then we need to schedule it within the next 30-60 days in order than it can be given every opportunity to succeed before we must file in the absence of a tolling agreement. Given your intimate familiarity with the Silow matter and the contents of your letter to me, I suspect that 30 days will be more than enough time for Mr. Weiser to get you up to speed.

Andy

Andrew B. Protzman
Protzman Law Firm, LLC
1100 Main Street
Suite 2430
Kansas City, Missouri 64105
816.421.5100/5105(fax)
andy@protzmanlaw.com

NOTE: The Missouri Bar Disciplinary Counsel requires all Missouri lawyers to notify all recipients of e-mail that (1) e-mail communication is not a secure method of communication, (2) any e-mail that is sent to you or by you may be copied and held by various computers it passes through as it goes from me to you or vice versa, (3) persons not participating in our communication may intercept our communications by improperly accessing your computer or my computer or even some computer unconnected to either of us which the e-mail passed through. I am communicating to you via e-mail because you have consented to receive communications via this medium. If you change your mind and want future communications to be sent in a different fashion, please let me know AT ONCE. The information contained in this electronic message may be attorney-client privileged, confidential, and exempt from disclosure under applicable law and is intended only for the use of the individual(s) to whom this electronic message is addressed. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this electronic communication or any attachment thereto is strictly prohibited. If you have received this electronic communication in error, you should immediately return it to us and delete the message from your system. We would also appreciate it if you would telephone us at (816) 421-5100, to advise of the misdirected communication. Thank you.

On 12/19/18, 4:25 PM, "MaryEllen Raynor" <MRaynor@sanddlawyers.com> wrote:

ON BEHALF OF PHILIP S. ROSENZWEIG, ESQUIRE

Mr. Protzman:

Please see the attached correspondence.  Thank you.

Best Regards,

Phil

_____

Philip S. Rosenzweig, Esquire
Partner
Silverang, Donohoe, Rosenzweig & Haltzman, LLC
595 East Lancaster Avenue
Suite 203
St. Davids, Pa. 19087
610-263-0124 (direct)
610-263-0115 (main)

215-754-4139 (efax)
prosenzweig@sanddlawyers.com

# EXHIBIT 33

19CV00407
Div11

IN THE DISTRICT COURT FOR JOHNSON COUNTY, KANSAS

MICHAEL HARTLEIB,                    )
                                     )
              Plaintiff,             )
                                     )
v.                                   )
                                     )        Case No. _____
THE WEISER LAW FIRM, P.C.,           )
                                     )        Division No. _____
and                                  )
                                     )
ROBERT WEISER,                       )
                                     )
and                                  )
                                     )
MONICA ROSS-WILLIAMS,                )
                                     )
              Defendants.            )

## PETITION

Comes now Plaintiff Michael Hartleib and, for his claims and causes of action against Defendants The Weiser Law Firm, P.C., Robert Weiser and Monica Ross-Williams, states and alleges as follows:

### PARTIES, VENUE AND JURISDICTION

1. Plaintiff is an individual whose residence is in the state of California.  He is a substantial shareholder in Sprint Nextel Corporation and is an objector to the proposed settlement in the underlying shareholder derivative litigation in Johnson County, Kansas, *Ross-Williams vs. Bennett et al.*, 11CV01688.

2. Defendant The Weiser Law Firm, P.C. is a Pennsylvania corporation with its principal place of business in Pennsylvania.  At all pertinent times, it acted by and through its agents and employees, including but not limited to Robert Weiser, who were admitted *pro hac vice* to represent a group of plaintiffs in the underlying litigation in Johnson County, Kansas.  It performed the acts and omissions complained of in this petition in the underlying litigation in Johnson County, Kansas.

*Clerk of the District Court, Johnson County Kansas*
*01/22/19  02:14pm SS*

3. Defendant Robert Weiser is an attorney licensed and residing in the state of Pennsylvania. He is an officer, agent and/or employee of Defendant The Weiser Law Firm, P.C. At all pertinent times, he was admitted *pro hac vice* to practice law in connection with the underlying litigation in Johnson County, Kansas, and he committed the acts and omissions complained of in the underlying litigation in Johnson County, Kansas. At all pertinent times, he was acting within the course and scope of his employment with and/or agency of Defendant The Weiser Law Firm, P.C.

4. Defendant Monica Ross-Williams is an individual residing in the state of Michigan. She is the lead named plaintiff in the underlying shareholder derivative litigation in Johnson County, Kansas, and committed the acts and omissions complained of in the underlying litigation in Johnson County, Kansas.

5. This Court is a court of general jurisdiction, so it has jurisdiction over the claims asserted herein.

6. All defendants, through their participation in the underlying litigation, committed the tortious acts and omissions that form the basis of these claims in the state of Kansas and submitted themselves to the jurisdiction of this Court, so this Court has personal jurisdiction over these defendants.

7. Venue is proper in this Court because the tortious acts and omissions that form the basis of these claims were committed in Johnson County, Kansas, in and through the underlying litigation.

8. Claims under the Kansas Consumer Protection Act are properly brought in this Court pursuant to K.S.A. § 50-638 because the acts and omissions giving rise to these claims were committed in Johnson County, Kansas, in the underlying *Ross-Williams* litigation.

<u>BACKGROUND FACTS</u>

9. In early 2009, Plaintiff Michael Hartleib ("Hartleib") contacted The Law Offices of Bruce G. Murphy ("the Murphy firm") about a potential shareholder derivative suit Mr. Hartleib wanted to pursue on behalf of Sprint Nextel Corporation. Mr. Hartleib was and is a substantial and vocal

*Clerk of the District Court, Johnson County Kansas*
*01/22/19  02:14pm SS*

shareholder in Sprint and other corporations with a prior history of effecting positive corporate changes in the companies in which he holds an ownership interest.

10. On or about March 22, 2009, after a short period of negotiation of the terms of an attorney-client engagement, Mr. Hartleib retained the Murphy firm to pursue a shareholder derivative action on behalf of Sprint Nextel Corporation arising from an unsuccessful merger between Sprint and Nextel. Mr. Hartleib insisted the terms of this engagement must preclude the Murphy firm from working with national derivative firm Robbins Arroyo due to Mr. Hartleib's witnessing of what he believed were that firm's unethical business practices in prior cases.

11. Prior to or on March 22, 2009, the Murphy firm entered into an agreement with Defendant The Weiser Law Firm, P.C. ("the Weiser firm") by which the Weiser firm would be co-counsel with the Murphy firm for purposes of representing Mr. Hartleib in the shareholder derivative action. Defendants Weiser and the Weiser firm agreed to the terms of the engagement with Mr. Hartleib and undertook representation of Mr. Hartleib in the underlying litigation.

12. Prior to their contact with Mr. Hartleib, on information and belief, neither the Murphy firm nor the Weiser firm was aware of the facts forming the basis for the underlying shareholder derivative suit that Mr. Hartleib alerted them to in his communications with them, nor had either firm been in contact with a potential client who knew of or had an interest in pursuing the underlying litigation.

13. On or shortly after March 22, 2009, Robert Weiser spoke with Mr. Hartleib. During this conversation, Mr. Hartleib expressed that, as lead plaintiff representing the class of shareholders in Sprint Nextel, he took his duties to represent the interests of the corporation and its shareholders seriously and he would not endorse superficial and toothless corporate governance reforms in order to achieve a settlement that would consist primarily of attorney fees.

14. For Mr. Hartleib to agree to a settlement, he advised Mr. Weiser that it would have to provide meaningful relief resulting in a real and positive impact for the corporation and, by extension, its shareholders.

15. On the morning of March 27, 2009, Mr. Hartleib was notified by Messrs. Murphy and Weiser via email that they were refusing to file the underlying shareholder derivative suit in Mr. Hartleib's name.

16. Their stated reason, which was false, was that they were concerned that Mr. Hartleib's history of effective and wholly unrelated shareholder derivative action somehow created a potential conflict and rendered Mr. Hartleib an inadequate shareholder representative.

17. This stated reason was pretextual.  Mr. Weiser did not want Mr. Hartleib as the named plaintiff because during their conversation Mr. Weiser learned that Mr. Hartleib is opposed to lawyer-driven derivative litigation in which the only meaningful relief obtained through a settlement is millions of dollars in attorney fees, and the substantive relief for the shareholders and the corporation is toothless or *de minimis*.

18. In fact, Mr. Hartleib's prior knowledge, skill and experience in shareholder matters rendered him a perfect shareholder representative.  For more than a decade, Mr. Hartleib has fought to ensure the interests of class and shareholder groups and the corporations derivative actions exist to protect are given predominant consideration in the ultimate resolution of class action and shareholder derivative litigation, when many representative plaintiffs appear to be satisfied to accept minimal relief along with excessive attorney fee awards in what has been referred to as lawyer-driven litigation.

19. On information and belief, after refusing to file suit in Mr. Hartleib's name, Mr. Murphy filed a case based on the facts presented by Mr. Hartleib in the name of an unqualified relative of Mr. Murphy while Messrs. Murphy and Weiser actively searched for a new plaintiff to use for Mr.

Hartleib's case, and they ultimately engaged a far less adequate shareholder representative to use as the named plaintiff in the underlying litigation, Monica Ross-Williams, who was unsophisticated in shareholder-corporate matters, corporate governance and litigation, and held a very small stake in Sprint Nextel Corporation, if any.

20. After filing the derivative action, the Weiser defendants effectively obtained a stay of the action during which no meaningful formal discovery was done in the *Ross-Williams* case while a related class-action lawsuit based on the same conduct was allowed to progress.

21. On February 26, 2016, Defendants moved for preliminary approval of a proposed settlement, which included toothless corporate governance reforms and would provide a basis for the Weiser defendants to request exorbitant fees not commensurate with the relief obtained in the settlement nor work performed in the *Ross-Williams* case.

22. On May 6, 2016, Defendants moved for final approval of the proposed settlement and excessive fee award.

23. On May 13, 2016, Mr. Hartleib notified the District Court that he objected to the settlement and requested attorney fee award.

24. On March 6, 2017, Mr. Hartleib sought contact information for Ms. Ross-Williams via the internet and called her to confirm she actually existed in an effort to discern Ms. Ross-Williams' level of involvement in the litigation and her suitability as a representative plaintiff. Mr. Hartleib was concerned about these issues because he had, on prior occasions, observed the Weiser firm, as well as other class action and shareholder derivative firms who work in concert with the Weiser firm, utilizing deceased and otherwise unqualified parties as plaintiffs in other shareholder derivative and class litigation.

25. On March 7th 2017, Mr. Hartleib placed one 15-minute call to Ms. Ross-Williams in which it became painfully clear that she had no involvement in the case and that Ms. Ross-Williams had not spoken to her counsel, Mr. Weiser, in years.

26. Ms. Ross-Williams admitted she was entirely unaware of any of the details in "her" case.

27. Ms. Ross-Williams was not aware of the scathing orders from the District Court of Johnson County, Kansas, criticizing her attorneys' use of an unlicensed disbarred "lawyer" to inflate their bill. She was unaware the judge in "her" case drastically reduced the attorney fees by ninety percent, from $4.5 million to $450,000, finding they were not remotely accurate or credible.

28. Ms. Ross-Williams was not aware that an appeal had been filed on her behalf and had not been provided with pleadings in her case.

29. Ms. Ross-Williams, plaintiff in the underlying litigation, even continually referred to herself as the defendant and appeared to completely lack understanding of her obligations as a representative plaintiff.

30. The conversation between Mr. Hartleib and Ms. Ross-Williams was pleasant and non-confrontational. Ms. Ross-Williams provided Mr. Hartleib with a private email address to send the pleadings in her case that her counsel failed to provide.

31. Later, instead of expressing outrage by the information Mr. Hartleib provided in the 15-minute affable call, after speaking with Defendant Weiser, Ms. Ross-Williams falsely accused Mr. Hartleib of threatening and harassing her.

32. After learning of the March 7, 2017 amicable phone call, Mr. Weiser induced Ms. Ross-Williams to file false declarations against Mr. Hartleib, accusing him of threats and harassment to gain a protective order under false pretenses. This was done to harm Mr. Hartleib's reputation and discredit him in the *Ross-Williams* action before the Kansas Court of Appeals and in other unrelated cases.

33. In court filings, the Weiser defendants made inflammatory false statements and allegations about Mr. Hartleib that were personally and professionally hurtful, harmful and without any basis in truth or fact.

34. The Weiser defendants also made false statements to the district and appellate courts in Kansas regarding their conduct and the conduct of their unlicensed non-lawyer whom they knowingly put forth as a licensed attorney who billed $350 per hour in search of their improper and excessive fee award (which Judge Vano noted and overwhelmingly reduced), as well as the practical effect of the near toothless "corporate reforms" they negotiated in the mediation.

35. As a result of Defendants' acts and omissions as described herein, Mr. Hartleib has suffered damage to his good name and reputation, lost the benefit of serving as lead plaintiff in the underlying litigation and the positive result that would likely have occurred had he been lead plaintiff, was forced to expend substantial sums and thousands of hours of personal time to oppose and expose Defendants' conduct and chicanery, and has suffered significant mental and emotional trauma from Defendants' actions.

36. Despite filing a related action years later, Mr. Hartleib was estopped from participation in the consolidated cases in the underlying litigation. In fact, all firms in the consolidated cases colluded and conspired to work as one in their effort to prevent Mr. Hartleib from seeking meaningful relief on behalf of Sprint Nextel. All other cases in the consolidated action were settled except one, Mr. Hartleib's.

37. Defendants Robert Weiser and the Weiser Law Firm's handling of the underlying litigation is part of a regular custom, pattern and practice they have engaged in for years. This modus operandi has been to the detriment of both the classes of shareholder plaintiffs they have falsely purported to represent as well as the corporations those shareholders are seeking to protect and improve.

*Clerk of the District Court, Johnson County Kansas*
*01/22/19  02:14pm SS*

38. The Weiser defendants regularly handle shareholder derivative suits in concert with other firms with whom they have relationships and who file securities class action lawsuits based on the same issues or conduct. The Weiser defendants will stay the shareholder derivative suit, whereby allowing sufficient time to pass allowing for the billing of thousands of fraudulent hours, piggyback on the discovery from the class action to bill fraudulent document review, then resolve the shareholder derivative suit by negotiating soft or meaningless corporate "reforms" and very high legal fees.

39. This framework is what the Weiser defendants attempted to do in the *Ross-Williams* matter when they piggybacked on a securities class action filed by the national class action firm Robbins Gellar, one of the national firms with which the Weiser defendants work in concert, until their efforts were partially derailed by Mr. Hartleib's objection, which resulted in Judge Vano's order finding the Weiser defendants' conduct and fee request to be both troubling and excessive.

## COUNT I
*Legal Malpractice/Breach of Fiduciary Duty*
*Robert Weiser and The Weiser Law Firm, P.C.*

40. Plaintiff incorporates all preceding allegations as if fully set forth herein.

41. Defendants Robert Weiser and The Weiser Law Firm, P.C., entered into an attorney-client relationship with Plaintiff Michael Hartleib which was never terminated.

42. Defendants Weiser and the Weiser firm owed Mr. Hartleib the duty to provide competent and skillful representation and the duties of undivided loyalty, to act solely for Mr. Hartleib's benefit as a shareholder and fiduciary for Sprint Nextel, and to avoid engaging in conflicts of interest.

43. The Weiser defendants further had the duty of honesty and candor in their communications and representations to the District Court and the Court of Appeals.

44. Defendants Weiser and the Weiser firm breached these duties by:

   a. Refusing to file Mr. Hartleib's claim in the underlying litigation when it became apparent that he would not kowtow to Mr. Weiser's demands on a potential settlement and would

*Clerk of the District Court, Johnson County Kansas*
*01/22/19  02:14pm SS*

not permit the underlying litigation to be lawyer-driven litigation, benefitting only the attorneys;

b.   By taking an adverse position to a former client in their attempt to protect their fraudulent scheme, defraud the Court and unjustly enrich themselves by 4.5 million dollars in fraudulent fees;

c.   By abusing process in the case in question and using the instrumentalities of the judicial system to vex, harass and annoy in retaliation for Mr. Hartleib's filing of an Amicus Brief in the unrelated *Equifax* action. In the *Equifax* action, Weiser and the Weiser Firm was removed as co-lead counsel in said case based on their actions in the *Ross-Williams* case;

d.   Representing Defendant Ross-Williams in her claims and requests for relief against Mr. Hartleib which presented a conflict of interest that was not waived;

e.   Using Mr. Hartleib's communications with them, which were protected by the attorney-client privilege, against him in connection with the underlying litigation and the dispute between Defendant Ross-Williams and Mr. Hartleib. In addition, sharing privileged communications in the unrelated case in the Northern district of Georgia, *In Re Equifax*, and proffering falsehoods relating to said communications in a willful attempt to harm Mr. Hartleib and obfuscate their duplicitous acts;

f.   Replacing Mr. Hartleib as lead plaintiff in the underlying litigation with a less qualified lead plaintiff who had little or no involvement in the case, in order to bill over 18,000 hours, and 4.5 million dollars in fraudulent fees;

g.   Employing in the underlying litigation the services of a criminal non-attorney, who was previously disbarred, charged with racketeering, and knowingly putting forth his work-product under a fraudulent name as a basis for a grossly excessive attorney fee request;

    h.   Putting forth and supporting Defendant Ross-Williams' untrue statements regarding Mr. Hartleib's actions and communications with her;

    i.   Making false statements to the District and Appellate Courts in Kansas regarding Mr. Hartleib's prior actions:

    j.   In such other and further ways as may be learned through discovery.

45. Defendants' actions and inactions described herein were willful, wanton, fraudulent and malicious.

46. As a direct and proximate result of Mr. Weiser's and the Weiser firm's breach of their duties, Plaintiff Michael Hartleib was damaged as described above in paragraphs 35 and 36.

WHEREFORE, Plaintiff Michael Hartleib prays for judgment in his favor on Count I, for compensatory damages in a fair and reasonable amount, for his costs incurred herein, and for such other and further relief as the Court deems just and proper.

**COUNT II**
*Violations of Kansas Consumer Protection Act*
*Robert Weiser and The Weiser Law Firm, P.C.*

47. Plaintiff incorporates all preceding allegations as if fully set forth herein.

48. Pursuant to K.S.A. § 50-623, *et seq.* (the "Kansas Consumer Protection Act" or the "KCPA"), Mr. Hartleib is a "consumer" and the Weiser defendants are "suppliers" for purposes of claims under the Kansas Consumer Protection Act.

49. When the Weiser defendants agreed to represent Mr. Hartleib as the shareholder representative plaintiff for the case Mr. Hartleib hired them to pursue, the Weiser defendants offered to reasonably represent Mr. Hartleib and the class of shareholders in accordance with their ethical duties of loyal, zealous representation in those claims and all other ethical duties related to client representation and litigation.

*Clerk of the District Court, Johnson County Kansas*
*01/22/19  02:14pm SS*

50. In fact, the Weiser defendants did not intend to and did not provide such reasonable, expectable legal services, and they did not disclose to Mr. Hartleib or the class of shareholders this knowledge and intent.

51. The Weiser defendants have colluded and conspired by falsely purporting to represent the interest of Sprint and its shareholders, including Mr. Hartleib, when their true motives were to stay this case for a prolonged period (over 5 years) to allow them to bill over 18,000 fraudulent hours and 4.5 million in fees. The Weiser defendants knowingly employed a criminal and disbarred attorney using an alias, Alexander Silow, to bill 1.6 million dollars in this case. Mr. Silow's actions in this case have led to new criminal convictions in Montgomery County Pennsylvania, including the Unauthorized Practice of Law, *(42Pa.C.S.2524)*, Unsworn Falsification to Authorities *(18 Pa. C. S. 4904) (b)* and Securing Execution of Documents by Deception *(18 Pa. C. S. 4114)*

52. On information and belief, Mr. Weiser and the Weiser Firm knew Mr. Silow's status as disbarred attorney and criminal when they hired him from the Abelson placement agency. For over a decade, Mr. Weiser instructed Mr. Silow to fraudulently bill tens of millions of dollars in cases across the country in addition to the 1.6 million in the Ross-Williams case. Weiser fraudulently put forth Mr. Silow as a securities expert and licensed attorney in Pennsylvania in the *Ross-Williams* case, when Mr. Silow's resume submitted by the Weiser firm in the case showed neither was true.

53. When the Weiser defendants moved the District Court for approval of a settlement that would include ineffective corporate governance reforms and fraudulent and excessive fees, they violated the terms of the KCPA insofar as their representations to the Court, Mr. Weiser and the entire class of shareholders contained knowing and intentional written exaggeration of a material fact, a willful failure to state a material fact and/or a willful concealment or omission of a material fact, and a knowing and intentional representation that their services had uses, benefits or characteristics which they did not have, all as described above.

54. The Weiser defendants' conduct described herein was unconscionable within the meaning of the KCPA in that they took advantage of Mr. Hartleib's and the shareholder class' relative ignorance and lack of sophistication in the technicalities of the legal system, because the requested fees grossly exceeded the price at which similar services could be obtained, and because Mr. Hartleib, the shareholder class was unable to receive a material benefit from the Weiser defendants' services and resulting litigation, the settlement obtained by the Weiser defendants was one-sided in favor of the Weiser defendants, and the Weiser defendants made misleading statements in connection with the litigation on which Mr. Hartleib and the shareholder class were likely to rely.

55. As a direct and proximate result of the Weiser defendants' conduct set forth herein, Mr. Hartleib was damaged as described above in paragraphs 35 and 36.

56. The Weiser defendants' actions and inactions as set forth herein are in violation of the KCPA, §§ 50-626, 627.

57. Defendants' actions and inactions described herein were willful, wanton, fraudulent and malicious.

58. This action is authorized and Plaintiff is entitled to an award of reasonable attorney fees pursuant to the KCPA, § 50-634.

WHEREFORE, Plaintiff Michael Hartleib prays for judgment in his favor on Count II, for compensatory damages in a fair and reasonable amount, for his attorney fees and costs incurred herein, and for such other and further relief as the Court deems just and proper.

## COUNT III
*Abuse of Process*
*All Defendants*

59. Plaintiff incorporates all preceding allegations as if fully set forth herein.

60. Defendants knowingly made false statements against Mr. Hartleib in court documents and sought and obtained a protective order under false pretenses. Defendant Ross-Williams filed false declarations under oath against Mr. Hartleib at the direction and request of Mr. Weiser in an

attempt to assail his character and protect Mr. Weiser's unlawful acts.  Defendants further obtained

a protective order so that that that it could be used by the Weiser defendants against Mr. Hartleib

in other litigation in which he might challenge their qualifications and conduct.  These actions

amount to the knowing improper use of legal process.

61. Defendants' actions were taken for the purposes of harassing Mr. Hartleib and causing him

hardship.

62. In fact, the Weiser defendants did use the protective order against Mr. Hartleib in the *Equifax*

litigation.

63. Defendants' actions directly and proximately resulted in damages to Mr. Hartleib as described

above in paragraphs 35 and 36.

64. Defendants' actions and inactions described herein were willful, wanton, fraudulent and malicious.

WHEREFORE, Plaintiff Michael Hartleib prays for judgment in his favor on Count III, for

compensatory damages in a fair and reasonable amount, for his costs incurred herein, and for such

other and further relief as the Court deems just and proper.

**COUNT IV**
*Breach of Fiduciary Duty*
*Defendant Ross-Williams*

65. Defendant Ross-Williams was an unfit plaintiff who simply allowed her name to be used to

facilitate a lawyer driven case for personal financial gain.

66. When Mr. Hartleib informed her of the fraud and chicanery that was taking place in "her" case,

she did nothing to stop it. In fact, she became a willing participant in the fraud upon the Court by

acting on behalf of the Weiser defendants in furtherance of their fraud upon the court.

67. Defendant Ross-Williams owed a fiduciary duty to Mr. Hartleib and all Sprint shareholders to

fairly and adequately represent their interests in the litigation, including the duties to ensure that

lead counsel fee requests were appropriate, the duties of care and loyalty to the class, and to fairly represent the interests of the entire class.

68. Defendant Ross-Williams failed to act in good faith and breached her fiduciary duty to properly represent Mr. Hartleib and the other Sprint shareholders by failing to ensure the fee request of the Weiser defendants was commensurate with the relief obtained, by failing to ensure that the relief agreed to in the settlement was sufficiently robust as to effect meaningful corporate change, by failing to adequately monitor and remain involved in the litigation, and by acting in her own interest rather than in the interest of Sprint Nextel and the absent class of shareholders.

69. As a direct and proximate result of Defendant Ross-Williams' breach of her fiduciary duties, Mr. Hartleib was damaged as described above in paragraphs 35 and 36.

WHEREFORE, Plaintiff Michael Hartleib prays for judgment in his favor on Count IV, for compensatory damages in a fair and reasonable amount, for his costs incurred herein, and for such other and further relief as the Court deems just and proper.

Respectfully Submitted by:

/s/ Andrew B. Protzman

Andrew B. Protzman, #18015
Ben Stelter-Embry, #25891
Protzman Law Firm LLC
1100 Main Street
Suite 2430
T: 816-421-5100
F: 816-421-5105
andy@protzmanlaw.com
ben@protzmanlaw.com

*Attorneys for Plaintiff*