**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **THE WEISER LAW FIRM, et al.**, | **CIVIL ACTION** |
| Plaintiffs, | |
| *v.* | **NO. 19-2728-KSM** |
| **MICHAEL HARTLEIB,** | |
| Defendant. | |

**MEMORANDUM**

**MARSTON, J.**                                        **October 9, 2020**

  This case involves over a decades' worth of history and heated disputes between Plaintiffs the Weiser Law Firm, P.C. ("the Firm") and Robert Weiser, Esquire, and Defendant Michael Hartleib.  The thrust of Plaintiffs' 325-page complaint, including exhibits, can be summarized as follows:  according to Plaintiffs, Hartleib has waged an all-out vendetta against them, in retribution for their refusal to enter into a fee-sharing or consulting arrangement with him and for the amount of attorneys' fees Plaintiffs billed in a particular shareholder derivative suit, which were deemed excessive.  (Doc. No. 1.)

  Plaintiffs specialize in providing legal services in shareholder class actions and shareholder derivative actions, and they allege that Hartleib, a former potential client, has frequently (and improperly) inserted himself into litigations in which they were involved.  (*Id.*)  In doing so, Hartleib has purportedly embarked on a campaign to publicly disparage and attack Plaintiffs to judges, other members of the legal community, and current and prospective clients.  (*Id.*)

  In their complaint, Plaintiffs assert claims for abuse of process, defamation, intentional

inflicition of emotional distress (IIED), negligent misrepresentation, intentional interference with prospective contractual relations, and tortious interference with contract.  (*Id.*)  Plaintiffs also seek a vexatious litigant order, to enjoin Hartleib from filing any action against Plaintiffs; from making any filing or submission in any case, derivative suit, class action suit, or qui tam suit that involves Plaintiffs; and from contacting any individual or entity about Plaintiffs, without first obtaining leave of the court.  (*Id.* at ¶ 170.)

On August 23, 2019, Hartleib, a California resident, moved to dismiss the complaint for lack of personal jurisdiction and improper venue.  Hartleib argues that he has not engaged in any acts that were expressly aimed at Pennsylvania and that there is no evidence that a substantial part of the events or omission giving rise to Plaintiffs' claims occurred in the Eastern District of Pennsylvania.  (Doc. Nos. 9, 15, 22, 32.)

In opposition, Plaintiffs contend that there are sufficient minimum contacts between Hartleib and Pennsylvania, citing a barrage of telephone calls and emails that Hartleib allegedly directed to Pennsylvania and Hartleib's sustained attacks upon Plaintiffs' Pennsylvania-based business, among others.  (Doc. Nos. 12, 25.)

Pursuant to this Court's June 16, 2020 order (Doc. No. 30), the parties have engaged in limited jurisdictional discovery and filed supplemental briefs (Doc. Nos. 32, 33).  The Court held oral argument on September 17, 2020.

For the reasons discussed below, we grant Hartleib's motion in part and deny it in part.

I.

The following facts are pled in the complaint or included in Plaintiffs' supplemental brief, and taken in the light most favorable to Plaintiffs.

The Weiser Law Firm is a Pennsylvania corporation with offices located in Berwyn,

Pennsylvania, and Weiser is a resident of Pennsylvania.  (Doc. No. 1 at ¶¶ 1–3.)  The Firm is a legal service provider, specializing in shareholder class actions and shareholder derivative actions, and Weiser's law practice focuses primarily on shareholder derivative litigation.  (*Id.* at ¶¶ 7, 10.)

In November 2008, Hartleib, a California resident, emailed Bruce Murphy, an attorney who had previously referred clients to the Firm.  Hartleib discussed how the shares he owned in Sprint Corporation and Nextel Communications lost value when the two companies merged to become Sprint Nextel Corporation.  (*Id.* at ¶¶ 11–12; *id.* at p. 66, Ex. 1.)  Murphy forwarded Hartleib's email to Weiser and inquired whether Weiser thought a shareholder derivative action could be brought on Sprint's behalf.  (*Id.* at ¶ 13; *id.* at p. 66, Ex. 1.)  The Firm did not recommend filing a derivative lawsuit at that time.  (*Id.* at ¶ 14.)

A few months later, in March 2009, a separate law firm filed a securities class action against Sprint, based on the Sprint/Nextel merger.  (*Id.* at ¶ 15.)  Several other substantially similar class action law suits were then filed and consolidated in Kansas Federal Court (the "Sprint Securities Class Action").  (*Id.* at ¶ 16.)

After the first suit against Sprint was filed, Murphy followed up with Weiser about potential shareholder derivative claims that could be brought on Sprint's behalf.  (*Id.* at ¶ 18.)  This time, the Firm concluded that Sprint may have potential claims against its' current and/or former officers and directors, and asked Murphy if Hartleib or any other potential client was interested in initiating the lawsuit.  (*Id.* at ¶¶ 19–20.)  Murphy responded that they were interested.  (*Id.* at ¶ 21.)  Accordingly, on March 13, 2009, Weiser sent a draft shareholder derivative complaint to Murphy, and Murphy circulated it to his actual or potential clients, which the Firm understood as including Hartleib.  (*Id.* at ¶¶ 23–24.)

3

On March 26, 2009, Weiser and Hartleib spoke for the first time.  During the call, Hartleib claimed to have spent "hundreds of hours" investigating Sprint and that he had previously provided separate counsel with the facts and analysis necessary to prosecute the federal securities claims asserted against Sprint in the Sprint Securities Class Action.  (*Id.* at ¶¶ 27–28.)  Hartleib also told Weiser that he was interested in seeking appointment as a lead plaintiff in the Sprint Securities Class Action.  (*Id.* at ¶ 29.)  Last, Hartleib strongly implied interest in sharing any attorneys' fees the Firm might recover if it represented Hartleib in connection with a shareholder derivative suit brought on Sprint's behalf.  (*Id.* at ¶ 30.)  Hartleib's interest in a fee sharing arrangement was "extremely troubling" to Weiser.  (*Id.* at ¶ 32.)

After their conversation, Weiser decided that the Firm could not represent Hartleib in a derivative action brought on behalf of Sprint due to a potential conflict of interest.  (*Id.* at ¶ 31; *id.* at p. 68, Ex. 2.)  Weiser reasoned that any role Hartleib played in launching or prosecuting the Sprint Securities Class Action *against* Sprint would preclude his participation as a plaintiff to a derivative suit brought *on behalf of* Sprint.  (*Id.*)  The following day, Weiser communicated his decision to Murphy, and Murphy informed Hartleib that neither his firm nor the Weiser Law Firm would represent Hartleib in a shareholder derivative action brought on behalf of Sprint. (*Id.* at ¶¶ 33–36; *id.* at p. 71, Ex. 3.)

Thereafter, the Firm decided to represent Monica Ross-Williams on behalf of Sprint in a shareholder derivative action filed in Kansas State Court.  (*Id.* at ¶ 37.)  In July 2011, another law firm filed a separate shareholder derivative action on Sprint's behalf and named Hartleib as the representative plaintiff.  (*Id.* at ¶ 38.)

Hartleib reached out to Weiser in June 2011, two years after they last spoke, this time in connection with a *pro se* shareholder derivative action he and other named plaintiffs filed on

behalf of Sirius XM Satellite Radio, Inc.  (*Id.* at ¶¶ 39–40.)  Hartleib sought to engage the Firm as counsel for the plaintiffs in the Sirius derivative action (*id.* at ¶¶ 41–42; *id.* at pp. 95–97, Ex. 5), but Plaintiffs declined (*id.* at ¶ 43).  Hartleib reiterated his request to Weiser a few months later (*id.* at ¶ 44; *id.* at p. 99, Ex. 6), but Weiser never responded (*id.* at ¶ 45).  In February 2012, Hartleib contacted Weiser again, asking "are we going to do some business together or what?" (*Id.* at ¶¶ 46–47; *id.* at p. 101, Ex. 7.)

Weiser and Hartleib did not have contact again until 2016, when a majority of the Sprint shareholder derivative lawsuits pending in the Kansas courts (including Ross-Williams's suit) achieved a collective settlement (the "Sprint Derivative Settlement").  (*Id.* at ¶ 48.)  Hartleib was a vocal opponent of the Sprint Derivative Settlement and the only Sprint derivative plaintiff to not participate in it.  (*Id.* at ¶ 49.)

When the Firm and others sought the Kansas State Court's final approval of the terms of the Sprint Derivative Settlement, including attorneys' fees for plaintiffs' counsel, Hartleib filed a *pro se* objection.  (*Id.* at ¶ 50.)  Hartleib also expressed his displeasure to Weiser when they spoke over the phone on May 20, 2016, a week before the final approval hearing on the settlement.  (*Id.* at ¶¶ 51– 52.)  Notwithstanding his opposition to the settlement, Hartleib proposed to withdraw his formal objection if Weiser agreed to enter into a "consulting agreement" with Hartleib.  (*Id.* at ¶ 53.)  Hartleib suggested that he would provide the Firm with ideas for initiating lawsuits against corporate defendants, in exchange for receiving hundreds of thousands of dollars.  (*Id.*)  Weiser was troubled by Hartleib's proposition and declined to enter into such an arrangement.  (*Id.* at ¶ 54.)

Hartleib appeared at the final hearing on May 26 before the Honorable James Vano in support of his objection.  (*Id.* at ¶ 55.)  In mid-June 2016, Judge Vano approved the Sprint

Derivative Settlement, but only awarded approximately 10% of the attorneys' fees requested, and the parties appealed.  (*Id.* at ¶¶ 61–62.)

In February 2017, during the pendency of the appeal, the Firm discovered that Jeffrey Silow,[1] one of its' contract attorneys who had performed document review during the Sprint derivative litigation, had been disbarred in Pennsylvania decades earlier.  (*Id.* at ¶¶ 59, 63, 66.) Silow had been placed with the Firm through Abelson Legal Search, a Philadelphia-based legal recruitment and placement firm.  (*Id.* at ¶ 59.)  Abelson had been "responsible for vetting the credentials and bar status of the attorneys it placed" and "held Silow out . . . as a licensed attorney in good standing."  (*Id.* at ¶ 60; *see also* Doc. No. 33 at p. 6 n.4.)  After learning of Silow's disbarment, the Firm immediately alerted Judge Vano and the Kansas Appeals Court, which was reviewing the attorneys' fee award.  (*Id.* at ¶ 66.)  The reduced attorneys' fee award in the settlement was ultimately affirmed on appeal.  (*Id.* at ¶ 67.)

Once the Silow controversy was brought to light, Hartleib proceeded to "unleash[] a deluge of abuse upon the Plaintiffs."  (*Id.* at ¶ 68.)  For example, on March 6, 2017, Hartleib emailed Weiser and copied eleven members of the bar,[2] as well as the administrative assistant for the Kansas State Court:

> Rob!  I am a little confused! . . . It seems your statements to the Appellate Court were disingenuous at best.  Shocking! . . . Ethical obligation, what a Saint [sic] . . . . Your attempts, [sic] to obfuscate your chicanery in this case is galvanizing my convictions, strengthening my resolve to expose all of the corrupt parties in this case!  This lawyer driven litigation must and will cease.  Your temerity, to seek leave of the Appellate Court to reinstate fees, given what I have uncovered is quite frankly astonishing and provoking wrath.

(*Id.* at ¶ 69; *id.* at pp. 117–18, Ex. 12.)

---

[1] Silow used his son's name, Alexander, "to perpetrate his deception."  (*Id.* at ¶ 63.)

[2] Hartleib copied Alfred Yates, who Hartleib admits is an attorney based in Pittsburgh, as well as two other employees of the Firm.  (*See id.* at p. 117, Ex. 12; Doc. No. 33 at p. 10.)

That same day, Hartleib called Ross-Williams, who Plaintiffs represented in the Sprint

derivative action, and "verbally harassed and threatened" her.  (*Id.* at ¶ 71.)  For example,

Hartleib told Ross-Williams that the Firm was a "criminal enterprise" and not serving her

interests as a Sprint shareholder.  (*Id.*)  Ross-Williams felt "shocked, disturbed, harassed and

threatened" during the call, and asked Hartleib not to contact her again.  (*Id.* at ¶¶ 73–74; *see*

*also id.* at pp. 120–23, Ex. 13.)  Nonetheless, the following day, Hartleib emailed Ross-Williams,

copying fifteen members of the bar[3] and the Kansas State Court's administrative assistant:

> Dear Ms. Williams, it was a pleasure speaking with you this evening . . . I find it
> unconscionable that your attorneys failed to inform you of Judge Vano's rulings
> or that an Appeal was filed on your behalf.  I do believe that you are a[n]
> unwitting victim of their fraud committed against the Court.  As we discussed
> they have submitted millions of dollars in fraudulent billing in your case.  As I
> informed you that this was not just my opinion, the Judge in your case came to a
> similar conclusion.  In fact, your attorney has now admitted to at least 1.6 million
> dollars in fraudulent bills submitted to the Court . . . I am no expert, but when a
> Firm admits criminal acts in a case I believe they are obligated to notify you as
> the Plaintiff.  Mr. Weiser and his Firm have already contacted their Bar
> associations and other Courts to report their criminal acts.  I have contacted the
> district attorney's offices in Pennsylvania and Kansas and will be filing formal
> complaints . . . As you can see by the letters from Mr. Weiser they are in a lot of
> trouble, but claim they are victims of Mr. Silow.  I will provide incontrovertible
> proof that Mr. Weiser et. al. is just as guilty as Mr. Silow.  This is just the tip of
> the iceberg.

(*Id.* at ¶ 77; *id.* at pp. 125–26, Ex. 14.)

In response, Plaintiffs sent Hartleib a cease-and-desist letter, which Hartleib ignored.

Hartleib also emailed Weiser, fifteen members of the bar[4] and the Kansas State Court's

administrative assistant:

> For you to characterize [the phone call with Ross-Williams and follow-up email]
> as harassment is another blatant attempt to distract and obfuscate your fraudulent

---

[3] Again, Hartleib copied Yates (located in Pittsburgh) and at least two other employees of the Firm. (*See id.* at p. 125. Ex. 14.)

[4] Hartleib again included Yates (based out of Pittsburgh) and at least two other employees of the Firm on the email. (*See id.* at p. 129, Ex. 14.)

acts and bastardization of the judicial system.  I caution you, that by coercing your 'client' to misstate facts regarding our call will only inflict additional damage to what little credibility you have left.  You Sir, and your coconspirators are the ones that need to Cease and Desist.  Your so-called 'client' is representing my interest and her attorneys are corrupt, therefore I will neither Cease nor Desist.  As far as your not so vailed [sic] threat that Ms. Williams 'reserves all of her rights', if you are threatening legal action against me, feel free, I will be happy to waive service to expedite said action.  I find the prospects of discovery quite compelling.  Your threats do nothing but, strengthen my resolve and galvanize my convictions.  Call it a personality defect!  Instead of wasting my time, I would suggest you consult an ethics attorney, that's right, you already have!

(*Id.* at ¶ 79; *id.* at p. 129, Ex. 14.)

Because of Hartleib's harassing conduct, the Kansas Appeals Court issued a protective order on March 30, 2017, prohibiting Hartleib from contacting Ross-Williams.  (*Id.* at ¶ 80.)  On two separate occasions, Hartleib sought to have the protective order lifted, but those motions were denied.  (*Id.* at ¶¶ 81–82.)  After the Firm opposed one such attempt, Hartleib emailed Weiser and copied eight other members of the bar (including other employees of the Firm):

> Rob, your ability to set the bar at new lows, never disappoints!  . . . Your attempt to mislead the Appellate Court with incomplete records might be your standard operating procedure, but I believe it will cost you when I seek sanctions.  Your personal attacks smack of desperation, they do nothing to dissuade me, in fact they galvanize my convictions and strengthen my resolve! . . . Your ill-advised actions, and ad-hominem attacks are making the Weiser Firm radioactive!

(*Id.* at ¶ 83; *id.* at p. 131, Ex. 15.)

Plaintiffs also allege that, as part of Hartleib's campaign against Plaintiffs, Hartleib gave a tip to the *Wall Street Journal* about Silow's disbarred status in Pennsylvania, his role as a document reviewer in the Sprint derivative action, and that Plaintiffs received only 10% of the requested attorneys' fees in the Sprint Derivative Settlement, leading to a highly-publicized article.  (*Id.* at ¶¶ 85–87.)

In addition, Plaintiffs claim that on April 25, 2017, Hartleib mailed several copies of an "anonymous" letter strewn with profanities to six Court of Common Pleas of Chester County

judges, which was forwarded to Weiser the following day.  (*Id.* at ¶¶ 89–92; *id.* at pp. 137–43, Ex. 17.)

Hartleib's vendetta against the Firm continued into early 2018, when he telephoned Abelson Legal Search located in Philadelphia—the organization that had placed Silow at the Firm and who the Firm had sued in the aftermath of learning about Silow's disbarment.  (Doc. No. 33.)  After the call, Hartleib emailed Cathy Abelson, explaining:

> I am the person who has exposed the fraud committed by the Weiser firm in the case that has brought Mr. Silow's criminal past and disbarred status into focus . . . Their actions in this case are truly unconscionable . . . they have filed multiple purjurious [sic] declarations and will stop at nothing to protect their duplicitous acts and criminal enterprise . . .  I am hopeful that we can work together and facilitate a cross-complaint against the Weiser firm . . . I know where the bodies are buried and intend to dig them up.

(Doc. No. 33-3 at p. 2.)  Abelson questioned Hartleib's motivation for contacting the search firm. Hartleib responded that he could help Abelson "defeat" the Firm in the Firm's suit against Abelson, and referred to the cease-and-desist letters hung on his office wall "as troph[ies] commemorating [his] accomplishments exposing corrupt firms such as (Weiser) et.al. [sic]."  (*Id.* at p. 4.)  Hartleib concluded,

> I can facilitate a cross-complaint that could lead to the demise of the Weiser Firm and damages for Abelson . . . Weiser et.al. [sic] are corrupt and inept.  After all, a layperson has defeated and humiliated them, and I am far from finished.  I predict when over certain attorneys may not be practicing law in the future.

(*Id.* at pp. 4–5.)

On February 24, Hartleib emailed the Abelson Search Firm a third time, writing:

> I just found out [Weiser's] firm was appointed lead in a huge nationwide suit.  I will be working tonight and tomorrow on an Amicus Brief, whereby I will inform the court of his criminal acts in the Sprint case, ongoing PA Bar investigation and forthcoming Order from the Kansas Court of Appeals.  His firm is unfit to be lead Counsel in any representative suit at this time.

(*Id.* at p. 3.)  Undeterred by a lack of response, on June 2, Hartleib emailed Abelson yet again,

asking "are you interested in working together to commence an action against the Weiser firm? Why won't you have your attorneys contact me?" (*Id.* at p. 6.)

Meanwhile, Hartleib simultaneously initiated contact with Thomas Goggin, a Detective Sergeant at the Chester County District Attorney's Office in Chester County, Pennsylvania. (Doc. No. 33 at p. 7.)  On March 13, 2018, Hartleib told Detective Goggin "the Weiser firm is claiming to be victim of Mr. Silow, when there is irrefutable proof they knew of Mr. Silow [sic] fraud and conspiracy against the court."  (Doc. No. 33-3 at p. 8.)  The following day, Hartleib responded to Detective Goggin's follow-up questions, emphasizing that "the Weiser firm knew exactly who Silow was and the Weiser [sic] was lying."  (*Id.* at p. 7.)  A week later, on March 22, Hartleib told Detective Goggin:  "Weiser knew exactly who Silow was!  I was hopeful [Abelson] would want to work together but I have not heard back from there [sic] lawyers.  I am going to bring a civil suit against Weiser.  Were you able to find the misdemeanor charges against Silow!"  (*Id.* at p. 9.)  Detective Goggin informed Hartleib that he did not "have anything new to report" but would "get back to [him]."  (*Id.*)

About two months later, in May 2018, Hartleib circulated the Kansas Appeals Court opinion upholding the reduced attorneys' fees award to Detective Goggin and asked:  "Were you ever able to find the charges filed against Silow?  I can't believe that the[y] can commit perjury and try to defraud the court and Sprint and walk away with 450k . . . Alexander Silow [Jeffrey Silow's son] knew and was likely receiving payments from Weiser."  (*Id.*)  Hartleib also said that he was going to file a Bar complaint and commence a civil action, though he did not specify whether such action would be taken against Weiser or Alexander Silow.  (*Id.*)  Six months later, Hartleib had clearly not let the subject die, emailing Detective Goggin yet again "to see if any action was taken by [Goggin's] department."  (Doc. No. 33 at p. 8.)

10

At the same time, Hartleib's emails to Weiser and others about Plaintiffs continued unabated.  For example, on May 19, 2018, Hartleib emailed Weiser and eight other members of the bar:  "Plaintiff Counsel, and I use this term loosely, when making false allegations against a party I would suggest you at least get it right.  I am no expert, but I am pretty sure it would be libelous!  I will demonstrate its proper use posthaste!"  (Doc. No. 1 at ¶ 93.)  Further, on June 2, 2018, Hartleib emailed Weiser, eleven other members of the bar (including other employees of the Firm), and the Kansas State Court's administrative assistant regarding media coverage of a State Street lawsuit (which Plaintiffs were not involved in), stating:

> It is clear that the Plaintiff's Bar is rife with corruption, in both Class Action and Derivative cases.  Much like the fraud Weiser et.al. [sic] committed in the 'Ross-Williams' case, it appears to be standard operating procedure for many firms to submit millions in fraudulent fee requests upon the Court . . . At present, it appears Weiser et.al. [sic] has not been out done, as there is no mention of the unlicensed practice of law by a convicted felon using an alias.  I will be contacting the Special Master, and filing an Amicus Brief in the State Street case to inform them of the chicanery that has taken place in the 'Ross-Williams' case.  Although entirely unrelated, it presents a troubling pattern of fraud and corruption in these lawyer driven cases . . . The actions of Weiser et.al. [sic] and the Firms in the State Street case is the very definition of Racketeering[.]

(*Id.* at ¶ 94; *id.* at p. 148, Ex. 19.)

In the midst of all this, Hartleib began inserting himself into the Firm's pending litigations.  (*Id.* at ¶¶ 95–96.)  In *In re Equifax, Inc. Derivative Litigation* (N.D. Ga.), Plaintiffs sought to be appointed as Co-Lead Counsel, and Hartleib tried to thwart their appointment by filing an amicus brief.  (*Id.* at ¶ 101; *id.* at pp. 153–62, Ex. 21.)  In doing so, Hartleib unleashed a host of allegations, including that the Firm "lied, misl[ed] the court," "used an unfit plaintiff," engaged "in fraudulent billing," operated a "criminal enterprise," and displayed "hubris and utter contempt for the Court."  (*Id.* at ¶¶ 102–03.)  Hartleib posited:  "[W]hat is going on at the Weiser firm?  Either they are corrupt, or entirely inept[.]"  (*Id.* at ¶ 105.)  Ultimately, the court denied the Firm's motion to be appointed co-lead counsel, and Hartleib "took credit for this result."  (*Id.*

at ¶ 109.)

Hartleib also attempted to interject in *In re Big Lots, Inc. Shareholder Litigation* (S.D. Ohio), after settlement of the derivative claims had already received preliminary approval. The court granted final approval to the settlement on August 28, 2018, and in its opinion, noted that Hartleib had emailed the court to raise concerns about the Firm's billing practices:

> On August 24, 2018, well after the time to object and the fairness hearing took place, the Court received an email from [Hartleib], a shareholder who had an interest in a different case involving The Weiser Firm . . . Hartleib raised concerns over Weiser's billing practices in this prior case and stated that he wanted to inform the Court so that it could scrutinize the fee request in this case . . . Hartleib does not indicate that he is a shareholder in Big Lots or otherwise an interested party in this case. Furthermore, the Court always scrutinizes the billing records of plaintiffs' counsel before approving fee awards.

(*Id.* at ¶¶ 110–15; *id*. at pp. 182–94, Ex. 25.)

Hartleib allegedly targeted *In re CenturyLink Sales Practices and Securities Litigation* (D. Minn.) next, a consolidated derivative action in which the law firm of Bragar Eagle & Squire, P.C. moved to be appointed lead counsel and proposed that the Weiser Law Firm be included as part of its support structure. (*Id.* at ¶¶ 116–18.) Even though the Firm was not seeking appointment as lead counsel, Hartleib filed an amicus brief in opposition of its appointment to "inform [the] Court of ongoing troubling actions by" the Firm. (*Id.* at ¶¶ 117–18.) On March 6, 2019, he attended a hearing before the court, reiterating his accusations against the Firm, stating, "I know for a fact that the Weiser firm knew who Mr. Silow was and that will come out, you know, during the course of the litigation . . . These firms, when these firms are up to no good, when they are billing illusory hours . . ." (*Id.* at ¶¶ 129, 131; *id.*, Ex. 27.) After the hearing, Hartleib forwarded his amicus brief to the Kansas State Court's administrative assistant and copied other members of the bar who had been involved in the Sprint derivation action,[5]

---

[5] This included Yates (based out of Pittsburgh) and two other employees of the Firm. (*See id.* at p. 264,

writing:  "I thought that the Honorable Vano would be interested to know that my quest to expose lawyer driven litigation and corruption rife throughout the Plaintiffs Bar continues."  (*Id.* at ¶¶ 134–36; *id.* at pp. 264–65, Ex. 28.)  Ultimately, the *CenturyLink* court appointed as lead counsel Bragar Eagle & Squire, whose proposed support structure included the Firm.  (*Id.* at ¶ 143.)

Finally, Hartleib initiated his own lawsuit against Plaintiffs in Kansas State Court, asserting claims for legal malpractice/breach of fiduciary duty, violation of the Kansas Consumer Protection Act, and abuse of process.  (*Id.* at ¶ 159; *id.* at pp. 308–21, Ex. 33.)  After its removal to federal court, the District of Kansas court dismissed the case and denied reconsideration, and Hartleib appealed.

Plaintiffs argue that, taken together, the allegations and evidence proffered detailing Hartleib's actions towards Plaintiffs in Pennsylvania demonstrate that personal jurisdiction and venue are proper in this case.  (Doc. Nos. 12, 25, 33.)

## II.

Under Federal Rule of Civil Procedure 12(b)(2), a defendant may move to dismiss a claim for lack of personal jurisdiction.  Fed. R. Civ. P. 12(b)(2).  "The burden of demonstrating the facts that establish personal jurisdiction falls on the plaintiff," *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009) (internal quotation marks and citations omitted), and the plaintiff must do so with "reasonable particularity,'" *Batista v. O'Jays, Inc.*, Civil Action No. 18-0636, 2019 WL 400060, at *3 (E.D. Pa. Jan. 30, 2019) (quoting *Mellon Bank PSFS, Nat'l Ass'n v. Farino*, 960 F.3d 1217, 1223 (3d Cir. 1992)).  When a court does not hold an evidentiary hearing, as is the case here, the plaintiff need only state a prima facie case of personal

---

Ex. 28.)

jurisdiction. *D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 102 (3d Cir. 2009); *Metcalfe*, 566 F.3d at 330.

In reviewing a 12(b)(2) motion, "'a court must accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff.'" *Lionti v. Dipna, Inc.*, Civil Action No. 17-01678, 2017 WL 2779576, at *1 (E.D. Pa. June 27, 2017) (quoting *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002)); *see also Metcalfe*, 566 F.3d at 330; *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 457 (3d Cir. 2003). Nonetheless, "once a defendant has raised a jurisdictional defense, the plaintiff must prove by affidavits or other competent evidence that jurisdiction is proper." *Metcalfe*, 566 F.3d at 330. A plaintiff may not merely rely on the allegations in the complaint to establish that jurisdiction exists. *See Lionti*, 2017 WL 2779576, at *1; *Pendergrass-Walker v. Guy M. Turner, Inc.*, Civil Action No. 16-5630, 2017 WL 2672634, at *3 (E.D. Pa. June 21, 2017); *Goodway Grp. v. Sklerov*, Civil Action No. 18-0900, 2018 WL 3870132, at *3 (E.D. Pa. Aug. 15, 2018); *Gutierrez v. N. Am. Cerruti Corp.*, Civil Action No. 13-3012, 2014 WL 6969579, at *2 (E.D. Pa. Dec. 9, 2014); *Yearwood v. Turner Constr. Co.*, Civil Action No. 09-5945, 2011 WL 570003, at *2 (E.D. Pa. Feb. 15, 2011).

### A.  Personal Jurisdiction Legal Standard

A district court may exercise personal jurisdiction over a non-resident defendant to the extent permitted by the law of the state in which the court sits. *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007); *see also Mellon Bank*, 960 F.2d at 1221. Pennsylvania's long-arm statute extends jurisdiction over a non-resident defendant who causes "harm or tortious injury in the Commonwealth by an act or omission outside the Commonwealth," *see* 42 Pa. Const. Stat. Ann. § 5322(a)(4); *see also Eubanks v. Filipovich*, Civil Action No. 12-4299, 2012 WL 6731123, at *2 (E.D. Pa. Dec. 27, 2012), or who transacts business within the

14

Commonwealth, *see* 42 Pa. Const. Stat. Ann. § 5322(a)(4); *Cerciello v. Canale*, Civil Action No. 12-6933, 2013 WL 3939580, at *5 (E.D. Pa. July 3, 2013). The statute also authorizes courts to assert personal jurisdiction to the fullest extent allowed under the United States Constitution. 42 Pa. Const. Stat. Ann. § 5322(b); *see also O'Connor*, 496 F.3d at 316; *D'Jamoos*, 566 F.3d at 102. Even though §§ 5322(a)(1) or (4) provide a basis for asserting personal jurisdiction over a defendant, the exercise of such jurisdiction must still comport with the requirements of due process. *See Eubanks*, 2012 WL 6731123, at *2; *Cerciello*, 2013 WL 3939580, at *6.

Under the Due Process Clause of the Fourteenth Amendment, for a court to exercise personal jurisdiction over a non-resident defendant, the *defendant*[6] must "have certain minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Compensation & Placement*, 326 U.S. 310, 316 (1945) (citation omitted); *see also O'Connor*, 496 F.3d at 316 ("[I]n determining whether personal jurisdiction exists, we ask whether, under the Due Process Clause, the defendant has 'certain minimum contacts with . . . [Pennsylvania] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" (citation omitted)); *D'Jamoos*, 566 F.3d at 102 (same).

There are two types of personal jurisdiction: general jurisdiction and specific jurisdiction. *O'Connor*, 496 F.3d at 317. "General jurisdiction is all-purpose" in that it

---

[6] Hartleib spends over half of his supplemental brief discussing *Plaintiffs'* contacts with California. (*See generally* Doc. No. 32 at pp. 1–7; *see, e.g., id.* at p. 3 ("At the time this cause of action arose, Plaintiffs were subject to jurisdiction in the state of California. It is Mr. Hartleib's position . . . that they are still subject to general jurisdiction in California[.]"); *id.* at p. 5 ("Plaintiffs' substantial ongoing activities and presence in the state of California greatly outweighs their corporeal presence in Pennsylvania."); *id.* at p. 6 ("Plaintiffs' entire argument that Mr. Hartleib's alleged actions were directed at Pennsylvania is contradicted by their overwhelming presence in California and their pleadings and exhibits.")). Given Hartleib's fixation with Plaintiffs' contacts with California, we find it necessary to emphasize the rudimentary principle that the personal jurisdiction inquiry focuses on the *defendant's* contacts with the forum, *not the plaintiff's*.

"allow[s] a court to exercise jurisdiction over the defendant for any claim lodged against that party." *PPG Indus., Inc. v. Jiangsu Tie Mao Glass Co., Ltd.*, 2:15-cv-00965, 2020 WL 1526940, at *3 (W.D. Pa. Mar. 31, 2020). Because Hartleib is a citizen of California and is not at home in Pennsylvania, Plaintiffs rightly do not argue that we have general jurisdiction over him.

In contrast, specific jurisdiction exists where the claims arise from or relate to the defendant's contacts with the forum state. *IMO Indus. v. Kiekert AG*, 155 F.3d 254, 265–66 (3d Cir. 1998). "Because this analysis depends on the relationship between the claims and contacts, we generally evaluate specific jurisdiction on a claim-by-claim basis." *Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007) (citation omitted); *see also Vizant Tech., LLC v. Whitchurch*, 97 F. Supp. 3d 618, 628 (E.D. Pa. 2015). Under the traditional test, to determine whether specific jurisdiction exists, courts in this Circuit consider whether (1) the defendant "purposefully directed its activities at the forum"; (2) the litigation "arise[s] out of or relate[s] to at least one of those activities"; and (3) if "the exercise of jurisdiction otherwise comports with fair play and substantial justice." *O'Connor*, 496 F.3d at 317 (internal quotation marks and citations omitted); *see also D'Jamoos*, 566 F.3d at 102.

In addition, the Supreme Court has endorsed a separate specific jurisdiction test for intentional tort claims, "which places emphasis upon the *effects* of a defendant's actions in the forum state." *Vizant Tech.*, 97 F. Supp. 3d at 628 (citing *Calder v. Jones*, 465 U.S. 783 (1984)) (emphasis added). The Third Circuit has instructed that, under the Supreme Court's *Calder v. Jones* decision, a plaintiff may demonstrate that personal jurisdiction exists if he or she shows: "(1) the defendant committed an *intentional tort*; (2) *the plaintiff felt the brunt of the harm in the forum* such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; and (3) *the defendant expressly aimed his tortious conduct at the forum* such

16

that the forum can be said to be the focal point of the tortious activity." *Marten*, 499 F.3d at 297

(quoting *IMO Indus.*, 155 F.3d at 265–66) (emphasis added); *Remick v. Manfredy*, 238 F.3d 248,

258 (3d Cir. 2001).  This is known as the "effects test."  *Marten*, 499 F.3d at 297.

The "effects test" allows a plaintiff to "demonstrate a court's jurisdiction over a

defendant even when the defendant's 'contacts with the forum alone . . . are too small to comport

with the requirements of due process' under [the] traditional analysis."  *Id.*; *see also IMO Indus.*,

155 F.3d at 265 (explaining that *Calder* recognized that "the unique relations among the

defendant, the forum, the intentional tort, and the plaintiff may under certain circumstances

render the defendant's contacts with the forum—which otherwise would not satisfy the

requirements of due process—sufficient").  That said, the Third Circuit has recognized that

"*Calder* did not change the fact that even in intentional tort cases the jurisdictional inquiry

'focuses on the relations among the defendant, the forum, and the litigation.'"  *Id.* (citation

omitted).  "Nor did *Calder* carve out a special intentional torts exception to the traditional

specific jurisdiction analysis, so that a plaintiff could always sue in his or her home state."  *Id.*;

*see also Marten*, 499 F.3d at 298 ("[T]he state of a plaintiff's residence does not on its own

create jurisdiction over nonresident defendants.").

Accordingly, the mere fact that a plaintiff suffers harm in the forum state is not enough to

give rise to personal jurisdiction in that state.  *See, e.g.*, *id.* at 297 ("Even if a defendant's

conduct would cause foreseeable harm in a given state, such conduct does not necessarily give

rise to personal jurisdiction in that state."); *IMO Indus.*, 155 F.3d at 265 ("[J]urisdiction under

*Calder* requires more than a finding that the harm caused by the defendant's intentional tort is

primarily felt within the forum."); *Vizant Tech.*, 97 F. Supp. 3d at 629 ("*Calder*'s test . . . is not

necessarily satisfied by the 'mere allegation that the plaintiff feels the effect of the defendant's

tortious conduct in the forum because the plaintiff is located there.' (citation omitted)); *Applied Tech. Int'l, Ltd. v. Goldstein*, No. Civ.A. 03-848, 2004 WL 2360388, at *3 (E.D. Pa. Oct. 20, 2004) ("[J]urisdiction in intentional tort cases will not lie automatically in the plaintiff's home state simply because the plaintiff feels the brunt of the harm there." (citation omitted)).

Rather, to establish that a defendant "expressly aimed" his conduct at the forum state, the plaintiff must show "the defendant *knew* that the defendant would suffer the brunt of the harm caused by the tortious conduct in the forum, *and point to specific activity* indicating that the defendant expressly aimed its tortious conduct at the forum." *Marten*, 499 F.3d at 297 (citation omitted); *IMO Indus.*, 155 F.3d at 266. Thus, "[s]imply asserting that the defendant knew the plaintiff's principal place of business was located in the forum [is] insufficient in itself to meet [the expressly aimed] requirement." *Id.* at 265.

## B. Specific Jurisdiction Analysis

As noted above, we must analyze specific jurisdiction with respect to each of Plaintiffs' seven claims. *See Remick*, 238 F.3d at 255 ("Such a determination is claim specific because a conclusion that the District Court has personal jurisdiction over [a] defendant[] as to a particular claim . . . does not necessarily mean that it has personal jurisdiction over that same defendant as to [the plaintiff's] other claims."). We address each claim in turn, beginning with the two non-intentional torts claims, which we analyze under the traditional test, and then the five intentional tort claims, which we analyze under the *Calder* effects test.

### Count I: Vexatious Litigant Order

Plaintiffs seek to enjoin Hartleib from filing any action against Plaintiffs, making any filing or submission in any case involving Plaintiffs, or contacting any person with respect to Plaintiffs. Under 28 U.S.C. § 1651(a), a district court is permitted to enjoin vexatious litigants

18

"when it believes that the abusive conduct will continue if not restrained." *Whitewood v. Sec'y Pa. Dep't of Health*, 621 F. App'x 141, 144 (3d. Cir. 2015); *see also Wright v. JPMorgan Chase Bank, Nat'l Ass'n*, Civil No. 18-8311(RMB/AMD), 2019 WL 5587262, at *8 (D.N.J. Oct. 30, 2019) ("Courts in the Third Circuit have made clear that a pattern of groundless and vexatious litigation will justify an order prohibiting further filings without permission of the court.'" (quoting *Chipps v. U.S. Dist. Ct. for the Middle Dist. of Pa.*, 882 F.2d 72, 73 (3d Cir. 1989)).

Plaintiffs allege that a number of Hartleib's acts provide the basis for entry of a vexatious litigant order, including, *inter alia*, contacting and harassing Ross-Williams; sending "multiple email missives" to Weiser and attorneys from other law firms involved in the Sprint Derivative Settlement and to the Court; submitting amicus briefs and attending hearings in unrelated litigations; and suing Plaintiffs for malpractice despite the fact that Hartleib was never their client.  (Doc. No. 1 at ¶ 172(a)-(o).)

Under the traditional test, we must first determine whether Hartleib purposefully directed his activities at Pennsylvania.  To show that they have satisfied the purposeful availment prong, Plaintiffs rely on Hartleib's various communications with Weiser in Pennsylvania and the anonymous letter he allegedly sent to Chester County judges, among others.  (Doc. No. 12 at pp. 25–26.)

Hartleib submits that he has never been to Pennsylvania (Doc. No. 9-2 at p. 2), but ignores that Plaintiffs need not show that he "physically stepped into the forum state." *PPG Indus.*, 2020 WL 1526940, at *4 (citing *Burger King v. Rudzewicz*, 471 U.S. 462, 476 (1985)). During oral argument, Hartleib also boldly maintained that "wire-type communications," such as emails and phone calls, "do not qualify as purposefully directing activities to a forum." (Oral Argument Tr. at 13:4–7.)  Hartleib is mistaken.  The Third Circuit has held that "mail and

19

telephone communications sent by the defendant into the forum may count toward the minimum contacts that support jurisdiction." *Grand Entm't Grp., Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 482 (3d Cir. 1993); *see also PPG Indus.*, 2020 WL 1526940, at *4.

Perhaps more to Hartleib's point, "[t]he mere fact that email, phone calls, or regular mail end up in the forum state is not enough to show purposeful availment." *Id.* Rather, the plaintiff must show that the defendant "deliberately reached into Pennsylvania to target . . . its citizens." *Id.* (citing *O'Connor*, 496 F.3d at 318). Ultimately, "the contacts need not be monumental—they are called minimum contacts, after all—but they must be deliberate." *PPG Indus.*, 2020 WL 1526940, at *4 (citing *O'Conno*r, 496 F.3d at 318).

In evaluating Hartleib's contacts with Pennsylvania, we do not consider the anonymous letter sent to Chester County judges, since Hartleib has submitted an affidavit, averring that he did not send the letter, and Plaintiffs do not proffer any evidence contradicting Hartleib's assertion. (*See* Doc. No. 9-2 at p. 2). *See Kurz v. Holiday Hospitality Franchising*, Civil Action No. 19-2189, 2019 WL 5068646, at *2 (E.D. Pa. Oct. 9, 2019) ("To counter opposing affidavits, plaintiffs may not repose upon their pleadings in this manner. Rather, they must counter defendant's affidavits with contrary evidence[.]" (internal quotation marks and citations omitted)).

Several of the emails Plaintiffs claim form the basis for seeking a vexatious litigant order were not directed to Pennsylvania. For example, Plaintiffs assert that Hartleib directed many emails in which he criticized and attacked Plaintiffs to the Kansas State Court's administrative assistant, other members of the bar, and Ross-Williams (a client of the Firm's located in Michigan)—*none* of whom Plaintiffs even attempt to allege lived in Pennsylvania.[7]

---

[7] We note, however, that Hartleib himself admits that Yates was copied on several of the emails, and that Yates was based out of Pittsburgh. Further, the emails show that other members of the Firm were often

In addition, Plaintiffs rely on communications between Hartleib and Weiser, in which Hartleib purportedly reached out to Weiser in Pennsylvania concerning the Sprint derivative action.  (*See* Doc. No. 1 ¶ 172(b) (Hartleib "improperly sought a share of the Law Firm's attorneys' fees from any Sprint derivative action in which he might be a plaintiff represented by the Law Firm"); ¶ 172(c) (Hartleib "offered to withdraw his objection to the Sprint Derivative Settlement in exchange for a consulting agreement with the Law Firm").)  Even if Hartleib's calls to Weiser constituted purposeful availment of Pennsylvania, Plaintiffs do not explain how any of their causes of action—let alone their vexatious litigant order claim—arose out of those two communications.  Indeed, the only argument Plaintiffs make is that Hartleib sought to enter into a fee sharing or consulting arrangement with Plaintiffs and because Plaintiffs declined, Hartleib launched a campaign of harassment against them.  Plaintiffs also rely on the fact that Hartleib sought legal representation from Weiser in Pennsylvania (Doc. No. 12 at p. 27; Doc. No. 25 at p. 8), but again Plaintiffs do not show how their vexatious litigant claim arises out of those very early communications, especially when the parties did not have contact for years afterwards—on its very face, any connection would be extremely attenuated.  We conclude that such communications are insufficient to establish personal jurisdiction.

Plaintiffs also point to Hartleib's communications with courts and his filings in other shareholder litigations (*see, e.g.*, Doc. No. 1 at ¶ 172(i) (Hartleib "opposed the Law Firm's application as co-lead counsel [sic] the Equifax Derivative Litigation" and submitted an amicus brief); ¶ 172(j) (Hartleib "initiated *ex parte* communication with Judge Watson in the *Big Lots* derivative litigation"); ¶ 172(k)-(l) (Hartleib submitted an amicus brief and appeared before the court "in unsuccessful opposition to the Law Firm's appointment as lead counsel in the

_____

copied on the emails.

*CenturyLink* Derivative Litigation")), but do not allege that *any* of those courts, judges, or cases were located in Pennsylvania or otherwise explain how those communications and filings were directed at Pennsylvania.  Ultimately, Plaintiffs do not show how the other litigations in which Hartleib inserted himself, or the litigation that Hartleib initiated against Plaintiffs,[8] have any nexus to Pennsylvania.  Plaintiffs largely hang their hat on the fact that the Firm is a Pennsylvania-based business and Weiser is a Pennsylvania resident, so the brunt of the harm was felt in the forum.  But Plaintiffs do not cite to any case holding that is enough to establish personal jurisdiction.

Last, in their supplemental brief, Plaintiffs claim that Hartleib's emails to Abelson and Detective Goggin "indicat[e] his clear intent to engage in baseless legal process against Plaintiffs solely with the aim of abusing them."  (Doc. No. 33 at p. 9.)  While the evidence shows that Hartleib reached out to Abelson in Pennsylvania regarding filing a cross-complaint against Plaintiffs, nothing appeared to come of it—no court filings, no new actions initiated, et cetera.  Indeed, Plaintiffs admit that settlement negotiations between Abelson and Plaintiffs began in earnest in March 2018—shortly *after* Hartleib initially reached out to Abelson.  (*Compare* Doc. No. 33 at p. 6 n.4 *with* Doc. No. 33-3 at p. 2.)  Although Hartleib's emails to Detective Goggin suggest that he may file a bar complaint and commence a civil action, it is unclear against whom he would take such action—the Silows or Plaintiffs.  Taking the facts in the light most favorable

---

[8] Plaintiffs also claim that the fact that they were served with Hartleib's Kansas lawsuit in Pennsylvania somehow establishes personal jurisdiction over Hartleib in Pennsylvania in this action but do not cite any case law to support that contention.  (Doc. No. 12 at p. 26; Doc. No. 25 at p. 9.)  At least one court in this Circuit has explicitly rejected such an argument.  *See Farkas v. Rich Coast Corp.*, Civil Action No. 2:13-cv-00926, 2014 WL 550594, at *20 (W.D. Pa. Feb. 11, 2014) (in personal jurisdiction analysis over abuse of process claim, rejecting plaintiff's argument that the fact that she was served with process on a Replevin action at her Pittsburgh residence establishes personal jurisdiction, and reasoning that "[t]he act of serving process of the Replevin action on Plaintiff in the Western District is not sufficient to show that [that defendant] purposefully directed the Replevin action at the Western District of Pennsylvania").

to Plaintiffs, Plaintiffs have not shown that any action was actually commenced against them in Pennsylvania.

Significantly, Plaintiffs do not cite a single case in which the plaintiffs sought a vexatious litigant order as an independent cause of action and in which the court found that the exercise of personal jurisdiction was proper.  Indeed, personal jurisdiction was not at issue in any of the cases cited in Plaintiffs' complaint, *see, e.g.*, *Fessler v. Sauer*, 455 F. App'x 220, 224–35 (3d Cir. 2011) (noting that the plaintiff may not "file as many lawsuits as he wants until he gets the result he wants"); *Brow v. Farrelly*, 994 F.2d 1027, 1030 (3d Cir. 1993) (vacating the district court's *sua sponte* order restraining the plaintiff from filing any subsequent lawsuits against the Virgin Islands government or its officers in their official capacities and from ever filing any document in the District Court of the Virgin Islands without prior approval); *Chipps*, 882 F.2d at 73 (involving a series of suits filed in the Middle District of Pennsylvania over the plaintiff's obligation to repay a student loan incurred while he was a student in Wilkes Barre, Pennsylvania in which the Court of Appeals concluded that the plaintiff could not file any complaint or other paper in any way concerning his attendance at college or his student loan); *Drone Techs., Inc. v. Parrot S.A.*, Civil Action No. 2:14-cv-00111-AJS, 2015 WL 4545291, at *3 (W.D. Pa. July 21, 2015) (awarding attorneys' fees where the defendants "advanced 'presumably false positions' and engaged in 'tactical and pervasive defiance' of the Court"), or in their briefs (Doc. No. 12 pp. 25-27; Doc. Nos. 25, 33.)

We dismiss Count I for lack of personal jurisdiction.

### Count V: Negligent Misrepresentation

Plaintiffs allege that Hartleib negligently misrepresented to multiple third parties— including Plaintiffs' client Ross-Williams and the *Equifax* and *Big Lots* courts—that Plaintiffs

were corrupt and inept in their legal and ethical practices.[9]  (Doc. No. 1 at ¶¶ 208–21.)  Plaintiffs

then plead that those third parties relied on these misrepresentations, and, as a result, Plaintiffs

suffered.  (*Id.* at ¶¶ 203–22.)

To state a negligent misrepresentation claim, a plaintiff must show that "(1) the defendant

made a misrepresentation of material fact, (2) with knowledge of its falsity, (3) with the intent to

induce the plaintiff to act on it, and (4) *injury must result to the plaintiff, acting in justifiable*

*reliance on the misrepresentation*."  *Tredennick v. Bone*, 323 F. App'x 103, 105 (3d Cir. 2008)

(citing *Bortz v. Noon*, 556 A.2d 555, 561 (Pa. 1999)) (emphasis added); *see also Med.*

*Consultants Network, Inc. v. Cantor & Johnston, P.C.,* No. CIV.A. 99-0528, 2001 WL 10788, at

*4 (E.D. Pa. Dec. 27, 2000).  As a preliminary matter, Plaintiffs do not explain how Hartleib's

alleged misrepresentations to *third parties*, such as the courts in the *Equifax* and *Big Lots*

derivative litigations and their client, Ross-Williams, create or otherwise support a negligent

misrepresentation cause of action for *Plaintiffs*.

Moreover, the sole case on which Plaintiffs rely to support their argument—*PJI*

*Distribution Corp. v. Top of the Line Office Furniture*, Civil No. 07-1551, 2007 WL 2667978

(E.D. Pa. Sept. 4, 2007)—is inapposite.  In *PJI Distribution Corp.*, two commercial entities (Top

of the Line Furniture (TOL) and National Furniture Brokers (NFB)) and their officers formed a

joint venture to acquire and resell Ernst & Young furniture.  *Id.* at *1.  One of their officers,

Doug Smith, contacted Tony Guhr to assist in finding a buyer for the furniture, and Guhr in turn

contacted potential buyer Ira Pressman in Pennsylvania.  *Id.*  Ultimately, Pressman, an officer for

---

[9] During oral argument, Plaintiffs' counsel stated that "the misrepresentations that are made by Mr.
Hartleib related to whether Weiser was his lawyer and what occurred in the context of that purported
representation."  (Oral Argument Tr. 29:22–25.)  That particular allegation is nowhere in Count V of the
complaint, but even if it were, it would not change our analysis below.

the plaintiff, PJI, learned that the furniture was 15 years old, contrary to his belief at the time of

contracting that the furniture was 10 years old.  *Id.* at *2.  Pressman demanded the return of PJI's

deposit, but the sellers refused.  *Id.*

PJI claimed that the defendants committed the tort of negligent misrepresentation by way

of Smith's email to Guhr, which stated that the furniture had been purchased or installed in 1997

or 1998 (10 years prior).  *Id.* at *4.  The court held that TOL purposefully directed its activities

toward Pennsylvania through this email, reasoning:

> By the time TOL sent this email to Guhr, it had already established Pressman as a
> potential buyer through Smith's phone call.  Therefore, TOL had to know that the
> information in the email would reach Pressman in Pennsylvania.  *Indeed it is
> reasonable to assume that TOL sent the email for the specific purpose of
> communicating with Pressman in Pennsylvania.  Hence, the fact that TOL sent the
> information to Pennsylvania through an intermediary in Kansas is immaterial.*

*Id.*  (emphasis added).  The court also concluded that the negligent misrepresentation claim arose

out of Smith's email to Guhr, because PJI alleged it would not have entered into the contract

without Smith's representation to Guhr and claimed that the age of the furniture was a

dispositive factor in its decision to enter into the contract.  *Id.* at *5.

Unlike in *PJI*—where it was reasonable to assume that Smith/TOL sent the email to Guhr

for the specific purpose of communicating with Pressman in Pennsylvania—Plaintiffs do not

argue, and presumably cannot argue, that the same is true here (i.e., that Hartleib only reached

out to the third parties for the specific purpose of communicating with Weiser and the Firm in

Pennsylvania).  Thus, it is material that Hartleib directed his communications to individuals

located in other states, such as Georgia (*Equifax* court), Ohio (*Big Lots* court), and Michigan

(Ross-Williams), and not Pennsylvania.  Further, to the extent Plaintiffs rely on the emails

Hartleib sent to third parties Abelson and Detective Goggin in Pennsylvania, they fail to explain

how their claims for negligent misrepresentation arise out of Hartleib's communications with

those third parties.  Because Plaintiffs were presumably not aware of Hartleib's emails to Abelson or Detective Goggin, they could not have been induced to rely upon the representations in those emails (which, according to Plaintiffs, are false).  Further, Plaintiffs do not cite to a single case finding personal jurisdiction where a negligent misrepresentation claim arises entirely out of a defendant's contacts with third parties but where the plaintiff is injured as a result. Accordingly, we dismiss the negligent misrepresentation claim for lack of personal jurisdiction.

***

We now turn to Plaintiffs' five intentional tort causes of action:  abuse of process, defamation, IIED, intentional interference of prospective contractual relations, and tortious interference with contract.

### Count II: Abuse of Process

In asserting that we have personal jurisdiction over their abuse of process claim, Plaintiffs point to Hartleib's threats to appear at hearings in unrelated cases across the country and his filing of amicus briefs in such cases, which they claim were done to "to harass, embarrass, extort, malign and denigrate Plaintiffs."  (Doc. No. 1 at ¶¶ 177–86.)  In their supplemental brief, Plaintiffs also rely on Hartleib's attempts to work together with Abelson to facilitate a cross-complaint to lead to the demise of the Firm and his threats to file a civil action against Plaintiffs. (Doc. No. 33 at p. 9.)

*Vizant Technologies, LLC v. Whitchurch* is instructive.  There, the court held that personal jurisdiction existed under both the traditional test and the effects test.  Under the traditional test, the court explained that, "[i]f, as plaintiffs plead, defendants did engage in litigation and threats of litigation with the purpose of extorting money from Vizant, a Pennsylvania-based company, then their conduct was 'purposefully directed' at Pennsylvania . . .

in that they targeted a company located within the forum." 97 F. Supp. 3d at 634–35; *see also BTG Int'l Inc. v. Bioactive Labs.*, Civil Action No. 15-04885, 2016 WL 3519712, at *6 (E.D. Pa. June 28, 2016) (concluding that "Defendants purposefully engaged in conduct directed at this forum by sending letters to BTG in Pennsylvania threatening legal action and aiming 'to extort money from BTG'"). As for the effects test, the court explained that abuse of process is an intentional tort and the plaintiffs pleaded that they 'felt the brunt of the harm' in Pennsylvania in that Vizant, based in Pennsylvania, has suffered reputational and financial harm as a result." *Id.* at 635. Further, the tortious conduct was "expressly aimed" at Pennsylvania because the plaintiffs alleged that the "defendants' actions were meant to have an impact upon Vizant, which, as defendants were aware, is headquartered in Pennsylvania." *Id.*

The *Vizant* court's analysis applies with equal force here. Under the traditional test, if, as Plaintiffs plead, Hartleib engaged in litigation and threats of litigation for the purpose of extortion, he purposefully directed his conduct at Pennsylvania. Second, the abuse of process claim arises out of such litigation and threats of litigation. (*See, e.g.*, Doc. No. 1 at ¶ 183(a)–(g).) Last, our exercise of personal jurisdiction over Hartleib for the abuse of process claim comports with notions of fair play and substantial justice.[10] Under the effects test, abuse of process is an

---

[10] "Generally, '[o]nce the plaintiff has made out a prima facie case of minimum contacts . . . the defendant must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *PJI Distribution Corp.*, 2007 WL 2667978, at *4 (quoting *Grand Entm't Grp.*, 988 F.2d at 483). The Supreme Court has identified several factors for courts to consider in determining whether the fair play and substantial justice prong is satisfied, including: "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the procedural and substantive interests of other nations." *O'Connor*, 496 F.3d at 324 (internal quotation marks and citations omitted).

During oral argument, Hartleib only argued that it would be inconvenient for him to travel for California to Pennsylvania to litigate here, and that it would be a "a great expense to defend the case in Pennsylvania." (Oral Argument Tr. 20:15–19) Notwithstanding the fact that a defendant is not automatically entitled to defend himself in the most convenient or least burdensome forum, we observe that Hartleib's argument is, at best, weak, and, at worst, potentially disingenuous, given that he has

intentional tort and Plaintiffs plead that the Firm, a Pennsylvania-based company, suffered

financial harm in that it was "forced to expend enormous resources of time and money to

respond to Hartleib's numerous oppressive communications, briefs, arguments and law suit."

(*Id.* at ¶ 186.)  As such, Plaintiffs have pleaded that they felt the brunt of the harm in

Pennsylvania.  As in *Vizant*, Plaintiffs here allege that Harleib's actions were meant to have an

impact on the Firm (*see, e.g.*, *id.* at ¶ 185 (Hartleib used litigation tactics "to harass, extort,

malign, and denigrate Plaintiffs")), which Hartleib was aware was based in Pennsylvania, and

therefore have met their burden of showing that Hartleib's conduct was expressly aimed at

Pennsylvania.  We deny Hartleib's motion to dismiss for lack of personal jurisdiction as to the

abuse of process claim.

### Count III: Defamation

Next, Plaintiffs allege that Hartleib defamed them by attacking and disparaging them in

court filings in other shareholder litigations, in emails to courts and other members of the bar, in

a call and email to their client Ross-Williams, and in a letter allegedly sent to Chester County

judges.  (Doc. No. 1 at ¶¶ 191–92.)  In their supplemental brief, Plaintiffs also assert that

Hartleib's emails to Abelson and Detective Goggin in Pennsylvania bolster their argument that

we have personal jurisdiction over their defamation claim.  (Doc. No. 33 at pp. 9–10.)

The two seminal Third Circuit cases concerning personal jurisdiction over defamation

claims are *Remick v. Manfredy*, 238 F.3d 248 (3d Cir. 2001) and *Marten v. Goodwin*, 499 F.3d

290 (3d Cir. 2007).  In *Remick*, the plaintiff's defamation claim arose out of two letters, both of

which were sent to the plaintiff in Pennsylvania.  238 F.3d at 257.  The copies for the letters did

---

traveled to other states, such as Kansas, Minnesota, and Georgia, during the course of other litigations
discussed in the complaint.  (*See, e.g.*, Doc. No. 1 at ¶¶ 55, 129, 131; *id.*, Ex. 27; Doc. No. 32 at p. 24.)
We find that there is not a compelling case against exercising jurisdiction over Hartleib in Pennsylvania.

not show any other Pennsylvania recipient. *Id.* However, the plaintiff alleged that two others saw the letter, which was faxed to him at his office, lying in the fax machine. *Id.* at 257. The Third Circuit concluded that the plaintiff satisfied the first two parts of the effects test, because defamation is an intentional tort and the plaintiff sufficiently argued that he bore the brunt of the harm in Pennsylvania, because his professional activities were based in Pennsylvania and the allegedly defamatory letters questioned his professional ability. *Id.* at 258. However, the Third Circuit found that the plaintiff did not show that the defendant had expressly aimed his conduct at Pennsylvania and rejected the plaintiff's argument that the fact that two others saw the fax while it was lying in the machine meant that the fax was targeted at them or anyone in Pennsylvania other than the plaintiff himself. *Id.* at 259.

Likewise, in *Marten*, the Third Circuit held that the plaintiff had not satisfied the expressly aimed requirement of the effects test, reasoning that nothing in the record indicated that the defendants made defamatory statements or sent defamatory material to anyone in Pennsylvania (other than, perhaps, the plaintiff). 499 F.3d at 298; *see also Shafik*, 2010 WL 2510194, at *7 (granting motion to dismiss for lack of personal jurisdiction where the plaintiff did not indicate "where the allegedly defamatory statements were made, to whom the allegedly defamatory statements were made, . . . or how the allegedly defamatory remarks impacted [him] in the Commonwealth of Pennsylvania").

The Third Circuit's holdings illustrate that "[w]hen a district court's personal jurisdiction over a defendant for a defamation claim is in dispute, '*where defendants aimed their defamatory statements is jurisdictionally significant*.' Absent allegations of 'specific facts showing a deliberate targeting of Pennsylvania,' we cannot exercise personal jurisdiction." *Vizant Tech.*, 97 F. Supp. 3d at 632 (quoting *Marten*, 499 F.3d at 298) (emphasis added).

In *Vizant Technologies*, the plaintiffs claimed that two of their former employees defamed them. *Id.* at 623–24.  One of the defendants emailed the company's employees, its leadership, and its investors to make allegedly defamatory remarks about the company, which was based in Pennsylvania.  *Id.* at 632.  She also mailed postcards to individuals, some of whom were located in Pennsylvania, and traveled to Pennsylvania to place defamatory statements on cars parked at the company's headquarters.  *Id.* at 632–33.  The other plaintiff sent an email to company leadership in which she made defamatory statements about the CEO.  *Id.* at 633.  Applying the effects test, the court determined that all three elements were satisfied:  (1) each defendant was alleged to have committed defamation, an intentional tort; (2) the plaintiffs, both located in Pennsylvania, felt the harm there; and (3) "each defendant engaged in allegedly defamatory conduct which she knew would reach individuals in Pennsylvania and which could cause harm in Pennsylvania."  *Id.* ("Indeed, the conduct was specifically calculated to cause harm in the Commonwealth.").

The facts of this case align more closely with *Vizant* than with *Remick* and *Marten*.  This is not a case where Hartleib never sent allegedly defamatory statements to Pennsylvania, or where Weiser was the only recipient of such statements.  Rather, Plaintiffs have shown that Hartleib sent allegedly defamatory statements to Abelson in Pennsylvania and to Detective Goggin in Pennsylvania.[11]  (*See, e.g.*, Doc. No. 33-3 at p. 5 (calling Weiser "corrupt and inept"); *id.* at p. 3 (accusing Weiser of having engaged in "criminal acts in the Sprint case"); *id.* at p. 2 (stating that the Weiser firm committed "fraud," perjured themselves, and maintain a "criminal

---

[11] Hartleib admits that the evidence indicates that he reached out to Abelson and to Detective Goggin in Pennsylvania.  (*See* Oral Argument Tr. 13:12–16 ("That appears to be the case from the e-mail contacts, that my client made first contact with Abelson."); *id.* at 13:19–24 (admitting that the communications available indicate that Harleib contacted Detective Goggin).

enterprise"); *id.* at p. 8 (suggesting Weiser engaged in criminal acts by stating that Weiser made checks payable to Silow's son, "making him a willing participant to his father's crimes").) Hartleib also sent at least some of the allegedly defamatory emails to Yates, an attorney based in Pittsburgh.[12]  Plaintiffs also contend that Hartleib knew Plaintiffs were located in Pennsylvania, and Hartleib does not refute this assertion.  Last, Plaintiffs pleaded that the allegedly defamatory statements "injured Plaintiffs' business and professional reputations," and as a Pennsylvania business and business owner respectively, they bore the brunt of the harm in the forum.  (Doc. No. 1 at ¶ 195; Doc. No. 12 at pp. 31–32.)  Taken together, we find that Plaintiffs have met their burden of establishing personal jurisdiction over the defamation claim by alleging Hartleib committed an intentional tort, that Pennsylvania was the focal point of the harm, and that Hartleib expressly aimed his tortious conduct at Pennsylvania.

**Count IV: IIED**

Plaintiffs claim that "Hartleib's insults, jeers, taunts, lies, affronts and abuses" have "intentionally caused Weiser to suffer enormous stress, anxiety, sleep deprivation, depression, anger and torment."  (Doc. No. 1 at ¶¶ 200–01.)  To support their contention that we have personal jurisdiction, Plaintiffs rely on *Shafik v. Curran*, Civil Action No. 1:09-cv-02469, 2010 WL 2510194 (M.D. Pa. June 17, 2010), a case in which the plaintiff, a resident of Pennsylvania, brought an IIED claim related to actions committed by the defendant with respect to the plaintiff's participation in the defendant's prospective senatorial campaign.  *Id.* at *1.  The plaintiff alleged that the defendant intended to fund his own campaign with any amount necessary and told the plaintiff that he would wire the plaintiff any necessary funds.  *Id.* at *6.

---

[12] Hartleib also copied other attorneys with the Firm.  Weiser, however, did not provide any evidence or allegation as to where these attorneys practiced when Hartleib sent these emails.

The plaintiff also alleged that the defendant intended to use the plaintiff's services for the duration of the claim, all the while knowing that he had no intention of funding the campaign or reimbursing the plaintiff. *Id.* Applying the effects test, the court held that personal jurisdiction was proper in Pennsylvania, reasoning that the defendant knew the plaintiff operated from an office in Pennsylvania, "and thus would bear the brunt of any failure to reimburse him for his efforts in the forum state." *Id.* ("If [the plaintiff] failed to pay vendors he had contacted on behalf of the campaign, it is his Pennsylvania business and his Pennsylvania bank accounts that would suffer."). The court concluded that such allegations showed that the plaintiff felt the burden of the tort in Pennsylvania and that the defendant expressly aimed his tortious conduct at Pennsylvania. *Id.*

Here, Plaintiffs allege that Hartleib knew Weiser resided in Pennsylvania and thus would bear the brunt of any insults and lies broadcast to the legal community in Pennsylvania, where his business was based. Like the *Shafik* court, we find that such allegations go to both the second and third prongs of the effects test. In addition, even Hartleib acknowledges the flurry of emails he sent directly to Weiser in Pennsylvania (Doc. No. 15 at p. 7; *see, e.g.*, Doc. No. 1 at ¶ 88 ("What an embarrassment to the bar! See you in Court."); *id.* at ¶ 83 ("Rob, your ability to set the bar at new lows, never disappoints! . . . Your ill-advised actions, and ad-hominem attacks are making the Weiser Firm radioactive!"), which provides further support for the expressly aimed element as well. Therefore, we deny Hartleib's motion to dismiss Plaintiffs' IIED claim for lack of personal jurisdiction.

### *Counts VI and VII: Intentional Interference with Prospective Contractual Relations and Tortious Interference with Contract*

Plaintiffs assert that Hartleib has intentionally interfered with prospective contractual relations (Count VI), but *nowhere* in their complaint have Plaintiffs specified a single

prospective contract with which Hartleib intentionally interfered.[13]  Plaintiffs only allege that

"Plaintiffs enjoy the valid ongoing expectation and reasonable likelihood of contractual relations

with fellow members of the plaintiffs' bar in the securities and derivative litigation arena," that

the Firm "partners with other firms in the vast majority of the cases in which it is involved," and

that Hartleib has interfered with such relationships through his attacks on Plaintiffs, causing them

to suffer harm in Pennsylvania.  (Doc. No. 1 at ¶¶ 228, 231–34; *see also* Doc. No. 12 at p. 36

("Weiser lives and works in Pennsylvania, and the law Firm is a registered Pennsylvania

corporation with no out-of-state office, therefore Hartleib's e-mails, letters, phone calls and

publications were necessarily aimed at injuring the Plaintiffs in Pennsylvania where they live and

work.").)  But merely alleging that Plaintiffs were *injured* in the forum is insufficient to establish

personal jurisdiction.  *See, e.g.*, *Marten*, 499 F.3d at 297.  We cannot find that Hartleib

"expressly aimed" his conduct at Pennsylvania.  *See Wolk*, 475 F. Supp. 2d at 506 (finding no

personal jurisdiction over intentional interference with prospective contractual relations claim as

to two of the defendants, where the plaintiff alleged that those defendants "published defamatory

statements with the purpose of 'damaging plaintiff's professional reputation, thereby preventing

future clients from hiring him and instead hiring some other aviation attorney who would be less

successful in litigating against them'").

---

[13] Although Hartleib moved to dismiss under Rules 12(b)(2) and (3) and has not yet addressed any Rule 12(b)(6) issues for failure to state a claim—pursuant to the Honorable Mitchell S. Goldberg's Order (Doc. No. 8)—we observe that Plaintiffs' intentional interference with prospective contractual relations would likely fail under the Rule 12(b)(6) standard due to this very same defect.  *See Wolk v. Teledyne Indus., Inc.*, 475 F. Supp. 2d 491, 513 (E.D. Pa. 2007) ("Nowhere in his complaint, or in his response to these defendants' motion to dismiss, has [the plaintiff] specified one prospective contract with which these defendants intentionally interfered.  Instead, [the plaintiff] makes vague and general assertions alleging that 'the false publicity has caused potential clients, who otherwise would have sought his services, not to hire plaintiff' and . . . [that] 'others in the defense bar have used it to damage plaintiff's credibility with courts, insurers, and clients.' . . . [The plaintiff] has failed to state a cause of action against LB & B for tortious interference with prospective contract/business relations.")

Further, the case on which Plaintiffs rely—*Remick v. Manfredy*—is distinguishable because there, the plaintiff asserted in an affidavit that "he conducted the majority of his negotiation, consulting, and advice services for Manfredy [one of the defendants] out of his Philadelphia office." 238 F.3d at 260.  But *nowhere* in Weiser's declaration did he specifically aver that he performs the majority of his legal services for prospective clients out of his Firm's Pennsylvania office or out of his Pennsylvania residence.  (*See generally* Doc. No. 12-3, Weiser Decl.)  And although Weiser's 2019 declaration avers that the Firm's sole office is located in Pennsylvania (*id.* at ¶ 11), Hartleib has proffered evidence indicating that as recently as 2017 the Firm had an office in San Diego, California (*see* Doc. No. 32, Exs. B, C).[14]  While we must construe the evidence in the light most favorable to Plaintiffs and thus accept that at the time Weiser submitted his declaration in 2019, the Firm did not have an out-of-state office, we still find that, on the record before us, *Remick* is distinguishable for the reasons explained above.  Accordingly, we dismiss Count VI for lack of personal jurisdiction.

Relatedly, Plaintiffs claim that Hartleib interfered with their contractual relationship with Ross-Williams, the named plaintiff the Firm represented in the Sprint derivative litigation, by deriding and undermining the Firm to her.  (Doc. No. 1 at ¶¶ 238–45.)  Again, unlike the plaintiff in *Remick*, Weiser does not explicitly aver that he conducted the majority of work for Ross-Williams (whose case was filed in Kansas) out of Pennsylvania.

*Applied Technology International v. Goldstein*—the sole case on which Plaintiffs rely (Doc. No. 12 at pp. 37–38)—is inapposite.  There, the court exercised specific jurisdiction over one of the defendants who allegedly interfered with a contract between the plaintiff Applied

---

[14] In their responses to jurisdictional discovery interrogatories, Plaintiffs assert that the California office was a non-physical, virtual office.  (*Id.* at pp. 18–19.)  However, Plaintiffs also admit at one time they had an employee of their California office.  (*Id.* at p. 39.)

Technology International (ATI), a Pennsylvania corporation, and an Illinois corporation (Ferris). 2004 WL 2360388, at *3.  The court explained that defendant Kilbey had "made sufficient entries into Pennsylvania for purposes relating to the alleged tortious interference," including negotiating a consulting contract with a Pennsylvania resident and meeting with ATI customers and manufacturers in Pennsylvania, among others.  *Id.*  The court found that such contacts diverted a contract with Ferris from ATI to another entity.  *Id.*

Unlike the defendant in *Applied Technology International*, Hartleib did not meet with Ross-Williams (nor with any of the Firm's other clients or potential clients) in Pennsylvania, nor were he or Ross-Williams at any time located in Pennsylvania.  Rather, Hartleib, a California resident who avers he has never visited Pennsylvania, contacted Ross-Williams, who resides in Michigan.  Although Hartleib could have reasonably foreseen that his contacts with Ross-Williams would have caused harm to Plaintiffs in Pennsylvania, that knowledge standing alone is insufficient to support personal jurisdiction.  *See Surgical Laser Tech., Inc. v. C.R. Bard, Inc.*, 921 F. Supp. 281, 283 (E.D. Pa. 1996) (holding that Trimedyne had not directed any activity at Pennsylvania—"no negotiation, no bid, no bargain, no benefit, no breach, no betrayal"—and explaining that although Trimedyne could have "reasonably foreseen" that its activities "would cause harm to [the plaintiff] in Pennsylvania, [that] knowledge, standing alone, does not establish the minimum contacts required for a Pennsylvania court to exercise jurisdiction").  Therefore, we also dismiss Count VII for lack of personal jurisdiction.[15]

---

[15] In their attempts to bolster their argument that we may exercise personal jurisdiction over their tortious interference claim, Plaintiffs cite to Hartleib's phone calls and emails to Weiser in "2009, 2011, 2012 and 2016 in order to enter into a business relationship with Plaintiffs – first as a conflicted client, later as 'consultant' of questionable legality and propriety."  (Doc. No. 12 at p. 38.)  Plaintiffs also assert that "Hartleib's intentional entry into the Commonwealth is evident" because Hartleib "share[d] with Weiser and members of the Law Firm his vicious, snarling *ad hominem* attacks upon Plaintiffs made to third-party members of the bench, bar, and media."  (*Id.*)  But Plaintiffs' reliance on such contacts is misguided.  Plaintiffs do not explain how Hartleib's early contacts with *Weiser* are remotely relevant to

III.

In deciding a motion to dismiss for improper venue under Federal Rule of Civil

Procedure 12(b)(3), we must accept all of Plaintiffs' allegations as true, unless those allegations

are contradicted by Hartleib's declaration. *Bockman v. First Am. Mktg. Corp.*, 459 F. App'x

157, 158 n.1 (3d Cir. 2012); *N. Am. Comm'cns, Inc. v. Eclipse Acqui Inc.*, Civil Action No. 3:17-

167, 2018 WL 651795, at *4 (W.D. Pa. Jan. 31, 2018). Unlike jurisdictional challenges, when

challenging venue, the *defendant* bears the burden of showing improper venue. *Bockman*, 459 F.

App'x at 160 (3d Cir. 2012). When jurisdiction is based on diversity of citizenship, 28 U.S.C.

§ 1391 governs venue. Under § 1391, a plaintiff may bring a case in:

> (1) a judicial district where any defendant resides, if all defendants reside in the
> same State; (2) a judicial district in which a substantial part of the events or
> omissions giving rise to the claim occurred, or a substantial part of property that is
> the subject of the action is situated, or (3) a judicial district in which any
> defendant is subject to personal jurisdiction at the time the action is commenced,
> if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(a)(1)–(3); *see also Bockman*, 459 F. App'x at 160. Here, both parties agree

that the only way venue is proper in the Eastern District is if § 1391(a)(2) applies (*i.e.*, if a

substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this

District).[16]

---

Plaintiffs' tortious interference of contract claim, which hinges entirely on Hartleib's contacts with *Ross-Williams*. Nor do Plaintiffs explain how Hartleib's disparagement of them to *other judges, attorneys, and the media* affected their contract with *Ross-Williams*. (*Compare id. with* Doc. No. 1 at ¶¶ 241–42 (citing to Hartleib's call with, and subsequent email to, Ross-Williams).)

[16] During oral argument, Hartleib conflated the personal jurisdiction and venue standards. For example, in summarizing his reasons for moving to dismiss for lack of personal jurisdiction and improper venue, his counsel stated, "I think I can sum up at this point, Your Honor, just by emphasizing again to consider whether my client's *minimal contacts* here are *substantial* within the context of this lawsuit." (Oral Argument Tr. 21:17–20.) In Plaintiffs' counsel's words, this was "game, set, match" (Oral Argument Tr. 22:21–23:12) in that Hartleib arguably conceded that this Court has personal jurisdiction. This is so because the test for specific jurisdiction is whether a defendant has sufficient *minimum* contacts with the forum so as to not offend notions of fair play and substantial justice. On the other hand, the test for venue under § 1391(a)(2) is whether a *substantial* part of the acts or omissions giving rise to the claim occurred

As the Third Circuit explained in *Cottman Transmission Systems, Inc. v. Martino*, "the statutory language of [§ 1391(a)(2)] favors the defendant in a venue dispute by requiring that the events or omissions supporting a claim be 'substantial.' Events or omissions that might only have some tangential connection with the dispute in litigation are not enough." 36 F.3d 291, 294 (3d Cir. 1994). "Substantiality is intended to preserve the element of fairness so that a defendant is not haled into a remote district having no real relationship to the dispute." *Id.* Further, in determining whether a substantial part of the events or omissions giving rise to a cause of action occurred in a particular district, "[t]he test . . . is not the defendant's 'contacts' with a particular district, but rather the location of those 'events or omissions giving rise to the claim.'" *Id.; see also Bockman*, 459 F. App'x at 160.

However, contrary to Hartleib's belief that a district in California would be a more appropriate venue[17] (*see, e.g.*, Doc. No. 32 at pp. 1–2), "Section 1391(b) does not require this Court to determine the 'best' forum, or 'the forum with the most substantial events.' In fact, venue may be proper in more than one district. It is necessary 'only that a substantial part of the

---

in the district. While we do not give weight to this concession for purposes of our personal jurisdiction ruling, such conflation rendered it necessary for us to address this distinction.

[17] We would be remiss to not address Plaintiffs' equally controvertible belief that venue is not proper elsewhere. When questioned on where this case should be transferred if we found that venue is improper here, Plaintiffs replied,

> But then the interesting question, Your Honor, that I would raise to the Court which I think also suggests why venue is appropriate here, is where would that venue be? . . . Is it California, which I would suggest strenuously it is not just because that is where Mr. Hartleib lives? Where is an appropriate forum if it is not the Commonwealth?

(Oral Argument Tr. 36:24–37:10; *see also id.* at 38:10–16 ("[There] would be no cause whatsoever for it to be in the California District Court. So if it . . . weren't Pennsylvania, then arguably, you know, Kansas would be the only other place that would seem to have some gravity[.]") But, despite Plaintiffs' protestations to the contrary, under § 1391, venue is indisputably proper in the California district in which Hartleib resides. *See* 28 U.S.C. § 1391(a)(1).

events occurred here.'" *Lannett Co., Inc. v. Asherman*, Civil Action No. 13-2006, 2014 WL 716699, at *4 (E.D. Pa. Feb. 24, 2014) (citations omitted); *see also id.* at *3 ("Because § 1391 does not require a majority of the events take place here, nor that the challenged forum be the best forum for the lawsuit to be venued, it is irrelevant that a more substantial part of the events took place in another district, as long as a substantial part of the events took place in [this] district as well.  At bottom, the substantiality inquiry is more qualitative than quantitative." (internal quotation marks and citations omitted)); *Leone v. Cataldo*, 574 F. Supp. 2d 471, 483–84 (E.D. Pa. Aug. 11, 2008) ("'The fact that substantial activities took place in district B does not disqualify district A as proper venue as long as substantial activities took place in A, too. Indeed, district A should not be disqualified even if it is shown that the activities in district B were more substantial, or even the most substantial.'" (quoting the Commentary following the revisions to § 1391)).  When deciding venue, a court "does 'not [look] to a single triggering event prompting the action, but to the entire sequence of events underlying the claim.'" *Id.* (quoting *Uffner v. La Reunion Francaise*, 244 F.3d 38, 42 (1st Cir. 2001)).

### Count II: Abuse of Process

The crux of Plaintiffs' abuse of process claim is that Hartleib has misused the legal process by inserting himself into litigations in which they were involved throughout the country, all of which stemmed from the Sprint derivative action in Kansas, Hartleib's opposition to the settlement, and the court's ruling awarding only 10% of the attorneys' fees requested. Specifically, Plaintiffs cite to Hartleib's repeated, unsuccessful attempts to vacate the protective order entered against him in the Sprint derivative action, threats to oppose lead counsel appointment motions by the Firm, attacks on the Firm's billing practices to other courts, and decision to file a malpractice suit against Plaintiffs.  (Doc. No. 12 at pp. 29–30.)

In determining whether Plaintiffs' abuse of process claim is properly venued, we must consider out of which lawsuits or actions Plaintiffs' claim arose.  For example, in *Tucker v. Interscope Records*, No. 98-4288, 1999 WL 80363 (E.D. Pa. Feb. 17, 1999), the plaintiffs asserted malicious prosecution and abuse of process claims in the Eastern District of Pennsylvania, and their claims arose out of two lawsuits that had been filed against one of the plaintiffs in the Central District of California.  *Id.* at *1.  The court concluded that venue was improper, reasoning that a substantial portion of the events did not take place in the Eastern District.  *Id.* at *2.  The court explained:

> All of the events alleged in Plaintiffs' complaint relate to the allegedly tortious prosecution of the California lawsuits instituted against Mrs. Tucker, [one of the plaintiffs].  Those lawsuits were litigated in the Central District of California and the alleged abuse of process about which Plaintiffs complain, such as the notices of deposition for Mrs. Tucker's depositions, were issued in the Central District of California.  None of the discovery in those cases . . . took place within the Eastern District of Pennsylvania.

*Id.*  Although the plaintiffs pointed to a few activities that occurred within the district (*e.g.*, defendants' private investigators investigating the plaintiffs; circulation of an advertisement in a paper that allegedly contained a "thinly veiled death threat" against one of the plaintiffs), the court found that those events were only tangentially connected to the instant lawsuit.  *Id.*; *see also Farkas*, 2014 WL 550594, at *23 (holding that venue was improper and reasoning that "a substantial portion of the events giving rise to [the] abuse of process claim occurred in Mifflin County, as that is where the Replevin action [that provided the basis for the abuse of process claim] was brought"); *accord. Cmty. Surgical Supply of Toms River, Inc. v. Medline DiaMed, LLC*, Civil Action No. 11-00221 (GEB)(TJB), 2011 WL 3235706, at *3–4 (D.N.J. July 28, 2011) ("Neither party submitted, nor has this Court found, authority in this District regarding claims for malicious use of process filed in a different venue from where the claim has been filed . . . [A]s the events giving rise to this claim involve the use of process related to the TRO Action in Ohio,

New Jersey is not the proper venue[.]").

We are persuaded by these cases and observe that Plaintiffs' claims do not arise out of any lawsuit in the Eastern District of Pennsylvania—rather, they primarily arise out of the Sprint derivative action in Kansas and Hartleib's civil action against Plaintiffs in Kansas. And none of the other lawsuits (*e.g.*, *Big Lots* or *Equifax*) in which Hartleib attacked Plaintiffs' billing practices occurred in this District either. Most importantly, the parties do not identify a single act or omission that occurred in the Eastern District—let alone a substantial amount. Although we certainly appreciate Plaintiffs' argument that Hartleib should not be permitted to gallivant across the country, inserting himself into litigations in which Plaintiffs are involved, and then be immune from being haled into court here, we are constrained by the case law and, on the facts before us, simply cannot find that the substantial threshold has been reached here. Accordingly, we dismiss Count II for improper venue.

***Counts III and IV: Defamation and IIED***

"[V]enue will not be proper in a district for a defamation claim if injury is the only event occurring in that district." *Lomanno v. Black*, 285 F. Supp. 2d 637, 642 (E.D. Pa. 2003) (citing *DaimlerChrysler Corp. v. Askinazi*, No. CIV.A. 99-5581, 2000 WL 822449, at *6 (E.D. Pa. June 26, 2000)). "Injury in conjunction with another event, however, may make" venue proper. *DaimlerChrysle*r, 2000 WL 822449, at *6. In defamation cases, "courts have repeatedly held that venue is proper in a district in which the allegedly defamatory statement was published, particularly if the injury was suffered in the same district." *Id.* (collecting cases).

For example, in *DaimlerChrysler Corp. v. Askinazki*, the court held that a substantial portion of events giving rise to the counterclaims occurred in the Eastern District of Pennsylvania and that venue was proper, reasoning that although the allegedly defamatory

statements were made in Michigan, they were published in the Eastern District of Pennsylvania and the publication caused injury to the counterclaimant's reputation there.  *Id.* at *7; *see also Emekekwue v. Agwuegbo*, Civil Action No. 1:12-cv-1503, 2012 WL 5386279, at *6 (M.D. Pa. Nov. 1, 2012) ("[V]enue is proper in this district.  [The plaintiff] resided in the Middle District of Pennsylvania when [the defendant] allegedly sent the defamatory email.  The brunt of [the plaintiff's] alleged harm likely has been felt in this district because this is where he . . . reside[s] . . . Further, the email directly discusses actions alleged to have taken place in Pennsylvania."); *cf. Lomanno*, 285 F. Supp. 2d at 642–43 (finding that venue was improperly laid within the Eastern District of Pennsylvania for the defamation claim, where the allegedly defamatory statements were made in Virginia and no party asserted that those statements were published in Pennsylvania); *Dobrick-Pierce v. Open Options*, No. 2:05CV1451, 2006 WL 2089960, at *6 (W.D. Pa. July 25, 2006) (holding that venue was improper in the Western District of Pennsylvania for the defamation claim, where the plaintiff failed to allege any facts indicating that the allegedly defamatory statements were published in Pennsylvania and only identified communications between Texas and Illinois, and Texas and Virginia).

Here, it is undisputed at least some of the allegedly defamatory statements were published in Pennsylvania—the emails Hartleib sent to Abelson and Detective Goggin, both of whom he knew were located in Pennsylvania, and to attorney Yates.  Further, Plaintiffs allege that as a Pennsylvania based-business and business owner, respectively, the Firm and Weiser have suffered injury within Pennsylvania.  Accordingly, we find that a substantial portion of events giving rise to Plaintiffs' defamation claim occurred in Pennsylvania and that venue is proper here.[18]

---

[18] In addition, Plaintiffs allege that after receiving a "tip" from Hartleib "about Silow's disbarred status and role as a document reviewer in the Sprint Derivative Action," the *Wall Street Journal* published an

For similar reasons, we find that a substantial part of the events giving rise to Weiser's IIED claim occurred in the Eastern District of Pennsylvania in light of the fact that Hartleib directed so many of his email diatribes to Weiser here, where then Weiser allegedly suffered emotional distress.  Therefore, we find venue is also proper on the IIED claim.

VI.

For the foregoing reasons, we dismiss Counts I, V, VI, and VII (vexatious litigant order, negligent misrepresentation, intentional interference with contractual relations, and tortious interference) for lack of personal jurisdiction and Count II (abuse of process) for improper venue.  We deny Hartleib's motion as to Counts III (defamation) and IV (IIED).

An appropriate order follows.

---

article entitled, "One Lawyer, 6,905 Hours Leads to $1.5 Million Bill in Sprint Suit," which was then picked up by nearly one hundred media outlets.  (Doc. No. 1 at ¶¶ 85–87.)  Hartleib does not refute this in his affidavit.  Viewing the Plaintiffs' allegations in the light most favorable to them, the *Wall Street Journal* article also provides further support to our holding that venue is proper over the defamation claim.  *See DaimlerChrysler*, 2000 WL 822449, at *7 ("There is no dispute that although Goldfarb's statements were actually made in Michigan, they were published in this district in the form of articles based on the press release, the *Wall Street Journal* article, and the *American Lawyer* article.  Goldfarb argues that this publication is tangential in nature . . . because he participated in the interviews that formed the basis of the *Wall Street Journal* . . . . article[] . . . We find Goldfarb's reasoning unpersuasive.").  Notably, even Hartleib states that such an at-issue, widely-published article (which he refers to as a *New York Post* article) would "obviously" be a "big deal" and substantial "if, in fact, it is defamatory."  (Oral Argument Tr. 17:4–6; *see also id.* at 17:19–25 ("An article that was published in the *New York Post* or one of their publications, I don't know if it was the actual periodical, off the top of my head.  Those are really the three many [sic] things I would call the substantial pieces and nuggets of the Plaintiffs' claim.").)