## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE WEISER LAW FIRM, P.C. : <br> 22 Cassatt Avenue : <br> Berwyn, Pennsylvania 19312 : <br> : <br>     and : <br> : <br> ROBERT B. WEISER, ESQUIRE : <br> 22 Cassatt Avenue : <br> Berwyn, Pennsylvania 19312 : <br> : <br>         Plaintiffs, : <br>   v. : <br> : <br> MICHAEL HARTLEIB : <br> 27020 Alicia Parkway, Suite G : <br> Laguna Niguel, CA 92677 : <br> : <br>         Defendant. : | CIVIL ACTION <br><br> Case No. 2:19-CV-02728-KSM |

### VERIFIED AMENDED COMPLAINT

Plaintiffs The Weiser Law Firm, P.C. (hereinafter the "Law Firm") and Robert B. Weiser, Esquire ("Weiser" or, together with the Law Firm, "Plaintiffs") bring this action by way of this amended complaint (this "Amended Complaint") against Michael Hartleib ("Hartleib" or "Defendant") and allege as follows:

### Parties

1.      Plaintiff Law Firm is a Pennsylvania professional corporation with offices located at 22 Cassatt Avenue, Berwyn, Pennsylvania 19312.

2.      The Law Firm was originally incorporated in the Commonwealth of Pennsylvania in 2004 under entity number 3272161.

3.      Plaintiff Weiser is an adult individual and resident of the Commonwealth of Pennsylvania.

{01292774;5}

1

4.      Defendant Hartleib is an adult individual and resident of the State of California.

**Venue and Jurisdiction**

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as the parties are citizens of diverse jurisdictions and the amount in controversy exceeds $75,000.

6.      Plaintiffs' principal place of business is located within the Eastern District of Pennsylvania.  As such, venue is appropriate within the Eastern District of Pennsylvania pursuant to 28 U.S.C.§ 1391(b)(1).

**Facts**

7.      The Law Firm is engaged in the provision of legal services with a focus on shareholder class actions, shareholder derivative actions, mergers and acquisitions related litigation, and whistleblower "qui tam" cases.

8.      Weiser is a founder and principal of the Law Firm.

9.      Weiser is a licensed attorney duly admitted in the State of New Jersey and the Commonwealth of Pennsylvania.

10.      Weiser's law practice is focused primarily on shareholder derivative litigation.

*The Sprint Securities Class Action & Shareholder Derivative Actions*

11.      On or about November 25, 2008, Hartleib e-mailed Bruce G. Murphy, Esquire ("Murphy") of the Law Offices of Bruce G. Murphy (the "Murphy Firm"), regarding the loss in value of shares he owned in Sprint Corporation and Nextel Communications when the two companies merged to become Sprint Nextel Corporation in 2005.  See November 25, 2008 e-mail string, a true and correct copy of which is attached hereto as **Exhibit 1**.

12.      Murphy is an attorney who had occasionally referred clients to the Law Firm.

13.     Because of the Law Firm's experience and expertise in the shareholder litigation arena, Murphy forwarded Hartleib's e-mail to Weiser and asked Weiser if he saw "a der" – meaning a stockholder derivative action that could be brought on Sprint's behalf – as a possibility in Hartleib's case based upon the $31 billion write-down Sprint was forced to take in connection with the failed Nextel merger.  Ex. 1

14.     In response to Murphy's inquiry, the Law Firm investigated the Sprint/Nextel merger and the resulting write-down, but the Law Firm's investigation did not produce sufficient information to recommend filing a derivative lawsuit on Sprint's behalf at that time.

15.     On March 10, 2009, the first securities class action lawsuit based on the Sprint/Nextel merger and the resulting write-down was filed against Sprint and certain of its officers and directors in the United States District Court for the District of Kansas (the "Kansas Federal Court"), by the law firm of Coughlin Stoia Geller Rudman & Robbins (the predecessor firm to Robbins Geller Rudman and Dowd, LLP, hereinafter "Robbins Geller").

16.     Several other substantially similar securities class action lawsuits were eventually filed against Sprint, which were subsequently consolidated in the Kansas Federal Court (the "Sprint Securities Class Action").

17.     Robbins Geller and Motley Rice LLC were appointed to serve as co-lead counsel for the plaintiff investor class in the Sprint Securities Class Action.

18.     On March 10, 2009, upon seeing that the first complaint in the Sprint Securities Class Action had been filed, Murphy contacted Weiser once again regarding potential shareholder derivative claims that could be brought on behalf of Sprint.

19.     The Law Firm thereupon reviewed the allegations forming the basis of the Sprint Securities Class Action, together with new information regarding the Sprint/Nextel merger and

{01292774;5}

resulting write-down, and concluded within a few days of the March 10, 2009 initiation of the Sprint Securities Class Action that Sprint may have potential claims against its then-current and/or former officers and directors.

20.    Weiser asked Murphy if Hartleib or any other potential client was interested in initialing a shareholder derivative suit on behalf of Sprint against its directors and officers.

21.    Murphy informed Weiser that Hartleib and other potential clients were still interested in bringing a shareholder derivative suit for the benefit of Sprint.

22.    The Law Firm began researching and drafting a shareholder derivative complaint.

23.    On or about March 13, 2009, Weiser provided Murphy with the draft shareholder derivative complaint for circulation among Murphy's actual or potential clients.

24.    At that time, Weiser understood that Hartleib was one of Murphy's potential clients in the contemplated Sprint derivative lawsuit; however, neither Weiser nor anyone else at the Law Firm had yet communicated with Hartleib.

25.    On March 21 or 22, 2009, Weiser became aware that Murphy sent a draft retention letter to Hartleib, even though up to that point Weiser had never directly communicated with Hartleib.

26.    Neither Weiser nor the Law Firm agreed to represent Hartleib at that time.

27.    On or about March 26, 2009, Weiser and Hartleib spoke for the first time, by telephone.

28.    During the March 26, 2009 call, Hartleib claimed to have spent "hundreds of hours" investigating Sprint, and also stated that he previously contacted Robbins Geller and "give[n] them" the facts and analysis necessary to prosecute the federal securities claims asserted against Sprint in the Sprint Securities Class Action.

29.     Hartleib also represented to Weiser during the March 26, 2009 call that he was interested in seeking appointment as the lead plaintiff or as a co-lead plaintiff in the Sprint Securities Class Action.  Hartleib stated to Weiser that Hartleib believed he would make an ideal lead plaintiff in the Sprint Securities Class Action based upon his claimed knowledge regarding Sprint.

30.     Also during the March 26, 2009 call, Hartleib strongly implied his interest in sharing any attorneys' fees the Law Firm might recover if it represented Hartleib in connection with a potential shareholder derivative action brought on Sprint's behalf.

31.     Based upon Hartleib's representations and/or statements to Weiser during the March 26, 2009 call regarding the Sprint Securities Class Action, Weiser concluded that the Law Firm could not represent Hartleib in any derivative action brought on behalf of Sprint, as any role potentially to be played by Hartleib in launching and/or prosecuting the Sprint Securities Class Action *against* Sprint would preclude his participation as a plaintiff to a derivative suit brought *on behalf of* Sprint.

32.     Furthermore, Hartleib's apparent interest in a fee sharing agreement with the Law Firm was extremely troubling to Weiser, as neither Weiser nor the Law Firm had ever or would ever agree to enter into such an agreement.

33.     By e-mail at 7:21 a.m. on March 27, 2009, a true and correct copy of which is attached hereto as **Exhibit 2**, Weiser informed Murphy of his decision that the Law Firm could not represent Hartleib in a shareholder derivative suit brought for the benefit of Sprint.

34.     Weiser explained to Murphy that his decision was based upon Hartleib's "potential conflict in light of the other [Sprint Securities Class Action] litigation he's involved in.  Thus, I don't think he would make an adequate representative for Sprint."  Ex. 2.

35.     Murphy and Weiser spoke by phone shortly after 7:21 a.m. on March 27, 2009, and Weiser reiterated that the Law Firm would not represent Hartleib in a shareholder derivative action brought on behalf of Sprint under any circumstances.

36.     By e-mail at 9:55 a.m. on March 27, 2009, a true and correct copy of which is attached hereto as **Exhibit 3**, Murphy informed Hartleib that neither the Murphy Firm nor the Law Firm would represent Hartleib in a shareholder derivative action on behalf of Sprint due to Hartleib's "potential conflict of interest." Ex. 3.

37.     The Law Firm eventually chose to represent Sprint shareholder Monica Ross-Williams ("Ross-Williams") as the plaintiff to a shareholder derivative action (the "Sprint Derivative Action") filed on behalf of Sprint against certain of its current and former officers and directors in the District Court of Johnson County, Kansas (the "Kansas State Court").

38.     In July 2011, the law firm of Kahn, Swick & Foti, LLC ("Kahn Swick") filed a separate shareholder derivative action on Sprint's behalf, naming Hartleib as the representative plaintiff.

### The Sirius XM Litigation

39.     On March 8, 2011, Hartleib and several other named plaintiffs filed a shareholder derivative action on behalf of Sirius XM Satellite Radio, Inc. ("Sirius XM") against Sirius XM's officers and directors in New York State Supreme Court (New York County), alleging negligence, fraud, breach of fiduciary duties and self-dealing (the "Sirius XM Derivative Action"). A true and correct copy of Hartleib's Sirius XM shareholder derivative complaint is attached hereto as **Exhibit 4**.

40.     The plaintiffs in the Sirius XM Derivative Action were represented *pro se* by Hartleib and his fellow named plaintiff, John Sorge. Ex. 4 pp. 1, 21.

41.    Although the Law Firm previously declined to represent Hartleib in a shareholder derivative action on behalf of Sprint, Hartleib sought to engage the Law Firm as counsel for the plaintiffs in the Sirius XM Derivative Action.

42.    To wit, Hartleib e-mailed Weiser about the Sirius XM Derivative Action multiple times, without response.  True and correct copies of e-mails from Hartleib to Weiser dated June 2, 2011, June 11, 2011 and June 20, 2011 are attached hereto as **Exhibit 5**.

43.    Weiser was wary of getting involved in the tangled and multi-faceted Sirius XM Derivative Action, and after undertaking a cursory review of the allegations and purported derivative claims asserted against Sirius XM's officers and directors, Weiser and the Law Firm determined that Hartleib's legal theories were insupportable.  Accordingly, Weiser and the Law Firm declined to represent Hartleib and his fellow shareholder plaintiffs in the Sirius XM Derivative Action.

44.    On August 31, 2011, Hartleib again e-mailed Weiser: "Rob, we need to talk about you coming in on my Sirius state case. This Federal case was taken from my case which was filed first. Khan Swick will work with us as I am providing all of the research. Call me ASAP[.]" A true and correct copy of Hartleib's August 31, 2011 e-mail to Weiser is attached hereto as **Exhibit 6**.

45.    Weiser declined to call Hartleib, however, and the Law Firm elected not to represent Hartleib or any other plaintiff(s) in any legal action with respect to Sirius XM.

46.    On February 16, 2012, Hartleib e-mailed Weiser and copied Hartleib's colleague, David Sacks: "Rob, are we going to do some business together or what? You never called us back after we tried six times to reach you. David and I need to make some money so that we can

buy you a new phone!"  A true and correct copy of Hartleib's February 16, 2012 e-mail to Weiser is attached hereto as **Exhibit 7**.

47.    The Law Firm declined to engage in any business transaction or litigation with Hartleib in 2012 or thereafter.

*The Sprint Derivative Settlement*

48.    Weiser did not speak with Hartleib for several years thereafter, until after the majority of the Sprint shareholder derivative lawsuits pending in the Kansas State Court and the Kansas Federal Court based on the Sprint/Nextel merger, including the Sprint Derivative Action initiated by Ross-Williams, achieved a collective settlement in or about 2016 (the "Sprint Derivative Settlement").

49.    Hartleib – the only Sprint derivative plaintiff in any forum who did not participate in the Sprint Derivative Settlement – was a vocal opponent of the Sprint Derivative Settlement.

50.    When the Law Firm and several other law firms representing other derivative plaintiffs sought final approval of the terms of the Sprint Derivative Settlement from the Kansas State Court, including the approval of agreed-to attorneys' fees for the plaintiffs' counsel, Hartleib filed a formal *pro se* objection.

51.    Weiser and Hartleib spoke by phone concerning Hartleib's objection to the Sprint Derivative Settlement on or about May 20, 2016, approximately one week prior to the Sprint Derivative Settlement's final approval hearing (the "Final Approval Hearing") in the Kansas State Court before the Honorable James Vano ("Judge Vano").

52.    During that telephone conversation, Hartleib expressed to Weiser his displeasure with the terms of the Sprint Derivative Settlement.

53.     Notwithstanding Hartleib's displeasure with the Sprint Derivative Settlement terms, however, Hartleib proposed to withdraw his formal objection to the Sprint Derivative Settlement if Weiser would agree to enter into a "consulting agreement" with Hartleib, pursuant to which Hartleib would receive several hundred thousand dollars and would provide the Law Firm with ideas for initiating lawsuits against unspecified corporate defendants.

54.     The Law Firm elected not to enter into any "consulting agreement" with Hartleib, and once again was roiled by the unethical request made by Hartleib.

55.     In retribution against the Law Firm, and because his own shareholder derivative action was not included in the Sprint Derivative Settlement, Hartleib appeared at the May 26, 2016 Final Approval Hearing before Judge Vano in support of his objection to the Sprint Derivative Settlement.

56.     As the approval process for the Sprint Derivative Settlement advanced, Hartleib sent occasional goading and derisive e-mails to Plaintiffs.  For example in a May 24, 2016 e-mail, a true and correct copy of which is attached hereto as **Exhibit 8**, Hartleib taunted Weiser: "Rob, you are going to lose either with the honorable Vano [sic] or on appeal!" and "You really should have been more diligent."  Ex. 9.

57.     Five days after the Final Approval Hearing, on May 31, 2016, Hartleib seemed to soften, e-mailing Weiser to "discuss the current case and any forthcoming derivative [sic] on the tax issues.  I would like to see the old [Sprint] board held accountable."  A true and correct copy of Hartleib's May 31, 2016 e-mail is attached hereto as **Exhibit 9**.

58.     Less than a month later, however, on June 28, 2016, Hartleib demanded certain information regarding attorneys' fees and reimbursement of costs for plaintiffs' counsel which had been submitted to the Kansas State Court *in camera*, e-mailing Weiser: "please provide me

with the documents in support of your fees filed yesterday. . . I will notify the clerk if I don't get

them today.  Also your delay will provide me yet another reason to appeal is [sic] the Honorable

Vano approves the settlement."  A true and correct copy of Hartleib's June 28, 2016 e-mail to

Weiser is attached hereto as **Exhibit 10**.

*The Law Firm is Duped by a Disbarred Document Reviewer,*
*and Hartleib's Harassment Campaign Begins in Earnest*

59.     Jeffrey M. Silow ("Silow") was hired by the Law Firm as a contract attorney on

several occasions between 2008 and 2017 for the purposes of performing document review

work; he was initially sourced through a Philadelphia-based legal search and placement firm,

Abelson Legal Search ("Abelson"), with which the Law Firm had contracted.

60.     Abelson was responsible for vetting the credentials and bar status of the attorneys

it placed, and Abelson held Silow out to the Law Firm as a licensed attorney in good standing.

61.     Meanwhile, in mid-2016, the Sprint Derivative Settlement was approved by the

Kansas State Court, but only about ten percent of the amount of the attorneys' fees for the

participating plaintiffs' counsel that was agreed to by the parties was awarded by the Court.

62.     The Law Firm and the other firms that participated in the Sprint Derivative

Settlement appealed the sharply discounted attorneys' fees awarded by the Kansas State Court.

63.     In February 2017, for the first time, and to its utter shock and dismay, the Law

Firm received notification that Silow had been disbarred in the Commonwealth of Pennsylvania

decades earlier,[1] although he had been holding himself out as an attorney admitted in good

standing to practice law.  In order to perpetrate his deception, Silow used his son's name on court

submissions made by the Law Firm with respect to Silow, and represented to the Law Firm that

although he went by the name "Jeffrey Silow" and wished to be called "Jeffrey," his legal name

---

[1] Silow was also admitted to practice law in the District of Columbia until 2000.

{01292774;5}

was "Alexander J. Silow."    Indeed, Silow represented himself to be Alexander J. Silow in a sworn certification filed with the Kansas State Court in the Sprint Derivative Action.

64.    After learning of this deceit, the Law Firm immediately severed ties with Silow, affirmatively notified the courts sitting in every action in which Silow's hours were included as part of an "attorney time" lodestar calculation, reported the incident to the Disciplinary Board of the Supreme Court of Pennsylvania, pressed criminal charges against Silow in Montgomery County, Pennsylvania, and instituted a pending civil case against Abelson and Silow in the Court of Common Pleas of Chester County, Pennsylvania captioned *The Weiser Law Firm, P.C. v. Abelson Legal Search and Jeffrey Mark Silow,* No. 2017-07778.

65.    After the Law Firm pressed criminal charges against him, Silow pled guilty to three criminal counts in Pennsylvania – unauthorized practice of law (42 Pa.C.S. § 2524), unsworn falsification to authorities (18 Pa.C.S. § 4904(b) and securing execution of documents by deception (18 Pa.C.S. § 4114).

66.    Over a multi-year period, Silow engaged in significant document review work in the Sprint Derivative Action, and the Law Firm immediately and voluntarily disclosed to Judge Vano, who reviewed and approved the Sprint Derivative Settlement, and to the Clerk of the Kansas Court of Appeals (the "Kansas Appeals Court") – which was then considering the appeal from the attorneys' fee award in the Sprint Derivative Settlement as well as Hartleib's own *pro se* appeal of Judge Vano's approval of the Sprint Derivative Settlement – that Silow affirmatively misrepresented himself to the Kansas State Court as a licensed attorney in good standing.  True and correct copies of the Law Firm's February 6, 2017 letters to both the Kansas State Court (Case No. 11-cv-01688) and the Kansas Appeals Court (Appeal No. 17-117139-A) are collectively attached hereto as **Exhibit 11**.

67.     Although a billing audit reinforced the validity of the hours Silow worked on the Sprint Derivative Action and the quality of Silow's review work, the reduced attorneys' fee award in the Sprint Derivative Settlement was affirmed on appeal.

68.     Hartleib was delighted to learn that the Law Firm had been duped by Silow, defrauded by Abelson, and awarded a vastly reduced fee in the Sprint Derivative Settlement, and he unleashed a deluge of abuse upon the Plaintiffs, and Weiser in particular.

69.     On March 6, 2017, Hartleib e-mailed Weiser and copied eleven members of the bar from five different law firms, as well as the administrative assistant for the Kansas State Court, writing in relevant portion as follows:

> Rob, I am a little confused!  . . . It seems your statements to the Appellate Court were disingenuous at best.  Shocking! . . .
>
> I especially like the comment that you felt as though you had an ethical obligation to inform the Court, prior to briefing . . . Ethical obligation, what a Saint [sic] . . . Your attempts, [sic] to obfuscate your chicanery in this case is galvanizing my convictions, strengthening my resolve to expose all of the corrupt parties in this case!  This lawyer driven litigation must and will cease.  Your temerity, to seek leave of the Appellate Court to reinstate fees, given what I have uncovered is frankly astonishing and provoking wrath.  I will take this all the way to the Kansas Supreme Court if needed, as the integrity of the judicial system is at stake!

A true and correct copy of Hartleib's March 6, 2017 e-mail is attached hereto as **Exhibit 12** (emphasis in original).

70.     On March 6, 2017, Hartleib contacted Ross-Williams, the plaintiff in the Sprint Derivative Action, by telephone.  Upon information and belief, Hartleib obtained the phone number for Ross-Williams through an internet search.

71.     During the March 6, 2017 call, Hartleib verbally harassed and threatened Ross-Williams; Hartleib also told Ross-Williams that the Law Firm was a "criminal enterprise" and was not serving her interests as a Sprint shareholder.

72.    Hartleib did not seek or obtain permission from Ross-Williams' counsel or an order of the Kansas Appeals Court to contact Ross-Williams, and therefore his unsolicited telephone call to her constituted a clear violation of Rule 4.2 of the Kansas Rules of Professional Conduct, asthe Kansas Appeals Court specifically held in its March 30, 2017 order (the "Protective Order").

73.    Ross-Williams explicitly asked Hartleib not to contact her again, and to direct all future communications to her counsel, the Law Firm.

74.    Ross-Williams then contacted the Law Firm, recounted Hartleib's call to her, and reported that she felt shocked, disturbed, harassed and threatened by Hartleib during the call.

75.    In a declaration filed with the Kansas Appeals Court on May 18, 2018, a true and correct copy of which declaration is attached hereto as **Exhibit 13**, Ross-Williams described the March 6, 2017 telephone call from Hartleib in relevant portion as follows:

> Upon answering the telephone when Hartleib called me on the evening of March 6, 2017, I did not realize at first who I was speaking to. Hartleib proceeded to attempt to discuss matters related to the Appeal with me, in a highly confrontational manner. Once I realized who Hartleib was and that he had somehow found my phone number and called me directly regarding the Appeal, I told Hartleib I did not wish to speak to him any further. I asked Hartleib not to contact me again and to direct all future communications to my counsel.

> Hartleib, however, did not hang up the phone at that point. Instead, he tried to continue the conversation by making references to certain matters about me that were wholly unrelated to the Appeal; specifically, my role as an elected official in Ypsilanti Township, Michigan, where I serve on the Township Board of Trustees. I can only assume that Hartleib conducted an internet search and tried to learn as much as he could about me prior to calling me on March 6, 2017.

> In the first instance, I was taken aback and frightened once I realized that Hartleib had called me directly about the Appeal, and given the tenor of the call I suspected that he did so in an attempt to intimidate me. But once Hartleib brought up matters about me that were completely unrelated to the Appeal, I became certain that his purpose for calling was to harass and threaten me. I felt very uncomfortable and wanted to end the call with Hartleib as soon as possible, but I thought it best to try to end the conversation in a non-confrontational way. To

that end, I told Hartleib that if he wished to do so he could copy me on communications directed to my counsel, and I provided him with an e-mail address which I seldom use.

Ex. 13 ¶¶ 3-5.

76.     Inexplicably, Hartleib disregarded Ross-Williams' clear directive and e-mailed her directly, copying fifteen members of the bar and the Kansas State Court's administrative assistant, at 3:16 a.m. the following morning, March 7, 2017, a true and correct copy of which e-mail is attached hereto as **Exhibit 14**.

77.     Therein, Hartleib stated to Ross-Williams and members of the bar:

Dear Ms. Williams, it was a pleasure speaking with you this evening. I am sorry that your Counsel has not kept you apprised of the details of your case. **I find it unconscionable that your attorneys failed to inform you of Judge Vano's rulings or that an Appeal was filed on your behalf. I do believe that you are a unwitting victim of their fraud committed against the Court. As we discussed they have submitted millions of dollars in fraudulent billing in your case. As I informed you that this was not just my opinion, the Judge in your case came to a similar conclusion. In fact, your attorneys have now admitted to at least 1.6 million dollars in fraudulent bills submitted to the Court. Mr. Weiser has confirmed this in two separate letters.** (See attached).  I am no expert, but **when a Firm admits criminal acts in a case** I believe they are obligated to notify you as the Plaintiff. Mr. Weiser and his Firm have already contacted their Bar associations and other Courts to **self-report their criminal acts.** I have contacted the district attorney's offices in Pennsylvania and Kansas and will be filing formal complaints. I am sorry to be the person to inform you of this, as it was your attorneys responsibility to do so. I am seeking a full evidentiary hearing where your Counsel will be forced to testify under oath and you can address the Court. As you can see by the letters from Mr. Weiser **they are in a lot of trouble,** but claim they are victims of Mr. Silow. **I will provide incontrovertible proof that Mr. Weiser et. al. is just as guilty as Mr. Silow. This is just the tip of the iceberg.** Details of our call will be submitted to the Kansas Court of Appeals in a sworn declaration and provided to Judge Vano. As per your request I copied all of the attorneys in your case as well as Judge Vano's Clerk. Thank you for taking the time to speak with me this evening.

Ex. 14 (emphasis supplied).

78.     Hartleib's March 7, 2017 e-mail to Ross-Williams, fifteen members of the bar and the Kansas State Court's administrative assistant was filled with gross misstatements of fact and

{01292774;5}
14

outright lies; to wit, the Law Firm *never* admitted to fraudulent billing or committed any "criminal acts," Judge Vano never concluded that the Law Firm "submitted millions of dollars in fraudulent billing," nor did the Law Firm's letters to the Kansas State Court and Kansas Appeals Court regarding Silow "confirm" any misdeed.  See Ex. 14.  The Law Firm was not "in a lot of trouble" or "just as guilty as Mr. Silow," nor was the fraud Silow and Abelson committed against the Law Firm "just the tip of the iceberg."  Id.

79.    Although the Law Firm sent Hartleib a cease-and-desist letter, see Ex. 14, Hartleib paid it no mind, responding by e-mail on March 7, 2017 (and copying fifteen members of the bar and Judge Vano's administrative assistant) as follows:

> Mr. Weiser, as I am preparing my sworn declaration regarding my communication with you "client", I do not have time to address all of the self-serving misrepresentations in your letter. The 15 minute consensual conversation with your "client" was very enlightening. She provided her e-mail address and ask that I copy Counsel, so that I could forward the documents you failed to provide. **For you to characterize this as harassment is another blatant attempt to distract and obfuscate your fraudulent acts and bastardization of the judicial system. I caution you, that coercing your "client" to misstate facts regarding our call will only inflict additional damage to what little credibility you have left. You Sir, and your coconspirators are the ones that need to Cease and Desist. Your so-called "client" is representing my interest and her attorneys are corrupt, therefore I will neither Cease nor Desist.** As far as your not so vailed threat that Ms. Williams "reserves all of her rights", **if you are threatening legal action against me, feel free, I will be happy to waive service to expedite said action. I find the prospects of discovery quite compelling. Your threats do nothing but, strengthen my resolve and galvanize my convictions. Call it a personality defect!** Instead of wasting my time, I would suggest you consult with an ethics attorney, that's right, you already have!

Ex. 14 (emphasis supplied).

80.    Of course, Hartleib lied about the consensual nature of his improper and unlawful contact with Ross-Williams, and his harassment of Ross-Williams resulted in the Kansas Appeals Court issuing its Protective Order on March 30, 2017 prohibiting Hartleib from contacting Ross-Williams.

{01292774;5}

81.    Hartleib sought twice before the Kansas Appeals Court and once before the
Kansas Supreme Court to have the Protective Order lifted.  In response to one such effort, Ross-
Williams wrote in a declaration submitted to the court:

> I was shocked to learn that Hartleib recently filed a motion to vacate the
> Protective Order.  I can only assume that Hartleib intends to try to contact me
> again and harass me further.  I was very frightened and disturbed by Hartleib's
> conduct in March 2017, and I was pleased and relieved that the Protective Order
> was granted.  If the Protective Order were to be vacated, I would fear that Hartleib
> would once again attempt to intimidate, harass, and threaten me.  I see no reason
> why Hartleib should be permitted to direct communications to me instead of my
> counsel.  I respectfully request that this Court deny Hartleib's motion and keep
> the Protective Order in place.

Ex. 13 ¶ 9.

82.    None of Hartleib's efforts to vacate the Protective Order were successful.

83.    In fact, one year later, on April 7, 2018, when the Law Firm opposed Hartleib's
unsuccessful Motion to Reconsider and Vacate the Protective Order, Hartleib e-mailed Weiser
and copied eight other members of the bar, as follows:

> **Rob, your ability to set the bar at new lows, never disappoints!** Clearly, this is
> in retaliation to your being rightfully removed as co-lead counsel in the Equifax
> case. **Your attempt to mislead the Appellate Court with incomplete records
> might be your standard operating procedure, but I believe it will cost you
> when I seek sanctions. Your personal attacks smack of desperation, they do
> nothing to dissuade me, in fact they galvanize my convictions and strengthen
> my resolve!** Rob, you may want to contact your investigators, L. English
> Research Services Inc. to seek a partial refund. When they pulled the records on
> March 26th, they missed a DUI from the eighties and a fixit ticket. **Your ill-
> advised actions, and ad-hominem attacks are making the Weiser Firm
> radioactive!**
>
> Have a wonderful weekend.

A true and correct copy of Hartleib's April 7, 2018 e-mail regarding the Law Firm's opposition
to Hartleib's Motion to Reconsider and Vacate the Protective Order is attached hereto as **Exhibit
15** (emphasis supplied).

84.     After learning about Silow's duplicity, the Law Firm hired a public relations firm, which was contacted on or about March 8, 2017 by a reporter from *The Wall Street Journal,* a high-profile daily newspaper with international distribution.

85.     Upon information and belief, the reporter from *The Wall Street Journal* received a "tip" from Hartleib about Silow's disbarred status and role as a document reviewer in the Sprint Derivative Action.

86.     On March 13, 2017, *The Wall Street Journal* published the resulting article: "One Lawyer, 6,905 Hours Leads to $1.5 Million Bill in Sprint Suit."  The article failed to mention the fact that Silow's nearly 7,000 billable hours were billed over the course of four years.

87.     Nearly one hundred media outlets picked up and further publicized *The Wall Street Journal*'s March 13, 2017 article.

88.     In an April 12, 2017 e-mail to Weiser and ten other members of the bar, as well as the Kansas State Court's administrative assistant, Hartleib wrote of Weiser: "What an embarrassment to the bar!  See you in Court."  A true and correct copy of Hartleib's April 12, 2017 e-mail is attached hereto as **Exhibit 16**.

89.     Alarmingly, upon information and belief, on April 25, 2017, Hartleib mailed several copies of an "anonymous" profanity-laced letter to six judges sitting on the Court of Common Pleas of Chester County, Pennsylvania, which was forwarded to Weiser on April 26, 2017 by Loretta M. Hines, Judicial Assistant to the Hon. Anthony A. Sarcione.  True and correct copies of the April 26, 2017 forwarding e-mail, the transmitting envelope and the April 25, 2017 threatening letter are attached hereto as **Exhibit 17**.

90.     In the April 25, 2017 letter, Hartleib circles a headline referencing the Kansas State Court's reduction of the attorneys' fees for plaintiffs' counsel in the Sprint Derivative

Settlement and writes in longhand: "What, if anything, do you intend to <u>DO</u> about this!!"  Ex.

16.  Over two typed and highlighted pages, Hartleib sets forth his negative views about class

actions – which are entirely distinguishable from the shareholder derivative litigation in which

the Law Firm and Weiser focus their practice – and recounts his version of Silow's fraud upon

the Law Firm, noting "**Judge <u>JIMMIE VANO in Kansas, God Bless His soul, caught the**

**firm in the act and knocked out 90% of their billing</u>  They claimed shock & surprise.**"  Ex.

17 (emphasis in original).

91.    Most concerningly, Hartleib attaches a page entitled "imaginary dialogue," which

ostensibly documents his imagined conversation with Weiser regarding Silow (including but not

limited to his misrepresentation of his first name, Jeffrey, on a court document, which he signed

"Alexander Jeffrey Silow," although Hartleib misstates this as "Andy").  Ex. 17.  The "imaginary

dialogue" concludes:

> [Weiser:]    "Well I get where you are going with this line of questioning.  Are
> you saying that we knew that he was a disbarred lawyer and we
> were trying to milk the class action jackpot with his phony billing"
> [sic]
> [Hartleib:]    You said it better than I could.
> [Weiser:]    "Well, you can ***GO F\*\*K YOURSELF ASSHOLE.  I'M OUT OF***
> ***HERE  AND  YOU  CAN  TALK  TO  MY  LAWYER  IF  YOU***
> ***WANT*** [sic]

Ex. 17.

92.    In forwarding the letter to Weiser from Judge Sarcione's chambers, Ms. Hines

wrote: "The attached letter was received in Chambers yesterday, 4/25/17.  Five other Judges in

Chester County received the same letter.  Judge Sarcione thought you should be alerted since you

are referenced in the letter.  Please feel free to contact Chambers if you feel it necessary or have

any questions or concerns."  Ex. 17.

{01292774;5}

18

93.    On May 19, 2018, Hartleib e-mailed Weiser and eight other members of the bar: "Plaintiff Counsel, and I use this term loosely, when making false allegations against a party I would suggest you at least get it right.  I am no expert, but I am pretty sure it would be libelous! I will demonstrate its proper use posthaste!"  A true and correct copy of Hartleib's May 19, 2018 e-mail is attached hereto as **Exhibit 18**.

94.    Two weeks later, on June 2, 2018, Hartleib sent an unsolicited e-mail to Weiser, eleven other members of the bar, and Judge Vano's administrative assistant, Jill Boren, regarding media coverage of a lawsuit against State Street Bank, with which Plaintiffs had no involvement whatsoever:

> Dear Ms. Boren, I thought the Honorable James Vano would find the link to the National Law Journal Article of interest. It is clear that the Plaintiff's Bar is rife with corruption, in both Class Action and Derivative cases. **Much like the fraud Weiser et.al. committed in the "Ross-Williams" case,** it appears to be standard operating procedure for many firms to submit millions in fraudulent fee requests upon the Court. This State Street case involves large well established firms and nearly 100 million in fees. **At present, it appears Weiser et.al. has not been out done, as there is no mention of the unlicensed practice of law by a convicted felon using an alias.**
>
> **I will be contacting the Special Master, and filing an Amicus Brief in the State Street case to inform them of the chicanery that has taken place in the "Ross-Williams" case. Although entirely unrelated, it presents a troubling pattern of fraud and corruption in these lawyer driven cases.** I will be seeking public dissemination of the Special Master's report to show the breadth of corruption within the Plaintiffs Bar. **The actions of Weiser et.al. and the Firms in the State Street case is the very definition of Racketeering**, and warrants legislative reform.
>
> https://www.law.com/nationallawjournal/2018/05/31/judge-presses-lead-plaintiff-in-state-street-bank-lawsuit-on-overbilling-questions/
>
> Michael Hartleib 646-494-5901

A true and correct copy of Hartleib's June 2, 2018 e-mail is attached hereto as **Exhibit 19** (emphasis supplied).

*Hartleib Inserts Himself into the Law Firm's Pending Litigations*

95.     Hartleib then began injecting himself into the Law Firm's pending litigations nationwide.

96.     Upon information and belief, Hartleib scanned federal dockets around the country for the names of the Law Firm's attorneys, in order to insert himself into the Law Firm's cases; Hartleib's principal aim was to harass Weiser and damage the Law Firm.

97.     For example, on August 17, 2018, Hartleib sent Weiser the following e-mail, a true and correct copy of which is attached hereto as **Exhibit 20**:

> Rob, will you be at the Witmer v Steven hearing on the 27th? I will do my best to attend. I am very familiar with Judge Carney? [sic] **We can discuss my concerns with L.C, A 10 and several other companies in which I am a shareholder. It appears we will be forced to deal with each other for the foreseeable future.** In hindsight, I should have avoided stocks, and invested more in real estate. Our interest were supposed to be aligned. Instead, I was attacked! If you have any questions, or wish to proffer an apology, you know how to reach me. That said, **other action is eminent!**

Ex. 20 (emphasis supplied).

98.     The "Witmer v. Steven" matter Hartleib references is actually *Witmer v. Sugarman,* a shareholder derivative suit filed in the United States District Court for the Central District of California, which was dismissed on August 23, 2018.   No. SACV 18-00246-CJC(DFMx), 2018 U.S. Dist. LEXIS 217850 (C.D. Cal. Aug. 23, 2018).   Hartleib was not a party in *Witmer v. Sugarman,* and Plaintiffs have no evidence that Hartleib was a shareholder of the underlying corporation.   No hearing was held in that case, and Hartleib never submitted any filing in that case.

99.     The *LC* and *A10* cases were other derivative actions pending in federal court in California at that time, in which Hartleib was not a named party and Plaintiffs have no evidence that Hartleib was a shareholder of the underlying corporations.

100.    Hartleib indicated in no uncertain terms that, as part of his laser-focused campaign to undermine Weiser and the Law Firm, he intended to involve himself in the Law Firm's other derivative litigations (which are unrelated to Hartleib in any way) throughout the country.  The following paragraphs offer a few examples of Hartleib's efforts.

EQUIFAX DERIVATIVE LITIGATION

101.    On March 15, 2018, in *In re Equifax, Inc. Derivative Litigation.,* No. 1:18-cv-00317-TWT (consolidated with Nos.: 1:218-cv-00477-TWT and 1:18-cv-00577-TWT) (N.D. Ga.) (the "Equifax Derivative Litigation"), during the pendency of competing motions for the appointment of lead counsel before the United States District Court for the Northern District of Georgia involving the Law Firm, Hartleib filed "Michael Hartleib, Shareholder and Concerned Citizen, Motion [sic] for Acceptance of Amicus Curiae Brief in Opposition to the Appointment of The Weiser Firm as Co-Lead Counsel," a true and correct copy of which – together with the proposed "Amicus Curiae Brief of Concerned Citizen and Shareholder Michael Hartleib in Opposition of [sic] the Appointment of The Weiser Firm as Co-Lead Counsel" – is attached hereto as **Exhibit 21**.

102.    Therein, Hartleib expresses his purported "extreme concern" about vague "troubling actions of Weiser et.al.," in the Sprint Derivative Action; Hartleib's "concern" largely pertains to the Law Firm's employment of disbarred attorney Silow as a document reviewer.  Ex. 21 p. 4.

103.    Hartleib alleges that the Law Firm "lied, misl[ed] the court," "attempt[ed] to confuse the Court [sic]," "used an **unfit plaintiff**," engaged "in fraudulent billing," made "false statements," employed another attorney who "repeatedly perjured himself" and constituted "an utter embarrassment to the Plaintiff's Bar," operates a "criminal enterprise," "sees plaintiff's

[sic] as a **'necessary nuisance,'**" displayed "hubris and utter contempt for the Court," engaged in "contemptuous actions in the case" and "Self-Dealing, Unclean Hands and Shameful Violations of Public Trust," undertook a "zealous quest for reinstatement of four million dollars in unwarranted fees," "follow[ed] a different set of standards, one that sets the bar at new lows," made a "desperate attempt to unjustly enrich themselves," and "has committed criminal acts upon the Kansas Court and a multitude of others across the country." Id. pp. 4-9 (emphasis in original).

104.    In his proposed *amicus* brief, Hartleib also grossly mischaracterizes the contents of the Law Firm's legal filings, the findings of the Kansas State Court, and certain statements from the appellate bench during oral argument before the Kansas Appeals Court, and admits to his unlawful contact with Ross Williams. Id. pp. 4, 6-8.

105.    Hartleib concludes: "what is going on at the Weiser firm?  Either they are completely corrupt, or entirely inept, whichever is the case they are not fit to act as lead on any representative suit." Id. p. 9.

106.    In its opposition to Hartleib's motion for leave to file his *amicus curiae* brief, a true and correct copy of which is attached hereto as **Exhibit 22**, the Law Firm notes:

> Hartleib submits his proposed *amicus* filing not as a true, disinterested "friend of the court" or even as a shareholder in Equifax, Inc., but purely in an adversarial capacity in his continuing and openly hostile effort to harass and disturb the Weiser Firm, its clients, and other law firms with whom the Weiser Firm works ...

> Hartleib is attempting to use his purported *amicus* filing in this Action as a weapon against the Weiser Firm and its clients, and this Court should not permit Hartleib's brazen abuse of the *amicus* mechanism to the partisan detriment of plaintiffs in this Action.

> Hartleib is not an "impartial individual" suggesting the proper interpretation of any law, but rather a serial harasser of the Weiser Firm and its clients.

> Hartleib is seeking to extend his malicious campaign against the Weiser Firm from the Sprint derivative action to this Action . . .

Ex. 22 pp. 1, 4, 6, 10 (parentheticals omitted).

107.    One of the attorneys at the Law Firm, James Ficaro, transmitted a copy of the Law Firm's opposition, to which Hartleib responded by e-mail on March 22, 2018, a true and correct copy of which is attached hereto as **Exhibit 23**: "I received these filings several hours ago!  Let Rob know he is making a catastrophic mistake!"

108.    At the hearing on the competing motions for appointment of lead counsel in the Equifax Derivative Litigation, prior to any ruling on Hartleib's *amicus* motion, Hartleib appeared before Judge Thomas W. Thrash, Jr. ("Judge Thrash") and was permitted to speak.[2]

109.    Without explaining his reasoning, Judge Thrash declined the Law Firm's motion to be appointed co-lead counsel in the Equifax Derivative Litigation. Hartleib took credit for this result, e-mailing Weiser a copy of Judge Thrash's order on April 5, 2018, a true and correct copy of which e-mail is attached hereto as **Exhibit 24**, and stating: "Just got home and wanted to make sure that you have this!  Good to finally meet you Rob!  Like I said, none of this was necessary!" Ex. 24.

### BIG LOTS DERIVATIVE LITIGATION

110.    *In re Big Lots, Inc. Shareholder Litigation*, No. 2:12-cv-445 (S.D. Oh.) ("Big Lots Derivative Litigation"), was a derivative suit which asserted a claim for corporate waste by certain of Big Lots' officers and directors in connection with an alleged insider stock selling scheme and stock repurchase plan.

---

[2] A copy of the transcript of the hearing before Judge Thrash was not made available to Plaintiffs.

{01292774;5}

111.    Settlement of the derivative claims received preliminary approval from the Honorable Michael H. Watson ("Judge Watson") of the United States District Court for the Southern District of Ohio on April 6, 2018.

112.    As Judge Watson noted in his August 28, 2018 Opinion and Order granting final approval to the settlement in the Big Lots Derivative Action, a true and correct copy of which Opinion and Order is attached hereto as **Exhibit 25**: "On August 24, 2018, well after the time to object and the fairness hearing took place, the Court received an e-mail from Michael Hartleib ("Hartleib"), a shareholder who had an interest in a different case involving The Weiser Firm, P.C. ("Weiser")." Ex. 25 p. 11 fn.2.

113.    Hartleib's e-mail to Judge Watson in the Big Lots Derivative Litigation was never provided to Plaintiffs, but Judge Watson described it as follows: "Hartleib raised concerns over Weiser's billing practices in this prior case and stated that he wanted to inform the Court so that it could scrutinize the fee request in this case." Id.

114.    Judge Watson noted that: "Hartleib does not indicate that he is a shareholder in Big Lots or otherwise an interested party in this case.  Furthermore, the Court always scrutinizes the billing records of plaintiffs' counsel before approving fee awards." Id.

115.    Judge Watson elected "out of an abundance of caution" to re-analyze the Law Firm's billing entries submitted in the Big Lots Derivative Litigation, gave the Law Firm an opportunity to respond to Hartleib's scurrilous allegations, and determined that "[t]he Court is fully satisfied that the hours billed by Weiser were reasonable in this case." Id.

CENTURYLINK DERIVATIVE LITIGATION

116.    *In re Centurylink Sales Practices and Securities Litigation,* No. 17-md-2795-MJD—MM (the "Centurylink Derivative Litigation"), was initiated in 2017 in the United States

District Court for the District of Minnesota.  It includes a consolidation of the separately-filed shareholder derivative cases captioned *Tansey v. Perry, et al.,* No. 18-cv-02460-MJD-KMM; *Flanders v. Post, et al.,* No. 18-cv-02833-MJD-KMM; *Ault v. Post, et al.,* No. 18-cv-02834-MJD-KMM; *Barbree, et al. v. Bejar, et al.,* No. 18-cv-02835-MJD-KMM; and *Palkon v. Boulet, et al.,* No. 19-cv-00284-MJD-KMM.

117.    On March 5, 2019, one day prior to a hearing addressing competing motions for appointment of lead counsel in the Centurylink Derivative Litigation, Hartlieb filed a self-styled "Amicus Curiae Brief of Shareholder Michael Hartlieb and Concerned Citizen in Opposition of [sic] the Appointment of Robbins Arroyo and the Weiser Firm et. al. as Lead Counsel in the Consolidated Derivative Action," a true and correct copy of which is attached hereto as **Exhibit 26**.

118.    The Law Firm was not seeking appointment as co-lead counsel with Robbins Arroyo LLP ("Robbins Arroyo") or any other law firm in the Centurylink Derivative Litigation. Instead, the Law Firm was a part of the support structure proposed by the law firm of Bragar Eagle & Squire, P.C. in *its* motion for appointment as lead counsel in the Centurylink Derivative Litigation.

119.    Robbins Arroyo filed an application for *its own* appointment as lead counsel in the Centurylink Derivative Litigation.

120.    Years earlier, Robbins Arroyo filed a shareholder derivative lawsuit on behalf of Sprint, arising from the Sprint/Nextel merger, which – like the Sprint Derivative Action filed by the Law Firm – was resolved by the Sprint Derivative Settlement.

121.    As noted hereinabove, Hartlieb did not participate in the Sprint Derivative Settlement, and objected vociferously to the Sprint Derivative Settlement.

122.    Furthermore, Hartleib is not a shareholder in Centurylink, nor does he claim to be a shareholder in Centurylink, thus depriving him of standing as *amici* in the Centurylink Derivative Litigation.

123.    In his brief, Hartleib claims that he seeks to "inform this Court of ongoing troubling actions by the Weiser and Robbins Arroyo et.al. [sic] Firms," pertaining to the Sprint Derivative Settlement.  Ex. 26 p. 2.

124.    Hartleib alleges that the Law Firm and Robbins Arroyo utilized "deceased parties, friends and family members which [sic] lacked standing, and paid serial criminal Plaintiffs," and that they "generate thousands of billable hours for illusory work, submit fraudulent time logs and seek hundreds of millions in unjust fees in cases across the country."  Id.

125.    Hartleib alleges that when he objected to the Sprint Derivative Settlement, "I was subjected to vicious ad hominem attacks as Weiser and Robbins Arroyo et.al. [sic] proved they would stop at nothing to protect their criminal enterprise . . . Weiser et.al [sic] lied, misleading the court [sic] . . . Weiser et.al. [sic] committed perjury and admitted to billing fraud."  Id. pp. 6-7.

126.    Hartleib admits to contacting Ross-Williams without consent of counsel or the Kansas Appeals Court, and further admits that upon receiving the Law Firm's cease-and-desist letter, "I replied by informing them that I would neither cease nor desist as the truth is an absolute defense.  I informed them that they and their co-conspirators were the ones that needed to *Cease and Desist*."  Id. p. 7 (emphasis in original).

127.    Hartleib alleges that in the Centurylink Derivative Litigation, Weiser "is now forced to initiate a new strategy, one of hiding behind another firm Bragar Eagel [sic] and Squire

seeking lead in this case in an effort to manage cases behind the scene [sic].  Greed appears to be

powerful [sic] motivator."  Id.

128.    Hartleib also alleges without any basis that "Mr. Jeffrey Mark Silow has worked

for the Weiser and Robbins Arroyo et.al. Firms [sic] for over 10 years, billing likely more than

100 million dollars in illicit fees, in a multitude of cases across the country."  Id. p. 8.

129.    On the following day, March 6, 2019, Hartleib appeared at a hearing before the

Honorable Michael J. Davis ("Judge Davis") with respect to the competing motions for

appointment of lead counsel in the Centurylink Derivative Litigation.  A true and correct copy of

the relevant portions of the transcript of the March 6, 2019 hearing before Judge Davis is

attached hereto as **Exhibit 27**.

130.    As the Law Firm did not seek lead counsel appointment in the Centurylink

Derivative Litigation, neither Weiser nor anyone else from the Law Firm attended that hearing.

131.    After counsel for each of the competing movants were heard, Hartleib was

permitted to speak by Judge Davis, and did so as follows, in relevant portion:

> As your honor knows, in the amicus brief I lay things out that shows [sic] a
> pattern, a course of conduct over many years.  I, as a shareholder, have had to
> defend my interests against the likes of Robbins Arroyo and more recently the
> Weiser Law Firm.

Ex. 27 at 40:11-15.

> [T]he way I have gotten involved in this is I see someone that [sic] falsely
> purports to represent the shareholders' interests or the corporation, the
> shareholders derivatively, and then I see no meaningful relief or nearly illusory
> relief and a tremendous amount in attorneys fees.  And in the Kansas case, I
> mean, I was subjected, I was – my character – I mean, I ended up having to
> defend my character, and I wasn't the one that [sic] did anything wrong.  You
> know, I mean, it's unbelievable the attacks that I took, so – **but it does nothing to
> dissuade me.  It just galvanizes my conviction and strengthens my resolve**.

Id. at 41:3-13 (emphasis provided).

With regard to the amicus brief, I didn't have a full service, the notice, you know, who to serve everyone.  And I understand that it could be prejudicial because they haven't had a chance to respond, but I welcome a response.  That said, **if the firms would like to give me a list of their forthcoming cases in which they are seeking leave, I could be certain to notify everybody timely** and I wouldn't have to prepare, stay up all night, all weekend long, to try to draft an amicus brief and get it to the court and then, you know, fly in.

Id. at 41:24-42:8 (emphasis provided).

And, Your Honor, *I know for a fact that the Weiser firm knew who Mr. Silow was and that will come out, you know, during the course of litigation.*  And I am pretty certain that the Robbins Arroyo firm knew who he was as well.

These firms, when these firms are up to no good, when they are billing illusory hours – you know, if I had 30 minutes with Your Honor in chambers, I could give Your Honor a lot more information . . .

Id. at 43:4-12.

132.    After bringing Hartleib's meandering comments to a close, Judge Davis permitted

George C. Aguilar, Esquire of Robbins Arroyo to respond to Hartleib's *amicus* brief and remarks

at the hearing.  Id. at 44:1-46:11.  The Court also gave Mr. Aguilar one week to respond in

writing to Hartleib's *amicus* brief.  Id. at 46:12-13.

133.    Hartleib then concluded his statements to the Court in relevant portion as follows:

HARTLEIB:   . . . The allegations that I make against these firms are very serious allegations.  He says that I am libeling him, slandering him and defaming the firm.  I have asked Mr. Aguilar on numerous occasions **if they would like to sue me, I will waive service. I am perfectly happy for you – if you want to commence an action, then I will get the discovery** –
THE COURT: Speak to me.
HARTLEIB:  Then I will get the discovery that I need to finally put an end to this, all of this, you know, unjust enrichment, you know, literally bastardizing our judicial process.
THE COURT: Okay.
HARTLEIB:  Thank you.

Id. at 47:8-21 (emphasis supplied).

134.    After the Centurylink hearing, on March 14, 2019, Harteib sent an e-mail to Jill Boren, administrative assistant to Judge Vano, who ruled on the Sprint Derivative Settlement in the Kansas State Court.  A true and correct copy of Hartlieb's March 14, 2019 e-mail is attached hereto as **Exhibit 28**.

135.    Hartleib copied the entire attorney distribution list for the Sprint Derivative Settlement on his March 14, 2019 e-mail to Ms. Boren.  *Id.*

136.    Therein, Hartleib wrote:

Dear Ms. Boren, I hope this e-mail finds you well. I thought that the Honorable Vano would be interested to know that my quest to expose lawyer driven litigation and corruption rife throughout the Plaintiffs Bar continues. Attached is an Amicus Brief filed in Minnesota, and transcript of the hearing before the Honorable Michael J. Davis. In addition, I have initiated legal action against Weiser and representative plaintiff Ross-Williams as outlined in the attached complaint.

. . .  **Maybe Judge Vano would be interested in setting the record straight before the Court appoints lead Counsel in the aforementioned [Centurylink] case**.

Interestingly, I received an anonymous letter last night which details an elaborate scheme by Weiser et.al. to procure "Relators" in Qui Tam cases. It involves the use of several LLC shell corporations set up for the sole purpose of soliciting information under false pretenses to facilitate lawyer driven Qui Tam cases. This has resulted in the DOJ filing a motion to dismiss 11 active cases, filed by Weiser et.al. including ABBVIE. The level of sinister is [sic] truly unbelievable, some of which is outlined in the attached Motion to dismiss by the Feds!

Lastly, I would like to express my gratitude to Judge Vano, I am, and remain incredible [sic] grateful for allowing me to be heard, and finding my arguments compelling. I will continue my quest to expose and reform the corruption rife throughout Derivative litigation.

With the Utmost Respect,
Michael Hartleib  (646) 494-5901

Ex. 28.

137.    The *qui tam* cases referenced by Hartleib involve whistleblower complaints brought by the National Healthcare Analysis Group ("NHCA") and related organizations accusing eleven pharmaceutical manufacturers of enticing doctors to prescribe their products using nurse educators as "kickbacks".

138.    The Law Firm was nominally involved in only three of the eleven of the NHCA's *qui tam* cases – *United States of America, et al v. OTSUKA Holdings Company, Ltd. et al,* No. 1:17-CV-00966 (N.D. Ill.) (the "Otsuka case"); *United States of America et al v. SMSF, LLC et al,* No. 1:16-CV-11379 (D. Mass.) (the "Biogen case"); and *Miller et al v. AbbVie Inc. et al,* No. 3:16-CV-02111 (N.D. Tex.) (the "AbbVie case").

139.    In the Otsuka case, the Law Firm never entered an appearance, and upon learning that the government did not wish to proceed, the Law Firm immediately informed its clients that they would need to secure new counsel if they wished to proceed.   On October 29, 2018, substitute counsel appeared for the relators, and on October 31, 2018, local counsel's motion to withdraw was granted.   After the government filed a motion to dismiss the Otsuka case, the relators, through their new counsel, filed a notice of voluntary dismissal.

140.    Similarly, in the Biogen case, the Law Firm never entered an appearance or sought admission *pro hac vice,* and informed its clients of the need to secure new counsel upon learning that the government did not wish to prosecute the case.  On August 24, 2018, substitute counsel, GeyerGorey LLP, appeared in the case, and on December 17, 2018 the government filed a motion to dismiss; the case was closed on or about December 26, 2018.

141.    Finally, in the AbbVie case, the Law Firm entered its appearance on June 22, 2018.  As with the Otsuka case and the Biogen case, upon learning of the government's decision not to pursue the case, the Law Firm immediately informed its clients that they would need to

secure new counsel.  On September 25, 2018, GeyerGorey LLP filed a notice of substitution for the Law Firm.  On December 17, 2018, the government moved to dismiss the case, and on March 13, 2019, the relators, through their new counsel, filed a notice of voluntary dismissal.

142.    The Law Firm did not engage in any nefarious conduct, nor has any court or government agency suggested the Law Firm did anything improper.

143.    On April 23, 2019, Judge Davis issued a Memorandum of Law & Order appointing Bragar Eagle & Squire, P.C. as lead counsel, whose proposed support structure includes the Law Firm.  A true and correct copy of the April 23, 2019 Memorandum issued by Judge Davis is attached hereto as **Exhibit 29**.

144.    With respect to Hartleib, Judge Davis wrote as follows: "The Court has carefully considered Hartleib's allegations, Robbins Arroyo's response, and the public record in the cases cited by Hartleib. The Court concludes that **Hartleib has raised no legitimate questions** with regard to the ethics or expertise of the Robbins Arroyo law firm. **The Court is satisfied that there are no ethical concerns** that would hinder Robbins Arroyo's application for appointment as Lead Counsel."  Ex. 29 p. 5 (emphasis supplied).

*Hartleib's Federal Lawsuit Against Plaintiffs*

145.    On December 12, 2018, Kansas-based counsel for Hartleib, Andrew Protzman, Esquire, provided Weiser with a draft copy of a petition alleging legal malpractice/breach of fiduciary duty and violations of Kansas Consumer Protection Act claims against Weiser and the Law Firm, and abuse of process and breach of fiduciary duty claims against Ross-Williams.  A true and correct copy of counsel's December 12, 2018 correspondence and the attached draft petition are attached hereto as **Exhibit 30**.

146.    The petition stems from Hartleib's claim that he was a client of the Law Firm for purposes of the 2009 Sprint Derivative Action, even though Hartleib filed separate derivative litigation with respect to Sprint in 2011 by and through separate counsel.

147.    In his December 12, 2018 letter, Mr. Protzman invited Weiser to "explore avenues to an agreeable resolution to the matter before it is filed." Ex. 30 p. 1.

148.    The undersigned, Philip S. Rosenzweig, Esquire, corporate counsel for the Law Firm and personal counsel for Weiser, responded by letter dated December 19, 2018, a true and correct copy of which is attached hereto as **Exhibit 31**.

149.    Therein Mr. Rosenzweig wrote, in part:

[The] causes of action [alleged against Weiser and the Law Firm in the draft petition] depend, inter alia, upon a demonstrably false and absurd premise: that the Weiser Firm and/or Mr. Weiser "agreed to represent Mr. Hartleib" and "entered into an attorney-client relationship" with Hartleib in March 2009. . . .

. . . while Hartleib may have sought my Clients' legal services, such services were certainly never provided to or received by Hartleib, because my Clients flatly declined to act as counsel (or co-counsel) to Hartleib immediately after Mr. Weiser first communicated with Hartleib.

Surely you agree that an implied attorney-client relationship is not formed simply because an individual seeking legal representation communicated with a lawyer once, and of course, as set forth above, Kansas law does not provide otherwise.

Ex. 31 p. 2 (internal citations omitted).

150.    Mr. Protzman e-mailed Mr. Rosenzweig twice more – on December 21, 2018 and January 7, 2019 (true and correct copies of which e-mail correspondence are attached hereto collectively as **Exhibit 32**) – seeking both times to initiate "pre-suit mediation of this matter." Ex. 32 p. 1.

151.    Plaintiffs herein did not wish to entertain Hartleib's overture of "pre-suit mediation," and Mr. Rosenzweig accordingly did not respond to Mr. Protzman's e-mails.

{01292774;5}

152.    On January 22, 2019, Hartleib filed a civil action in the Kansas State Court, alleging legal malpractice/breach of fiduciary duty, violation of the Kansas Consumer Protection Act and abuse of process claims against Weiser and the Law Firm (the "Hartleib Action"). Hartleib's complaint also includes claims for abuse of process and breach of fiduciary duty against Ross-Williams.  A true and correct copy of Hartleib's complaint against Plaintiffs and Ross-Williams in the Hartleib Action is attached hereto as **Exhibit 33**.

153.    Plaintiffs herein subsequently removed the Hartleib Action to the Kansas Federal Court, and moved to dismiss Hartleib's complaint on February 27, 2019, which motion was granted by Memorandum and Order dated August 21, 2019.

154.    On September 18, 2019, Hartleib moved for reconsideration of the dismissal of the Hartleib Action, which motion was denied by Memorandum and Order dated June 22, 2020.

155.    Shortly thereafter, Hartleib filed an appeal of the dismissal of the Hartleib Action, which appeal remains pending.

*Hartleib Contacts Abelson and Detective Thomas J. Goggin in Pennsylvania*

156.    Hartleib intentionally contacted certain individuals in Pennsylvania seeking help in his efforts to harm the Plaintiffs there.

157.    For example, in February of 2018, Hartleib called Abelson at its sole office located in Philadelphia, Pennsylvania and spoke with Joyce A. Feinstein ("Feinstein").  Hartleib had no previous relationship with Abelson or Feinstein.

158.    Feinstein is the recruiter who first placed Silow with the Law Firm a decade earlier.

159.    After the call, Feinstein e-mailed Hartleib: "[I] told Cathy [Abelson] what I could about your and our phone call. I was confused about the motivation of your call to Abelson. Also

{01292774;5}

confused if you were an attorney or a plaintiff yourself. I found out through more digging, you

are a professional plaintiff." A true and correct copy of Feinstein's e-mail is attached hereto as

**Exhibit 34**.

160.    Hartleib responded by e-mail:

I understand that I am on a rant, but you hit a nerve. . . . I tell people all the time
that I have a personality disorder . . . I cannot [sic] only help you defeat their suit,
I can facilitate a cross-complaint that could lead to the demise of the Weiser Firm
and damages for Abelson.  If you are still not convinced, I can provide contacts,
or more from the current case to convince you. . . . Weiser et.al. [sic] are corrupt
and inept.  After all, a layperson has defeated and humiliated them, and I am far
from finished.  I predict when over certain attorneys may not be practicing law in
the future.  I am hopeful that we can work together.

A true and correct copy of Hartleib's e-mail is attached hereto as **Exhibit 35**.

161.    Neither Abelson nor Feinstein responded to Hartleib.

162.    Undeterred, Hartleib called and e-mailed Abelson *again* on February 22, 2018:

. . . My name is Michael Hartleib, I am the person who has exposed the fraud
committed by the Weiser firm in the case that has brought Mr. Silow's criminal
past and disbarred status into focus. . . Their actions in this case are truly
unconscionable . . . they have filed multiple purjurious [sic] declaration and will
stop at nothing to protect their duplicitous acts and criminal enterprise. . . . I am
hopeful that we can work together and facilitate a cross-complaint against the
Weiser firm. . . . I know where the bodies are buried and intend to dig them up.  I
look forward to speaking with you.

A true and correct copy of Hartleib's February 22, 2018 e-mail is attached hereto as

**Exhibit 36**.

163.    Hartleib e-mailed Feinstein a *third* time on February 24, 2018:

. . . I just found out [Weiser's] firm was appointed lead in a huge nationwide suit.
I will be working tonight and tomorrow on an Amicus Brief [sic], whereby I will
inform the court of his criminal acts in the Sprint case, ongoing PA Bar
investigation and forthcoming Order from the Kansas Court of Appeals.  His firm
is unfit to be lead Counsel [sic] in any representative suit at this time. . . . My goal
will be to have him removed as lead plaintiff counsel in said case.  You are in a
fantastic position with regard to the Weiser suit, this could end up being a huge

win for Abelson.  Tell Cathy not to worry about it.  They have dug themselves a
hole that will be impossible to escape from.

A true and correct copy of Hartleib's February 24, 2018 e-mail is attached hereto as **Exhibit 37**.

164.    Months later, on June 2, 2018, Hartleib e-mailed Abelson yet *again*, stating:
"Cathy, are you interested in working together to commence an action against the Weiser firm?
Why won't you have your attorney's contact me." A true and correct copy of the June 2, 2018 e-
mail is attached hereto as **Exhibit 38**.

165.    Seeking assistance throughout Pennsylvania in his campaign of destruction
against Plaintiffs, Hartleib was simultaneously contacting Thomas J. Goggin, Detective Sergeant
at the Chester County District Attorney's Office in Chester County, Pennsylvania ("Detective
Goggin").

166.    On March 13, 2018, Hartleib wrote to Detective Goggin: "the Weiser firm is
claiming to be a victim of Mr. Silow, when there is irrefutable proof they knew of Mr. Silow
[sic] fraud and conspiracy against the court." A true and correct copy of the March 13, 2018 e-
mail is attached hereto as **Exhibit 39**.

167.    Hartleib sent a second e-mail to Detective Goggin the following day, stating:
"Hey Thomas . . . [Silow] was presented as an attorney in good standing, and securities expert . .
. the Weiser firm knew exactly who Silow was and the Weiser [sic] is lying." A true and correct
copy of the March 14, 2018 e-mail is attached hereto as **Exhibit 40**.

168.    A week later, on March 22, 2018, Hartleib sent a third e-mail:

Mr. Goggin's [sic] . . . Weiser knew exactly who Silow was!  I was hopeful
[Abelson] would want to work together but I have not heard back from there [sic]
lawyers. I am going to bring a civil suit against Weiser.  Were you able to find the
misdemeanor charges against Silow?  Were you able to find the suit Vs [sic]
Abelson?  Any information could be helpful!

A true and correct copy of the March 22, 2018 e-mail is attached hereto as **Exhibit 41**.

{01292774;5}

169.    Approximately two months later, on May 14, 2018, Hartleib e-mailed Detective Goggin *again*, attaching the opinion of the Kansas Appeals Court upholding the reduced attorneys' fee award in the Sprint Derivative Litigation and writing: "Were you ever able to find charges filed against Silow? I can't believe that the[y] can commit perjury and try to defraud the court and Sprint and walk away with 450k . . . I am going to file a Bar complaint and commence a civil action." A true and correct copy of the May 14, 2018 e-mail is attached hereto as **Exhibit 42**.

170.    By providing the aforementioned opinion to Detective Goggin, Hartleib clearly intended to mischaracterize the Kansas Appeals Court opinion as the product of the frauds he alleged against Weiser and the Firm, without basis.

171.    On November 6, 2018, Hartleib reached out to Detective Goggin a final time, "following up to see if any action was taken by [Detective Goggin's] department" and describing an attached document Hartleib received from Weiser as an "attempt to impugn [Hartleib's] integrity" and "[c]ompletely inconsistent with what [Weiser] told the appellate court." A true and correct copy of the November 6, 2018 e-mail is attached hereto as **Exhibit 43**.

172.    Hartleib's communications with each of Abelson and Detective Goggin demonstrate Hartleib's knowing and intentional injection into Pennsylvania in order to solicit the assistance of and collaboration with Abelson and Detective Goggins in harming Plaintiffs.

173.    Hartleib's actions as set forth hereinabove – including but not limited to the distribution of unsolicited missives to attorney contact lists in ongoing litigations, the multiple applications to vacate a Protective Order preventing Hartleib from continued unlawful contact with clients of the Law Firm, the filing of *amicus curiae* briefs and appearances at hearings in unrelated litigations simply to insult, defame, and disparage Plaintiffs and their colleagues, the

threatening and profane letters to the bench of the Court of Common Pleas of Chester County, Pennsylvania, the threats to insert himself into the Law Firm's pending cases such as *Witmer, LC* and *A10*, and the repeated improper written and oral requests for *ex parte* contact with a judge or for a judge to insert himself into an unrelated pending case – demonstrate Hartleib's campaign to insult, degrade, belittle, harass, annoy, denigrate, malign, harm, embarrass and destroy the reputations of Plaintiffs.

174.    Hartleib's various communications to Plaintiffs' colleagues, to judges, to clients, to Abelson, and to Detective Goggins is defamatory insofar as it maligns Plaintiffs by name to third parties, thereby injuring Plaintiffs' professional reputations and profitability.

175.    Hartleib's various communications directly attacking the quality of the services provided by Plaintiffs to judges, clients, and Detective Goggins are disparaging insofar as they directly undermine the legal services provided by Plaintiffs.

176.    Hartleib has intentionally caused Weiser to suffer emotional distress as a result of Hartleib's outrageously cruel, indecent, inflammatory and/or false personal attacks upon Weiser's abilities, character, actions, relationships, legal ethics, beyond all possible bounds of decency.  Hartleib's targeted and personal affronts and intentional deceits, fabrications, slurs and smears have directly resulted in Weiser suffering great distress, anxiety and upset, and the primary interests of the Law Firm suffering severe harm.

177.    Not only has Hartleib caused Weiser to suffer personal emotional distress, but he has selectively published and mischaracterized matters related to Weiser in such a way that they cast Weiser in a false, negative light.

178.    Hartleib's outrageous behavior cannot be permitted in a judicial system founded on the pillars of honesty, fairness and legitimacy.

## Count I-- Defamation

179.    Plaintiffs repeat and reassert each of the previous paragraphs as though the same were set forth herein.

180.    "A prima facie case for defamation requires the plaintiff to plead the following: (1) the defamatory character of the communication; (2) publication of the communication to a third party; (3) the communication refers to the plaintiff; (4) the third party's understanding of the communication's defamatory character; and (5) injury." *Brown v. Blaine,* 833 A.2d 1166, 1173 n. 14 (Pa. Commw. 2003)(citing 42 Pa. C.S.A. § 8343).

181.    "Pennsylvania, like many other jurisdictions, recognizes a judicial litigation privilege providing immunity for communications which are made in the regular course of judicial proceedings and are material to the relief sought." *Schanne v. Addis,* 121 A.3d 942, 947 (Pa. 2015).  The privilege covers statements made by parties, witnesses, attorneys, or judges.  *Id.* "[T]he privilege is absolute, meaning that, where it attaches, the declarant's intent is immaterial even if the statement is false and made with malice."  *Id.* at 947 (citing *Bochetto v. Gibson,* 580 Pa. 245, 860 A.2d 67, 71 (Pa. 2004)).  The judicial privilege is not limited to statements made in open court, but encompasses pleadings as well.  *Grey v. Johansson,* No. 15-2479 2016 U.S. Dist. LEXIS 53931 *14-*15, 2016 WL 1613804 (E.D. Pa. April 22, 2016)(citing *Post v. Mendel,* 510 Pa. 213, 507 A.2d 351, 353 (Pa. 1986); *Stein v. City of Philadelphia,* 2013 U.S. Dist. LEXIS 172172, 2013 WL 6408384, at *6 (E.D. Pa. Dec. 5, 2013) ("Parties in litigation are given an absolute privilege with regard to statements that relate to a judicial proceeding if the communications are preliminary to, instituting, or part of the proceeding.")).

182.    "[I]t is well-settled law that a communication which ascribes to another conduct, character, or a condition that would adversely affect his fitness for the proper conduct of his

business, trade, or profession, is defamatory per se.  Where there is any doubt that the communication disparages or harms the complainant in his business or profession, that doubt must be resolved in favor of the complainant; even where a plausible innocent interpretation of the communication exists, if there is an alternative defamatory interpretation, it is for the jury to determine if the defamatory meaning was understood by the recipient." Pelagatti v. Cohen, 370 Pa. Super. 422, 438-39, 536 A.2d 1337 (Pa. Super. 1987)(internal citations omitted).

183.    Hartleib made several defamatory statements about Plaintiffs to members of the bench and the bar who were involved in the Sprint Derivative Settlement, to wit:

      a.   On March 6, 2017, Hartleib wrote to eleven members of the bar at five different law firms, as well as Judge Vano's administrative assistant, that Weiser made "statements to the Appellate Court [which] were disingenuous at best.  Shocking!" Ex. 12.  Hartleib implied that Weiser did not honor any "ethical obligation," and accused Weiser of "attempt[ing] to obfuscate your chicanery in this case," and being one of "the corrupt parties in this case!" who was threatening "the integrity of the judicial system . . ." Id.

      b.   Also on March 6, 2017, Hartleib contacted the Law Firm's client, Ross-Williams, the lead plaintiff in the Sprint Derivative Action.  Ex. 13.  Therein Hartleib told Ross-Williams that the Law Firm was a "criminal enterprise" and was not serving her interests as a Sprint shareholder.

      c.   On March 7, 2017, Hartleib e-mailed Ross-Williams, fifteen members of the bar and Judge Vano's administrative assistant and falsely stated: "you are a unwitting victim of [the Law Firm's] fraud committed against the

Court. As we discussed they have submitted millions of dollars in fraudulent billing in your case. As I informed you that this was not just my opinion, the Judge in your case came to a similar conclusion. In fact, your attorneys have now admitted to at least 1.6 million dollars in fraudulent bills submitted to the Court. Mr. Weiser has confirmed this in two separate letters. (See attached). I am no expert, but when a Firm admits criminal acts in a case I believe they are obligated to notify you as the Plaintiff. Mr. Weiser and his Firm have already contacted their Bar associations and other Courts to self-report their criminal acts. . . they are in a lot of trouble . . . I will provide incontrovertible proof that Mr. Weiser et. al. is just as guilty as Mr. Silow. This is just the tip of the iceberg." Ex. 14.

d. In a second March 7, 2017 e-mail to fifteen members of the bar and Judge Vano's administrative assistant, Hartleib accused Weiser of making "self-serving misrepresentations" in correspondence, of "fail[ing] to provide" documents to his client; of committing "fraudulent acts and bastardization [sic] of the judicial system," of "coercing your 'client' to misstate facts," of having "little credibility," of making a "not so vailed [sic] threat" to reserve Ross-Williams' rights, and of needing to "consult with an ethics attorney, that's right you already have!" Ex. 14.

e. After Hartleib tipped *The Wall Street Journal* about the Law Firm's victimization by Silow and Abelson, Hartleib e-mailed eleven members of

the bar and Judge Vano's assistant regarding Weiser: "What an embarrassment to the bar!  See you in Court."  Ex. 16.

f.   In an April 7, 2018 e-mail to Weiser and eight other members of the bar, Hartleib accused Weiser of "attempt[ing] to mislead the Appellate Court with incomplete records," of making "personal attacks [that] smack of desperation," and of making "ill-advised actions, [sic] and ad-hominem attacks [which] are making the Weiser Firm radioactive!"  Ex. 15.

g.   On May 19, 2018, Hartleib admitted in writing in an e-mail to numerous attorneys that he intended to make false allegations against the Law Firm, stating: "Plaintiff Counsel, and I use this term loosely, when making false allegations against a party I would suggest you at least get it right. I am no expert, but I am pretty sure it would be libelous! I will demonstrate its proper use posthaste!"  Ex. 18.

h.   On June 2, 2018, Hartleib sent an e-mail to a host of members of the bar in which he referred to the Law Firm's work in the Sprint Derivative Action as "fraud" and "the very definition of [r]acketeering."  Ex. 19.  Hartleib implied that the Law Firm's "standard operating procedure" is "to submit millions in fraudulent fee requests upon the Court" which "prevents a troubling pattern of fraud and corruption in these lawyer-driven cases."  Id.

i.   Finally, in a March 14, 2019 e-mail to Judge Vano's chambers, Hartleib asked Judge Vano to interject himself into the Centurylink Derivative Action in opposition to the Law Firm's role in the support structure of

proposed (and ultimately approved) lead counsel Bragar, Eagle & Squire, P.C. ("Maybe Judge Vano would be interested in setting the record straight before the Court appoints lead counsel in the aforementioned case."); and accused the Law Firm and Weiser of "sinister" behavior in an "elaborate scheme" involving "the use of LLC shell corporations set up for the sole purpose of soliciting information under false pretenses to facilitate lawyer driven Qui Tam cases." Ex. 28.

184.    Hartleib also made defamatory statements about Plaintiffs to members of the bench and bar outside of the Sprint Derivative Settlement context, for example:

    a.  On April 25, 2017, Hartleib mailed a letter to sitting members of the Court of Common Pleas of Chester County, Pennsylvania – where the Law Firm is located – about Weiser and the Law Firm, stating that Judge Vano "caught the firm in the act" of falsifying their billings in the Sprint Derivative Settlement, and implying that Weiser was a profane bully and incompetent lawyer and firm manager. Ex. 17.

    b.  On August 24, 2018, Hartleib e-mailed Judge Watson in the Big Lots Derivative Action, even though he was not "a shareholder in Big lots or otherwise an interested party in this case" raising "concerns over Weiser's billing practices in [a] prior case and stat[ing] that he wanted to inform the Court so it would scrutinize the fee request in this case." Ex. 25 p. 11 fn.2.

    c.  Similarly, in the Centurylink Derivative Litigation, Hartleib submitted an *amicus curiae* brief on March 5, 2019 opposing the Law Firm's role in the

case, purportedly to "inform the Court of ongoing troubling actions by the Weiser [Firm] . . ." Ex. 26. Hartleib specifically alleged that the Law firm utilized "deceased parties, friends and family members which [sic] lacked standing, and paid serial criminal Plaintiffs," and "generate thousands of billable hours for illusory work, submit fraudulent time logs and seek hundreds of millions in unjust fees in cases across the country." Id. According to Hartleib, the Law Firm "would stop at nothing to protect their criminal enterprise . . . Weiser et.al [sic] lied, misleading the court [sic] . . . Weiser et.al. [sic] committed perjury and admitted to billing fraud . . . likely more than 100 million dollars in illicit fees, in a multitude of cases across the country." Id.

d.   Hartleib appeared at a hearing in the Centurylink Derivative Action on March 6, 2019, stating to the Court and everyone present in the courtroom: "I lay things out that shows [sic] a pattern, a course of conduct over many years . . . I see no meaningful relief or nearly illusory relief and a tremendous amount in attorneys fees . . . And, Your Honor, I know for a fact that the Weiser firm knew who Mr, Silow was and that will come out, you know, during the course of litigation . . . These firms, when these firms are up to no good, when they are billing illusory house – you know, if I had 30 minutes with Your Honor in chambers, I could give Your Honor a lot more information . . . The allegations that I make against these firms are very serious allegations." Ex. 27.

185.    Hartleib also made defamatory statements about Plaintiffs to other third parties located in Pennsylvania, such as Abelson and Detective Goggins, for example:

      a.   In an e-mail to Abelson on February 22, 2018, Hartleib indicated that he had "exposed the fraud committed by the Weiser firm" and that the alleged actions of the Firm were "unconscionable" and that the Firm had filed "multiple purjurious [sic] declaration [sic]" to "protect their duplicitous acts and criminal enterprise. Ex. 36.

      b.   In an e-mail to Feinstein on February 24, 2018, Hartleib stated his interests in facilitating the "demise of the Weiser Firm" and that "Weiser et.al. [sic] are corrupt and inept" because a "layperson . . . defeated and humiliated them" and concluding that, based on his actions, "certain attorneys may not be practicing law in the future. Ex. 35.

      c.   E-mailing Feinstein again on February 24, 2018, writing that Hartleib intended to inform "the court of his criminal acts in the Sprint case [and] ongoing Pa Bar investigation" and that the Firm was "unfit to be lead Counsel [sic] in any representative suit[.]" Ex. 37.

      d.   In contacting Detective Goggin, Hartleib stated that the Law Firm "knew of Mr. Silow [sic] fraud and conspiracy[,]" that "Weiser [sic] is lying" and "knew exactly who Silow was[,]" that Hartleib could not "believe that the[y] can commit perjury and try to defraud the court and Sprint and walk away[,]" and implicitly mischaracterizing the reduction of attorneys' fees in the Sprint Derivative Action as the product of the frauds baselessly alleged by Hartleib. Exs. 39, 40, 41, and 42.

186.    Upon information and belief, in each of the eighteen instances detailed hereinabove in which Hartleib made a defamatory statement to multiple third parties about Plaintiffs, the third parties hearing or reading the statement(s) understood the nature of those statements as disparaging Plaintiffs with respect to the practice of law.  Therefore, they constitute defamation *per se.*

187.    None of these defamatory statements could be excused by judicial privilege, as none were relevant to the "relief sought" by Hartleib as a Sprint shareholder in the derivative case brought on behalf of Sprint.

188.    The effect of Hartleib's defamatory statements to third parties has been to injure Plaintiffs' business and professional reputations.

189.    Plaintiffs have been compelled to defend and repair their professional reputations against Hartleib's baseless allegations.

WHEREFORE, Plaintiffs Robert Weiser and The Weiser Law Firm, P.C. demand judgment in their favor and against Michael Hartleib in an amount to be determined at trial for damages due to defamation, and respectfully request that this Honorable Court grant them such other relief that the Court deems appropriate under the circumstances.

## Count II – Intentional Infliction of Emotional Distress

190.    Plaintiffs repeat and reassert each of the previous paragraphs as though the same were set forth herein.

191.    "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."  *Hoy v. Angelone,* 554 Pa. 134,

150-151, 720 A.2d 745 (Pa. 1998)(citing and quoting Restatement (Second) of Torts § 46(1) (1965)).

192.    To establish a claim for intentional infliction of emotional distress, a plaintiff must show that the defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Hoy,* 720 A.2d at 754 (internal citations omitted).

193.    Hartleib's insults, jeers, slurs, taunts, lies, affronts and abuses aimed at Weiser and at the Law Firm that he founded and operates with his spouse, and broadcast to judges and colleagues and to the legal community at large via publicly-available pleadings and to the international population via *The Wall Street Journal*'s article are indecent, dishonest, outrageous, malicious, atrocious and should not be tolerated by this Honorable Court.

194.    Hartleib's conduct as described hereinabove has intentionally caused Weiser to suffer enormous stress, anxiety, sleep deprivation, depression, anger and torment.

WHEREFORE, Plaintiff Robert Weiser demands judgment in his favor and against Michael Hartleib in an amount to be determined at trial for damages from intentional infliction of emotional distress, and respectfully request that this Honorable Court grant him such other relief that the Court deems appropriate under the circumstances.

### Count III – Commercial Disparagement

195.    Plaintiffs repeat and reassert each of the previous paragraphs as though the same were set forth herein.

196.    Hartleib viciously leveled false claims directed at the legal services provided by Weiser and the Law Firm, disparaging both their quality and the ethics of Plaintiffs' practice.

197.    "Regardless of the label, the publication of a disparaging statement concerning the business of another is actionable where: (1) the statement is false; (2) the publisher intends the publication to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss; (3) pecuniary loss does in fact result; and (4) the publisher either knows that the statement is false or acts in reckless disregard of its truth or falsity." *Neurotron Inc. v. Med. Serv. Ass'n of Pa.*, 254 F.3d 444, 448 (3d Cir. 2001) (quoting *Pro Golf Manufacturing, Inc. v. Tribune Review Newspaper Company*, 2000 Pa Super 273, 761 A.2d 553 (2000) (internal citations omitted)).

198.    Hartleib, through his false and disparaging statements regarding events in the Sprint Derivative Litigation and the demonstrably false characterizations thereof, commercially disparaged Weiser and the Law Firm, to wit:

   a.  On March 6, 2017, Hartleib wrote to eleven members of the bar at five different law firms, as well as Judge Vano's administrative assistant, that Weiser made "statements to the Appellate Court [which] were disingenuous at best. Shocking!" Ex. 12. Hartleib implied that Weiser did not honor any "ethical obligation," and accused Weiser of "attempt[ing] to obfuscate your chicanery in this case," and being one of "the corrupt parties in this case!" who was threatening "the integrity of the judicial system . . ." Id.

   b.  Also on March 6, 2017, Hartleib contacted the Law Firm's client, Ross-Williams, the lead plaintiff in the Sprint Derivative Action. Ex. 13. Therein Hartleib told Ross-Williams that the Law Firm was a "criminal enterprise" and was not serving her interests as a Sprint shareholder.

c.  On March 7, 2017, Hartleib e-mailed Ross-Williams, fifteen members of the bar and Judge Vano's administrative assistant and falsely stated: "you are a unwitting victim of [the Law Firm's] fraud committed against the Court. As we discussed they have submitted millions of dollars in fraudulent billing in your case. As I informed you that this was not just my opinion, the Judge in your case came to a similar conclusion. In fact, your attorneys have now admitted to at least 1.6 million dollars in fraudulent bills submitted to the Court. Mr. Weiser has confirmed this in two separate letters. (See attached). I am no expert, but when a Firm admits criminal acts in a case I believe they are obligated to notify you as the Plaintiff. Mr. Weiser and his Firm have already contacted their Bar associations and other Courts to self-report their criminal acts. . . they are in a lot of trouble . . . I will provide incontrovertible proof that Mr. Weiser et. al. is just as guilty as Mr. Silow. This is just the tip of the iceberg." Ex. 14.

d.  In a second March 7, 2017 e-mail to fifteen members of the bar and Judge Vano's administrative assistant, Hartleib accused Weiser of making "self-serving misrepresentations" in correspondence, of "fail[ing] to provide" documents to his client; of committing "fraudulent acts and bastardization [sic] of the judicial system," of "coercing your 'client' to misstate facts," of having "little credibility," of making a "not so vailed [sic] threat" to reserve Ross-Williams' rights, and of needing to "consult with an ethics attorney, that's right you already have!"  Ex. 14.

e.  After Hartleib tipped *The Wall Street Journal* about the Law Firm's victimization by Silow and Abelson, Hartleib e-mailed eleven members of the bar and Judge Vano's assistant regarding Weiser: "What an embarrassment to the bar!  See you in Court."  Ex. 16.

f.  In an April 7, 2018 e-mail to Weiser and eight other members of the bar, Hartleib accused Weiser of "attempt[ing] to mislead the Appellate Court with incomplete records," of making "personal attacks [that] smack of desperation," and of making "ill-advised actions, [sic] and ad-hominem attacks [which] are making the Weiser Firm radioactive!"  Ex. 15.

g.  On May 19, 2018, Hartleib admitted in writing in an e-mail to numerous attorneys that he intended to make false allegations against the Law Firm, stating: "Plaintiff Counsel, and I use this term loosely, when making false allegations against a party I would suggest you at least get it right. I am no expert, but I am pretty sure it would be libelous! I will demonstrate its proper use posthaste!"  Ex. 18.

h.  On June 2, 2018, Hartleib sent an e-mail to a host of members of the bar in which he referred to the Law Firm's work in the Sprint Derivative Action as "fraud" and "the very definition of [r]acketeering."  Ex. 19.  Hartleib implied that the Law Firm's "standard operating procedure" is "to submit millions in fraudulent fee requests upon the Court" which "prevents a troubling pattern of fraud and corruption in these lawyer-driven cases." Id.

      i.    Finally, in a March 14, 2019 e-mail to Judge Vano's chambers, Hartleib asked Judge Vano to interject himself into the Centurylink Derivative Action in opposition to the Law Firm's role in the support structure of proposed (and ultimately approved) lead counsel Bragar, Eagle & Squire, P.C. ("Maybe Judge Vano would be interested in setting the record straight before the Court appoints lead counsel in the aforementioned case."); and accused the Law Firm and Weiser of "sinister" behavior in an "elaborate scheme" involving "the use of LLC shell corporations set up for the sole purpose of soliciting information under false pretenses to facilitate lawyer driven Qui Tam cases."  Ex. 28.

199.    Hartleib also made disparaging statements regarding events outside the Sprint Derivative Litigation, for example:

      a.    On April 25, 2017, Hartleib mailed a letter to sitting members of the Court of Common Pleas of Chester County, Pennsylvania – where the Law Firm is located – about Weiser and the Law Firm, stating that Judge Vano "caught the firm in the act" of falsifying their billings in the Sprint Derivative Settlement, and implying that Weiser was a profane bully and incompetent lawyer and firm manager.  Ex. 17.

      b.    On August 24, 2018, Hartleib e-mailed Judge Watson in the Big Lots Derivative Action, even though he was not "a shareholder in Big lots or otherwise an interested party in this case" raising "concerns over Weiser's billing practices in [a] prior case and stat[ing] that he wanted to inform the

Court so it would scrutinize the fee request in this case." Ex. 25 p. 11 fn.2.

c. Similarly, in the Centurylink Derivative Litigation, Hartleib submitted an *amicus curiae* brief on March 5, 2019 opposing the Law Firm's role in the case, purportedly to "inform the Court of ongoing troubling actions by the Weiser [Firm] . . ." Ex. 26. Hartleib specifically alleged that the Law firm utilized "deceased parties, friends and family members which [sic] lacked standing, and paid serial criminal Plaintiffs," and "generate thousands of billable hours for illusory work, submit fraudulent time logs and seek hundreds of millions in unjust fees in cases across the country." Id. According to Hartleib, the Law Firm "would stop at nothing to protect their criminal enterprise . . . Weiser et.al [sic] lied, misleading the court [sic] . . . Weiser et.al. [sic] committed perjury and admitted to billing fraud . . . likely more than 100 million dollars in illicit fees, in a multitude of cases across the country." Id.

d. Hartleib appeared at a hearing in the Centurylink Derivative Action on March 6, 2019, stating to the Court and everyone present in the courtroom: "I lay things out that shows [sic] a pattern, a course of conduct over many years . . . I see no meaningful relief or nearly illusory relief and a tremendous amount in attorneys fees . . . And, Your Honor, I know for a fact that the Weiser firm knew who Mr, Silow was and that will come out, you know, during the course of litigation . . . These firms, when these firms are up to no good, when they are billing illusory house – you know,

if I had 30 minutes with Your Honor in chambers, I could give Your Honor a lot more information . . . The allegations that I make against these firms are very serious allegations." Ex. 27.

200.    Hartleib also made disparaging statements about Plaintiffs and their services to other third parties located in Pennsylvania, such as Abelson and Detective Goggins, for example:

    a.   In an e-mail to Abelson on February 22, 2018, Hartleib indicated that he had "exposed the fraud committed by the Weiser firm" and that the alleged actions of the Law Firm were "unconscionable" and that the Firm had filed "multiple purjurious [sic] declaration [sic]" to "protect their duplicitous acts and criminal enterprise. Ex. 36.

    b.   In an e-mail to Feinstein on February 24, 2018, Hartleib stated his interests in facilitating the "demise of the Weiser Firm" and that "Weiser et.al. [sic] are corrupt and inept" because a "layperson . . . defeated and humiliated them" and concluding that, based on his actions, "certain attorneys may not be practicing law in the future. Ex. 35.

    c.   E-mailing Feinstein again on February 24, 2018, writing that Hartleib intended to inform "the court of his criminal acts in the Sprint case [and] ongoing Pa Bar investigation" and that the Law Firm was "unfit to be lead Counsel [sic] in any representative suit[.]" Ex. 37.

    d.   In contacting Detective Goggin, Hartleib stated that the Law Firm "knew of Mr. Silow [sic] fraud and conspiracy[,]" that "Weiser [sic] is lying" and "knew exactly who Silow was[,]" that Hartleib could not "believe that the[y] can commit perjury and try to defraud the court and Sprint and walk

away[,]" and implicitly mischaracterizing the reduction of attorneys' fees in the Sprint Derivative Action as the product of the frauds baselessly alleged by Hartleib. Exs. 39, 40, 41, and 42.

201.    None of these disparaging statements could be excused by judicial privilege, as none were relevant to the "relief sought" by Hartleib as a Sprint shareholder in the derivative case brought on behalf of Sprint.

202.    The effect of Hartleib's disparaging statements to third parties has been to injure Plaintiffs' business and professional reputations – Hartleib specifically targeted the services provided by Plaintiffs, characterizing the Law Firm and Weiser as "incompetent" and that the Weiser was running the firm as a "criminal enterprise[.]" *See* Exs. 13 & 17.

203.    The statements and characterizations made by Hartleib regarding the services of the Law Firm and Weiser are categorically false.

204.    Hartleib, appreciating the falsity of his characterizations, published them anyway with the intention of causing harm to the Law Firm and to Weiser.

205.    As a result of Hartleib's actions, Plaintiffs have suffered pecuniary loss through the loss of referrals and reduced prestige among the derivative action bar, a critical component for a successful derivative litigation practice.

206.    Upon information and belief, Plaintiffs are less likely to be selected to be lead counsel in derivative actions, less likely to be included in the support structures in such litigations, and less likely to be retained overall.

207.    Furthermore, Plaintiffs have been damaged insofar as they are compelled to defend and repair their professional reputations against Hartleib's baseless allegations.

208.    Hartleib acted in complete and utter reckless disregard for the falsity of his statements against Plaintiffs – characterizing an attorney as an incompetent individual who committed frauds upon the court, who failed to adhere to ethics standards, who operated a criminal enterprise are serious accusations in the legal profession.

WHEREFORE, Plaintiffs Robert Weiser and The Weiser Law Firm, P.C. demand judgment in their favor and against Michael Hartleib in an amount to be determined at trial for damages from commercial disparagement, and respectfully request that this Honorable Court grant them such other relief that the Court deems appropriate under the circumstances.

### Count IV – False Light

209.    Plaintiffs repeat and reassert each of the previous paragraphs as though the same were set forth herein.

210.    Hartleib deliberately and misleadingly published certain material regarding Weiser containing outright false statements in order to cast a negative light upon Weiser's professional reputation.

211.    "One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other was placed would be highly offensive to a  reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed. Unlike the law of defamation, false light invasion of privacy offers redress not merely for the publication of matters that are provably false, but also for those that, although true, are selectively publicized in a manner creating a false impression." *Meyers v. Certified Guar. Co., LLC*, 2019 PA Super 316, 221 A.3d 662, 674 (Pa. Super. 2019) (citations omitted).

212.    Hartleib, through his selective references to events in the Sprint Derivative Litigation and incendiary characterizations thereof, cast false light on Weiser, to wit:

a.  On March 6, 2017, Hartleib wrote to eleven members of the bar at five different law firms, as well as Judge Vano's administrative assistant, that Weiser made "statements to the Appellate Court [which] were disingenuous at best. Shocking!" Ex. 12. Hartleib implied that Weiser did not honor any "ethical obligation," and accused Weiser of "attempt[ing] to obfuscate your chicanery in this case," and being one of "the corrupt parties in this case!" who was threatening "the integrity of the judicial system . . ." Id.

b.  Also on March 6, 2017, Hartleib contacted the Law Firm's client, Ross-Williams, the lead plaintiff in the Sprint Derivative Action. Ex. 13. Therein Hartleib told Ross-Williams that the Law Firm was a "criminal enterprise" and was not serving her interests as a Sprint shareholder.

c.  On March 7, 2017, Hartleib e-mailed Ross-Williams, fifteen members of the bar and Judge Vano's administrative assistant and falsely stated: "you are a unwitting victim of [the Law Firm's] fraud committed against the Court. As we discussed they have submitted millions of dollars in fraudulent billing in your case. As I informed you that this was not just my opinion, the Judge in your case came to a similar conclusion. In fact, your attorneys have now admitted to at least 1.6 million dollars in fraudulent bills submitted to the Court. Mr. Weiser has confirmed this in two separate letters. (See attached). I am no expert, but when a Firm

admits criminal acts in a case I believe they are obligated to notify you as the Plaintiff. Mr. Weiser and his Firm have already contacted their Bar associations and other Courts to self-report their criminal acts. . . they are in a lot of trouble . . . I will provide incontrovertible proof that Mr. Weiser et. al. is just as guilty as Mr. Silow. This is just the tip of the iceberg." Ex. 14.

d.  In a second March 7, 2017 e-mail to fifteen members of the bar and Judge Vano's administrative assistant, Hartleib accused Weiser of making "self-serving misrepresentations" in correspondence, of "fail[ing] to provide" documents to his client; of committing "fraudulent acts and bastardization [sic] of the judicial system," of "coercing your 'client' to misstate facts," of having "little credibility," of making a "not so vailed [sic] threat" to reserve Ross-Williams' rights, and of needing to "consult with an ethics attorney, that's right you already have!" Ex. 14.

e.  After Hartleib tipped *The Wall Street Journal* about the Law Firm's victimization by Silow and Abelson, Hartleib e-mailed eleven members of the bar and Judge Vano's assistant regarding Weiser: "What an embarrassment to the bar! See you in Court." Ex. 16.

f.  In an April 7, 2018 e-mail to Weiser and eight other members of the bar, Hartleib accused Weiser of "attempt[ing] to mislead the Appellate Court with incomplete records," of making "personal attacks [that] smack of desperation," and of making "ill-advised actions, [sic] and ad-hominem attacks [which] are making the Weiser Firm radioactive!" Ex. 15.

g.  On May 19, 2018, Hartleib admitted in writing in an e-mail to numerous attorneys that he intended to make false allegations against the Law Firm, stating: "Plaintiff Counsel, and I use this term loosely, when making false allegations against a party I would suggest you at least get it right. I am no expert, but I am pretty sure it would be libelous! I will demonstrate its proper use posthaste!"  Ex. 18.

h.  On June 2, 2018, Hartleib sent an e-mail to a host of members of the bar in which he referred to the Law Firm's work in the Sprint Derivative Action as "fraud" and "the very definition of [r]acketeering."  Ex. 19.  Hartleib implied that the Law Firm's "standard operating procedure" is "to submit millions in fraudulent fee requests upon the Court" which "prevents a troubling pattern of fraud and corruption in these lawyer-driven cases." Id.

i.  Finally, in a March 14, 2019 e-mail to Judge Vano's chambers, Hartleib asked Judge Vano to interject himself into the Centurylink Derivative Action in opposition to the Law Firm's role in the support structure of proposed (and ultimately approved) lead counsel Bragar, Eagle & Squire, P.C. ("Maybe Judge Vano would be interested in setting the record straight before the Court appoints lead counsel in the aforementioned case."); and accused the Law Firm and Weiser of "sinister" behavior in an "elaborate scheme" involving "the use of LLC shell corporations set up for the sole purpose of soliciting information under false pretenses to facilitate lawyer driven Qui Tam cases."  Ex. 28.

213.    Hartleib also cast false light on Weiser outside of the Sprint Derivative Settlement context, selectively and inaccurately detailing events in various litigations and leveling insidious mischaracterizations thereof, for example:

a. On April 25, 2017, Hartleib mailed a letter to sitting members of the Court of Common Pleas of Chester County, Pennsylvania – where the Law Firm is located – about Weiser and the Law Firm, stating that Judge Vano "caught the firm in the act" of falsifying their billings in the Sprint Derivative Settlement, and implying that Weiser was a profane bully and incompetent lawyer and firm manager.  Ex. 17.

b. On August 24, 2018, Hartleib e-mailed Judge Watson in the Big Lots Derivative Action, even though he was not "a shareholder in Big lots or otherwise an interested party in this case" raising "concerns over Weiser's billing practices in [a] prior case and stat[ing] that he wanted to inform the Court so it would scrutinize the fee request in this case."  Ex. 25 p. 11 fn.2.

c. Similarly, in the Centurylink Derivative Litigation, Hartleib submitted an *amicus curiae* brief on March 5, 2019 opposing the Law Firm's role in the case, purportedly to "inform the Court of ongoing troubling actions by the Weiser [Firm] . . ."  Ex. 26.  Hartleib specifically alleged that the Law firm utilized "deceased parties, friends and family members which [sic] lacked standing, and paid serial criminal Plaintiffs," and "generate thousands of billable hours for illusory work, submit fraudulent time logs and seek hundreds of millions in unjust fees in cases across the country."   Id.

According to Hartleib, the Law Firm "would stop at nothing to protect their criminal enterprise . . . Weiser et.al [sic] lied, misleading the court [sic] . . . Weiser et.al. [sic] committed perjury and admitted to billing fraud . . . likely more than 100 million dollars in illicit fees, in a multitude of cases across the country." Id.

d. Hartleib appeared at a hearing in the Centurylink Derivative Action on March 6, 2019, stating to the Court and everyone present in the courtroom: "I lay things out that shows [sic] a pattern, a course of conduct over many years . . . I see no meaningful relief or nearly illusory relief and a tremendous amount in attorneys fees . . . And, Your Honor, I know for a fact that the Weiser firm knew who Mr, Silow was and that will come out, you know, during the course of litigation . . . These firms, when these firms are up to no good, when they are billing illusory house – you know, if I had 30 minutes with Your Honor in chambers, I could give Your Honor a lot more information . . . The allegations that I make against these firms are very serious allegations." Ex. 27.

214.    Hartleib also publicized and misrepresented matters related to Weiser, while simultaneously publishing defamatory falsities, to other third parties located in Pennsylvania, such as Abelson and Detective Goggins, for example:

a. In an e-mail to Abelson on February 22, 2018, Hartleib indicated that he had "exposed the fraud committed by the Weiser firm" and that the alleged actions of the Firm were "unconscionable" and that the Law Firm

had filed "multiple purjurious [sic] declaration [sic]" to "protect their duplicitous acts and criminal enterprise. Ex. 36.

b.   In an e-mail to Feinstein on February 24, 2018, Hartleib stated his interests in facilitating the "demise of the Weiser Firm" and that "Weiser et.al. [sic] are corrupt and inept" because a "layperson . . . defeated and humiliated them" and concluding that, based on his actions, "certain attorneys may not be practicing law in the future. Ex. 35.

c.   E-mailing Feinstein again on February 24, 2018, writing that Hartleib intended to inform "the court of his criminal acts in the Sprint case [and] ongoing Pa Bar investigation" and that the Law Firm was "unfit to be lead Counsel [sic] in any representative suit[.]" Ex. 37.

d.   In contacting Detective Goggin, Hartleib stated that the Law Firm "knew of Mr. Silow [sic] fraud and conspiracy[,]" that "Weiser [sic] is lying" and "knew exactly who Silow was[,]" that Hartleib could not "believe that the[y] can commit perjury and try to defraud the court and Sprint and walk away[,]" and implicitly mischaracterizing the reduction of attorneys' fees in the Sprint Derivative Action as the product of the frauds baselessly alleged by Hartleib. Exs. 39, 40, 41, and 42.

215.   None of these misleading publications is excused by judicial privilege, as none were relevant to the "relief sought" by Hartleib as a Sprint shareholder in the derivative case brought on behalf of Sprint.

216.   Through Hartleib's selective and incendiary characterization of events surrounding the Sprint Derivative Settlement and various other litigations, Hartleib has

deliberately cast Weiser as unethical attorney operating a criminal enterprise law practice that takes advantage of its clients.

217.    Hartleib's objective in selectively publicizing mischaracterizations was to create a false negative impression of Weiser to the bench, bar, law enforcement and the general public, and thereby to harm Weiser.

218.    Indeed, Hartleib engaged in a campaign of publicizing negative matters regarding Weiser, while contemporaneously publishing outright falsities about Weiser, in such a manner as to create a false negative impression of Weiser.

219.    Hartleib acted in complete and utter reckless disregard for the falsity of his publicized statements.

WHEREFORE, Plaintiff Robert Weiser demands judgment in his favor and against Michael Hartleib in an amount to be determined at trial for damages from false light, and respectfully request that this Honorable Court grant him such other relief that the Court deems appropriate under the circumstances.

Respectfully submitted,

**SILVERANG, ROSENZWEIG & HALTZMAN, LLC**

By:    /s/ Philip S. Rosenzweig
       Philip S. Rosenzweig, Esquire
       Attorney I.D. No. 62461
       Woodlands Center
       900 E. 8th Avenue, Suite 300
       King of Prussia, PA 19406
       (phone) 610-263-0115
       (fax) 610-263-0122
       *Attorneys for Plaintiffs*
       *The Weiser Law Firm, P.C. and*
       *Robert B. Weiser, Esquire*

{01292774;5}