**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **THE WEISER LAW FIRM, P.C., et al.,**<br><br>Plaintiffs,<br><br>*v.*<br><br>**MICHAEL HARTLEIB,**<br><br>Defendant. | **CIVIL ACTION**<br><br>**NO. 2:19-cv-02728-KSM** |

## MEMORANDUM

**MARSTON, J.**                                                    **March 31, 2022**

This case spawns from a years long dispute between Plaintiffs, the Weiser Law Firm,

P.C. (the "Law Firm") and Robert Weiser, Esquire, and Defendant Michael Hartleib.  Plaintiffs

claim that Hartleib has embarked on a campaign to disparage them to judges, members of the

legal community, and current and prospective clients.  (*See* Doc. No. 69.)  Plaintiffs assert claims

for defamation, intentional infliction of emotional distress ("IIED"), commercial disparagement,

and false light invasion of privacy.  (*Id.*)  Presently before the Court is Hartleib's motion to

dismiss.  (Doc. No. 72.)  For the reasons below, Hartleib's motion is granted in part and denied

in part.

## I.        BACKGROUND

### A.        *Factual Background*

Taking the allegations in the Amended Complaint as true, the relevant facts are as

follows.

The Law Firm specializes in shareholder class actions and shareholder derivative actions.

(Doc. No. 69 ¶ 7.)  Weiser is the founder and principal of the Law Firm, and his practice focuses

primarily on shareholder derivative litigation.  (*Id.* ¶ 10.)

### 1.      Hartleib Is Introduced to Plaintiffs

In November 2008, Hartleib emailed Bruce Murphy, Esquire, an attorney who had previously referred clients to Weiser and the Law Firm.  Hartleib explained that he owned shares in Sprint Corporation and Nextel Communications, which lost value when the two companies merged.  (*Id.* ¶¶ 11–12; *see also* Doc. No. 69-1.)  Murphy forwarded Hartleib's email to Weiser and asked if Weiser thought a shareholder derivative action could be brought on Sprint's behalf. (Doc. No. 69 ¶ 13.)  After conducting some research, Weiser told Murphy that he did not recommend filing a derivative lawsuit at that time.  (*Id.* ¶ 14.)

A few months later, in March 2009, another law firm filed a securities class action against Sprint based on the Sprint/Nextel merger.  (*Id.* ¶ 15.)  Several other similar securities class actions were also filed, and the cases were consolidated in the U.S. District Court for the District of Kansas (the "Sprint Securities Class Action").  (*Id.* ¶ 16.)

The same day the first securities class action was filed against Sprint, Murphy followed up with Weiser about potential shareholder derivative claims that could be brought on Sprint's behalf.  (*Id.* ¶ 18.)  At that point, the Law Firm concluded that Sprint may have potential claims against its current and/or former officers and directors and asked Murphy if Hartleib or any other potential client was interested in initiating the lawsuit.  (*Id.* ¶¶ 19–20.)  Murphy responded that Hartleib and other potential clients were interested.  (*Id.* ¶ 21.)  On March 13, 2009, Weiser sent a draft shareholder derivative complaint to Murphy, and Murphy circulated it to his actual or potential clients, which the Law Firm understood included Hartleib.  (*Id.* ¶¶ 23–24.)

Weiser and Hartleib spoke for the first time on March 26, 2009.  (*Id.* ¶ 27.)  Hartleib claimed to have spent "hundreds of hours" investigating Sprint in connection with the Securities

Class Action and explained that he was interested in serving as the lead plaintiff in the case.  (*Id.* ¶¶ 28–29.)  He also strongly suggested that he would be interested in sharing any attorneys' fees the Law Firm may recover if it represented Hartleib in connection with a shareholder derivative suit brought on Sprint's behalf.  (*Id.* ¶ 30.)  Weiser found Hartleib's proposal "extremely troubling."  (*Id.* ¶ 32.)

Following their conversation, Weiser decided that the Law Firm could not represent Hartleib in a derivative action brought on behalf of Sprint due to a potential conflict of interest.  (*Id.* ¶ 31.)  Specifically, Weiser reasoned that any role Hartleib played in launching or prosecuting the Sprint Securities Class Action *against* Sprint would preclude his participation as a plaintiff to a derivative suit brought *on behalf of* Sprint.  (*Id.* ¶ 31.)  Weiser communicated his decision to Murphy, and Murphy informed Hartleib that neither his firm nor Weiser's Law Firm would represent Hartleib in a shareholder derivative action brought on behalf of Sprint.  (*Id.* ¶¶ 33–36; *see also* Doc. No. 69-2.)

Thereafter, the Law Firm decided to represent another Sprint shareholder, Monica Ross-Williams, in a shareholder derivative action filed in Kansas State Court (the "Sprint Litigation").  (*Id.* ¶ 37.)  And another law firm filed a separate shareholder derivative action on Sprint's behalf and named Hartleib as the representative plaintiff.  (*Id.* ¶ 38.)

### 2.     Hartleib Reconnects with Plaintiffs

In March 2011, two years after they last spoke, Hartleib reached out to Weiser in connection with a *pro se* derivative action he and several other plaintiffs filed on behalf of Sirius XM Satellite Ratio, Inc.  (*Id.* ¶¶ 39–40.)  Hartleib asked whether the Law Firm would represent the plaintiffs in the Sirius derivative action, but Weiser declined because he felt the plaintiffs' legal theories were weak.  (*Id.* ¶ 43.)  Hartleib renewed his request several months later, but

Weiser never responded.  (*Id.* ¶¶ 44–45.)  In February 2012, Hartleib contacted Weiser again, asking whether they were "going to do some business together or what?"  (*Id.* ¶ 46; *see also* Doc. No. 69-7.)  Weiser did not respond to Hartleib's inquiry, and the Law Firm has never engaged in any business with or represented Hartleib.  (Doc. No. 69 ¶ 47.)

### 3.      The Sprint Litigation Settles

In 2016, a majority of the Sprint shareholder derivative lawsuits pending in the Kansas courts (including the Law Firm's Ross-Williams's suit) achieved a collective settlement.  (*Id.* ¶ 48.)  When the Law Firm and others sought the court's final approval of the terms of the settlement, including attorneys' fees for plaintiffs' counsel, Hartleib filed a *pro se* objection.  (*Id.* ¶ 50.)  Hartleib also called Weiser on May 20, 2016, about a week before the final approval hearing, and proposed to withdraw his objection if Weiser entered into a "consulting agreement" with Hartleib.  (*Id.* ¶¶ 51–53.)  Hartleib suggested that he would provide the Law Firm with ideas for initiating lawsuits against corporate defendants in exchange for hundreds of thousands of dollars.  (*Id.* ¶ 53.)  Weiser was again troubled by Hartleib's proposition and declined to enter into such an arrangement.  (*Id.* ¶ 54.)

On May 26, 2016, Hartleib appeared at the final approval hearing before the Honorable James Vano in support of his objection.  (*Id.* ¶ 55.)  In mid-June 2016, Judge Vano approved the Sprint Derivative Settlement, but only awarded approximately ten percent of the attorneys' fees requested, and the parties appealed.  (*Id.* ¶¶ 61–62.)

In February 2017, during the pendency of the appeal, the Law Firm discovered that Jeffrey Silow,[1] one of its contract attorneys who performed approximately 7,000 hours of document review for the Law Firm's Sprint Litigation over four years, had been disbarred in

---

[1] Silow used his son's name, Alexander, "to perpetrate his deception."  (*Id.* ¶ 63.)

Pennsylvania decades earlier.  (*Id.* ¶¶ 59, 63, 66.)  Silow had been placed with the Law Firm

through Abelson Legal Search, a Philadelphia legal recruitment and placement firm.  (*Id.* ¶ 59.)

Abelson had been "responsible for vetting the credentials and bar status of the attorneys it

placed" and "held Silow out . . . as a licensed attorney in good standing."  (*Id.* ¶ 60.)  After

learning of Silow's disbarment, the Law Firm immediately alerted Judge Vano and the Kansas

Court of Appeals,[2] which was reviewing the fee award.  (*Id.* ¶ 66.)  The Court of Appeals

ultimately affirmed the reduced fee award.  (*Id.* ¶ 67.)

Once the Silow controversy was brought to light, Hartleib proceeded to "unleash[] a

deluge of abuse upon the Plaintiffs."  (*Id.* ¶ 68.)  For example, on March 6, 2017, Hartleib

emailed Weiser and copied eleven attorneys, as well as Judge Vano's administrative assistant,

stating:

> Rob!  I am a little confused! . . . It seems your statements to the
> Appellate Court were disingenuous at best.  Shocking! . . . Ethical
> obligation, what a Saint [sic] . . . Your attempts, [sic] to obfuscate
> your chicanery in this case is galvanizing my convictions,
> strengthening my resolve to expose all of the corrupt parties in this
> case!  This lawyer driven litigation must and will cease.  Your
> temerity, to seek leave of the Appellate Court to reinstate fees, given
> what I have uncovered is quite frankly astonishing and provoking
> wrath.

(*Id.* at ¶ 69; *see also* Doc. No. 69-12.)

That same day, Hartleib called Ross-Williams, the Law Firm's named plaintiff in the

Sprint Litigation, and "verbally harassed and threatened" her.  (Doc. No. 69 ¶¶ 70–71.)  Hartleib

told Ross-Williams that the Law Firm was a "criminal enterprise" and was not serving her

interests as a Sprint shareholder.  (*Id.* ¶ 71.)  Ross-Williams felt "shocked, disturbed, harassed

---

[2] Weiser and the Law Firm also notified "the courts sitting in every action in which Silow's hours were included as part of an 'attorney time' lodestar calculation."  (Doc. No. 69 ¶ 64.)

and threatened" during the call and asked Hartleib not to contact her again.[3]  (*Id.* ¶¶ 73–74.)

Nonetheless, the following day, Hartleib directly emailed Ross-Williams and copied fifteen

attorneys and Judge Vano's administrative assistant about the call, stating:

> Dear Ms. Williams, it was a pleasure speaking with you this evening
> . . . I find it unconscionable that your attorneys failed to inform you
> of Judge Vano's rulings or that an Appeal was filed on your behalf.
> I do believe that you are a[n] unwitting victim of their fraud
> committed against the Court.  As we discussed they have submitted
> millions of dollars in fraudulent billing in your case.  As I informed
> you that this was not just my opinion, the Judge in your case came
> to a similar conclusion.  In fact, your attorney has now admitted to
> at least 1.6 million dollars in fraudulent bills submitted to the Court
> . . . I am no expert, but when a Firm admits criminal acts in a case I
> believe they are obligated to notify you as the Plaintiff.  Mr. Weiser
> and his Firm have already contacted their Bar associations and other
> Courts to report their criminal acts.  I have contacted the district
> attorney's offices in Pennsylvania and Kansas and will be filing
> formal complaints . . . As you can see by the letters from Mr. Weiser
> they are in a lot of trouble, but claim they are victims of Mr. Silow.
> I will provide incontrovertible proof that Mr. Weiser et. al. is just as
> guilty as Mr. Silow.  This is just the tip of the iceberg.

(*Id.* ¶ 77; *see also* Doc. No. 69-14.)

Plaintiffs sent Hartleib a cease-and-desist letter, which he ignored.  (Doc. No. 69 ¶ 79.)

The same day, Hartleib emailed Weiser, fifteen members of the bar, and the Judge Vano's

administrative assistant, stating:

> For you to characterize [the phone call with Ross-Williams and
> follow-up email] as harassment is another blatant attempt to distract
> and obfuscate your fraudulent acts and bastardization of the judicial
> system.  I caution you, that by coercing your 'client' to misstate facts
> regarding our call will only inflict additional damage to what little
> credibility you have left.  You Sir, and your coconspirators are the
> ones that need to Cease and Desist.  Your so-called 'client' is
> representing my interest and her attorneys are corrupt, therefore I
> will neither Cease nor Desist.  As far as your not so vailed [sic] threat
> that Ms. Williams 'reserves all of her rights', if you are threatening
> legal action against me, feel free, I will be happy to waive service to

---

[3] Ross-Williams asked Hartleib to direct any future correspondence through her counsel, the Law
Firm.  (Doc. No. 69 ¶ 72.)

> expedite said action.   I find the prospects of discovery quite
> compelling.  Your threats do nothing but, strengthen my resolve and
> galvanize my convictions.  Call it a personality defect!  Instead of
> wasting my time, I would suggest you consult an ethics attorney,
> that's right, you already have!

(Doc. No. 69 ¶ 79; Doc. No. 69-14.)

Because of Hartleib's harassing conduct, the Kansas Court of Appeals issued a protective

order prohibiting Hartleib from contacting Ross-Williams.  (Doc. No. 69 ¶ 80.)  On two separate

occasions, Hartleib sought to have the protective order lifted, but those motions were denied.

(*Id.* ¶¶ 81–82.)  After the Law Firm opposed one such attempt, Hartleib emailed Weiser and

copied eight other members of the bar (including other employees of the Firm), stating:

> Rob, your ability to set the bar at new lows, never disappoints!  . . .
> Your attempt to mislead the Appellate Court with incomplete
> records might be your standard operating procedure, but I believe it
> will cost you when I seek sanctions.  Your personal attacks smack
> of desperation, they do nothing to dissuade me, in fact they
> galvanize my convictions and strengthen my resolve! . . . Your ill-
> advised actions, and ad-hominem attacks are making the Weiser
> Firm radioactive!

(*Id.* ¶ 83; Doc. No. 69-15.)

On June 2, 2018, Hartleib emailed Weiser, eleven other attorneys, and Judge Vano's

administrative assistant, stating:

> Dear Ms. Boren, I thought the Honorable James Vano would find
> the link to the National Law Journal Article of interest. It is clear
> that the Plaintiff's Bar is rife with corruption, in both Class Action
> and Derivative cases. Much like the fraud Weiser et.al. committed
> in the "Ross-Williams" case, it appears to be standard operating
> procedure for many firms to submit millions in fraudulent fee
> requests upon the Court. This State Street case involves large well
> established firms and nearly 100 million in fees. At present, it
> appears Weiser et.al. has not been out done, as there is no mention
> of the unlicensed practice of law by a convicted felon using an alias.
>
> I will be contacting the Special Master, and filing an Amicus Brief
> in the State Street case to inform them of the chicanery that has taken
> place in the "Ross-Williams" case. Although entirely unrelated, it

> presents a troubling pattern of fraud and corruption in these lawyer
> driven cases. I will be seeking public dissemination of the Special
> Master's report to show the breadth of corruption within the
> Plaintiffs Bar. The actions of Weiser et.al. and the Firms in the State
> Street case is the very definition of Racketeering, and warrants
> legislative reform.

(Doc. No. 69 ¶ 94; *see also* Doc. No. 69-19.)

### 4.       Hartleib Intervenes in Other Litigations

Beginning in 2018, Hartleib began inserting himself into the Law Firm's pending litigations, including litigations in which he had no stake.[4]  (*Id.* ¶¶ 95–96.)  First, Hartleib filed an amicus brief in *In re Equifax, Inc. Derivative Litigation* (N.D. Ga.), where Plaintiffs sought to be appointed as Co-Lead Counsel in the action.  (*Id.* ¶ 101; *see also* Doc. No. 69-21.)  In doing so, Hartleib unleashed a host of allegations, including that the Law Firm "lied, misl[ed] the court," "used an unfit plaintiff," engaged "in fraudulent billing," operated a "criminal enterprise," and displayed "hubris and utter contempt for the Court."  (Doc. No. 69 ¶¶ 102–03.) Hartleib posited, "[W]hat is going on at the Weiser firm?  Either they are corrupt, or entirely inept[.]"  (*Id.* ¶ 105.)  Hartleib also spoke in support of his amicus brief at the hearing on the motions for appointment of lead counsel.  (*Id.* ¶ 108.)  Ultimately, the court denied the Law Firm's motion to be appointed co-lead counsel, and Hartleib "took credit for this result."  (*Id.* ¶ 109.)

Second, Hartleib attempted to interject in another derivative action involving the Law Firm, *In re Big Lots, Inc. Shareholder Litigation*, No. 12-cv-445 (S.D. Ohio) (the "Big Lots Litigation"), after the court had already preliminarily approved the settlement.  In the opinion finally approving the settlement, the Honorable Michael H. Watson noted that Hartleib had

---

[4] Additionally, on April 25, 2017, the Plaintiffs allege that Hartleib mailed several copies of an "anonymous" letter riddled with profanities to six judges for the Chester County Court of Common Pleas. (Doc. No. 69 ¶¶ 89–92; *see also* Doc. No. 69-17.)

emailed the court to raise concerns about the Law Firm's billing practices:

> On August 24, 2018, well after the time to object and the fairness hearing took place, the Court received an email from [Hartleib], a shareholder who had an interest in a different case involving The Weiser Firm . . . Hartleib raised concerns over Weiser's billing practices in this prior case and stated that he wanted to inform the Court so that it could scrutinize the fee request in this case . . . Hartleib does not indicate that he is a shareholder in Big Lots or otherwise an interested party in this case. Furthermore, the Court always scrutinizes the billing records of plaintiffs' counsel before approving fee awards.

(*Id.* ¶¶ 110–15; *see also* Doc. No. 69-25.)

Next, Hartleib targeted the Law Firm in *In re CenturyLink Sales Practices and Securities Litigation* (D. Minn.) (the "CenturyLink Litigation"), a consolidated derivative action. (Doc. No. 69 ¶ 116.) The law firm of Bragar Eagle & Squire, P.C. moved to be appointed lead counsel and proposed that the Weiser Law Firm be included as part of its support structure. (*Id.* ¶¶ 117–18; *see also* Doc. No. 69-26.) Hartleib filed an amicus brief in opposition to the Law Firm's appointment to "inform [the] Court of ongoing troubling actions by" the Law Firm. (Doc. No. 69 ¶¶ 117–18.) On March 6, 2019, Hartleib reiterated his accusations against the Law Firm at a hearing before the Court, stating, "I know for a fact that the Weiser firm knew who Mr. Silow was and that will come out, you know, during the course of the litigation . . . . These firms, when these firms are up to no good, when they are billing illusory hours . . . ." (*Id.* ¶¶ 129, 131; *see also* Doc. No. 69-27.)

After the hearing, Hartleib forwarded his amicus brief to Judge Vano's administrative assistant and copied other attorneys who had been involved in the Sprint derivation action, writing: "I thought that the Honorable Vano would be interested to know that my quest to expose lawyer driven litigation and corruption rife throughout the Plaintiffs Bar continues." (Doc. No. 69 ¶¶ 134–36; *see also* Doc. No. 69-28.) Ultimately, the *CenturyLink* court appointed

as lead counsel Bragar Eagle & Squire, whose proposed support structure included the Law

Firm.  (Doc. No. 69 ¶ 143.) [5]

### 5.      Hartleib's Fixation on Plaintiffs Continues

In addition to inserting himself in the Law Firm's pending litigations, Hartleib also

contacted individuals in law enforcement and the legal field to discuss Plaintiffs and even

initiated a lawsuit against Plaintiffs.

In February 2018, after the Law Firm filed a lawsuit against Abelson Legal Search for its

placement of disbarred attorney Silow with the Law Firm, Hartleib contacted Abelson Legal

Search.  (*Id.* ¶ 157.)  After the call, Hartleib emailed Cathy Abelson, the President of Abelson

Legal Search, explaining that he could "facilitate a cross-complaint that could lead to the demise

of the Weiser Firm" and promised to provide "contacts" to convince Abelson that Weiser was

"corrupt and inept."  (*Id.* ¶ 160; *see also* Doc. No. 69-35.)

Abelson never responded to Hartleib's email, but Hartleib emailed her again on February

22, 2018, stating:

> I am the person who has exposed the fraud committed by the Weiser
> firm in the case that has brought Mr. Silow's criminal past and
> disbarred status into focus . . . Their actions in this case are truly
> unconscionable . . . they have filed multiple purjurious [sic]
> declarations and will stop at nothing to protect their duplicitous acts
> and criminal enterprise . . . I am hopeful that we can work together
> and facilitate a cross-complaint against the Weiser firm . . . I know
> where the bodies are buried and intend to dig them up.

---

[5] Additionally, on August 17, 2018, Hartleib sent Weiser an email regarding another shareholder
derivative suit filed in the Central District of California.  (Doc. No. 69 ¶ 97; *see also* Doc. No. 69-20.)
Hartleib asked whether Weiser was attending an upcoming hearing and expressed regret that he had
invested in stocks because he kept being "forced to deal" with Weiser.  (Doc. No. 69 ¶ 97.)  He
concluded, "If you have any questions, or wish to proffer an apology, you know how to reach me.  That
said, other action is eminent!"  (*Id.*)  Plaintiffs do not allege that Hartleib made any statements to third
parties about Weiser or the Law Firm in connection with this specific lawsuit.

(Doc. No. 69 ¶ 162; *see also* Doc. No. 69-36.)  Two days later, Hartleib emailed Joyce Feinstein, an employee at Abelson Legal Search, stating that he was preparing an *amicus curiae* brief to "inform the court of [Weiser's] criminal acts in the Sprint case."  (Doc. No. 69 ¶ 163; *see also* Doc. No. 69-37.)  He explained that he felt Weiser "unfit to be lead Counsel in any representative suit" and that he was trying to have Weiser "removed as lead plaintiff counsel in said case."  (Doc. No. 69 ¶ 163.)  Hartleib emailed Abelson again on June 2, 2018, stating, "Cathy, are you interested in working together to commence an action against the Weiser firm? Why won't you have your attorney's [sic] contact me."  (*Id.* ¶ 164; *see also* Doc. No. 69-38.)

Around the same time, in March 2018, Hartleib contacted Detective Sergeant Thomas J. Goggin of the Chester County, Pennsylvania District Attorney's Office.  (Doc. No. 69 ¶ 165; *see also* Doc. No. 69-39.)  On March 13, 2018, Hartleib told Detective Goggin "the Weiser firm is claiming to be victim of Mr. Silow, when there is irrefutable proof they knew of Mr. Silow['s] fraud and conspiracy against the court."  (Doc. No. 69 ¶ 166.)  The following day, Hartleib responded to Detective Goggin's follow-up questions, emphasizing that "the Weiser firm knew exactly who Silow was and the Weiser [sic] was lying."  (*Id.* ¶ 167; *see also* Doc. No. 69-40.)  A week later, on March 22, Hartleib told Detective Goggin:  "Weiser knew exactly who Silow was! I was hopeful [Abelson] would want to work together but I have not heard back from there [sic] lawyers.  I am going to bring a civil suit against Weiser.  Were you able to find the misdemeanor charges against Silow!"  (Doc. No. 69 ¶ 168; *see also* Doc. No. 69-41.)  Detective Goggin informed Hartleib that he did not "have anything new to report" but would "get back to [him]." (Doc. No. 69 ¶ 168.)

About two months later, in May 2018, Hartleib sent Detective Goggin the opinion from the Kansas Court of Appeals upholding the reduced attorneys' fees award and asked:  "Were you

ever able to find the charges filed against Silow?  I can't believe that the[y] can commit perjury and try to defraud the court and Sprint and walk away with 450k . . . Alexander Silow [Jeffrey Silow's son] knew and was likely receiving payments from Weiser."  (*Id.* ¶ 169; *see also* Doc. No. 69-42.)  Hartleib also said that he was going to file a Bar complaint and commence a civil action, though he did not specify whether such action would be taken against Weiser or Alexander Silow.  (Doc. No. 69 ¶ 169.)  Six months later, Hartleib emailed Detective Goggin "to see if any action was taken by [Goggin's] department."  (*Id.* ¶ 171; *see also* Doc. No. 69-43.)

Finally, on December 12, 2018, Hartleib initiated a lawsuit against Plaintiffs, asserting claims for legal malpractice/breach of fiduciary duty, violation of the Kansas Consumer Protection Act, and abuse of process.  (*Id.* ¶ 159; Doc. No. 69-33.)  The U.S. District Court for the District of Kansas dismissed the case, and the U.S. Court of Appeals Tenth Circuit affirmed the dismissal.  *See Hartleib v. The Weiser Law Firm, P.C.*, Case No. 19-2099-EFM-JPO, 2020 WL 3412480 (D. Kan. June 22, 2020), *aff'd*, 861 F. App'x 714 (10th Cir. 2021).

**B.    Allegedly Disparaging Statements**

Plaintiffs identify seventeen statements that Hartleib made from 2017 through 2019 in order "to injure Plaintiffs' business and professional reputations."[6]

- **Statement No. 1**:  A March 6, 2017 email from Hartleib to Judge Vano's administrative assistant and eleven attorneys stating that Weiser "made statements to the Appellate Court [which] were disingenuous at best" and accusing Weiser of "attempt[ing] to obfuscate [his] chicanery" and being "[one of] the corrupt parties." (Doc. No. 69 ¶ 183(a).)

---

[6] Plaintiffs state that they identified "eighteen instances . . . in which Hartleib made a defamatory statement" (Doc. No. 69 ¶ 186); however, the Amended Complaint identifies only seventeen such statements (*id.* ¶¶ 183–85).

- **Statement No. 2**:  A March 6, 2017 email from Hartleib to Ross-Williams stating that the Law Firm was a "criminal enterprise."  (*Id.* ¶ 183(b).)

- **Statement No. 3**:  A March 7, 2017 email from Hartleib to Ross-Williams, Judge Vano's administrative assistant, and fifteen attorneys stating that they were "unwitting victim[s] of [the Law Firm's] fraud committed against the Court" and that the Law Firm had "admitted to at least 1.6 million dollars in fraudulent bills submitted to the Court."  (*Id.* ¶ 183(c).)

- **Statement No. 4**:  A March 7, 2017 email to Judge Vano's administrative assistant and fifteen attorneys accusing Weiser of making "self-serving misrepresentations," committing "fraudulent acts and bastardization of the judicial system," and having "little credibility."  (*Id.* ¶ 183(d).)

- **Statement No. 5**:  An April 12, 2017 email from Hartleib to Judge Vano's administrative assistant and eleven attorneys calling Weiser "an embarrassment to the bar."  (*Id.* ¶ 183(e).)

- **Statement No. 6**:  An April 7, 2018 email from Hartleib to Weiser and eight other attorneys accusing Weiser of "attempt[ing] to mislead the Appellate Court with incomplete records" and of making "personal attacks [that] smack of desperation." (*Id.* ¶ 183(f).)

- **Statement No. 7**:  A May 9, 2018 email from Hartleib to "numerous" attorneys stating, "Plaintiff Counsel, . . . when making false allegations against a party I would suggest you at least get it right.  I am no expert, but I am pretty sure it would be libelous!"  (*Id.* ¶ 183(g).)

- **Statement No. 8**:  A June 2, 2018 email from Hartleib to "a host" of attorneys calling

13

the Law Firm's work in the Sprint Litigation "the very definition of Racketeering."
(*Id.* ¶ 183(h).)

- **Statement No. 9**:  A March 14, 2019 email to Judge Vano's chambers asking Judge
  Vano to "set[] the record straight" in the CenturyLink Litigation.  (*Id.* ¶ 183(i).)

- **Statement No. 10**:  An April 25, 2017 letter from Hartleib to members of the Chester
  County, Pennsylvania Court of Common Pleas stating that Judge Vano caught the
  Law Firm "in the act" of falsifying its bills.  (*Id.* ¶ 184(a).)

- **Statement No. 11**:  An August 24, 2018 email from Hartleib to Judge Watson raising
  "concerns over Weiser's billing practices in [a] prior case."  (*Id.* ¶ 184(b).)

- **Statement No. 12**:  A March 5, 2019 *amicus curiae* brief Hartleib filed in the
  CenturyLink Litigation opposing the Law Firm's role in the case and stating that the
  Law Firm used "deceased parties, friends and family members [who] lacked
  standing" as Plaintiffs and that the Law Firm "generate[ed] thousands of billable
  hours for illusory work, submit[ted] fraudulent time logs and [sought] hundreds of
  millions in unjust fees in cases across the country."  (*Id.* ¶ 184(c).)

- **Statement No. 13**:  A March 6, 2019 statement Hartleib made at a hearing in the
  CenturyLink Litigation stating that the Law Firm was "up to no good" and was
  "billing illusory [hours]."  (*Id.* ¶ 184(d).)

- **Statement No. 14**:  A February 22, 2018 email from Hartleib to Abelson stating that
  he had "exposed the fraud committed by the Weiser firm," decrying the Law Firm's
  actions as "unconscionable," and accusing the Law Firm of filing "multiple
  purjurious [sic] declaration[s] . . . to protect their duplicitous acts and criminal
  enterprise."  (*Id.* ¶ 185(a).)

- **Statement No. 15**:  A February 24, 2018 email from Hartleib to Feinstein describing Weiser as "corrupt and inept."  (*Id.* ¶ 185(b).)

- **Statement No. 16**:  A February 24, 2018 email from Hartleib to Feinstein informing her that the Law Firm was "unfit to be lead Counsel in any representative suit."  (*Id.* ¶ 185(c).)

- **Statement No. 17**:  March 14, 2018 and May 14, 2018 emails from Hartleib to Detective Goggin stating that Weiser "knew of Mr. Silow['s] fraud and conspiracy" and expressing disbelief that Weiser could "commit perjury and try to defraud the court and Sprint and walk away."  (*Id.* ¶ 185(d).)

### C.    *Procedural History*

Plaintiffs initiated this lawsuit on June 24, 2019, asserting claims for abuse of process, defamation, IIED, negligent misrepresentation, intentional interference with prospective contractual relations, and tortious interference with contract.  (Doc. No. 1.)  Plaintiffs also sought a vexatious litigant order to enjoin Hartleib from filing any action against Plaintiffs; from making any filing or submission in any case, derivative suit, class action suit, or qui tam suit that involves Plaintiffs; and from contacting any individual or entity about Plaintiffs, without first obtaining leave of the court.  (*Id.* at ¶ 170.)

On August 23, 2019, Hartleib, a California resident, moved to dismiss the complaint for lack of personal jurisdiction and improper venue.  (Doc. No. 9.)  The Court dismissed Plaintiffs' request for a vexatious litigant order and claims for negligent misrepresentation, intentional interference with contractual relations, and tortious interference for lack of personal jurisdiction and dismissed Plaintiffs' claim for abuse of process for improper venue.  (Doc. No. 35.)  The Court denied Hartleib's motion to dismiss as to the defamation and IIED claims.  (*Id.*)

Following the entry of the Court's Order, Hartleib sought leave to file a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Doc. No. 40.)  The Court granted Hartleib leave to file a motion to dismiss the complaint pursuant to Rule 12(b)(6).  (Doc. No. 41.)

Before Hartleib could file a Rule 12(b)(6) motion, Plaintiffs sought leave to amend their complaint.  (Doc. No. 50.)  The Court permitted Plaintiffs to amend their complaint (Doc. No. 68), and Plaintiffs filed the Amended Complaint on January 21, 2021 (Doc. No. 69).  Plaintiffs continue to assert the defamation and IIED claims and added claims for commercial disparagement and false light invasion of privacy.  (*Id.*)

On February 9, 2021, Hartleib moved to dismiss the Amended Complaint for failure to state a claim.  (Doc. No. 72.)  Hartleib argues that the defamation, commercial disparagement, and false light claims fail because many of the allegedly defamatory statements on which these claims are based are not actionable because they are time barred and judicially privileged.  (*Id.* at 26.)  He also argues that Plaintiffs have failed to state a claim for defamation, commercial disparagement, or false light as to any of the statements.  (*Id.* at 20.)  Hartleib argues that the IIED claim fails because the alleged conduct is not outrageous.  (*Id.* at 30.)  Plaintiffs oppose Hartleib's motion.  (Doc. No. 73.)  They contend that they have stated a claim for defamation, commercial disparagement, and false light and that these claims are not time barred or based on privileged statements.[7]  (*Id.* at 8.)  Plaintiffs also contend that they stated a claim for IIED.  (*Id.* at 24.)

## II.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

---

[7] Plaintiffs also assert that the Court may consider all of Hartleib's allegedly defamatory statements "regardless of their timeliness" in evaluating the totality of Plaintiffs' claims.  (Doc. No. 73 at 8.)

accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

"As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). "However, an exception to the general rule is that a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." *Id.* (cleaned up). Similarly, the Court "may consider an undisputably authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

## III.   ANALYSIS

The Court addresses each of Plaintiffs' claims in turn.

### A.   *Defamation*

Plaintiffs claim that Hartleib made 17 defamatory statements that have "injure[d] Plaintiffs' business and professional reputations." To state a claim for defamation under

17

Pennsylvania law, a plaintiff must allege:

> (1) The defamatory character of the communication.
>
> (2) Its publication by the defendant.
>
> (3) Its application to the plaintiff.
>
> (4) The understanding by the recipient of its defamatory meaning.
>
> (5) The understanding by the recipient of it as intended to be applied to the plaintiff.
>
> (6) Special harm resulting to the plaintiff from its publication.
>
> (7) Abuse of a conditionally privileged occasion.

42 Pa. Stat. & Cons. § 8343(a).

Hartleib argues that Plaintiffs' defamation claim fails because most of the statements on which it is based are time barred, other of the statements are protected by the judicial privilege, and Plaintiffs did not suffer harm from any of the statements.  (Doc. No. 72 at 20–30.)

### 1.      Statute of Limitations

Pennsylvania has a one-year statute of limitations on defamation claims.  *See* 42 Pa. Stat. & Cons. § 5523(1).  Plaintiffs initiated this suit on June 24, 2019, so any statements made prior to June 24, 2018 are time barred.

Plaintiffs argue that Hartleib "engaged in an ongoing, concerted and intentional course of conduct, the intent of which, collectively, was to defame and damage Plaintiffs," so the continuing violation exception applies, rendering all seventeen statements actionable, regardless of when they were made.  (Doc. No. 73 at 9.)  Under the exception, "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period."  *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001).

The continuing violation exception does not, however, render all seventeen statements actionable because the exception does not apply to actions for defamation. *Smith v. IMG Worldwide, Inc.*, 437 F. Supp. 2d 297, 304–05 (E.D. Pa. 2006) ("Federal courts almost universally decline to apply the continuing tort doctrine to defamation claims. A cause of action for defamation accrues immediately upon the occurrence of the tortious act and, thus, is not appropriate for the continuing violation exception." (cleaned up)); *Porta v. Fee*, No. CIV. A. 98–2094, 1998 WL 334355, at *2 (E.D. Pa. June 24, 1998) ("The 'continuing violation theory' can not toll the statute of limitations for Plaintiff's defamation claim."); *see also Deangelo Bros., Inc. v. Platte River Ins.*, Civil Action No. 3:09–CV–1198, 2010 WL 2635983, at *7 (M.D. Pa. June 29, 2010) ("[T]he continuing violations doctrine does not apply to actions for defamation."); *Samuel Dowling, Sr. v. Phila. Newspapers, Inc.*, No. 3031, 1995 WL 1315957, at *142 (Pa. Commw. Feb. 6, 1995) ("[T]here is no 'continuing tort' exception to Pennsylvania's one-year statute of limitations for actions for defamation . . . .").

Plaintiffs also argue that the discovery rule "preserves certain of [Hartleib's] statements that might otherwise be considered untimely." (Doc. No. 73 at 11.) "The discovery rule tolls the accrual of the statute of limitations when a plaintiff is unable, '*despite the exercise of due diligence*,' to know of the injury or its cause." *Mest v. Cabot Corp.*, 449 F.3d 502, 510 (3d Cir. 2006) (quoting *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983)). "Under the rule, . . . the statute of limitations does not begin to run until 'the plaintiff knows, or reasonably should know, (1) that he has been injured, and (2) that his injury has been caused by another party's conduct.'" *Id.* (quoting *Debiec v. Cabot Corp.*, 352 F.3d 117, 129 (3d Cir. 2003)). Unlike the continuing violation exception, the discovery rule may toll the statute of limitations on a defamation claim where the allegedly defamatory statements were "published in

a format that the plaintiff is not likely to discover." *See Coviello v. Berkley Publishing Grp.*,

CIVIL NO: 1:15-CV-01812, 2017 WL 891323, at *11 (M.D. Pa. Jan. 19, 2017) (citing *Gallucci*

*v. Phillips & Jacobs, Inc.*, 614 A.2d 284 (Pa. Super. Ct. 1992)).

Plaintiffs contend that the discovery rule applies to Hartleib's email communications with

Detective Goggin.  (Doc. No. 73 at 12.)  Hartleib emailed Goggin about "filing criminal charges"

against Silow.  (Doc. No. 69-39 at 2.)  Hartleib told Goggin he "[could not] believe that the [Law

Firm] can commit perjury and try to defraud the court and Sprint and walk away with 450k."

(Doc. No. 69-41 at 2.)  These emails were not broadly publicized; in fact, Plaintiffs only learned

of their existence during a limited discovery phase in this case.[8]  (Doc. No. 73 at 12.)  Plaintiffs

did not know and could not have known about these statements until they were handed over in

discovery, so the defamation claim is not time barred insofar as it arises out of Hartleib's email

communications with Goggin.  *See Gallucci*, 614 A.2d at 314 (holding that the discovery rule

applied in a defamation action where the plaintiff's former employer allegedly made defamatory

statements to the FBI).  *Contra Wolk v. Olson*, 730 F. Supp. 2d 376, 378–79 (E.D. Pa. 2010)

(holding that the discovery rule did not toll the statute of limitations for a defamation claim based

on statements published on a mass-media website).

In sum, the continuing violation exception does not apply to defamation claims, and the

discovery rule tolled the statute of limitations only as to Hartleib's emails to Goggin (Statement

No. 17), so the Court dismisses the defamation claim to the extent it is based on Statements No.

1, 2, 3, 4, 5, 6, 7, 8, 10, 14, 15, and 16, which were made prior to June 24, 2018.

### 2.    Judicial Privilege

"It has long been the law of Pennsylvania that statements made by judges, attorneys,

---

[8] On June 16, 2020, the Court permitted the parties to engage in limited discovery "related to the
jurisdictional and venue issues in this case."  (Doc. No. 30.)

witnesses and parties in the course of or pertinent to any stage of judicial proceedings are absolutely privileged and, therefore, cannot form the basis for liability for defamation." *Pawlowski v. Smorto*, 588 A.2d 36, 41 (Pa. Super. Ct. 1991). The Commonwealth affords this privilege because it recognizes an interest in allowing "[a]ll persons involved in a judicial proceeding . . . to speak frankly and argue freely without danger or concern that they may be required to defend their statements in a later defamation action." *Smith v. Griffiths*, 476 A.2d 22, 24 (1984). The judicial privilege applies only to statements (1) "issued as a matter of regular course of the proceedings"; and (2) "pertinent and material to the proceedings." *Bochetto v. Gibson*, 860 A.2d 67, 73 (Pa. 2004). "[T]he privilege extends not only to communications made in open court, but also encompasses pleadings and even less formal communications such as preliminary conferences and correspondence between counsel in furtherance of the client's interest." *Richmond v. McHale*, 35 A.3d 779, 785 (Pa. Super. Ct. 2012).

The judicial privilege applies broadly. *Id.* "The existence of the privilege does not depend upon the motive of the defendant in making the allegedly defamatory statement. The privilege is absolute and cannot be destroyed by abuse." *Schatzberg v. State Farm Mut. Auto. Ins. Co.*, 877 F. Supp. 2d 232, 247 (E.D. Pa. 2012) (cleaned up). "[A]ll doubt as to whether the alleged defamatory communication was indeed pertinent and material to the relief or redress sought is to be resolved in favor of pertinency and materiality." *Richmond*, 35 A.3d at 785 (citing *Greenburg v. Aetna Ins. Co.*, 235 A.2d 576, 578 (Pa. 1967)).

Hartleib argues that the allegedly defamatory statements made to judges or in connection with the Sprint, CenturyLink, or Big Lots litigations are protected by the judicial privilege. (Doc. No. 72 at 23.) Plaintiffs respond that none of Hartleib's statements are protected by the judicial privilege because they were "not made in the regular course of proceedings and [were]

extraneous to the relief being sought in those litigations" given that he lacked standing in those cases. (Doc. No. 73 at 16.) The Court will now consider whether the judicial privilege protects each of the remaining statements.

*Statement No. 9.* On March 14, 2019, Hartleib emailed Judge Vano's chambers asking the judge to intervene in the CenturyLink Litigation and accusing the Law Firm of engaging in "sinister" behavior. (Doc. No. 69 ¶ 183(i).) Hartleib does not expressly claim that this statement is judicially privileged, but he argues, at a high level, that "his statements in filings or hearings are subject to the absolute judicial privilege." (Doc. No. 72 at 23.) The judicial privilege does not protect this statement. Hartleib sent this communication to Judge Vano, who had presided over the Sprint Litigation, asking him to intervene in the CenturyLink Litigation. The mere fact that Hartleib made this statement to a member of the judiciary does not mean the judicial privilege applies. Neither of the two prerequisites is satisfied as to this letter. An individual's plea for one proceeding judge to intervene in *another judge's* pending cases is certainly not made "in the regular course" of either proceeding, and, similarly, such a request is not pertinent or material to the proceedings in either litigation. *See Post v. Mendel*, 507 A.2d 351, 356 (Pa. 1986) (holding that a defamatory letter sent to a judge was not protected by the judicial privilege because it was not relevant to the pending proceedings and transmittal of the letter would not "logically have been expected to affect the course of trial"); *id.* at 357 ("[I]t would not be pertinent, material, and in the regular course of procedure to send copies of the [allegedly defamatory] letter to Judge Kelton," nor would allegations "describing plaintiff as an unprofessional attorney and a nefarious piranha and liar . . . be relevant to a perjury proceeding").

*Statement No. 11.* On August 24, 2018, Hartleib emailed Judge Watson, the judge

presiding over the Big Lots Litigation, raising concerns over the Law Firm's billing practices. Similar to Statement No. 9, this statement is an email from a third party who admits that he is not "a shareholder . . . or otherwise an interested party in this case." (Doc. No. 69 ¶ 184(b).) Given Hartleib's admitted lack of interest in the case, this statement was not made in the regular course of the proceedings and is not protected by the judicial privilege. *See Post*, 507 A.2d at 356.

*Statements No. 12 and 13*. On March 5, 2019, Hartleib filed an *amicus curiae* brief opposing the Law Firm's involvement in the CenturyLink Litigation. (*Id.* ¶ 117.) The Law Firm was not moving to be named lead counsel; rather, it was part of the support structure proposed by a third-party firm in its motion to serve as lead counsel. (*Id.*) At a hearing on the motion the very next day, the court allowed Hartleib to argue. Hartleib rehashed the same arguments in his brief. Specifically, Hartleib argued that because of the Law Firm's history of engaging in fraudulent billing practices, the court should reject the Law Firm's role in the lead plaintiff's support structure. Hartleib contends that these allegedly defamatory statements (contained in his brief and during oral argument) are privileged because the judicial privilege protects "statements in filings" such as this. (Doc. No. 72 at 23.) In response, Plaintiffs counter that Hartleib's involvement in the CenturyLink Litigation was "highly irregular," in part because Hartleib's status as a CenturyLink shareholder was not established. (Doc. No. 73. at 16.) Regardless of whether Hartleib was a CenturyLink shareholder, the Court finds that the judicial privilege applies. He made these statements in an amicus brief, which was filed in the ordinary course of the litigation.[9] These statements accusing the Law Firm of having fraudulent billing practices are also very likely to have been relevant to the court's decision whether to grant a motion that would allow the Law Firm to play some role in the CenturyLink Litigation. *See Richmond*, 35

---

[9] The District of Minnesota, the judicial district in which the CenturyLink Litigation was heard, does not have any rules prohibiting amicus briefs. *See generally* D. Minn. Local Rules.

A.3d at 784–85 ("[A]ll doubt as to whether the alleged defamatory communication was indeed pertinent and material to the relief or redress sought is to be resolved in favor of pertinency and materiality."). And even if Hartleib filed this brief and appeared at the hearing "under false pretenses in order to shame and embarrass Plaintiffs among their peers," a defendant's bad motive does not render the privilege inapplicable. *Schatzberg*, 877 F. Supp. 2d at 247.

*Statement No. 17.* In March and May 2018, Hartleib emailed Detective Goggin "to seek filing criminal charges against Alexander Silow and his father Jeffrey Mark Silow." (Doc. No. 69-39 at 2.) Hartleib argues that any allegedly defamatory statements contained in these communications are judicially privileged because Hartleib "specifically expresse[d] his interest in pursuing criminal charges." (Doc. No. 72 at 29.) Plaintiffs argue that these statements are not privileged because "Detective Goggin replied only once" and "did not investigate or seek prosecution of Plaintiffs for any criminal act." (Doc. No. 73 at 18.) The judicial privilege protects "statements made to law enforcement officials for the purpose of persuading those officials to initiate criminal proceedings." *Schanne v. Addis*, 121 A.3d 942, 947–48 (Pa. 2015); *see also Pawlowski v. Smorto*, 588 A.2d 36, 41–42 (Pa. Super. Ct. 1991) (holding that statements "made solely to law enforcement officials in which an accusation of a crime . . . is made and which are made for the purpose of inducing those officials to bring criminal charges against the accused, are absolutely privileged").

Hartleib made these statements to Detective Goggin with the express intent of initiating criminal proceedings against the Silows. (Doc. No. 69-39 at 2.) The fact that Hartleib sent these emails only to Detective Goggin bolsters this finding. *Contra Miller v. County of Centre*, 702 F. App'x 69, 73 (3d Cir. 2017) (holding that the judicial privilege did not apply to statements made for reasons other than "to start or aid a criminal prosecution"). Although Chester County never

initiated criminal proceedings against the Silows, it is clear to the Court that Hartleib made these statements for the purposes of initiating criminal proceedings, so these statements are judicially privileged.  *See Pawlowski*, 588 A.2d at 41–42; *see also Sacks v. Stinsky*, No. 18-cv-3500, 2019 WL 2521635, at *4 (E.D. Pa. June 19, 2019) (holding that the defendant's statements "report[ing] what he believed were terroristic threats" to the police were judicially privileged regardless of the defendant's motive because "an individual's motives for making statements are not relevant in deciding whether those statements are privileged"); *Jackson v. Trustees of Univ. of Pa.*, CIVIL ACTION No. 17-4645, 2019 WL 309729, at *7 n.6 (E.D. Pa. Jan. 23, 2019) ("To the extent Mr. Jackson's complaint can be interpreted as asserting a libel claim against Ms. Chikaonda for reporting him to Penn Police, the claim is dismissed because statements to law enforcement officials accusing someone of criminal activity are absolutely privileged under Pennsylvania Law.").

* * *

In sum, the Court finds that Statements No. 12, 13, and 17 are protected by the judicial privilege and cannot be the bases for Plaintiffs' defamation claim.

### 3.    Defamatory Nature of Statements, Publication, and Harm

Hartleib argues that the remaining two statements cannot serve as the basis for the defamation claim because one was not actually defamatory, the other was published to a limited audience, and neither caused Plaintiffs any harm.  (Doc. No. 72 at 18, 22.)

*Statement No. 9.*  On March 14, 2019, Hartleib emailed Judge Vano's chambers and fourteen other attorneys involved in the Sprint Litigation accusing the Law Firm of "us[ing] several LLC shell corporations set up for the sole purpose of soliciting information under false pretenses to facilitate lawyer driven Qui Tam suits."  (Doc. No. 69-28 at 3.)  He also informed

Judge Vano that he had "initiated legal action against Weiser" and, in the same paragraph,

promised that his "quest to expose lawyer driven litigation and corruption rife throughout the

Plaintiffs Bar continue[d]."  (*Id.* at 2.)  Plaintiffs allege that this statement has "injure[d]

Plaintiffs' business and professional reputations."  (Doc. No. 69 ¶ 188.)  Hartleib argues that

these statements are not defamatory because he "qualifie[d] the reliability of information as

being sourced by an unknown third-party" and because the recipients were already aware of

Hartleib's qualms with Weiser's billing practices given their involvement in the Sprint

Litigation.  (Doc. No. 72 at 29.)

Plaintiffs have sufficiently alleged a claim of defamation as to this statement.  First, this

statement is defamatory even though Hartleib explained that the statement was based on

information from an "anonymous letter"—statements based on information from anonymous

sources can still give rise to defamation claims.  *See Castellani v. Scranton Times, L.P.*, 124

A.3d 1232, 1241 (Pa. 2015) (demonstrating that a newspaper article based on an anonymous tip

could serve as the basis for a defamation claim).

Second, Plaintiffs have alleged that this statement damaged their professional reputation.

"A communication is defamatory if it tends so to harm the reputation of another as to lower him

in the estimation of the community or to deter third persons from associating or dealing with

him."  *Thomas Merton Ctr. v. Rockwell Int'l Corp*, 442 A.2d 213, 215 (Pa. Super. Ct. 1981); *see*

*also Goldfarb v. Kalodimos*, 539 F. Supp. 3d 435, 456 (E.D. Pa. 2021) ("For Plaintiff to prevail,

it is not enough that he be the victim of the slings and arrows of outrageous fortune, be

embarrassed or annoyed, he must have suffered that kind of harm which has grievously fractured

his standing in the community of respectable society.").  This is the first time Hartleib accused

Defendants of engaging in fraudulent conduct in connection with qui tam lawsuits.  (Doc. No. 69

26

¶ 136.)  Thus, even if Hartleib had already told the attorneys on the distribution list that Defendants were engaged in fraudulent *billing* practices, he had not told them that Hartleib was engaged in fraudulent *information-gathering* practices, so the statements in this email may have further injured Defendants' reputation.  *See Marcone v. Penthouse Int'l Magazine for Men*, 745 F.2d 1072, 1079 (3d Cir. 1985) (acknowledging that some plaintiffs' reputations may be so sullied that the plaintiffs cannot possibly be harmed further by additional defamatory statements but explaining that the "doctrine is narrow" and courts cannot determine whether a plaintiff is "libel proof" as a matter of law).

Accordingly, the Court finds that these statements, which were published to Judge Vano and fourteen other lawyers (and perhaps even more legal professionals, because one of the recipients was a "docketing" listserv), could have irretrievably harmed Plaintiffs' standing in the legal community.  *See Goldfarb*, 539 F. Supp. 3d at 461–62 (holding that the defendant's Tweet that the plaintiff was "part of a noxious group of physicians who seek to hide abuse and protect abusers" caused the defendant harm because they "imput[e]d business misconduct"); *Kilmaski v. Parexel Int'l*, Civil Action No. 05–cv–0298, 2008 WL 2405006, at *5 (E.D. Pa. June 13, 2008) (holding that statements accusing the plaintiff of mismanaging or misappropriating money could have harmed the plaintiff's professional standing as an accountant); *Rockwell v. Allegheny Health, Educ. & Research Found.*, 19 F. Supp. 3d 401, 408 (E.D. Pa. 1998) (holding that statements the defendant made to the plaintiff's supervisors that the plaintiff "abused time off" "produced personal humiliation, mental anguish and suffering sufficient to satisfy the harm element").

*Statement No. 11*.  On August 24, 2018 Hartleib emailed Judge Watson, the judge presiding over the Big Lots Litigation, raising concerns over the Law Firm's billing practices.

(Doc. No. 69 ¶ 184(b).)  Judge Watson mentioned Hartleib's concern on a conference call with the parties in the Big Lots case and gave James Ficaro, an attorney at the Law Firm, the opportunity to respond to Hartleib's allegations.  (Doc. No. 69-25 at 11 n.2.)  In his opinion approving the settlement, Judge Watson indicated that he was "fully satisfied that the hours billed by Weiser were reasonable in this case" and said he saw "no similarities to the billing issues that may have occurred in the case involving Hartleib."  (*Id.*)  Hartleib argues that Plaintiffs have not alleged that the email was widely published or that they suffered any harm from this statement, particularly because Judge Watson approved their fee petition over Hartleib's objections.  (Doc. No. 72 at 25.)  Plaintiffs respond that the contents of the email were published on the call with attorneys for all the parties in the Big Lots Litigation, which harmed Plaintiffs' reputation in the legal community.[10]  (Doc. No. 73 at 19.)

    The Court finds that Plaintiffs have alleged defamation as to this statement.  First, the fact that Hartleib initially sent this email to Judge Watson alone is of no import because this statement was later passed on to the other attorneys in the Big Lots Litigation (and was eventually published in the opinion filed on the public docket approving the settlement).  *See Pendergrass v. ChoicePoint, Inc.*, Civil Action No. 08–188, 2008 WL 5188782, at *4 (E.D. Pa. Dec. 10, 2008) (acknowledging that the defendant could be held liable for allegedly defamatory statements he made to one individual who later passed that information along to other individuals, thereby causing the plaintiff harm); *Green v. Mizner*, 692 A.2d 169, 171–72 (Pa. Super. Ct. 1997) (reversing trial court's dismissal of a defamation claim against an individual who authored a private letter containing allegedly defamatory statements, which he sent to the

---

[10] The Court takes judicial notice of the docket sheet in the Big Lots Litigation and notes that thirty attorneys entered an appearance in the case.  *See generally In re Big Lots, Inc. Shareholder Litig.*, No. 2:12-cv-00445-MHW-KAJ (S.D. Oh.).

Attorney General of Pennsylvania and then forwarded to a newspaper).  Second, Plaintiffs have

pleaded sufficient allegations to support a finding of harm.  Judge Watson repeated Hartleib's

claims about the Law Firm's billing practices on a call with many attorneys on the Big Lots

Litigation, and there is nothing to suggest that any of these attorneys had ever been told that the

Law Firm may have had a *history* of engaging in fraudulent billing practices.  (Doc. No. 69-25 at

11 n.2.)  The fact that so many attorneys learned such professionally damning information would

unquestionably harm Plaintiffs' reputation in the legal community.  *See Goldfarb*, 539 F. Supp.

3d at 461–62; *Kilmaski*, 2008 WL 2405006, at *5; *Rockwell*, 19 F. Supp. 3d at 408.

*     *     *

Certain statements identified in the Amended Complaint cannot serve as the bases for

Plaintiffs' defamation claim because they are barred by the statute of limitations or are protected

by the judicial privilege, so the Court grants Hartleib's motion to dismiss the defamation claim as

to Statements No. 1, 2, 3, 4, 5, 6, 7, 8, 10, 12, 13, 14, 15, 16, and 17.  Plaintiffs have, however,

stated a claim for defamation as to Statements No. 9 and 11.

### B.      *Intentional Infliction of Emotional Distress*

Weiser alone brings a claim for IIED.  (Doc. No. 69 ¶ 191.)  He claims that Hartleib's

"insults, jeers, slurs, taunts, lies, affronts and abuses" are "indecent, dishonest, outrageous,

malicious, atrocious and should not be tolerated."  (*Id.* ¶ 193.)  He also claims that he has

suffered "enormous stress, anxiety, sleep deprivation, anger and torment" as a result of Hartleib's

statements.  (*Id.* ¶ 194.)

"To state a claim for IIED, a plaintiff must show extreme and outrageous conduct that is

deliberate or reckless and causes severe emotional distress."  *Fugarino v. Univ. Servs.*, 123 F.

Supp. 2d 838, 844 (E.D. Pa. 2000) (citations omitted).  Pennsylvania courts "have been chary to

allow recovery for a claim of intentional infliction of emotional distress." *See Hoy v. Angelone*, 720 A.2d 745, 755 (Pa. 1998). Liability for IIED does not extend to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Burke v. Kubicek*, No. 1015 EDA 2020, 2021 WL 4307031, at *6 (Pa. Super. Ct. Sept. 22, 2021). The conduct alleged must be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society." *Hoy*, 720 A.2d at 754. "A person's conduct is outrageous when he acts with a bad motive or when he acts with reckless indifference to the interests of others." *Sprague v. Walter*, 656 A.2d 890, 923 (Pa. Super. Ct. 1995). In assessing whether a plaintiff has stated a claim for IIED, the court must consider the complaint as a whole. *See Allen v. Lackawanna Cty. Bd. of Comm'rs*, 3:18-CV-209, 2019 WL 4644244, at *7 (M.D. Pa. Sept. 23, 2019). Hartleib argues that Weiser has failed to state a claim for IIED because Hartleib's conduct was not "extreme and outrageous." (Doc. No. 72 at 31–32.) Weiser responds that the Amended Complaint's allegations detail an ongoing course of conduct to destroy Weiser's professional career such that a reasonable person could find Hartleib's conduct extreme and outrageous. (Doc. No. 73 at 24.)

Here, Weiser alleges that over the course of two years Hartleib made at least seventeen statements accusing Weiser and the Law Firm of being unethical, running a "criminal enterprise," and "engaging in fraudulent billing practices." (Doc. No. 69 ¶¶ 198–200.) Further, Weiser claims that Hartleib made these statements with the intent to harm Weiser—specifically, Hartleib sought to malign Weiser's professional reputation and make it more difficult for Weiser to maintain a successful career in the derivative action plaintiffs' bar. (*Id.* ¶ 204.) Given the allegations in the Amended Complaint, the Court cannot at this stage say that Weiser is incapable of asserting IIED claims against Hartleib—Hartleib's near-constant haranguing in professional

settings could rise to the level of "outrageous." *See Sprague*, 656 A.2d at 923 (holding that a reporter acted "outrageously" when he published a series of defamatory statements about the plaintiff where the reporter "was outspoken . . . regarding his intention to destroy [the plaintiff's] career" and was ultimately successful, causing permanent damage to the plaintiff's reputation and "destroy[ing] all hope of future public service employment").

Accordingly, the Court denies Hartleib's motion to dismiss Weiser's IIED claim.

### C.     *Commercial Disparagement*

Plaintiffs also bring a commercial disparagement claim on the basis of the seventeen statements Hartleib made regarding the Law Firm's integrity and billing practices. (Doc. No. 69 ¶ 46.) To state a claim for commercial disparagement, a plaintiff must allege that the defendant made a statement and (1) the statement is false; (2) the publisher either intends the publication to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss; (3) pecuniary loss does result; and (4) the publisher either knows that the statement is false or acts in reckless disregard of its truth or falsity (actual malice). *Brooks Power Sys., Inc. v. Ziff Commc'ns Inc.*, No. CIV.A. 93-3954, 1994 WL 444725, at *2 (E.D. Pa. Aug. 17, 1994) (citing *Menefee v. Columbia Broad. Sys., Inc.*, 329 A.2d 216 (Pa. 1974)). "The distinction between actions for defamation and disparagement turns on the harm towards which each is directed." *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 924 (3d Cir. 1990). "An action for commercial disparagement is meant to compensate a vendor for pecuniary loss suffered because statements attacking the quality of his goods have reduced their marketability, while defamation is meant protect an entity's interest in character and reputation." *Id.*

Hartleib argues that Plaintiffs' commercial disparagement claim fails for the same reason the defamation claim fails—certain of the statements are time barred, the judicial privilege

applies to certain of the statements, and Plaintiffs have failed to allege that any remaining statements caused them harm.  (Doc. No. 72 at 20–30.)  Plaintiffs respond that the Amended Complaint sets forth "legally sufficient claims for [commercial disparagement]" and that the commercial disparagement claim is timely.  (Doc. No. 73 at 5–6.)

As a threshold matter, the commercial disparagement claim is time barred to the extent it is based on any statements made prior to June 24, 2018.  Commercial disparagement is a defamation-based claim, so a one-year statute of limitations applies, and the continuing violation exception does not apply to make otherwise time-barred statements actionable.  *See Pro Golf Mfg., Inc. v. Tribune Reviews Newspaper Co.*, 809 A.2d 243, 247 (Pa. 2002); *see also Logan v. Salem Baptist Church of Jenkintown*, Civil Action No. 10–cv–0144, 2010 WL 3364203, at *6 (E.D. Pa. Aug. 17, 2010) (explaining that the same statute of limitations applies to claims for defamation and commercial disparagement).  Accordingly, the following statements cannot serve as the bases for the commercial disparagement claim:  Statements No. 1, 2, 3, 4, 5, 6, 7, 8, 10, 14, 15, and 16.  Similarly, the judicial privilege applies in commercial disparagement cases as in defamation cases, *see Bochetto v. Gibson*, 860 A.2d 67, 71 (Pa. 2004), so Statements No. 12, 13, and 17 cannot serve as the bases for Plaintiffs' commercial disparagement claim.

The Court must now determine whether Plaintiffs have stated a claim for commercial disparagement as to the two remaining statements, Statements No. 9 and 11.  A commercially disparaging statement is one that is intended "to cast doubt upon the existence or extent of another's property in land, chattels or intangible things, *or upon their quality*."  *U.S. Healthcare*, 898 F.2d at 924 (emphasis added).  Again, "an action for commercial disparagement is meant to compensate a vendor for pecuniary loss suffered because statements attacking the quality of his goods have reduced their marketability," whereas an action for defamation is "meant to protect

an entity's interest in character and reputation." *Id.*

Here, the remaining statements arguably call into question the marketability of Plaintiffs' legal services. (Doc. No. 69 ¶¶ 183(i), 184(b).) In Statement No. 9, Hartleib implies that Plaintiffs are "corrupt[]" and accuses Weiser of engaging in a fraudulent, "sinister" scheme, which could imply that his legal work is of shoddy quality and/or unethical. (Doc. No. 69-28 at 2–3.) Similarly, in Statement No. 11, Hartleib "raise[s] concerns over Weiser's billing practices," and prospective clients may be less likely to retain a lawyer known to inflate his bills. (Doc. No. 69-25 at 12 n.2.) Because the two remaining statements arguably attack the quality of Plaintiffs' legal services, they are actionable for commercial disparagement. *See U.S. Healthcare*, 898 F.2d at 926 (holding that a statement criticizing a competitor's health plan could support a claim for commercial disparagement); *Am. Bd. of Internal Med. v. Von Muller*, Civil Action No. 10–CV–2680, 2011 WL 857337, at *6 (E.D. Pa. Mar. 10, 2011) (holding that a statement that a doctor "cheated on a certification examination" could be commercially disparaging because it implied that the doctor was not qualified to practice medicine).

Accordingly, the Court denies Hartleib's motion to dismiss the commercial disparagement claim as to Statements No. 9 and 11.

### D.    *False Light*

Finally, Plaintiffs claim that Hartleib published the seventeen allegedly defamatory and disparaging statements "in order to cast a negative light upon Weiser's professional reputation." (Doc. No. 69 ¶ 210.) "Pennsylvania recognizes that publicity which places a person in a false light is a viable cause of action." *Mallory v. S & S Publishers*, 168 F. Supp. 3d 760, 776 (E.D. Pa. 2016) (citing *Graboff v. Colleran Farm*, No. CIV. A. 10-1710, 2013 WL 1286662, at *16 (E.D. Pa. Mar. 28, 2013), *aff'd*, 744 F.3d 128 (3d Cir. 2014)). To state a claim for false light, a

plaintiff must allege that the defendant published material about the plaintiff that "is not true, is highly offensive to a reasonable person, and is publicized with knowledge or in reckless disregard of its falsity." *Graboff*, 744 F.3d at 136.  Hartleib argues that Plaintiffs' false light claim fails because the majority of the statements on which the claim is based are time barred or privileged and because Plaintiffs have failed to state a claim as to the remaining statements. (Doc. No. 72 at 20–30.)  Plaintiffs respond, arguing that the false light claim is timely and legally sufficient.  (Doc. No. 73 at 5–6.)

As a threshold matter, the majority of the claims are time barred.  False light, like commercial disparagement, is rooted in defamation, so it carries a one-year statute of limitations, and the continuing violation exception does not apply.  *See Tomlinson v. Borough of Norristown*, Civil Action No. 09-3711, 2010 WL 1337724, at *3 (E.D. Pa. Apr. 5, 2010) (citing 42 Pa. Stat. & Cons. § 5523); *Lavellier v. City of Philadelphia*, Civil Action No. 12–1357, 2012 WL 2500980, at *7 (E.D. Pa. June 29, 2012) (holding that the continuing violation exception did not apply to the plaintiff's false light/invasion of privacy claim).  This means that Statements No. 1, 2, 3, 4, 5, 6, 7, 8, 10, 14, 15, and 16 are time barred.  Similarly, the judicial privilege protects statements made in the course of judicial proceedings from being the basis of defamation-based claims, such as false light.  *See Schatzberg*, 877 F. Supp. 2d at 246–47 ("To the extent that Dr. Schatzberg's claim is based on Mr. Goldberg's conduct or statements in prosecuting the particular lawsuits raised in the Complaint, the Court concludes that such statements are protected by absolute judicial privilege.").  So Statements No. 12, 13, and 17 are privileged.

The Court now considers whether Plaintiffs have stated a false light claim as to the remaining two statements.  False light differs from defamation in that it requires a showing that the statements would have been "highly offensive to a reasonable person" but does not require a

showing of harm.  *Mallory*, 168 F. Supp. 3d at 777.  Put differently, false light protects one's

"right to be left alone," while defamation protects one's "interest in a good reputation."  *Id.*

Hartleib does not argue that the statements he made were true (or that he did not know the

statements he made were not true).  And, as discussed above, *see supra* Section III.A.3, the

Amended Complaint alleges that Hartleib published these statements even though he knew them

to be untrue.  Thus, the Court need only consider whether Statements No. 9 and 11 would have

been highly offensive to a reasonable person to determine whether Plaintiffs have stated a claim

for false light.

Statements No. 9 and 11 accuse Plaintiffs of employing fraudulent schemes to drum up

frivolous lawsuits and of engaging in fraudulent billing practices to earn higher fees.  (Doc. No.

69 ¶¶ 183(i), 184(b).)  The legal profession is one that prides itself on integrity, and these

statements cast Plaintiffs as greedy, dishonest, and unethical.  Further, Hartleib published these

statements to judges, judicial staff, and other attorneys in the derivative action bar—everyone in

this audience knows that lawyers are held to the highest of ethical standards and are not

permitted to engage in the alleged practices.  These attacks on Plaintiffs' professional character,

particularly in light of the audience, could have been highly offensive to a reasonable person.

*See Krajewski v. Gusoff*, 53 A.3d 793, 809–10 (Pa. Super. Ct. 2012) (holding that statements that

a city councilwoman was "systematically pilfering the public purse" and "accessing money that

did not belong to [her]" supported a claim for false light); *Banks v. Columbia Broadcasting Co.*,

63 F. Supp. 3d 501, 508 n.6 (E.D. Pa. 2014) (holding that statements that a doctor provided his

patients with heart stents they did not need could form the bases of a false light claim); *Fanelle v.*

*LoJack Corp.*, 79 F. Supp. 2d 558, 563 (E.D. Pa. 2000) ("Being falsely labeled a criminal could

be highly offensive to a reasonable person . . . .").

Accordingly, the Court denies the motion to dismiss the false light claim as to Statements No. 9 and 11 and grants the motion to dismiss the false light claims as to Statements No. 1, 2, 3, 4, 5, 6, 7, 8, 10, 12, 13, 14, 15, 16,and 17

## IV.    CONCLUSION

For the reasons above, the Court denies Defendant's motion to dismiss as to Statements 9 and 11 as to Plaintiffs' defamation, commercial disparagement, and false light claims and as to Plaintiff Weiser's IIED claim.  Defendant's motion to dismiss is granted as to all other statements in connection with Plaintiffs' defamation, commercial disparagement, and false light claims.

An appropriate Order follows.