**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **THE WEISER LAW FIRM, P.C., et al.,** | **CIVIL ACTION** |
| Plaintiffs, | |
| *v.* | **NO. 2:19-cv-02728-KSM** |
| **MICHAEL HARTLEIB,** | |
| Defendant. | |

<u>**MEMORANDUM**</u>

**MARSTON, J.**                                                    **March 29, 2023**

This case spawns from a years-long dispute between Plaintiffs, the Weiser Law Firm, P.C. (the "Law Firm") and Robert Weiser, Esquire, and Defendant Michael Hartleib.  Plaintiffs assert claims for defamation, commercial disparagement, and false light invasion of privacy. Presently before the Court is Hartleib's motion for summary judgment.  (Doc. No. 193.)  For the reasons below, the Court grants in part and denies in part the motion.

## I.  BACKGROUND

### A.  *Allegedly Disparaging Statements*

In their First Amended Complaint, Plaintiffs brought claims for defamation, commercial disparagement, and false light in connection with seventeen statements Hartleib allegedly made to judges, members of the legal community, and clients.  (*See* Doc. No. 69.)  Following the Court's ruling on Hartleib's motion to dismiss, the claims survived only with respect to the following two statements:

- **Statement No. 9**:  A March 14, 2019 email Hartleib sent to Judge Vano's chambers asking Judge Vano to "set[] the record straight" in the *CenturyLink* Litigation, on

which 14 attorneys were copied.[1]  (*Id.* at ¶ 183(i); *see also* Doc. No. 69-28.)

- **Statement No. 11**:  An August 24, 2018 email from Hartleib to Judge Watson in the *Big Lots* Litigation[2] raising "concerns over Weiser's billing practices in [a] prior case."  (*Id.* at ¶ 184(b); *see also* Doc. No. 69-25.)

Bearing this in mind, the Court sets forth the relevant facts below.[3]

### B.  Factual Background

The Law Firm provides legal services for shareholder class actions and shareholder derivative actions, among other practice areas.  (*See* Doc. No. 194-4 at 71:15–73:11.)  Weiser's practice focuses primarily on shareholder derivative litigation.  (*Id.* at 75:1–76:8.)

#### 1.  The Sprint Litigation

Hartleib, whose "holdings initially were in Nextel," was unhappy "at the loss of value that took place after" Sprint and Nextel merged.  (Doc. No. 194-2 at 30:15–32:15, 45:17–46:4.)  Subsequently, he retained Bruce Murphy, Esquire, to pursue legal redress in connection with the Sprint-Nextel merger.  (*Id.* at 46:5–47:2.)  Murphy reached out to Weiser, but Weiser was not interested in pursuing a Sprint derivative action with Hartleib as the named plaintiff.  (*See* Doc. No. 69-2 at 2 (Mar. 27, 2009 Email from Weiser to Murphy) ("I think he has a potential conflict

---

[1] *In re CenturyLink Sales Practices and Securities Litigation* (D. Minn.).

[2] *In re Big Lots, Inc. Shareholder Litigation*, No. 12-cv-445 (S.D. Ohio).

[3] The parties have provided well over a thousand of pages of record evidence in connection with their summary judgment briefing, the vast majority of which is irrelevant to the narrow issue currently before the Court at this stage in the litigation—namely, whether there are any genuine issues of material fact precluding summary judgment on Plaintiffs' remaining claims, which involve *only two* statements of the seventeen statements originally pleaded in the Amended Complaint.  Therefore, the Court omits the background facts concerning the parties' contentious relationship and incorporates by reference its previous opinions for those.  *See The Weiser Law Firm v. Hartleib*, Civil Action No. 2:19-cv-02728-KSM, 2022 WL 970757 (E.D. Pa. Mar. 31, 2022); *The Weiser Law Firm v. Hartleib*, Civil Action No. 19-2728, 2020 WL 5993628 (E.D. Pa. Oct. 9, 2020), *reconsideration denied*, 2020 WL 6781941 (E.D. Pa. Nov. 17, 2020).

in light of other litigation he's involved in.  Thus, I don't think he would make an adequate

representative for sprint."); Doc. No. 69-3 at 2 (Mar. 27, 2009 Email from Murphy to Hartleib)

("Rob Weiser and I have conferred and thought about the motion to appoint the Sprint Derivative

Action Representative.  We believe you may have a potential conflict in light of the other

litigation in which you are involved. . . . Therefore, we will not be able to file the Sprint

derivative suit in your name.").)  Ultimately, the Law Firm represented named plaintiff Monica

Ross-Williams in a Sprint derivative action instead, which was later consolidated in the state

court of Kansas.  (*See, e.g.*, Doc. No. 193, Exs. B, G, & H; Doc. No. 194-11 at ¶ 18 (admitting

that "Plaintiffs represented Monica Ross-Williams in connection with the Sprint Derivative

Litigation"), ¶ 19 (admitting same and that the "Sprint Derivative Litigation . . . was consolidated

in the State Court of Kansas").)

In 2016, several of the Sprint shareholder derivative lawsuits pending in the Kansas

courts (including the Ross-Williams suit) achieved a collective settlement.  (*See, e.g.*, Doc. No.

193, Ex. B (noting that on February 26, 2016, Plaintiff filed an Unopposed Motion for

Preliminary Approval of Settlement and that the court granted the motion); Doc. No. 194-4 at

143:18–24 (Weiser's testimony that Ross-Williams was considered "a plaintiff amongst the

settling plaintiffs group," all of whom were on equal footing).)  The court preliminarily approved

the settlement and when the Law Firm and others sought the court's final approval of the terms

of the settlement, including attorneys' fees for plaintiffs' counsel, Hartleib filed a *pro se*

objection.  (*See* Doc. No. 194-11 at ¶ 20 (admitting that "Hartleib objected to the already

approved settlement in the Sprint Derivative Litigation").)  On May 26, 2016, Hartleib appeared

at the final approval hearing before the Honorable James Vano in support of his objection.  (Doc.

No. 193, Ex. A; *see also* Doc. No. 194-11 at ¶ 22 (admitting that "Hartleib appeared at a hearing

to object to the settlement in the Spring Derivative Litigation").)  On November 22, 2016, Judge

Vano approved the Sprint Derivative Settlement, but only awarded a small percent of the

attorneys' fees requested.  (Doc. No. 193, Ex. 11 (approving the settlement, limiting attorneys'

fees and expenses to $450,000, and rejecting the requested $4.25 million fee award as

"unjustifiably high"); *see also id.* (finding the "billing records . . . paint[ed] a troublesome

portrait of exploiting Sprint's missteps for a substantial reward for counsel, and minimal relief to

Sprint and its shareholders that suffered" and noting that "no motion practice or serious

discovery efforts were ever undertaken to address the egregious acts originally alleged against

the individual Defendants who were responsible for the losses to Sprint"); Doc. No. 194-11 at

¶ 33 (admitting that the Kansas state court approved the settlement but cut the attorneys' fees for

Plaintiffs and their peers by 90%).)

In the opinion, Judge Vano specifically called out the amount of time billed by one of the

Law Firm's contract attorneys, Alexander J. Silow.[4]  (*See* Doc. No. 193, Ex. B ("Of the nearly

18,000 [sic] of work, 6905.25 of those hours were billed by attorney Alexander J. Silow for

document review.  This is astonishing!  The adequacy of Mr. Silow's billing records are

discussed in detail below."); *id.* ("Mr. Silow's billing records reflect that on most days, he

performed billable work between 10 to 15 hours per day.  In fact, only 46 out of the 550 billing

records—8.36% in total—show Mr. Silow working under ten hours a day.  The Court is very

skeptical about the credibility of Mr. Silow's billing records.  Working 14 hours a day, as Mr.

Silow's records reflect he did for 315 of the days in question, would mean that he would be

---

[4] On December 20, 2016, Plaintiffs Filed a Second Motion to Alter or Amend the Kansas Court's
November 22, 2016 Order and Memorandum, requesting that the court strike its findings regarding
Silow's billing records.  (Doc. No. 193, Ex. G.)  On January 6, 2017, the Kansas court denied the motion.
(Doc. No. 193, Ex. H.)

performing document review from 6:00 AM until 8:00 PM every day, without any breaks to eat meals or attend to other personal matters.  This is unbelievable!").)

The parties appealed Judge Vano's November 22, 2016 decision.  (Doc. No. 194-11 at ¶ 34.)  In February 2017, during the pendency of the appeal, the Law Firm discovered that Silow had misrepresented himself as a barred attorney by providing another individual's bar number.  (*Id.* at ¶¶ 38–39.)  Silow had been placed with the Law Firm through Abelson Legal Search, a Philadelphia legal recruitment and placement firm.  (*Id.* at ¶ 42.)  The Law Firm notified the Court of Appeals about the information it learned about Silow.[5]  *See id.*  The Court of Appeals ultimately affirmed the reduced fee award in April 2018.  *See id.* at 635 ("Based on our review of the record on appeal in light of Kansas law, we do not find the district court's decision to approve attorney fees and expenses in the amount of $450,000 to be an abuse of discretion.").

### 2.   Statement No. 11 to Judge Watson

In the *Big Lots* Litigation, another derivative action involving the Law Firm, Hartleib (who was *not* a Big Lots shareholder) emailed the court about the Law Firm after the court had preliminarily approved the settlement in that case.  (*See* Doc. No. 69-25 at 12 n.2.)  Specifically, on August 28, 2018, in the opinion finally approving the settlement, the Honorable Michael H. Watson noted that Hartleib had emailed the court[6] to raise concerns about the Law Firm's billing practices:

> On August 24, 2018, well after the time to object and the fairness

---

[5] In its opinion, the Court of Appeals wrote:  "Although we will yield to the disciplinary authorities in the Commonwealth of Pennsylvania—or elsewhere—to sort out what the attorneys representing the plaintiffs in these derivative actions knew or should have known about the status of Jeffrey Silow's license to practice law, we find the information provided by Weiser to be very troubling."  *See Ross-Williams v. Bennett*, 419 P.3d 608, 624 (Kan. App. 2018).

[6] Hartleib testified that he reached out to the *Big Lots* court to ask if it was too late for him to file an amicus brief and was instructed to send the clerk an email.  (Doc. No. 194-2 at 318:4–11.)

> hearing took place, the Court received an email[7] from [Hartleib], a shareholder who had an interest in a different case involving The Weiser Firm . . . Hartleib raised concerns over Weiser's billing practices in this prior case and stated that he wanted to inform the Court so that it could scrutinize the fee request in this case . . . Hartleib does not indicate that he is a shareholder[8] in Big Lots or otherwise an interested party in this case.  Furthermore, the Court always scrutinizes the billing records of plaintiffs' counsel before approving fee awards.[9]

(*See id.*)

Hartleib testified that his "intent was to provide information that [Judge Watson] may or may not deem relevant to his determination as to fairness of fees, appointment of lead counsel, any of those things."  (Doc. No. 194-2 at 320:22–5; *see also id.* at 321:6–14 ("Given what had transpired in Kansas, I deemed it prudent to inform the judge as to what took place.  At that time, I didn't know who was involved in the case and who billed.  I didn't know if Silow was involved in that case.  I didn't know who was involved.  It's just giving the judge information that he may or may not deem relevant.").)

Weiser testified that he was not aware of anyone who read the email, other than Judge

---

[7] The parties have not provided the Court with the email Hartleib sent to Judge Watson.

[8] Hartleib testified that he was never a Big Lots shareholder.  (*See* Doc. No. 194-2 at 318:19–11 ("[T]here is an error in this because I never put myself out as being a shareholder.  So this starts out by saying [the] court received an email from 'Michael Hartleib, a shareholder, who had an interest in a different case involving the Weiser' – 'Hartleib raised concern over Weiser's billing practices in this prior case and stated that he wanted to inform the Court so that it could scrutinize the fee request in this case.  Hartleib does not indicate that he is a shareholder in Big Lots or otherwise an interested party in this case.'  So this is kind of contradictory because in one section it says that I was a shareholder, and, then, it goes on to correct that, and say that I was not a shareholder.").)

[9] Judge Watson held a call with the parties to discuss Hartleib's email.  (*See* Doc. No. 194-5 at 332:2–10; *see also* Doc. No. 69-25 at 12 n. 2 ("The Court held a telephone conference with the parties on August 24, 2018, on which James Ficaro, one of the attorneys from Weiser, was afforded the opportunity to respond to Hartleib's email.").)  At the motion to dismiss stage, the Court took judicial notice of the docket sheet in the *Big Lots* Litigation, which showed that thirty attorneys entered an appearance in the case.  (Doc. No. 150 at 28 n.10.)

Watson.  (Doc. No. 194-5 at 328:10–13.)  As to the harm he suffered, Weiser testified:  "[I]t is like the world I am in is small.  I may see Judge Watson again.  Judge Watson didn't seem overly concerned or moved by [Hartleib's] note.  On the other hand, maybe I apply to be Lead Counsel in front of Judge Watson this year, why deal with my trouble.  You got a couple [movants], they are all more or less qualified.  They are pretty much all in the same boat.  Is this enough to throw the judge; maybe, maybe not."  (*Id.* at 330:8–331:1.)

### 3.  Statement No. 9 to Judge Vano

Hartleib also raised his concerns about the Law Firm in the *CenturyLink* Litigation, a consolidated derivative action.  (*See* Doc. Nos. 69-26 ("Amicus Curiae Brief of Shareholder Michael Hartleib and Concerned Citizen In Opposition [sic] of the Appointment of Robbins Arroyo and the Weiser Firm et. al. as Lead Counsel in the Consolidated Derivative Action"), 69-28.)  The law firm of Bragar Eagle & Squire, P.C. moved to be appointed lead counsel and proposed that the Law Firm be included as part of its support structure.[10]  (*See* Doc. No. 69-27; Doc. No. 194-5 at 281:2–4 ("Q: What role were you hoping to have in the CenturyLink litigation?  A [Weiser]: To support Lead Counsel.").)  On March 5, 2019, Hartleib filed an amicus brief in opposition to the Law Firm's appointment as part of the lead counsel's proposed support structure, stating he wanted to "inform [the] Court of ongoing troubling actions by" the Law Firm.  (Doc. No. 69-26 at 3.)  On March 6, 2019, Hartleib reiterated his accusations against the Law Firm at a hearing before the Court, stating, "I know for a fact that the Weiser firm knew who Mr. Silow was and that will come out, you know, during the course of the litigation . . . .

---

[10] Weiser testified that to repair the Law Firm's professional reputation, it agreed to a support structure in the *CenturyLink* litigation—instead of moving to be appointed co or Lead Counsel—and therefore to take a back seat and earn less money, to "build our good graces in the community."  (Doc. No. 194-5 at 291:8–18.)

These firms, when these firms are up to no good, when they are billing illusory hours . . . ."[11] (Doc. No. 69-27 at 43:4–10.)

After the hearing, Hartleib forwarded his amicus brief to Judge Vano's administrative assistant and copied other attorneys who had been involved in the *Sprint* derivation action, writing: "I thought that the Honorable Vano would be interested to know that my quest to expose lawyer driven litigation and corruption rife throughout the Plaintiffs Bar continues." (Doc. No. 69-28.)  He also noted that he had received an anonymous letter "detailing an elaborate scheme by [the Law Firm] to procure 'Relators' in Qui Tam cases.  It involves the use of several LLC shell corporations[12] set up for the sole purpose of soliciting information under false pretenses to facilitate lawyer driven Qui Tam cases."[13]  (*Id.*)

Hartleib testified that he forwarded the amicus brief to Judge Vano for informational purposes only; he did not ask Judge Vano to do anything, nor did he expect a response.[14]  (*See* Doc. No. 194-2 at 308:18–22 ("Q: So what was your purpose in raising Qui TAM issues to

---

[11] Ultimately, the *CenturyLink* court appointed as lead counsel Bragar Eagle & Squire, whose proposed support structure included the Law Firm.  (Doc. No. 69-29.)

[12] Weiser testified that "the reason why the shell corporations were setup is to preserve client confidentiality.  It happens as a matter of course in Qui Tam and whistleblower litigation.  Really is that simple.  There is no – there is no big mystery."  (Doc. No. 194-5 at 303:2–8.)

[13] Hartleib testified that he "investigated what was alleged in the anonymous letter," meaning he "found the Department of Justice motion to dismiss, and then, them outing all these Qui TAM cases, which corresponded to what the anonymous letter said."  (Doc. No. 194-2 at 3–10.)  When asked the basis for his statement, he stated, "Based on my research and information that will probably be forthcoming at some point."  (*Id.* at 303:18–22.)

[14] At the time Hartleib sent Judge Vano this email, there was nothing pending before Judge Vano in the *Sprint* derivative litigation, other than general oversight of the settlement.  (*See* Doc. No. 194-2 at 308:23–309:8 ("Q: What was pending before Judge Vano at that time in Sprint Nextel?  A [Hartleib]: Oversight of the settlement?  Q: It was over, wasn't it?  A: No.  The Court retains jurisdiction for several years, I believe. . . . Q: But there were no motions or rulings to come from the Court, were there?  A: I wasn't expecting any. . . .").)

Judge Vano through his clerk?  A: Just to inform the judge of the ongoing issues with this and other firms."), 309:20–310:12 ("Q: But you weren't asking the Court to do anything, right?  A: No.  Q: So you were just providing information for what purpose?  What response did you expect?  A: I didn't expect a response.  No response.  I don't believe I ever expected or received any response, whatsoever, if Jill Boren thought it might be something that the judge would find interesting or relevant to future cases, or if another firm came before his Court, not just the Weiser firm, but any firm, it would give him information that might not otherwise have.  Q: That he needs for what purpose?  A: To be a good judge.").)

Weiser testified that emails "like this harm[ed] [his] reputation in the plaintiff's bar" and "ma[d]e people not want to do business with him."[15]  (Doc. No. 194-5 at 297:12–16.)  As to *CenturyLink* specifically, Weiser testified that because of Hartleib's email, the Law Firm "didn't receive any work on the case."  (*Id.*; *see also id.* at 298:12–23 ("I don't believe it is a coincidence that [Hartleib] got involved in the case . . . and we end up with no role in the case.").)

### C.  Procedural History

Plaintiffs initiated this lawsuit on June 24, 2019, asserting claims for abuse of process, defamation, intentional infliction of emotional distress ("IIED"), negligent misrepresentation, intentional interference with prospective contractual relations, and tortious interference with contract.  (Doc. No. 1.)  Plaintiffs also sought a vexatious litigant order to enjoin Hartleib from filing any action against Plaintiffs; from making any filing or submission in any case, derivative suit, class action suit, or qui tam suit that involves Plaintiffs; and from contacting any individual or entity about Plaintiffs, without first obtaining leave of the court.  (*Id.* at ¶ 170.)

---

[15] Weiser was unable to identify any individuals who expressed that Hartleib's email to Judge Vano impacted their opinion of him.  (Doc. No. 194-5 at 297:17–298:5.)

On August 23, 2019, Hartleib, a California resident, moved to dismiss the complaint for lack of personal jurisdiction and improper venue.  (Doc. No. 9.)  The Court dismissed Plaintiffs' request for a vexatious litigant order and claims for negligent misrepresentation, intentional interference with contractual relations, and tortious interference for lack of personal jurisdiction and dismissed Plaintiffs' claim for abuse of process for improper venue.  (Doc. No. 35.)  The Court denied Hartleib's motion to dismiss as to the defamation and IIED claims.  (*Id.*)

Plaintiffs sought leave to amend their complaint.  (Doc. No. 50.)  The Court permitted Plaintiffs to amend their complaint (Doc. No. 68), and Plaintiffs filed the Amended Complaint on January 21, 2021 (Doc. No. 69).  Plaintiffs continued to assert the defamation and IIED claims and added claims for commercial disparagement and false light invasion of privacy.  (*Id.*)

On February 9, 2021, Hartleib moved to dismiss the Amended Complaint for failure to state a claim (Doc. No. 72), which the Court granted in part and denied in part (Doc. Nos. 150–51).  The Court denied the motion to dismiss the defamation, commercial disparagement, and false light claims as to Statements Nos. 9 and 11.  (Doc. No. 151.)  The Court granted the motion to dismiss as to all other statements in connection with Plaintiffs' defamation, commercial disparagement, and false light claims.  (*Id.*)  The Court also denied the motion to dismiss as to Weiser's IIED claim.  (*Id.*)  However, on September 23, 2022, Weiser withdrew his IIED claim. (Doc. No. 186.)

On December 14, 2022, Hartleib filed a motion for summary judgment.  (Doc. No. 193.) Hartleib argues that summary judgment is proper because:  Statements Nos. 9 and 11 are subject to judicial privilege; Plaintiffs are libel proof and no reasonable juror could find that Statements Nos. 9 and 11 caused any harm to Plaintiffs' reputations; evidence establishes the truth of Statement No. 9; Statement No. 9 is merely Hartleib's opinion and is not actionable; Judge

Watson's summary of Hartleib's email (Statement No. 11) does not contain Hartleib's actual statement and the summary is not defamatory or disparaging; Plaintiffs are limited public figures; and Plaintiffs have not produced proof of damages.  (*See id.*)  Plaintiffs oppose the motion.  (Doc. No. 194.)

## II.    LEGAL STANDARDS

### A. *Summary Judgment*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248.

Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In examining the motion, we must draw all reasonable inferences in the nonmovant's favor.  *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159–60 (3d Cir. 2003).

Disagreements over what inferences may be drawn from the facts, even undisputed ones, preclude summary judgment.  *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996) (citation omitted).  "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from those facts" are matters left to the jury.  *Anderson*, 477 U.S. at 255.

The initial burden of demonstrating that there are no genuine issues of material fact falls on the moving party.  *Celotex*, 477 U.S. at 323.  Once the moving party has met its burden, the

nonmoving party must counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). The non-moving party must show more than the "mere existence of a scintilla of evidence" in support of its position. *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

**B. Causes of Action**

Plaintiffs bring three causes of actions—defamation, commercial disparagement, and false light—in connection with Statements Nos. 9 and 11.

To succeed on a claim for defamation under Pennsylvania law, a plaintiff must establish:

(1) The defamatory character of the communication.

(2) Its publication by the defendant.

(3) Its application to the plaintiff.

(4) The understanding by the recipient of its defamatory meaning.

(5) The understanding by the recipient of it as intended to be applied to the plaintiff.

(6) Special harm resulting to the plaintiff from its publication.

(7) Abuse of a conditionally privileged occasion.

42 Pa. Stat. & Cons. § 8343(a).

To bring a claim for commercial disparagement, a plaintiff must show that the defendant made a statement and (1) the statement is false; (2) the publisher either intends the publication to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss; (3) pecuniary loss does result; and (4) the publisher either knows that the statement is false or acts in reckless disregard of its truth or falsity (actual malice). *Brooks Power Sys., Inc. v. Ziff*

12

*Commc'ns Inc.*, No. CIV.A. 93-3954, 1994 WL 444725, at *2 (E.D. Pa. Aug. 17, 1994) (citing

*Menefee v. Columbia Broad. Sys., Inc.*, 329 A.2d 216 (Pa. 1974)).  "The distinction between

actions for defamation and disparagement turns on the harm towards which each is directed."

*U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 924 (3d Cir. 1990).  "An

action for commercial disparagement is meant to compensate a vendor for pecuniary loss

suffered because statements attacking the quality of his goods have reduced their marketability,

while defamation is meant protect an entity's interest in character and reputation."  *Id.*

Finally, "Pennsylvania recognizes that publicity which places a person in a false light is a

viable cause of action."  *Mallory v. S & S Publishers*, 168 F. Supp. 3d 760, 776 (E.D. Pa. 2016)

(citing *Graboff v. Colleran Farm*, No. CIV. A. 10-1710, 2013 WL 1286662, at *16 (E.D. Pa.

Mar. 28, 2013), *aff'd*, 744 F.3d 128 (3d Cir. 2014)).  To state a claim for false light, a plaintiff

must allege that the defendant published material about the plaintiff that "is not true, is highly

offensive to a reasonable person, and is publicized with knowledge or in reckless disregard of its

falsity."  *Graboff*, 744 F.3d at 136.

## III.   ANALYSIS

The Court addresses Hartleib's arguments as to Statements Nos. 11 and 9 in turn below,

followed by Hartleib's alternative arguments.

### A.   *Statement No. 11*

Hartleib argues that summary judgment is proper as to Statement No. 11 because

Statement No. 11 consists only of Judge Watson's August 28, 2018 opinion, which does not

contain Hartleib's actual statement.  (Doc. No. 193 at 27–29.)  In other words, Statement No. 11

is merely a summary of Hartleib's email to the court and not actionable.

As noted above, in his August 28, 2018 opinion finally approving of the settlement in the

*Big Lots* Litigation, Judge Watson wrote:

> On August 24, 2018, well after the time to object and the fairness hearing took place, the Court received an email from [Hartleib], a shareholder who had an interest in a different case involving The Weiser Firm . . . Hartleib raised concerns over Weiser's billing practices in this prior case and stated that he wanted to inform the Court so that it could scrutinize the fee request in this case . . . Hartleib does not indicate that he is a shareholder in Big Lots or otherwise an interested party in this case.  Furthermore, the Court always scrutinizes the billing records of plaintiffs' counsel before approving fee awards.

(Doc. No. 69-25.)

The Court agrees that Statement No. 11 cannot form the basis for Plaintiffs' claims. There is no record evidence of Hartleib's specific statement.  *Contra Diodato v. Wells Fargo Ins. Servs., USA, Inc.*, 44 F. Supp. 3d 541, 563 (M.D. Pa. 2014) (finding that the record identified specific defamatory statements attributable to the defendant or defendant's management where the record established that a meeting occurred on August 3, 2011, that the meeting was attended by three of defendant's managers, and during the meeting, one of those managers described the plaintiff as "insubordinate" and his business practice as "suspect").

Although Judge Watson's opinion is circumstantial evidence that Hartleib said *something* to Judge Watson about the Law Firm's billing practices and suggested scrutiny of the bills, without evidence of the *content* of the *actual* statement, a reasonable juror could not find that Hartleib's statement was false or created a false impression.  This is the death knell for Plaintiffs' claims.  *See, e.g.*, *Graboff v. Colleran Firm*, 744 F.3d 128, 136 (3d Cir. 2014) ("Though we are not aware of any Pennsylvania Superior Court case on the point, inferior Pennsylvania courts applying Pennsylvania law have concluded that defamation may be established where a statement, viewed in context, creates a false implication."); *id.* at 136–37 (explaining that the tort of false light "imposes liability on a person who publishes material that is not true . . . and is

publicized with knowledge or in reckless disregard of its falsity" and noting that a plaintiff "can establish falsity by showing that a defendant selectively printed or broadcast true statements or pictures in a manner which created a false impression" and that the definition of falsity is "broad" and "drawn" from "defamation law, which permits recovery where a publication is true, but implied falsehoods"); *QVC, Inc. v. MJC Am., Ltd.*, Civil Action No. 08-3850, 2011 WL 2843746, at *4 (E.D. Pa. July 18, 2011) ("[T]o defeat QVC's motion for summary judgment [on the commercial disparagement claim] Soleus must establish as a threshold matter that QVC made a false statement. The legal standards applicable to defamation claims—including those for determining the truth or falsity of statements—are appropriately applied in determining the sufficiency of Soleus's claim for commercial disparagement."); *id.* at *6 ("Absent evidence of a statement which is either literally false or false in context, Soleus has not met its burden to support its claim for commercial disparagement."); *see also Pace v. Baker-White*, 432 F. Supp. 3d 465, 502 n.7 (E.D. Pa. 2020) ("Pennsylvania courts apply the same analysis to both defamation and false light. Defendants raise the same arguments for the false light claims as for the defamation claims, and they will therefore be analyzed together." (cleaned up)); *Williams v. Roc Nation, LLC*, Civil Action No. 20-3387, 2020 WL 6158242, at *6 (E.D. Pa. Oct. 21, 2020) ("Pennsylvania courts consistently apply the same analysis to defamation and false light claims when the causes of action are based on the same set of underlying facts." (cleaned up)).

For these reasons, we grant summary judgment on Plaintiffs' defamation, commercial disparagement, and false light claims with respect to Statement No. 11.

### B. Statement No. 9

In Statement No. 9, Hartleib wrote:

> I thought the Honorable Judge Vano would be interested to know that my quest to expose lawyer driven litigation and corruption rife

throughout the Plaintiffs [sic] Bar continues.  Attached is an Amicus Brief filed in Minnesota, and [a] transcript of the hearing before the Honorable Michael J. Davis.  In addition, I have initiated legal action against Weiser and representative Ross-Williams as outlined in the attached complaint.

I am a shareholder in Centurylink, and once again forced to defend my interest against these firms.  Weiser is hiding behind the scene, and Robbins Arroyo seeks lead with a plaintiff holding 13 shares of a fourteen dollar stock.  Clearly this case would become yet another that is entirely lawyer driven.  Wherefore, no party would seek Counsel for redress with less than $300 dollars in damages.  Once again, proving the case would be entirely lawyer driven.  To hear Mr. Aguilar describe what transpired in Kansas is clearly misleading the Minnesota Court.  Maybe Judge Vano would be interested in setting the record straight before the Court appoints lead Counsel in the aforementioned case.

Interestingly, I received an anonymous letter last night which details an elaborate scheme by Weiser et.al. [sic] to procure 'Relators' in Qui Tam cases.  It involves the use of several LLC shell corporations set up for the sole purpose of soliciting information under false pretenses to facilitate lawyer driven Qui Tam cases.  This has resulted in the DOJ filing a motion to dismiss 11 active cases, filed by Weiser et.al. [sic] including ABBVIE.  The level of sinister is truly unbelievable, some of which is outlined in the attached Motion to dismiss by the Feds!

Lastly, I would like to express my gratitude to Judge Vano, I am, and remain incredible [sic] grateful for allowing me to be heard, and finding my arguments compelling.  I will continue my quest to expose and reform the corruption rife throughout Derivative litigation.

(Doc. No. 69-28.)  This email was sent to Judge Vano's administrative assistant and copied other

attorneys who had been involved in the *Sprint* derivation action.

Hartleib argues that summary judgment is warranted on Statement No. 9 because it is

(1) judicially privileged, (2) a truthful statement, and/or (3) mere opinion.  Hartleib also

maintains that Plaintiffs are libel proof and did not suffer any harm as a result of Statement No.

9.  The Court addresses each contention in turn below.

16

1. **Judicial Privilege**

First, Hartleib argues that summary judgment is warranted on Statement No. 9 because it

is judicially privileged.  (Doc. No. 193 at 13–14.)  The Court discussed judicial privilege at

length in its March 31, 2022 Memorandum on Hartleib's motion to dismiss and held that the

judicial privilege did not apply to Statement No. 9:

> The judicial privilege does not protect this statement.  Hartleib sent
> this communication to Judge Vano, who had presided over the
> Sprint Litigation, asking him to intervene in the CenturyLink
> Litigation.  The mere fact that Hartleib made this statement to a
> member of the judiciary does not mean the judicial privilege applies.
> Neither of the two prerequisites is satisfied as to this letter.  An
> individual's plea for one proceeding judge to intervene in *another
> judge's* pending case is certainly not made 'in the regular course' of
> either proceeding, and, similarly, such a request is not pertinent or
> material to the proceedings in either litigation.

(Doc. No. 150 at 22; *see also id.* at 20–25.)  Notably, Hartleib fails to address the fact that this

Court already decided that Statement No. 9 is not judicially privileged.  (*See generally* Doc. No.

193.)

Nor does the Court find that the record evidence Hartleib cites in his brief supports a

change in our analysis.[16]  (*See id.* at 13 (citing Doc. No. 193, Exs. G & H).)  Hartleib cites to

Plaintiffs' Second Motion to Alter or Amend in the *Sprint* Litigation and Judge Vano's January

6, 2017 decision denying said motion.  (*See id.*)  Specifically, Hartleib hones in on the language

from Judge Vano's decision in the *Sprint* Litigation that emphasized that Hartleib was a *pro se*

objector when discussing his unsolicited emails to the court.  (Doc. No. 193, Ex. H at 4–5 ("First,

Plaintiff argues that it is improper for Objector Michael Hartleib to send unsolicited e-mails to

---

[16] During oral argument, Hartleib's counsel conceded that he did not have any new evidence that would
support a change of the Court's ruling at the motion to dismiss stage as to judicial privilege.  (Mar. 13,
2023 Rough Hr'g Tr. at 7:19–23.)

the Court after [sic] decision has been made.  The Court agrees that is improper.  Plaintiff's

counsel should be aware of Mr. Hartleib's position in this action as an unrepresented Objector.

He is likely not fully aware of the bounds of appropriate communication with the Court.").)

Ultimately, neither of these documents—both of which were filed on the docket in the *Sprint*

Litigation—bears on whether the email Hartleib sent to Judge Vano two years later about the

*CenturyLink* Litigation and Plaintiffs' qui tam suits is judicially privileged.  Just because Hartleib

had sent Judge Vano emails objecting to the settlement previously (i.e., in 2016 and 2017) does

not mean the email he sent to Judge Vano two years later in 2019 on an unrelated matter is

judicially privileged.  And Hartleib does not cite a single case that gives *pro se* litigants or

objectors carte blanche to use judicial privilege as a shield, irrespective of the context and

content of the statement.  This Court will not begin such a practice here.

Further, as noted in our prior Memorandum, the judicial privilege applies only to

statements (1) "issued as a matter of regular course of the proceedings"; and (2) "pertinent and

material to the proceedings."  *Bochetto v. Gibson*, 860 A.2d 67, 73 (Pa. 2004).  "[T]he privilege

extends not only to communications made in open court, but also encompasses pleadings and

even less formal communications such as preliminary conferences and correspondence between

counsel in furtherance of the client's interest."  *Richmond v. McHale*, 35 A.3d 779, 785 (Pa.

Super. Ct. 2012).  The judicial privilege applies broadly.  *Id.*  "The existence of the privilege

does not depend upon the motive of the defendant in making the allegedly defamatory statement.

The privilege is absolute and cannot be destroyed by abuse."  *Schatzberg v. State Farm Mut.*

*Auto. Ins. Co.*, 877 F. Supp. 2d 232, 247 (E.D. Pa. 2012) (cleaned up).

Here, the Court finds that Statement No. 9—Hartleib's email to Judge Vano about the

*CenturyLink* Litigation and Plaintiffs' "elaborate scheme" involving qui tam lawsuits—was not

sent in the regular course of proceedings in the *Sprint* Litigation. As Hartleib admits, there was

nothing pending in the *Sprint* Litigation and all that remained was oversight of the settlement. At

bottom, Hartleib suggests that Judge Vano intervene in the *CenturyLink* case, which is before a

*different* judge in an *unrelated* matter, underscoring that Hartleib's email was not "sent in the

regular course of proceedings."

And, even if the email was sent in the regular course between Hartleib as objector and

Judge Vano as the presiding judge in the *Sprint* Litigation, there is nothing to show that

Hartleib's email was "pertinent and material" to the *Sprint* Litigation, where, again, all that was

remaining was oversight of the settlement and the content of the email was completely

untethered from the *Sprint* Litigation's proceedings. *See Post v. Mendel*, 507 A.2d 351, 355–56

(Pa. 1986) (holding that a letter sent to the court was not judicially privileged because "although

the letter made reference to matters which occurred in an ongoing trial, the letter was not directly

relevant to the court proceedings"); *see also Bochetto v. Gibson*, 860 A.2d 67, 73 (Pa. 2004)

("As Gibson's act of sending the complaint to [the reporter] was an extrajudicial act that

occurred outside of the regular course of the judicial proceedings and was not relevant in any

way to those proceedings, it is plain that it was not protected by the judicial privilege.").

Accordingly, the Court denies Hartleib's motion for summary judgment as to this ground.

### 2. <u>Truth</u>

Next, Hartleib argues that the Statement No. 9 is true and therefore Plaintiffs' defamation

claim cannot lie. (Doc. No. 193 at 21–25.) "A defendant may avoid liability for defamation if it

shows that its statements were substantially true." *Graboff*, 744 F.3d at 136 (citations omitted);

*see also Weaver v. Lancaster Newspapers, Inc.*, 926 A.2d 899, 903 (Pa. 2007) (stating that a

defendant may rebut a *prima facie* case of defamation by proving the truth of the defamatory

communication); *Eck v. Oley Valley Sch. Dist.*, 431 F. Supp. 3d 607, 633 (E.D. Pa. 2019) ("Under Pennsylvania law, truth is an affirmative defense to defamation." (citing 42 Pa. C.S.A. § 8343(b)(1))). "Under Pennsylvania law, proof of substantial truth must go to the 'gist' or 'sting' of the alleged defamatory matter; the test is whether the alleged libel as published would have a different effect on the mind of the reader which the pleaded truth would have produced." *Eck*, 431 F. Supp. 3d at 633 (cleaned up). "Determining the truth of an alleged defamatory statement is typically a matter for a jury." *Martin v. Finley*, 349 F. Supp. 3d 391, 427 (M.D. Pa. 2018); *Eck*, 431 F. Supp. 3d at 633. Hartleib bears the burden of proving the truth of Statement No. 9. *See Manno v. Am. Gen. Finance Co.*, 439 F. Supp. 2d 418, 433 (E.D. Pa. 2006) ("When the moving party has the burden of proof at trial on the issue on which summary judgment is sought, it must show that no reasonable jury could find for the non-moving party on that issue."); *see also id.* at 434 ("[T]here is a genuine issue as to whether 'charged off' is a true characterization of the state of Plaintiffs' American General account. . . . . American General bears the burden of proving the truth of the statement, and it has not demonstrated that no reasonable jury could find that the characterization of Plaintiffs' account as a derogatory 'charge-off' is false.").

Here, as just one example, the Court notes that there is a dispute of fact as to the truth of Hartleib's assertion that Plaintiffs' "scheme" involved "the use of several LLC shell corporations set up for the sole purpose of soliciting information under false pretenses." (Doc. No. 69-28.) To that end, Hartleib and Weiser offer contradicting reasons for why the LLC shell corporations were created. Weiser testified that the LLC shell corporations were set up "to preserve client confidentiality," which he claimed "happens as a matter of course in Qui Tam and whistleblower litigation." (Doc. No. 194-5 at 303:2–8.) In addition, Chris Nelson, an attorney at the Law Firm

whose practice includes qui tam litigation, testified that the statement was false.  (*See* Doc. No. 194-8 at 38:19–39:8 ("Q: So I'm going to focus on . . . where it says that Mr. Hartleib accused the law firm and Weiser of sinister behavior in an elaborate scheme involving the use of LLC shell corporations set up for the sole purpose of facilitating information under false pretenses to facilitate lawyer driven Qui Tam cases.  That – the portion I just read, which – is any section of that false?  A: Yes.  Q: And what about that is a false statement?  A: All of it.").)  Drawing all facts in the light most favorable to Plaintiffs, a reasonable juror could find that Hartleib's assertion that Plaintiffs set up LLC shell corporations for the "sole purpose of soliciting information under false pretenses" is untrue.

In sum, the Court concludes that there are genuine disputes of material fact as to the truth of Statement No. 9 and therefore will deny summary judgment on that ground.  *See Eck*, 431 F. Supp. 3d at 633 ("Fact issues preclude summary judgment on the Director Lyons's truth defense."); *Martin*, 349 F. Supp. 3d at 428 ("Given the extensive factual disputes on this issue, the Court cannot rule as a matter of law that the Newsletter was 'substantially true' with respect to the statements regarding Martin's resignation.").

### 3.  Opinion

Hartleib also contends that Statement No. 9 is an opinion and not actionable.  (Doc. No. 193 at 25–27.)

"Importantly, only statements of fact, rather than mere expression of opinion, are actionable under Pennsylvania law."  *Regis Ins. Co. v. A.M. Best Co., Inc.*, Civil Action No. 10-3171, 2013 WL 775521, at *4 (E.D. Pa. Mar. 1, 2013).  "In Pennsylvania, an opinion cannot be defamatory unless it 'may reasonably be understood to imply the existence of *undisclosed defamatory facts* justifying that opinion.'"  *Remick v. Manfredy*, 238 F.3d 248, 261 (3d Cir.

2001) (citation omitted); *cf. Regis*, 2013 WL 775521, at *7 ("When all the facts are disclosed, an opinion cannot be defamatory because the listener is able to evaluate the facts for himself and is free to disregard the conclusion the speaker made from these facts.  But when an opinion discloses only *some* of the facts on which it [is] based, it is capable of defamatory meaning and therefore actionable.").  *Accord Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–19 (1990) ("Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact.  Simply couching such statements in terms of opinion does not dispel these implications.").  Determining whether a statement constitutes a fact or mere opinion is question of law.  *See, e.g.*, *Goralski v. Pizzimenti*, 540 A.2d 595, 599 (Pa. Comm. Ct. 1988).

Viewing all evidence in the light most favorable to Plaintiffs, the Court cannot conclude that Statement No. 9 consists entirely of non-actionable opinion.  Although certain lines or phrases can be construed as pure opinion (e.g., that the Law Firm brings and litigates "lawyer driven" cases), other parts of the email conceivably are actionable because they rely on the existence of undisclosed defamatory facts.  For example, when discussing Plaintiff's involvement in qui tam litigation, Hartleib writes:

> Interestingly, I received an anonymous letter last night which details an elaborate scheme by Weiser et.al. [sic] to procure 'Relators' in Qui Tam cases.  It involves the use of several LLC shell corporations set up for the sole purpose of soliciting information under false pretenses to facilitate lawyer driven Qui Tam cases.  This has resulted in the DOJ filing a motion to dismiss 11 active cases, filed by Weiser et.al. [sic] including ABBVIE.  The level of sinister is truly unbelievable, some of which is outlined in the attached Motion to dismiss by the Feds!

(Doc. No. 69-28.)  Hartleib's opinion that "[t]he level of sinister is truly unbelievable" relies on the existence of undisclosed facts.  Specifically, although Hartleib attached the Department of Justice's motion to dismiss, the language he employs suggests that his opinion is based on more

than that alone.  (*See id.* ("The level of sinister is truly unbelievable, *some of which* is outlined in the attached Motion to dismiss by the Feds!" (emphasis added)).)  Further, Hartleib did not attach the anonymous letter he received and only summed up the letter in a sentence, despite the fact that he says the letter "detail[ed] an *elaborate* scheme."[17]  (*Id.* (emphasis added).) Ultimately, the email implies the existence of undisclosed facts and is therefore capable of defamatory meaning.  Therefore, the Court finds that the email is not pure opinion speech and denies summary judgment on this ground as well.  *Cf. Regis*, 2013 WL 775521, at *7–9 ("Best's press release is barely more than a page and neglects to mention—let alone disclose—the details of how Best arrived at such a substantial downgrade.  That is to say, Best's press release is almost entirely devoid of context.  . . . . Accordingly, the Court finds that Best's rating, as reflected in the press release, is capable of defamatory meaning because it is an 'opinion' that implies the existence of undisclosed defamatory facts.").

### 4.  Libel Proof

Last, Hartleib argues that Plaintiffs are libel proof as a matter of law and that no reasonable jury could find that Statement No. 9 harmed their reputations.  (Doc. No. 193 at 14–21.)

In at least one case, the Third Circuit recognized (albeit in a non-precedential opinion) that there is "no indication that the Pennsylvania Supreme Court has adopted the libel-proof plaintiff doctrine as a bar to liability, at the pleading stage or otherwise."  *Wallace v. Media News Grp., Inc.*, 568 F. App'x 121, 125 (3d. Cir. 2014).  "To the contrary," the Third Circuit has noted that "the Pennsylvania Supreme Court appears to treat the issue of a plaintiff's already tarnished

---

[17] As an aside, the Court also notes that Hartleib testified that his email was based on other information that would be "forthcoming."  (*See* Doc. No. 194-2 at 303:18-22.)

reputation as going to damages." *Id.* (citation omitted); *see also Marcone v. Penthouse Int'l Magazine for Men*, 754 F.2d 1072, 1079 (3d Cir. 1985) ("[W]e cannot say as a matter of law that [the plaintiff] was libel proof. Evidence of a tarnished reputation is admissible and should be considered as a factor to mitigate the level of compensatory damages. In the present case, the jury was informed of the evidence regarding Marcone's reputation, and its verdict for compensatory damages may well reflect the diminished status of Marcone[.]").

Based on the facts of this case, the Court cannot find as a matter of law that Plaintiffs are libel proof. Although Hartleib has pointed to some evidence indicating that Plaintiffs' reputation may have been sullied (at least in some respects) before he sent his 2019 email to Judge Vano, the Court finds that this should not serve as a total bar to liability but instead may be considered by the jury with respect to damages.[18]

For these reasons, the Court will deny summary judgment on this ground.

## C. Alternative Arguments

Finally, the Court considers Hartleib's alternative arguments that summary judgment is appropriate because (1) Plaintiffs are limited public figures and (2) Plaintiffs have not produced any evidence that they were harmed by Statement No. 9. (Doc. No. 193 at 29–34.)

### 1. Limited Public Figures

---

[18] Further, the Court cannot conclude as a matter of law that under every reasonable interpretation of Statement No. 9, Plaintiffs would be unable to recover any damages. *See Schiavone Constr. Co. v. Time, Inc.*, 847 F.2d 1069, 1081 (3d Cir. 1988) ("This court was confronted with the libel proof doctrine in *Marcone*. We did not rule affirmatively on the viability or wisdom of the doctrine, but simply refused to apply it to the facts of the case. . . . We will do what we did in *Marcone* and decline to rule on the libel proof doctrine, concluding here as we did there that under the facts of the case, we cannot determine the plaintiffs to be libel proof. We agree with plaintiffs that a jury could find . . . that the last paragraph of the article presents a new and distinct allegation that departs significantly from the rest of the piece and from allegations against the plaintiffs from other sources. . . . While we find the district court's skepticism about the plaintiffs' ability to recover such damages perfectly understandable, nevertheless, we do not believe that it can be asserted as matter of law that under every reasonable interpretation of the sting the plaintiffs would be unable to recover compensatory damages.").

Hartleib argues that Plaintiffs are limited public figures with respect to their work on derivative and qui tam litigations and therefore are required to show Hartleib acted with actual malice.  (*Id.* at 31.)

The question of whether a plaintiff is public or private figure is a question of law. *Marcone*, 754 F.2d at 1081 n.4.  "[A] limited purpose public figure is 'an individual [who] voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.'"  *Id.* at 1082 (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974)); *see also Ralston v. Garabedian*, -- F. Supp. 3d --, Civil Action No. 19-1539, 2021 WL 6072881, at *17 (E.D. Pa. Dec. 23, 2021) ("A defamation plaintiff who voluntarily injects himself into a [public] controversy assumes the risk and consequent fairness of public figure status."  (cleaned up)); *id.* ("An individual may voluntarily become a limited-purpose public figure by 'actively participating in the public issue in a manner intended to obtain attention.'" (citation omitted)).  "[T]he voluntariness requirement may be satisfied even though an individual does not intend to attract attention by his actions.  When an individual undertakes a course of conduct that invites attention, even though such attention is neither sought nor desired, he may be deemed a public figure."  *McDowell v. Paiewonsky*, 769 F.2d 942, 949 (3d Cir. 1985).  An individual may be deemed a public figure for a limited purpose based on their profession. *See id.* ("For example, a professional football player was classified as a limited purpose public figure because of the inevitable publicity that accompanies such a position."); *Marcone*, 754 F.2d at 1083–84 ("[C]ourts have classified some people as limited purpose public figures because of their status, position, or associations.  For example, sports figures are generally considered public figures because of their position as athletes or coaches. . . . In addition to sports figures, others have been classified as limited purpose public figures by virtue of their associations or positions.

For example, the Fifth Circuit deemed Louis Rosanova, a reputed underworld personality, a public figure in the context of his connection to organized crime."); *Ralston*, 2021 WL 6072881, at *16 ("An individual's status, position, or associations . . . may make him a limited-purpose public figure.  This transition to limited-purpose public figure may occur if the individual engages in a profession which draws him regularly into regional and national view and leads to fame and notoriety in the community." (cleaned up)).  To determine whether a plaintiff is a limited purpose public figure, courts consider (1) whether there is a "public controversy" and (2) "the nature and extent of [the plaintiff's] participation in this controversy."  *Marcone*, 754 F.2d at 1082.

To recover damages in a defamation case, public figure plaintiffs must prove the defendant made the statement with "actual malice."  *See McDowell*, 769 F.2d at 947; *see also New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964) ("The constitutional guarantees require, we think, a federal law that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with actual malice.").  Actual malice means "with knowledge that it was false or with reckless disregard of whether it was false or not."  *New York Times Co.*, 376 U.S. at 280.

Hartleib contends that Weiser and the Law Firm are limited purpose public figures (and therefore must show actual malice) because, among other things, their "work on derivative action matters is certainly of concern to the shareholders of these corporations, and the small community of the derivative action bar" and Plaintiffs hold Weiser "out to be a person of importance in the realm of derivative actions" on the Law Firm's website.  (Doc. No. 193 at 31.) The Court is not persuaded.  Hartleib does not cite a single analogous case, for example, a case holding that attorneys in shareholder derivative or class action lawsuits are limited purpose

public figures merely by virtue of their profession and being well-respected in their field (such as by being repeatedly selected as lead counsel). Nor does Hartleib cite a case holding that an attorney is a limited purpose public figure based on advertisements on his firm's website as to his specialty. The cases in which other courts have found attorneys to be limited purpose public figures are not remotely similar. *See Marcone*, 754 F.2d at 1086 (holding that the attorney's "voluntary connection with motorcycle gangs . . . in conjunction with the intense media attention he engendered [were] sufficient to render [him] a public figure for the limited purpose of his connection with illicit drug trafficking"); *Ratner v. Young*, 465 F. Supp. 386, 400 & n.24 (D.V.I. 1979) (holding that attorney Ratner was "a public figure for the limited purpose of the Fountain Valley murder trial" because: "[w]ith its racial overtones and devastating effect on the economy of the Islands, it was unquestionably a public controversy of deep concern to all of the people in the Islands, and to those who owned property there but lived elsewhere," the trial was highly publicized all over the United States, and the attorney "voluntarily thrust [himself] into the vortex of the case that had far-reaching and serious effect on many people not connected with it").

According to the Third Circuit, "if an attorney does more than merely represent the client in a strictly legal context—such as holding news conferences or otherwise affirmatively making a public issue of the case—then those activities may be counted in the public figure calculus." *Marcone*, 754 F.2d at 1086; *see also id.* ("Nothing in the record of the present case indicates that Marcone was engaged in bringing attention to his clients or himself in regard to their legal relationship. Thus we may give only limited significance to Marcone's representational activities in the public figure analysis."). In this case, Hartleib has not pointed to any evidence showing that Plaintiffs represented Ross-Williams or their other clients in more than a strictly

legal context, i.e., he has not presented evidence of any news conferences or press releases

Plaintiffs held relating to the *Sprint* or *CenturyLink* Litigations.[19]  The only evidence Hartleib

points to is the Law Firm's website that holds out Weiser as a "vanguard," "innovator in his

field," and "one of the pioneers of the modern stockholder derivative case," and Weiser's

testimony that those representations were accurate.  (*See* Doc. No. 193 at 31 (citing Exs. L &

AA).)  But the Court is not persuaded that the Law Firm's website alone, which would, of

course, advertise its services and the accomplishments of its attorneys, shows that Plaintiffs are

limited purpose public figures as it relates to *this case*.  Further, during oral argument, Hartleib's

counsel admitted he could not recall examples of Plaintiffs holding press conferences with

respect to their cases or making an affirmative public issue about a case.  (*See* Mar. 13, 2023

Rough Hr'g Tr. at 14:20–15:2.)

 For these reasons, the Court finds that Plaintiffs are not limited public figures.

  **2.** <u>**Evidence of Damages**</u>

 Finally, Hartleib argues that summary judgment is warranted because Plaintiffs have not

met their burden of establishing damages.  (Doc. No. 193 at 31–34.)  The Court considers this

argument with respect to the defamation and commercial disparagement claims in turn below.[20]

 ***Defamation***.  Under Pennsylvania law, to prevail on a defamation claim, a plaintiff must

---

[19] During oral argument, Hartleib's counsel cited to a March 13, 2017 Wall Street Journal article as
supporting his position that Plaintiffs were limited public figures.  (Mar. 13, 2023 Rough Hr'g Tr. at
13:22–14:7.)  But the Wall Street Journal article does not show that Plaintiffs sought out media attention
or affirmatively made a public issue of the *Sprint* case (or any other case for that matter).  (*See* Doc. No.
193, Ex. F.)  The Wall Street Journal article solely related to Silow's billing practices and how Judge
Vano slashed the attorneys' fees on the *Sprint* settlement.  (*See id.*)  Further, Hartleib's counsel also
admitted that he had no other evidence to show that Plaintiffs were limited public figures.  (Mar. 13, 2023
Rough Hr'g Tr. at 14:20–15:2.)

[20] Hartleib argues that Plaintiffs' defamation claim cannot survive because Plaintiffs have provided no
evidence of damage to their reputation.  (Doc. No. 193 at 31–34.)  He also contends that Plaintiffs'
commercial disparagement claim must fail because Plaintiffs have failed to show actual pecuniary loss.
(*See, e.g., id.* at 32.)  Hartleib does not make any specific argument with respect to Plaintiffs' false light

prove "special harm resulting to the plaintiff from its publication."  42 Pa. C.S. § 8343(a)(6).

However, the term "special harm" is a bit of a misnomer.  *See Joseph*, 129 A.3d at 428–29 &

n.10 (noting that "consistent with the Restatement (Second) of Torts § 569, Pennsylvania case

law holds that proof of special harm, i.e., monetary damages, is not a prerequisite to recovery in

a defamation libel matter" (cleaned up)); *Durando v. Trustees of Univ. of Pa.*, Civil Action No.

21-756, 2022 WL 2192943, at *6 (E.D. Pa. June 17, 2022) (explaining that the statute's use of

the "term 'special harm' is a deceptive one," given that Pennsylvania has also adopted the

Restatement (Second) of Torts, which "provides that liability may attach for libel although no

special harm results from the publication").

Ultimately, to prevail on a defamation case, a plaintiff must demonstrate "actual harm."[21]

*See Joseph*, 129 A.3d at 428–29 & n.10 (explaining that for private plaintiffs to recover damages

in defamation cases, they must suffer an "actual injury"); *Durando*, 2022 WL 2192943, at *6

("[T]o prevail on a libel claim in Pennsylvania, a plaintiff need not show economic harm, but he

must demonstrate actual harm." (cleaned up)); *see also Ralston v. Garabedian*, Civil Action No.

19-1539, -- F. Supp. 3d --, 2021 WL 6072881, at *23 (E.D. Pa. Dec. 23, 2021) ("The term

special harm as used in the statute has been interpreted to mean general damages which are

proven upon a showing of actual harm." (cleaned up)); *id.* at *24 ("Pennsylvania law does not

require 'special harm'—defined as economic harm or pecuniary loss—as an element of a

defamation claim.  Pennsylvania merely requires actual harm, which includes reputational

---

claim (indeed, he does not mention false light once in his damages section). (*See id.* at 31–34.).)
Therefore, the Court does not consider whether Plaintiffs have adequately proven damages on their false
light claim and summary judgment is denied as to that claim.

[21] This is true even in a defamation *per se* matter, as is the case here.  *See, e.g.*, *United Senior Advisors
Grp., Inc. v. Leisawitz Heller Abramowitch Phillips, P.C.I.*, No. 365 MDA 2017, 2018 WL 850442, at
*3–4 (Pa. Super. Ct. 2018).

damage.").  Actual harm includes "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering."  *Joseph*, 129 A.3d at 429; *Ralston*, 2021 WL 6072881, at *23.

Critically, "[f]or purposes of a Pennsylvania defamation case, proof of actual injury to a private plaintiff's reputation is a prerequisite to the recovery of damages for other actual injuries, including mental and emotional injuries."[22]  *Joseph*, 129 A.3d at 429; *see also id.* at 430 ("[P]ermitting the recovery of damages for injuries such as mental anguish without a showing of injury to reputation subverts the intended 'protective influence' of *Gertz's* actual injury structure. We note that Pennsylvania is not alone in requiring reputational injury as a prerequisite to a defamation plaintiff's recovery of damages for mental and emotional injuries."); *Ralston v. Garabedian*, -- F. Supp. 3d --, 2022 WL 3704097, at *39 (E.D. Pa. Aug. 26, 2022)  ("The Pennsylvania Supreme Court concluded a private-figure defamation plaintiff who does not prove actual malice must prove actual injury to his reputation as a prerequisite to the recovery of damages for other actual injuries, including mental and emotional injuries . . . Permitting the recovery of damages for injuries such as mental anguish without a showing of injury to reputation subverts the United States Supreme Court's defamation framework because protection of an individual's reputation is the very essence of a claim for defamation.  These findings abrogated the Pennsylvania Superior Court's previous findings in the same case that a defamation plaintiff only needed to prove reputational harm **or** personal humiliation to recover damages." (cleaned up)).

---

[22] Plaintiffs did not address reputational damages specifically in their opposition brief.  (*See generally* Doc. No. 194 at 22–24 (generally addressing lost referrals, a lost fee award, a reduced fee award, declining to pursue lead counsel appointments, lost income, and the expense of retaining ethics counsel).) During oral argument, Plaintiffs' counsel argued that both Mr. and Mrs. Weiser testified as to reputational damage.  (*See, e.g.*, Mar. 13, 2023 Rough Hr'g Tr. at 35:15–23.)

As Hartleib notes (*see* Doc. No. 193 at 33), Plaintiffs have not produced a single witness who testified that Statement No. 9 diminished Plaintiffs' reputation in their mind.  *See United Senior Advisors Grp., Inc.*, 2018 WL 850442, at *4 ("While it did not have to establish economic loss, it did have to adduce some proof that its business reputation was affected by the communication.  Appellant admitted to the trial court that it could present no witness to attest that its reputation in the community was harmed due to the dissemination of the correspondence in question.  Since Appellant had the burden of proving that aspect of its defamation cause of action, summary judgment was properly entered herein.").  Although noteworthy, this is not dispositive, however, because "[t]he plaintiff's testimony may alone show reputational harm; evidence of others in the community is not required."  *Ralston*, 2022 WL 3704097, at *45. "Still, the plaintiff's testimony regarding reputational harm must bear on the perception of others, rather than that of the plaintiff."  *Id.*

Weiser testified that he could not recall any witnesses who told him that Hartleib's statement to Judge Vano, which copied other attorneys to the *Sprint* litigation, damaged Plaintiffs' reputation in their eyes.  (*See* Doc. No. 193, Ex. L at 8:11–9:5 ("Q: Are you aware of any human being that has ever said to you that any verbal or written statements by Michael Hartleib have damaged your firm's reputation?  A:  . . . [T]hat sounds like . . . you are asking me to testify on behalf of third parties . . . [A]t trial we may produce a witness that would so testify. But off the top of my head, I am not – I am not comfortable characterizing testimony from third parties . . . Q: Has any human being ever communicated to you with their words, with an e-mail, with a letter, with any communication at all that any verbal or written statements made by Michael Hartleib have damaged your law firm's reputation?  A: I just don't recall."); *see also* Doc. No. 194-4 at 25:2–21 ("Q: [Y]ou can't recall anybody ever telling you verbally that any

written or verbal statements made by Michael Hartleib have impacted your or your firm's

reputation?  A: I don't recall.  I know there is one case where [sic] I am thinking of one case

where someone didn't want me to be one of the co-lead Counsels, but I couldn't tell you what

case that is because, again, that's six years ago. . . . Q: And who – you don't recall what the case

was?  A: I don't.").)

Further, much of Weiser's testimony as to Plaintiffs' diminished reputation hinged on his

own speculation.  (*See* Doc. No. 193, Ex. L at 510:1–7 (admitting that he is speculating and does

not know if the reason for the lack of a fee award in an Equifax case was because of Hartleib's

accusations); Doc. No. 194-5 at 330:8–331:1 (testifying that with respect to Hartleib's August

24, 2018 email to Judge Watson, "Judge Watson didn't seem overly concerned or moved by

[Hartleib's] note" but that the world in which he works is "small" and speculating that in the

future, if he applies to be lead counsel before Judge Watson, perhaps Hartleib's email would be

enough to "throw the judge"); Doc. No. 194-5 at 298:12–23 (with respect to the *CenturyLink*

Litigation, testifying "I don't believe it is a coincidence that [Hartleib] got involved in the

case . . . and we end up with no role in the case."); *see also* Doc. No. 194-4 at 26:14–27:3

("There are a whole bunch of firms that I don't seem to work with anymore.  And, you know,

they are – I am not getting cannon balls lobbed at my front door, people just don't return my

calls or I am not part of the structure or it is more subtle than that. . . . I mean one of the law

firms wouldn't work – I mean the firm that used to represent Mr. Hartleib – like Kahn, Swick,

you know, they won't work with me.  Now they don't like me.  Some if it has to do with this,

some of it has to do with other things, but I mean it is usually not – because, again, like why –

from their perspective, why would they start a war unnecessarily."); Doc. No. 194-4 at 29:22–24

("But in the absence of any other intervening cause or circumstance, I think your client moved

the needle in a number of cases.").) *Cf. Durando*, 2022 WL 2192943, at *6 (Plaintiff "rests his case on a theory of hypothetical probabilities:  that 'it is impossible for a medical doctor or scientific researcher not to suffer professional damage by the dissemination of false allegations of sexual harassment, given the extremely serious nature of the same.'  This theory falls short of the threshold established by the Pennsylvania Supreme Court in *Joseph*.  Plaintiff must point to record evidence of *actual* reputational injury.  Without it, Plaintiff's evidence of 'humiliation and mental anguish and suffering' is irrelevant, because such injuries cannot alone establish the special harm element of a defamation claim in Pennsylvania." (citations omitted)).  *Contra Ralston*, 2021 WL 6072881, at *24 ("The record contains ample evidence of Mr. Ralston's reputational harm, including Headmaster Lehman asking Mr. Ralston to limit his campus access and not be alone with students after Attorney Garabedian's publication of the 2018 letters.").

Although a close call, the Court nonetheless cannot conclude that Plaintiffs have provided no evidence that their reputation has been damaged.  Plaintiffs "need only show just one person's opinion of him was negatively affected." *Ralston*, 2022 WL 3704097, at *45.  Law Firm employee Chris Nelson's and Weiser's testimony satisfies this minimal showing at this stage of the litigation when the Court must view all evidence in the light most favorable to Plaintiffs, draw all inferences in their favor, and not make any credibility determinations— though the Court notes Plaintiffs likely have an uphill battle with respect to causation.  (*See, e.g.*, Doc. No. 194-8 at 115:16–116:20 ("Q: Since 2017, has anyone made any statements to you regarding the reputation of Robert Weiser?  A [Chris Nelson]: I mean, they talked about how, you know, like colleagues in a bar, you know, other lawyers that you run into practice, that sort of thing.  You know, they've talked about this stuff.  You know, they haven't said that it made them, you know, think worse of Rob, but it was definitely a topic in their minds.  Q: And same

question but for the law firm; has any third party or colleague made any statements to you regarding the [reputation] of the law firm since 2017?  A: I mean, they just talked about how, you know, the statements are out there, people were talking.  And, you know, I try not to curse on the record, but, you know, their comments were, you know, this looks like something that's not good. . . . People would say it looks like shit.  You know, they read these statements in the public or they hear about it, and it circulates through the bar, and yeah, it does look like shit."); Doc. No. 194-4 at 7:4–9 ("I know you deposed Al Yates[23] in this case already.  And I understand that Al Yates had nice enough things to say about me, but we haven't received a client from Al Yates in seven years.  So what you have to understand is people aren't making war to my face as a general principal [sic].").)  *Cf. Sprague v. Am. Bar Ass'n*, 276 F. Supp. 2d 365, 371 (E.D. Pa. 2003) ("Although not evidence of reputational harm from the perspective of this particular witness's estimation of plaintiff, surely where defamation results in professional acquaintances avoiding association with plaintiff, this is 'any other injury of which libel is the legal cause,' which is compensable in general actual harm." (quotation omitted).)

Because Plaintiffs have satisfied the prerequisite of showing their reputations were damaged, *see Joseph*, 129 A.3d at 429, the Court finds they suffered actual harm, such that their defamation claim survives summary judgment.

***Commercial Disparagement***.  "Because the tort of disparagement protects against pecuniary loss, the elements of the cause of action are much more stringent than those for defamation.  General loss of reputation or character is insufficient for recovery."  *Syngy, Inc. v. ZS Assocs., Inc.*, 110 F. Supp. 3d 602, 618 (E.D. Pa. 2015) (cleaned up).  "Importantly, a plaintiff

---

[23] Notably, Alfred Yates was one of the 14 attorneys copied on Hartleib's email to Judge Vano (Statement No. 9).  (*See* Doc. No. 69-28.)

claiming commercial disparagement *must* prove actual pecuniary loss." *Id.* (cleaned up); *see also Brooks Power Sys., Inc. v. Ziff Communications, Inc.*, No. CIV.A. 93-3954, 1994 WL 444725, at *3 (E.D. Pa. 1994) ("Plaintiffs must establish *direct* pecuniary loss resulting from the disparagement of the particular product; general loss of reputation or character is insufficient for recovery." (cleaned up)). "Plaintiff may establish direct pecuniary loss either by a general diminution in sales or specific lost sales." *Synygy, Inc.*, 110 F. Supp. 3d at 619 (quoting *Brooks*, 1994 WL 444725, at *3). "[O]n summary judgment a plaintiff must set forth evidence sufficient to show either a general diminution in sales and evidence of a causal connection between [the disparaging statement] and the decrease in sales or specific lost sales." *Id.* (cleaned up). "A disparaging statement causes financial loss if its publication is a substantial factor in causing a third person not to buy the thing disparaged. Commercial disparagement, unlike defamation, requires stringent proof of special damages." *Id.* (cleaned up).

As an initial matter, the Court notes that Plaintiffs claim they "incurred expenses relative to retaining ethics counsel to navigate the treacherous waters and climate created by the dark nimbus of Hartleib's defamatory statements (and threat of further defamatory statements) of nearly $10,000.00." (Doc. No. 194-1 at 24.) This alone does not show actual pecuniary loss. *See Brooks*, 1994 WL 444725, at *7 ("Rehabilitation costs alone are not sufficient to establish pecuniary loss, because unless other pecuniary loss was occasioned by this article, the 'rehabilitation' was not necessary. The need for rehabilitation derives directly from direct pecuniary loss; plaintiff cannot establish its *prima facie* case through expenditures on rehabilitation. To hold otherwise would permit a plaintiff to establish direct pecuniary loss simply by spending money on 'rehabilitation' even if no direct damage had been done by the allegedly disparaging statement."); *see also Synygy, Inc.*, 110 F. Supp. 3d at 619–20 (same, and

holding that the defendant's expert's opinion "regarding the amount [the defendant] expended internally in order to respond to [the plaintiff's] press release is not evidence of a causal connection between the press release and any decrease in sales" (cleaned up)).

As to general diminution in sales, Pennsylvania has adopted Restatement of Torts, § 633, comment f, which provides, in relevant part, "[A] tradesman whose goods are denounced as adulterated can prove not only the existence of pecuniary loss necessary to recovery but also its extent by showing after the dissemination of the disparaging matter the sales of his goods have fallen off *to an extent explainable only as the result of the defamatory publication*." *Brooks*, 1994 WL 444725, at *3 (cleaned up).  Even if Plaintiffs established diminished sales (i.e., that the demand for their legal services in the derivative and qui tam fields had diminished), "that would not suffice unless the sales diminution is explainable only by the disparaging statement." *Id.*  That is not the case here, given that the Law Firm was undisputedly embroiled with billing issues related to Silow (e.g., its fees were slashed in the *Sprint* litigation and the judge explicitly called out the Law Firm for the outlandishness of Silow's billing) that could also explain a diminution of the sales of their legal services.  *Cf. Brooks*, 1994 WL 444725, at *4 ("An overall diminution of Brooks Power sales to the commercial end user market could have many causes other than the *PC Magazine* article.  Plaintiff has offered no evidence, expert or otherwise, of the condition of the surge suppressor market in general to rule out other possible causes of a decline in plaintiff's sales. . . . Without any evidence of causation, plaintiff cannot rely only on an unexplained general diminution in sales to establish pecuniary loss.").

Ultimately, Plaintiffs have failed to meet their burden of showing that Statement No. 9 caused actual pecuniary loss.

Plaintiffs claim that "[a]s a result of Defendant's actions, Plaintiffs were damaged (in

terms of lost income) in an amount of $4,837,500.00 attributable to a lost fee award in a shareholder derivative action captioned as *In re Equifax, Inc. Derivative Litigation, N.D. Ga.*, No. 1-18-CV-00317." (Doc. No. 194-9 at 3.)  But Plaintiffs fail to show causation—namely, how Statement No. 9 caused Plaintiffs to be removed as lead counsel.  Notably, Plaintiffs appear to have been removed as lead counsel in the *Equifax* action in 2018 (*see* Doc. No. 194-9 at 3–4), but Hartleib did not send Statement No. 9 to Judge Vano until 2019 (*see* Doc. No. 69-28).

Plaintiffs also claim that they lost income in the amount of $122,000 in the *In re Fifth Street Finance Corp. Shareholder Derivative Litigation*.  (*See* Doc. No. 194-9 at 3 ("As a result of Defendant's false statements and affirmative actions, Plaintiffs were forced to reduce the amount retained by the Firm after attorneys' fees had been awarded, for a loss of income in the amount of $122,000 . . . in the *In re Fifth Street Finance Corp. Shareholder Derivative Litigation*.").)  Plaintiffs fail to identify the timing of this forced reduction in their summary judgment briefing; however, it appears that it would have occurred at some point in 2017, long before Statement No. 9 came into existence.  (*See* Doc. No. 193, Ex. K (Feb. 8, 2017 Letter from Rob Weiser to the Hon. Robert N. Chatigny) (noting that in support of the motion for final approval of settlement in Fifth Street—which had been submitted on November 15, 2016— Plaintiffs reported hours for Jeffrey Silow and that on February 2, 2017, Plaintiffs learned that Silow was not a licensed attorney).)  Given the timing, no reasonable juror could conclude that Statement No. 9—the only remaining statement at issue in this case—caused lost income in either the *Equifax* or *Fifth Street* litigations.

Plaintiffs also claim that they lost income in the *CenturyLink* litigation.  (Doc. No. 194-1 at 23.)  Plaintiffs appear to solely rely on Weiser's testimony to support this claim.  (*See id.* ("Robert Weiser specifically testified to the Law Firm receiving less work in the support

structure of the CenturyLink Derivative Litigation and therefore lost income as a result.").)

Weiser testified, "I don't believe it is a coincidence that [Hartleib] got involved in the case . . .

and we end up with no role in the case."  (Doc. No. 194-5 at 298:12–23.)  But Weiser's

testimony is speculation and that alone cannot show causation.

Plaintiffs also claim that Hartleib's statements had a "chilling effect," which (a) "caus[ed]

the Law Firm to not pursue lead counsel appointments for fear of Hartleib using the opportunity

to further defame Plaintiffs," resulting in loss of income damages of $1,000,000, and

(2) "caus[ed] the loss of referrals from both other firms as well as potential lost clients that

would have otherwise contacted the Law Firm for representation," resulting in a loss of income

damages of $2,000,000.  (Doc. No. 194-1 at 23.)  But, critically, Plaintiffs fail to connect these

losses to Statement No. 9.  For instance, Plaintiffs did not produce any evidence indicating that

any of the attorneys copied on Hartleib's March 2019 email to Judge Vano declined to refer

business to them *because of* said statement.[24]  Nor did Plaintiffs rule out any alternate reasons

that would have led those attorneys not to refer business to them.  Plaintiffs also do not point the

Court to any evidence showing that anyone other than the attorneys copied on the email received

the email, which in turn indicates they have failed to provide evidence that potential clients have

failed to seek their services because of Hartleib's statement.

The manner with which Plaintiffs' alleged losses were calculated underscores the lack of

specificity and lack of evidence of causation at play.  Weiser testified as to how they were

calculated:  "Back of the envelope, thumbnail sketch, taking a look at the number of cases that

---

[24] The Court emphasizes that the bar for commercial disparagement is higher than that for defamation.
Although Weiser testified that Alfred Yates did not refer business to him following Statement No. 9, and
the Court considered that in denying summary judgment on the defamation claim, here, Weiser did not
rule out alternative theories or provide anything other than his own speculation, and, therefore, his
commercial disparagement claim cannot survive summary judgment.

we would typically be in prior to Sprint, how many lead positions we would be in, approximate value of those cases.  I mean it is not – it is not an exact science, but it is also not a complete shot in the dark either."  (Doc. No. 193, Ex. L at 511.)

Because Plaintiffs have failed to provide evidence that Statement No. 9 caused actual pecuniary loss, the Court grants summary judgment on Plaintiffs' commercial disparagement claim.  *See Synthes v. Emerge Medical, Inc.*, Civil Action No. 11-1566, 2014 WL 2616824, at *16 (E.D. Pa. June 11, 2014) ("[N]othing in the expert report specifically connects the litigation letters to the losses Emerge suffered or explicitly rule[d] out other possible causes for Emerge's falling sales, other than noting that temporal proximity of the letters and the fall in sales supports the causal connection. . . . Given that Emerge has had more than ample time to conduct discovery on this issue, its inability to come forward with specific evidence to satisfy the requisite standard requires that summary judgment be entered in favor of Synthes on this claim.").

* * *

In sum, the Court denies summary judgment as to the defamation claim and grants summary judgment as to the commercial disparagement claim.  And as noted, to the extent Hartleib seeks summary judgment on the false light claim, summary judgment is denied on that claim.

## IV.   CONCLUSION

For the reasons above, the Court grants in part and denies in part Hartleib's motion for summary judgment.

An appropriate Order follows.